Brendan P. Cullen (SBN 194057)
(cullenb@sullcrom.com)
Alexis C. Holmes (SBN 321393)
(holmesa@sullcrom.com)
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, California 94301
Telephone:    (650) 461-5600
Facsimile:    (650) 461-5700

*Counsel for Defendants Cutera, Inc., David H. Mowry,
Rohan Seth, J. Daniel Plants, Sheila Hopkins,
Taylor Harris, Stuart Drummond, and
Vikram Varma*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| IN RE CUTERA, INC. SECURITIES LITIGATION. | Case No. 4:23-cv-02560-JST<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS; MEMORANDUM OF LAW IN SUPPORT THEREOF**<br><br>The Hon. Jon S. Tigar<br>Courtroom: 6<br>Date: November 7, 2024<br>Time: 2:00 p.m. |

DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT
CASE NO. 4:23-CV-02560-JST

## NOTICE OF MOTION AND MOTION

TO PLAINTIFF AND ITS COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on November 7, 2024 at 2:00 p.m., or as soon thereafter as counsel may be heard in Courtroom 6 of the U.S. District Court for the Northern District of California, located at 1301 Clay Street, Oakland, California 94612, Defendants Cutera, Inc. ("Cutera" or the "Company"), David H. Mowry, Rohan Seth, J. Daniel Plants, Sheila Hopkins, Taylor Harris, Stuart Drummond, and Vikram Varma (the "individual Defendants," and, collectively with Cutera, "Defendants") will and hereby do move this Court to dismiss the Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 59 ("Complaint" or "AC")) filed by Lead Plaintiff New England Teamsters Pension Fund on the ground that it fails to state a claim upon which relief can be granted.

This motion is made pursuant to the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(a) *et seq.* (the "PSLRA"), and Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, and is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Brendan P. Cullen and exhibits attached thereto, the accompanying Request for Judicial Notice filed concurrently herewith, the complete files and records in this action, oral argument of counsel, and any matter that may be submitted at or after the hearing.

Dated: July 8, 2024

*/s/ Brendan P. Cullen*
Brendan P. Cullen (SBN 194057)
(cullenb@sullcrom.com)
Alexis C. Holmes (SBN 321393)
(holmesa@sullcrom.com)
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, California 94301
Telephone:     (650) 461-5600
Facsimile:     (650) 461-5700

*Counsel for Defendants Cutera, Inc., David H. Mowry, Rohan Seth, J. Daniel Plants, Sheila Hopkins, Taylor Harris, Stuart Drummond, and Vikram Varma*

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION.................................................................................................................................... 1

BACKGROUND AND ALLEGATIONS OF THE COMPLAINT ......................................................... 2

       A.     Cutera. ....................................................................................................................... 2

       B.     Cutera's Internal Controls.......................................................................................... 3

       C.     The AviClear Launch. ............................................................................................... 3

       D.     Executive Leadership Changes. ................................................................................. 4

       E.     Restatement. .............................................................................................................. 4

       F.     Plaintiff's Claims. ..................................................................................................... 5

PLEADING STANDARD ....................................................................................................................... 5

ARGUMENT ........................................................................................................................................... 6

    I.     PLAINTIFF DOES NOT STATE A CLAIM UNDER SECTION 10(B) OR RULE 10B-5.............................................................................................................................6

       A.     Plaintiff Fails Adequately To Plead that Numerous of the Challenged Statements Are Actionably False or Misleading. ....................................................... 6

       B.     Most Statements about AviClear/Core Capital Are Immaterial as a Matter of Law........................................................................................................................... 13

       C.     Plaintiff Fails Adequately To Plead Scienter. ......................................................... 15

    II.    PLAINTIFF DOES NOT STATE A CLAIM UNDER SECTION 20(A). ........................25

CONCLUSION ...................................................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Accuray, Inc. S'holder Derivative Litig.*,
  757 F. Supp. 2d 919 (N.D. Cal. 2010) ...................................................................................22

*Bodri* v. *GoPro, Inc.*,
  252 F. Supp. 3d 912 (N.D. Cal. 2017) ..............................................................................14, 23

*Brodsky* v. *Yahoo! Inc.*,
  630 F. Supp. 2d 1104 (N.D. Cal. 2009) ................................................................................18

*Cement & Concrete Workers Dist. Council Pension Fund* v. *Hewlett Packard Co.*,
  964 F. Supp. 2d 1128 (N.D. Cal. 2013) ...........................................................................14, 15

*City of Sunrise Firefighters Pension Fund* v. *Oracle Corp.*,
  2019 WL 6877195 (N.D. Cal. Dec. 17, 2019) ..................................................................14, 18

*Curry* v. *Yelp Inc.*,
  2015 WL 1849037 (N.D. Cal. Apr. 21, 2015) .......................................................................11

*In re Cutera Sec. Litig.*,
  610 F.3d 1103 (9th Cir. 2010) ..........................................................................................14, 15

*Desaigoudar* v. *Meyercord*,
  223 F.3d 1020 (9th Cir. 2000) ...............................................................................................2

*In re DOT Hill Sys. Corp. Sec. Litig.*,
  594 F. Supp. 2d 1150 (S.D. Cal. 2008).................................................................................14

*DSAM Glob. Value Fund* v. *Altris Software, Inc.*,
  288 F.3d 385 (9th Cir. 2002) .............................................................................................1, 16

*In re Eventbrite, Inc. Sec. Litig.*,
  2020 WL 2042078 (N.D. Cal. Apr. 28, 2020) .......................................................................11

*In re Extreme Networks, Inc. Sec. Litig.*,
  2018 WL 1411129 (N.D. Cal. Mar. 21, 2018)........................................................................21

*Garcia* v. *J2 Glob., Inc.*,
  2021 WL 1558331 (C.D. Cal. Mar. 5, 2021)..........................................................................20

*Glazer Cap. Mgmt., LP* v. *Magistri*,
  549 F.3d 736 (9th Cir. 2008) .................................................................................................20

*In re Hansen Natural Corp. Sec. Litig.*,
  527 F. Supp. 2d 1142 (C.D. Cal. 2007) .................................................................................16

-ii-

SULLIVAN & CROMWELL LLP

*In re Intrexon Corp. Sec. Litig.*,
   2017 WL 732952 (N.D. Cal. Feb. 24, 2017) ....................................................................14

*Jiu-Yang Hong* v. *Extreme Networks, Inc.*,
   2017 WL 1508991 (N.D. Cal. Apr. 27, 2017) ...................................................................23

*Johnson* v. *Costco Wholesale Corp.*,
   2019 WL 6327580 (W.D. Wash. Nov. 26, 2019) .................................................................7

*Karinski* v. *Stamps.com, Inc.*,
   2020 WL 281716 (C.D. Cal. Jan. 17, 2020) .....................................................................13

*M & M Hart Living Tr.* v. *Glob. Eagle Entm't Inc.*,
   2017 WL 5635424 (C.D. Cal. Aug. 20, 2017)....................................................................9

*Metzler Inv. GMBH* v. *Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008) .......................................................................6, 15, 16

*In re Netflix, Inc. Sec. Litig.*,
   2005 WL 1562858 (N.D. Cal. June 28, 2005) ..................................................................11

*In re Nektar Therapeutics Sec. Litig.*,
   34 F.4th 828 (9th Cir. 2022) ...........................................................................................6

*Pirani* v. *Netflix, Inc.*,
   2024 WL 69069 (N.D. Cal. Jan. 5, 2024) .....................................................................3, 11

*In re Pivotal Sec. Litig.*,
   2020 WL 4193384 (N.D. Cal. July 21, 2020)..............................................................11, 13

*Police Ret. Sys. of St. Louis* v. *Intuitive Surgical, Inc.*,
   2012 WL 1868874 (N.D. Cal. May 22, 2012) ..................................................................17

*Police Ret. Sys. of St. Louis* v. *Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ...................................................................................23, 24

*Prodanova* v. *H.C. Wainwright & Co., LLC*,
   993 F.3d 1097 (9th Cir. 2021) ........................................................................................24

*Rok* v. *Identiv, Inc.*,
   2017 WL 35496 (N.D. Cal. Jan. 4, 2017) ........................................................................8

*In re Skechers USA, Inc. Sec. Litig.*,
   444 F. Supp. 3d 498 (S.D.N.Y 2020)...............................................................................22

*Smith* v. *NetApp, Inc.*,
   2021 WL 1233354 (N.D. Cal. Feb. 1, 2021) ....................................................................6

*Sneed* v. *AcelRx Pharms., Inc.*,
   2023 WL 4412164 (N.D. Cal. July 7, 2023)....................................................................14

-iii-

SULLIVAN & CROMWELL LLP

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
    160 F. Supp. 2d 1059 (N.D. Cal. 2001) .................................................................................13

*Strezsak* v. *Ardelyx Inc.*,
    2024 WL 1160900 (N.D. Cal. Mar. 18, 2024).........................................................................3

*In re SunPower Corp. Sec. Litig.*,
    2018 WL 4904904 (N.D. Cal. Oct. 9, 2018)...........................................................................15

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).............................................................................................................6, 16

*Ebeid ex rel. United States* v. *Lungwitz*,
    616 F.3d 993 (9th Cir. 2010) ...................................................................................................6

*Veal* v. *LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. 2019) ....................................................................................9

*Wanca* v. *Super Micro Comput., Inc.*,
    2018 WL 3145649 (N.D. Cal. June 27, 2018) .........................................................................9

*Webb* v. *SolarCity Corp.*,
    884 F.3d 844 (9th Cir. 2018) ............................................................................................15, 25

*Weir* v. *SE*,
    2024 WL 1813520 (C.D. Cal. Mar. 14, 2024)..........................................................................8

*Weston Family P'ship LLLP* v. *Twitter, Inc.*,
    29 F.4th 611 (9th Cir. 2022) ....................................................................................................6

*Wochos* v. *Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) ................................................................................................10

*Zucco Partners, LLC* v. *Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ......................................................................................... *passim*

**Statutes & Regulations**

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) .............................................................5, 6

Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) ................................................................5

15 U.S.C. § 78u-4(b)......................................................................................................................6

SEC Rule 10b-5 ..........................................................................................................................5, 6

-iv-

SULLIVAN & CROMWELL LLP

**ISSUES TO BE DECIDED**

1.    Has Plaintiff adequately pleaded its claims under Section 10(b) of the Securities Exchange Act and Rule 10b-5 where it fails to allege particularized facts demonstrating (i) that certain of the alleged misstatements were materially false or misleading or (ii) a strong inference of intent to defraud on the part of any Defendant?

2.    Has Plaintiff adequately pleaded its claims under Section 20(a) of the Securities Exchange Act for control-person liability where it fails to allege any primary violation of the securities laws under Section 10(b)?

**INTRODUCTION**

The Complaint certainly does allege a difficult year in the life of Cutera.  (It then, as is typical, alleges those difficulties over and over — often in the exact same words (if you read CW2's detail-free claim that some customers "were so dissatisfied with" their Cutera product "that they tried to send it back," you read it (literally) nine times).)  But investors assume the risk of hard years and the securities laws do not provide them an insurance policy against losses when things do not go according to plan.  What the securities laws prohibit is knowing misrepresentations that cause investor losses.  Plaintiff alleges (preposterously) that Cutera and the individual Defendants made 44 such misrepresentations over the 24-month class period.  But it never alleges these things adequately.  The PSLRA requires a plaintiff to plead exactly which statements supposedly were false and why, and to plead "in great detail" facts giving rise to a "strong inference" that the persons who made or were responsible for the alleged misstatements acted intentionally to deceive or with deliberate recklessness for the truth.  *DSAM Glob. Value Fund* v. *Altris Software, Inc.*, 288 F.3d 385, 388 (9th Cir. 2002) (citations omitted).  The Complaint does none of these things.

Across its extravagant 492 paragraphs, the Complaint describes a decidedly non-actionable chain of events:  (i) at the start of the class period, Cutera began designing and implementing measures to improve, among other things, its internal controls over financial reporting; (ii) meanwhile, with FDA clearance, Cutera initiated a limited commercial launch of AviClear (Cutera's novel laser-based treatment for acne) in April 2022 in the hope that it would perform well enough to support a full release by November 2022; and (iii) things went reasonably well, until 2023 — when Cutera experienced the misfortune of a four-week plant shutdown at the beginning of the year, challenges to its rollout of AviClear, a disruptive change in leadership, and the realization at the end of 2023 that it must restate its financial statements for the first and second quarters of that year (the "Restatement").  What can be gleaned from the Complaint is a company enduring a rough year, including strategic business decisions that, with the benefit of hindsight, were not as successful as initially hoped — not securities fraud.

*First*, Plaintiff fails adequately to plead that the challenged statements about Cutera's internal controls, the launch of AviClear, and the alignment of AviClear and "Core Capital" (the non-AviClear part of Cutera's business) were false or misleading when made.  Often, Plaintiff does not even try to allege that these statements were false (or never says what was false about them).  Where it does attempt to show falsity,

the Complaint regularly strips the alleged misstatements of necessary context or otherwise misconstrues them. The Complaint also regularly attempts to falsify statements of fact by alleging supposedly inconsistent occurrences from months later, the sort of fraud-by-hindsight pleading that has not been allowed for decades.

*Second*, nearly all challenged statements about AviClear and Core Capital are immaterial as a matter of law. Most of them — including those that tout Cutera's "first-mover advantage" with AviClear, the excitement over its "successful" launch, the growing "momentum" of AviClear and Core Capital, and Cutera's "strong" performance — are indistinguishable from those that courts in this Circuit have repeatedly held to be inactionable puffery.

*Third*, Plaintiff fails totally to allege particularized facts giving rise to a "strong" inference of scienter — *i.e.*, that the maker of each alleged misstatement knew that the statement was false when made. In fact, the Complaint is a greatest-hits compilation of how not to plead scienter. Plaintiff speculates that the individual Defendants must have known about negative and supposedly undisclosed information (because other people supposedly did or because of the positions those Defendants occupied at Cutera). It pleads that some of the individual Defendants signed SEC filings and SOX certifications and thus must have known that they contained falsehoods. Plaintiff alleges that certain Cutera executives were motivated to lie so they could earn more money and that executives left the Company after bad news was revealed. Plaintiff points to the fact of Cutera's Restatement. And Plaintiff relies heavily on allegations attributed to confidential witnesses that, in turn, rely on layers of unreliable hearsay. Every single one of these categories repeatedly has been held inadequate to plead scienter and, if anything, Plaintiff pleads these sorts of allegations even less well than other plaintiffs whose claims have been dismissed.

*Finally*, because Plaintiff has not pleaded a primary violation, it cannot plead a Section 20(a) claim.

## BACKGROUND AND ALLEGATIONS OF THE COMPLAINT

### A.    Cutera.

Cutera is a California-based medical-device developer and manufacturer of novel laser and energy-based aesthetic and dermatology treatments for medical providers worldwide. (AC ¶ 63.)[1] Cutera's business

---

[1]    In deciding this Motion, the Court considers only well-pleaded factual allegations. *See Desaigoudar* v. *Meyercord*, 223 F.3d 1020, 1021 (9th Cir. 2000). The Court may also consider documents "incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Pirani* v. *Netflix, Inc.*, 2024 WL 69069, at *6 (N.D. Cal.

has two principal segments: Core Capital and AviClear. (*Id.*) The former comprises Cutera's established suite of medical-equipment offerings as well as "related one-time use products necessary to perform treatments with the equipment" (*i.e.*, "consumables"). (*Id.* ¶ 64.) AviClear is Cutera's innovative prescription-free laser-based treatment solution for acne. (*Id.* ¶ 67.)

### B.    Cutera's Internal Controls.

To improve operations and modernize its inventory-management, Cutera began implementing a new ERP system developed by SAP in January 2022. (*Id.* ¶ 86.) The ERP system was intended to enable Cutera to manage its operations, including inventory, "from a single platform." (*See id.* ¶ 81.) In February 2022, Cutera also adopted a new Salesforce system, which would "store, organize, and track customer and product data." (*Id.* ¶¶ 82 n.8, 86.) Cutera began training its employees on the new systems early in the second quarter of 2022. (*Id.* ¶¶ 14, 87.) In its 2021 10-K, filed on March 1, 2022, Cutera disclosed that it "ha[d] begun the process of designing and implementing effective internal control measures to improve its internal controls over financial reporting . . . ." (Ex. A at 114[2]; *see* AC ¶ 219.)

### C.    The AviClear Launch.

Also in March 2022, the FDA approved AviClear for commercial use and, on April 5, 2022, Cutera announced that the first patient outside clinical trials had been successfully treated for acne with the new device, kicking off AviClear's limited commercial release. (AC ¶¶ 25, 67; Ex. V.) Cutera initially used a new lease-based model for AviClear (rather than selling the AviClear devices outright, as with its Core Capital products) to facilitate the placement of AviClear devices and, in part, to compete with a similar product called Accure, which was coming to market around the same time. (*See* AC ¶¶ 19, 68.)

AviClear was rolled out over the course of 2022 (the "Launch"), until its full commercial release in November 2022. (*Id.* ¶¶ 68, 128.) During the Launch, Cutera disclosed that its strategy was to prioritize the placement of AviClear devices through 2022, then pivot to driving physicians' use of those devices — from which use AviClear would earn the bulk of its AviClear revenues — in 2023. (*See* Ex. L at 6; *see also* Ex. B at 9.) Thus, Cutera measured the Launch's success by its ability to place AviClear devices. (*E.g.*, Ex. H at 4; Ex. L at 6.) According to Plaintiff, the AviClear Launch was a "disaster" because Cutera used this lease-

---

Jan. 5, 2024) (Tigar, J.). "Once a document is deemed incorporated by reference, the entire document is assumed to be true for purposes of a motion to dismiss, and both parties — and the Court — are free to refer to any of its contents." *Strezsak* v. *Ardelyx Inc.*, 2024 WL 1160900, at *3 (N.D. Cal. Mar. 18, 2024).

[2]    "Ex. [_]" refers to exhibits to the accompanying Declaration of Brendan P. Cullen.

SULLIVAN & CROMWELL LLP

-3-

based commercial model, which customers allegedly rejected, and rushed the device to market without adequate testing. (AC ¶ 106.) As a result, AviClear allegedly had a "higher than normal failure rate," which led to some unspecified number of "upset customers and returned devices." (*Id.* ¶¶ 106, 110.)

### D. Executive Leadership Changes.

On April 11, 2023, a special committee of Cutera's Board of Directors dismissed Cutera's Executive Chairman and Chairman of the Board (Mr. Plants) and CEO (Mr. Mowry) "with cause." (*Id.* ¶ 151.) Sheila Hopkins was appointed to replace Mr. Mowry as Interim CEO. (*Id.*) On April 12, 2023, Cutera announced these leadership changes and that it was "withdrawing its full-year 2023 outlook." (*Id.* ¶ 152.) Five days later, the special committee announced that Mr. Mowry was dismissed "due to poor execution and ineffective leadership," particularly with respect to AviClear, and that Mr. Plants was dismissed due to his "apparent" motivation for "personal enrichment." (*Id.* ¶¶ 156-57 (cleaned up).) On May 9, 2023, Cutera issued another press release reporting, among other matters, that CFO Rohan Seth had stepped down. (*Id.* ¶ 160.) During Cutera's earnings call on May 9, 2023, then-CEO Sheila Hopkins reported lower-than-expected results for Q1 2023, which she attributed to "suboptimal leadership direction" and operational challenges. (*Id.* ¶ 344.) Specifically, Ms. Hopkins explained that the Company's sales team continued to focus on driving AviClear placements during the quarter, which led to fewer Core Capital sales, and that Cutera's year-end physical inventory count took four weeks, which disrupted production and order fulfillment. (*Id.* ¶¶ 346-48.) On May 5, Stuart Drummond was appointed Cutera's Interim CFO. (*Id.* ¶ 39.) And on July 27, Cutera announced that Taylor Harris had been named CEO. (*Id.* ¶ 172.)

### E. Restatement.

In preparing its 10-Q for the period ended September 30, 2023 ("Q3 2023 10-Q"), Cutera performed a physical-inventory count, which revealed "a shortfall of inventory relative to the system of record." (*Id.* ¶ 372.) Cutera announced on November 8, 2023, that it would be unable to file its Q3 2023 10-Q timely and that it would need to restate certain previously reported financial statements. (*Id.* ¶ 196.) Several weeks later, on December 21, 2023, Cutera explained that, during the physical-inventory count, "management . . . identified material errors in the Company's accounting for physical inventory and deficiencies in the related internal controls," which impacted the Company's previously issued financial statements for the first and second quarters of 2023. (*Id.* ¶ 197.) As a result of these issues, "the inventory balance in [Cutera's] system of record as of September 30, 2023 was overstated relative to the result of the physical inventory count."

SULLIVAN & CROMWELL LLP

(*Id.* ¶ 199.)  At the time, the Company was still "in the process of identifying and evaluating the magnitude and severity of internal control deficiencies that resulted in" these inventory issues.  (*Id.* ¶ 201.)

On March 5, 2024, Cutera filed restated financial statements for Q1 and Q2 2023.  Cutera confirmed that, due to "an accounting error," "there was a shortfall of inventory relative to the Company's system of record" (*id.* ¶¶ 391, 397), which resulted in an overstatement of inventory and a corresponding understatement of cost of revenue for Q1 and Q2 2023 (Exs. X at 8 & Y at 9).  Inventory was found to have been overstated by $1.2 million (2.8%) for Q1 2023 and $4.5 million (6.6%) for Q2 2023.  (AC ¶¶ 285, 300.)  As a result, Cutera corrected several financial figures in the Restatement, including cost of revenue (which increased by 9.3% for Q1 and 7.5% for Q2) and gross profits and gross margins (which decreased by 13.3% and 12.4% for Q1 and 7.1% and 8.3% for Q2, respectively).  (AC ¶¶ 285, 300.)

## F.    Plaintiff's Claims.

The difficulties that Cutera experienced over 2023 and into early 2024 were reflected in its stock price, which fell over that period.  As night follows day, these stock price drops were followed by this putative class action securities case.  Plaintiff challenges 44 statements made by Defendants in SEC filings, press releases, or on earnings calls during the class period.  The alleged misstatements relate to (i) the adequacy of Cutera's internal controls over financial reporting, particularly those concerning inventory; (ii) the AviClear Launch; and (iii) the financial performance of the Core Capital business following the Launch.  Over the course of a 14-month period, Plaintiff alleges that the "truth" regarding Defendants' fraud was revealed through a series of "partial" corrective disclosures, beginning on January 9, 2023 and ending on March 21, 2024.  (AC ¶¶ 307-414.)  The Complaint asserts claims against David Mowry (former CEO), Rohan Seth (former CFO), J. Daniel Plants (former Executive Chairman and Chairman of the Board), Sheila Hopkins (former Interim CEO and Board member), Taylor Harris (current CEO), Stuart Drummond (current Interim CFO), and Vikram Varma (former General Counsel).  Plaintiff asserts claims under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 against all Defendants, and Section 20(a) control-person claims against the individual Defendants, *id.* § 78t(a).

## PLEADING STANDARD

Securities claims face "[e]xacting pleading requirements."  *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).  To survive dismissal, Plaintiff "must satisfy the dual pleading requirements

of [Rule] 9(b) and the [PSLRA]." *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 835 (9th Cir. 2022). Rule 9(b) requires that Plaintiff "state with particularity the circumstances constituting fraud or mistake." Plaintiff must allege "the who, what, when, where, and how of the misconduct charged," as well as "what is false or misleading about a statement, and why it is false." *Ebeid ex rel. United States* v. *Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010). Under the PSLRA, Plaintiff must not only "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading," it must also "state with particularity facts giving rise to a *strong inference* that the defendant acted with [scienter]." 15 U.S.C. § 78u-4(b) (emphasis added). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

## ARGUMENT

## I.    PLAINTIFF DOES NOT STATE A CLAIM UNDER SECTION 10(B) OR RULE 10B-5.

To state a claim under Section 10(b) and Rule 10b-5, Plaintiff "must plausibly allege: '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Weston Family P'ship LLLP* v. *Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022). The Complaint fails adequately to plead the first and second elements of Plaintiff's securities fraud claim.

### A.    Plaintiff Fails Adequately To Plead that Numerous of the Challenged Statements Are Actionably False or Misleading.

"A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet" the PSLRA's "exacting requirements." *Metzler Inv. GMBH* v. *Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008). A plaintiff also must allege contemporaneous falsity, meaning that, "there must have been some contemporaneous information that would have shown that the statements were false at the exact time that defendants made them." *Smith* v. *NetApp, Inc.*, 2021 WL 1233354, at *6 (N.D. Cal. Feb. 1, 2021) (Tigar, J.). The challenged statements contained in the restated financials (Statements 29, 31-33, 37, 39-41) are adequately pleaded to be false — that is no credit to Plaintiff, as Cutera itself disclosed that those statements were incorrect. Plaintiff fails to plead that any other alleged

SULLIVAN & CROMWELL LLP

misstatement is actionably false.[3]

### 1. Statements about Cutera's Internal Controls over Financial Reporting.

*Statement about controls being designed.* Plaintiff claims that Cutera's statement in its 2021 10-K that the Company was "designing and implementing effective internal control measures to improve its internal controls over financial reporting . . ." (Statement 1) was false. (AC ¶ 219.) As an initial matter, Cutera, in fact, said that it "*has begun* the process of designing and implementing effective internal control measures . . . ." (Ex. A at 114 (emphasis added).) And, in fact, what little Plaintiff alleges on the subject indicates that Cutera had, in fact, begun this process. Among other things, Plaintiff alleges that Cutera was implementing new SAP and Salesforces systems to revamp its operations and inventory management and starting to train its employees on these new systems. This is consistent with Statement 1 and is further bolstered by the allegations of CW8, alleged to be Senior Director of Field Service during part of the class period, that Cutera began implementing and training its employees on these systems by the start of Q2 2022. (*See* AC ¶¶ 83, 86-87, 220(a)-(b).) Plaintiff's own allegations, in other words, indicate that Cutera was doing exactly what it said. *See Johnson* v. *Costco Wholesale Corp.*, 2019 WL 6327580, at \*17 (W.D. Wash. Nov. 26, 2019) (rejecting falsity where veracity of statement aligned with former employee's allegations).

Nor is Statement 1 falsified by other CW allegations. CW8 also stated that Cutera's "system would [incorrectly] show that a particular part was available in the warehouse" — but those alleged inventory problems, according to CW8, "*started* in approximately the second or third quarters of 2022," *after* Cutera filed its 2021 10-K. (AC ¶¶ 220(a), 268 (emphasis added).) CW1 — who allegedly served in an executive leadership role during part of the class period — reported that "Cutera had been struggling with supply chain and inventory problems" "throughout 2023," which is at least months and possibly more than a year after Statement 1. (*Id.* ¶¶ 220(e), 269.) And CW6 — alleged to be a Senior Field Service Engineer during part of the class period — asserted that "anyone *could* walk in[to]" the warehouse and "walk out" with parts, without ever testifying that anyone ever did this or that any of Cutera's inventory problems had to do with inventory "walking out" the door. (*Id.* ¶ 220(c) (emphasis added).) But, most importantly, there is no way to know during what time period CW6 allegedly contended this was the case. If it was after Statement 1,

---

[3]    Attached as Appendix 1 is a chart that sets out the 44 statements alleged to be false or misleading and that summarizes by statement the reason(s) why Plaintiff has failed to state a claim as to any of the challenged statements.

-7-

SULLIVAN & CROMWELL LLP

this allegation cannot (without much more) falsify Statement 1.  In any event, Plaintiff never alleges that the measures that Cutera adopted to "improve its internal controls," however imperfect, were not, in fact, *designed* to be effective as Cutera said they were.  *See Weir* v. *SE*, 2024 WL 1813520, at *8 (C.D. Cal. Mar. 14, 2024) ("A statement that internal controls exist is not objectively false because the controls are later found ineffective.").[4]

*SOX certifications.*  Plaintiff challenges Messrs. Mowry's and Seth's SOX certifications of Cutera's 2022 10-K, filed on April 7, 2023, which certified that:

- "the information contained in the annual report fairly presents, in all material respects, the financial condition and results of operations of Cutera, Inc. for the periods presented therein" (Statement 26) (AC ¶ 265);

- Messrs. Mowry and Seth "[e]valuated the effectiveness of [Cutera's] disclosure controls and procedures" (Statement 27) (AC ¶ 266); and

- Messrs. Mowry and Seth "[d]esigned such internal control over financial reporting . . . to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements" (Statement 28) (AC ¶ 266).

Plaintiff also challenges Defendants Drummond's, Harris's, and Hopkins's SOX certifications of Cutera's Q1 and Q2 10-Qs, filed on May 10 and August 9, 2023, respectively, which made essentially identical certifications (Statements 34-36, 42-44).  (AC ¶ 287-88; 302-03.)[5]

None of these certifications is false or misleading.  As an initial matter, Plaintiff fails to acknowledge that "each SOX Certification contains important qualifying language" that "the declarants only certified the financial reporting *to the extent of his or her knowledge on the date of execution*."  *Wanca* v. *Super Micro Comput., Inc.*, 2018 WL 3145649, at *6 (N.D. Cal. June 27, 2018) (emphasis added); (*see* Exs. M, Q, U).  As detailed below (*infra* Section I.C), the Complaint fails to allege facts explaining how Defendants Mowry, Seth, Drummond, Harris, and Hopkins *knew* that their certifications, or any financial statements reported in

---

[4]    Statement 1 appears in the 2021 10-K issued by Cutera and signed by Defendants Mowry, Seth, Plants, and Hopkins.  (AC ¶ 219.)  Defendants understand that — because Cutera issued it and those Defendants signed it — those are the only persons whom Plaintiff seeks to hold liable for this statement. Defendants understand this to be Plaintiff's approach as to all of the statements challenged in the Complaint.

[5]    The Complaint includes a block quotation consisting of the entire Section 302 SOX certification. (AC ¶ 264.)  To the extent Plaintiff intends to challenge any portion of it beyond those specifically alleged in the Complaint (*id.* ¶¶ 266, 283, 298), Plaintiff fails to meet the PSLRA's pleading requirements. *See Rok* v. *Identiv, Inc.*, 2017 WL 35496, at *9 (N.D. Cal. Jan. 4, 2017) (allegations challenging SOX certification were "not sufficiently particular" where the complaint included "a page-and-a-half-long block quote consisting of the entire SOX certification").

the filings to which their certifications were attached, were untrue.  *See Wanca*, 2018 WL 3145649, at *6 ("[T]o successfully plead falsity [of SOX certifications], Plaintiff must also allege facts explaining why the declarants knew the financial reporting was false at the time it was made.").

Plaintiff's attempt to plead the falsity of these certifications fails for additional reasons. Statements 27, 36, and 44 could only be false if Plaintiff plausibly alleged that Defendants did not, in fact, evaluate the effectiveness of Cutera's disclosure controls and procedures — the Complaint never alleges this (if paragraphs 270, 288, and 303 attempt to allege this, they fail because, at most, they allege this conclusion).  Statements 26 and 28 fare no better.  Plaintiff never alleges that any financial figure reported in the 2022 10-K was false or not reliably reported/prepared, meaning that Plaintiff does not allege that these certifications — concerning the presentation and preparation of Cutera's financial reports — were false.  *See Veal* v. *LendingClub Corp.*, 423 F. Supp. 3d 785, 808 (N.D. Cal. 2019) ("Absent any allegations of financial wrongdoing, the SOX certifications have no nexus to Plaintiffs' reasons for falsity.").  And, critically, that Cutera subsequently restated financial results for Q1 and Q2 *2023* has no bearing whatsoever on the truthfulness of the SOX certifications *that concern financial results from 2022*.  *See Wanca*, 2018 WL 3145649, at *6 (holding that the "subsequent disclosure of a weakness in internal controls" or "a later-discovered inaccuracy in certified reports" is insufficient to plead the falsity of SOX certifications); *M & M Hart Living Tr.* v. *Glob. Eagle Entm't Inc.*, 2017 WL 5635424, at *8-9 (C.D. Cal. Aug. 20, 2017) (allegations "in hindsight" that defendants misrepresented the company's state of internal controls in SOX certifications by omitting such information that was later disclosed "are insufficient to state a claim for securities fraud").[6]

### 2.   Statements about AviClear and Core Capital.

Plaintiff challenges multiple statements made between May 2022 and August 2023 about the AviClear Launch and its impact on Cutera's Core Capital business.  As to these statements, Plaintiff misconstrues their meaning or takes them out of context, and then points to vague and conclusory CW allegations, or relies on fraud-by-hindsight, to try to plead falsity.  All of it fails.

---

[6]   The allegations attributed to CWs also do not serve to falsify these certifications.  Plaintiff points to allegations from CW1, CW6, and CW8 to try to show that "Defendants completely lacked control over [Cutera's] inventory and business operations" when these certifications were made.  (AC ¶¶ 220, 266-70; *see id.* ¶¶ 284, 299.)  For the reasons discussed above, none of these CW allegations is adequately pleaded. And CW8's allegations, which at least purport to relate to some period covered by the 2022 10-K, lack any meaningful detail and say nothing at all about the state of Cutera's controls as of the time of the relevant SOX certifications in 2023.

***Statements about the Launch's success.*** Plaintiff challenges several statements that describe the Launch as "successful" (Statements 7, 10, 21, 38), tout Cutera's progress in placing AviClear devices (Statements 12, 30, 38), or otherwise discuss the Launch positively (Statements 4, 20, 22). (AC ¶¶ 223, 229, 236, 240, 251, 254, 258, 275, 293.)

None of these statements is adequately alleged to be false or misleading. Each statement is consistent with Cutera's disclosed business strategy to focus *first* on placing AviClear devices through year-end 2022, *then* pivot to "utilization." (Ex. B at 9 (Mr. Mowry discussing strategy of "driv[ing] utilization once devices get placed").) In other words, Cutera measured the "success" of the Launch by its ability to place devices in physician's offices. And at the time of these statements, Cutera was meeting or exceeding its placement goals. As just one example, for the third quarter of 2022, Cutera "outpaced" its goal of 100 new placements during the quarter with more than "160 active devices in the field." (Ex. H at 4; *see also* Ex. L at 3, 6 (Mr. Mowry remarking that Cutera "overachieved [its] AviClear placement expectations" with more than 600 devices placed to date).) Customers' *use* of AviClear, however, was not disclosed as a priority in 2022; "utilization" was a goal for 2023. (Ex. L at 6 ("To date, we have been prioritizing our efforts *on placements* . . . ." (emphasis added)).)

Moreover, Defendants' statements about the success of AviClear placements would be false "only if" Cutera "had been 'making no progress at all,'" yet Plaintiff pleads "no facts that would establish falsity in that sense." *Wochos* v. *Tesla, Inc.*, 985 F.3d 1180, 1196 (9th Cir. 2021). Indeed, none of the CW allegations falsifies these statements. CW2 and CW3 — both of whom allegedly worked in sales but left the Company in late 2022, *before* Cutera's pivot to utilization — reported that "Cutera was not seeing much revenue" from placements and that the bundling sales practice "ma[de] it look like AviClear's sales were strong." (AC ¶ 233(a)-(b)). Again, placement (not use) was paramount in 2022. Plaintiff quotes — nine times — CW2's assertion that some customers "were so dissatisfied with AviClear that they tried to send it back." (*E.g.*, *id.* ¶ 232.) But CW2 never said why or how many physicians were dissatisfied with AviClear or when customers tried to return (let alone succeeded in returning) devices. *See In re Eventbrite, Inc. Sec. Litig.*, 2020 WL 2042078, at *14 (N.D. Cal. Apr. 28, 2020) (rejecting former employees' allegations about customer dissatisfaction on falsity grounds when they failed to explain "*why* or *how* [the company]'s customers were dissatisfied" (emphasis in original)). And even if CW2's allegations provided actual detail,

SULLIVAN & CROMWELL LLP

courts have rejected similar attempts to plead the falsity of generally positive statements about a company's business based on customer complaints. The court in *In re Netflix, Inc. Securities Litigation* rejected the argument that Netflix's statement — "consumers love our service" — was rendered false or misleading because "the Company was aware that its service was much worse than represented and was leading to customer defections" based on the existence of customer complaints. 2005 WL 1562858, at *7 (N.D. Cal. June 28, 2005). The court reasoned that "[p]roblems and difficulties are the daily work of business people" and the "exist[ence]" of those problems "does not make a lie out of any of the alleged false statements." *Id.* (quoting *Ronconi* v. *Larkin*, 253 F.3d 423, 434 (9th Cir. 2001)); *see also Curry* v. *Yelp Inc.*, 2015 WL 1849037, at *8 (N.D. Cal. Apr. 21, 2015) (Tigar, J.) ("Plaintiffs have not pointed the Court to any case holding that customer complaints alleging a state of affairs contrary to a defendant's representations independently suffice to establish the falsity of those representations.").

The same is true of the allegations of CW4, who is alleged to have been a Key Account Manager until February 2023. (AC ¶ 58.) CW4 claimed that some customers cancelled their AviClear orders due to lengthy delays and that these "delivery problems" "were raised by many people, frequently, on company-wide town hall Zoom meetings where upper management" was present. (*Id.* ¶ 118.) But CW4 failed to provide the number of order cancellations, identify who allegedly raised these "delivery problems" and who attended these Zoom meetings, or specify when those meetings were supposedly held. And, in any event, that there may have been *some* AviClear delivery delays or order cancellations in no way falsifies Defendants' statements that the Launch was generally progressing well and that devices were being placed in the amounts that Cutera said they were. *See Netflix*, 2005 WL 1562858, at *7. Plaintiff claims that Ms. Hopkins's August 2023 statement that Cutera was "experiencing major quality, reliability, and order fulfillment problems affecting AviClear and non-AviClear devices alike" somehow falsified challenged statements about AviClear from as early as May 2022. This is textbook (and improper) hindsight pleading. *See In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *17 (N.D. Cal. July 21, 2020) ("It is well-settled in the Ninth Circuit that 'fraud by hindsight is not actionable . . . .'" (quoting *Ronconi*, 253 F.3d at 430 n.12)).

Plaintiff also fails adequately to plead that Mr. Mowry's November 2022 comment that he had not seen "any customer stop using AviClear" (Statement 20) is actionably false or misleading. (AC ¶ 251.) Although Plaintiff claims that "customers in fact stopped using AviClear" (*Id.* ¶ 253), the Complaint contains

no particularized facts showing any such thing as of November 2022 (or at any time — CW2's repeated allegation about customers trying to send back AviClear devices never once says when this supposedly happened).  In any event, Mr. Mowry went on to explain that "[w]e have seen kind of spikes and troughs" and the "typical pattern" is that physicians will conduct treatments and then "wait to see the results . . . and then maybe they start to ramp up again." (Ex. J at 7.)  Plaintiff ignores this context.

*Statements about physician and patient interest in AviClear.*  Plaintiff also challenges general statements about physician or patient "interest" in and "demand" for AviClear (Statements 11, 18, 23) or about its clinical effectiveness (Statements 16 & 19).  (AC ¶¶ 240, 244, 248, 250, 256; *see also* Statement 38.)  Again, the Complaint lacks particularized allegations showing that these statements were false.  Plaintiff never disputes that "physician adoption" and "patient demand" increased in 2022.  (AC ¶ 240; *see* Ex. D at 5 (Mr. Mowry reporting 500 AviClear treatments; patients rating their AviClear treatments with an average score of 4.9/5).)  Nor does Plaintiff dispute Mr. Mowry's statement that Cutera's sales force shifted focus to AviClear at year-end 2022 *due to* "strong underlying interest" in and "customer demand" for AviClear.  (AC ¶ 256.)  Notably, Plaintiff's assertion that "there was never 'a strong underlying interest in AviClear' among customers" (*id.* ¶ 259) not only is inadequately pleaded, but also is inconsistent with CW1's repeated assertion that AviClear was a "top three seller[]" (*id.* ¶¶ 97, 220(e), 417).

*Statements about Core Capital's strength.*  Plaintiff challenges statements that, among other things, describe the "strength" and "momentum" of Core Capital (Statements 5, 6, 8, 9, 13-15) or otherwise discuss Core Capital positively (Statements 3 & 17).  (AC ¶¶ 222-23, 228, 230, 235, 242-44.)  Contrary to Plaintiff's allegations that these statements assured investors of Core Capital's future performance (*id.* ¶ 243), each statement represented Core Capital's performance during that or the prior fiscal quarter.  For instance, Plaintiff challenges Mr. Mowry's statement during the Q2 2022 earnings call on August 4, 2022, about the strength of Core Capital (Statement 8), but during that same call, Mr. Mowry made clear that Cutera set a "record" high for Core Capital sales and revenue for the quarter ended June 2022.  (*See* Ex. D at 4.)  Plaintiff also challenges multiple statements made during the Q3 2022 earnings call on November 3, 2022, and in a press release issued that same day (Statements 13-15, 17), when the Company again reported strong Core Capital performance for the quarter ended September 2022.  (Exs. H at 3 & G at 3.)  Plaintiff does not dispute those results.  Instead, it claims that these sort of statements about Core Capital's performance were

misleading because *subsequently* Core Capital sales began to decline in late 2022 or early 2023, when Cutera's sales force shifted focus to AviClear placements. (*E.g.*, AC ¶¶ 245, 271.) But those subsequent events do not make these earlier statements false. *See In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1078 (N.D. Cal. 2001) ("Statements regarding past events contain no implicit prediction that those events or conditions will continue in the future."); *Karinski* v. *Stamps.com, Inc.*, 2020 WL 281716, at *14 (C.D. Cal. Jan. 17, 2020) ("Disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future."); *see also In re Pivotal*, 2020 WL 4193384, at *17 ("[H]onest optimism followed by disappointment is not the same as lying or misleading.").

   ***Statements about the alignment of Cutera's sales force.*** Plaintiff challenges three statements made by Mr. Mowry about the "alignment" of Cutera's sales force. The first was made during the Q1 2022 earnings call on May 10, 2022: "So as you think about the sales process, it's one where we have joint . . . arrival . . . . This is really a full company sales process. . . . So the sales process, we've got it. We've aligned it. We're working through it. We've trained to it" (Statement 2). (AC ¶ 221.) Plaintiff asserts that this statement — made just weeks after Cutera initiated the Launch — was false and misleading based on Cutera's supposed "admissions" six months later that the Company was using the same personnel to sell AviClear and Core Capital equipment. (*Id.* ¶¶ 224-26.) Nope. The very language that Plaintiff challenges made clear that "[t]his is really a *full company* sales process." (*Id.* ¶ 221 (emphasis added).) For the same reason, Mr. Mowry's February 28, 2023 statement, during Cutera's Q4 2022 earnings call, that "sales reps finally pivoted back to their core capital pipeline" (Statement 24) is not false, as Mr. Mowry told investors during the prior quarter's earnings call that Cutera had been using "the *entire* sales team" to place AviClear devices. (Ex. H at 8 (emphasis added).) And Mr. Mowry's statement about managers "delivering a strong accountability message" across the sales team (Statement 25) could be false only if Cutera's sales managers, in fact, were *not* communicating that message. (AC ¶ 257.) Plaintiff alleges no such thing.

   **B.**  **Most Statements about AviClear/Core Capital Are Immaterial as a Matter of Law.**

   Plaintiff's claims related to AviClear and Core Capital also should be dismissed on the separate ground that most of the challenged statements are indistinguishable from those that courts routinely hold are immaterial as a matter of law. Plaintiff points to statements characterizing the Launch as "successful" (Statements 7, 10, 21, 38), describing Cutera as having a "first-mover advantage" or being "well-positioned"

SULLIVAN & CROMWELL LLP

-13-

(Statements 4, 5, 30), and depicting the interest in and demand for the device among physicians and patients as "widespread," "growing," or "strong" (Statements 11, 18, 23). (*E.g.*, AC ¶¶ 223, 229, 240, 248, 256; *see also id.* ¶ 240 ("pleased with the speed of integration of this novel device" (Statement 12)).) Plaintiff also points to statements that management was excited by the "momentum" across Cutera's business (Statements 6, 8, 13) and the "feedback" received about AviClear (Statements 16 & 19), as well as multiple statements describing AviClear's or Core Capital's performance as "strong" (Statements 4, 5, 8, 14, 15). (*E.g.*, AC ¶¶ 228, 230, 242.)

None of these statements gives rise to a securities fraud claim. Each statement is the sort of "'vague, generalized, and unspecific assertions' of corporate optimism or statements of 'mere puffing'" that cannot constitute "actionable material misstatements of fact under federal securities laws." *Cement & Concrete Workers Dist. Council Pension Fund* v. *Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1138 (N.D. Cal. 2013) (Tigar, J.); *see In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010). Courts have dismissed claims based on statements, indistinguishable from these statements, concerning:

- "terrific momentum," which management said was a "testament to the strength of the GoPro brand," *Bodri* v. *GoPro, Inc.*, 252 F. Supp. 3d 912, 924 (N.D. Cal. 2017) (Tigar, J.);

- "a first-mover advantage in synthetic biology," *In re Intrexon Corp. Sec. Litig.*, 2017 WL 732952, at *3 (N.D. Cal. Feb. 24, 2017);

- "the launch" of a new drug that was "progressing well," as the company was "getting really great feedback" and management was "very pleased" with the "progress to date," *Sneed* v. *AcelRx Pharms., Inc.*, 2023 WL 4412164, at *8 (N.D. Cal. July 7, 2023);

- the "tremendous growth across [the company's] cloud business" and "very strong" "[c]ustomer adoption of [] cloud products and services," *City of Sunrise Firefighters Pension Fund* v. *Oracle Corp.*, 2019 WL 6877195, at *9 (N.D. Cal. Dec. 17, 2019);

- the progress of an acquisition that was described as "proceeding 'very well' and was 'already a success,' such that the integration of" the acquired company's "technology" into the defendant company's "products was 'on schedule and continuing smoothly,'" *In re DOT Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1158 (S.D. Cal. 2008); and

- the "very, very strong demand for [the company's] commercial business," *In re SunPower Corp. Sec. Litig.*, 2018 WL 4904904, at *4 (N.D. Cal. Oct. 9, 2018).

Plaintiff also challenges statements that are incapable of objective verification. For instance, Plaintiff points to four statements by Mr. Mowry that discuss the "alignment" of Cutera's sales force across AviClear and Core Capital (Statements 2, 3, 24, 25). (*See* AC ¶ 221 (describing the AviClear sales process as "one where we have . . . joint arrival . . . . we've got it. . . ."); *id.* ¶ 222 ("The investments we've made in

-14-

the key account managers have continued to pay off."); *id.* ¶ 256 (". . . sales reps finally pivoted back to their core capital pipeline"); *id.* ¶ ("our sales managers are delivering a strong accountability message . . .").) Because these vague, amorphous statements are incapable of objective verification, they are immaterial. *See Cement & Concrete*, 964 F. Supp. 2d at 1138-39 (statements "lack[ing] a standard against which a reasonable investor could expect them to be pegged" are not actionable). The same is true for Mr. Mowry's statements that Cutera had "begun to see green shoots" with AviClear (Statement 22), and that positive "[p]ractice performance indicators . . . instill[ed] confidence in the core capital equipment and consumable run rates" (Statement 17). (AC ¶¶ 244, 258.) These "mildly optimistic, subjective assessment[s]" of Cutera's business "hardly amount[] to a securities violation." *In re Cutera*, 610 F.3d at 1111.

\* \* \*

The first requirement of a securities fraud claim is a false or misleading statement (or omission) of material fact. As to the vast majority of the challenged statements, Plaintiff never identifies (let alone adequately pleads) any such thing.

## C. Plaintiff Fails Adequately To Plead Scienter.

Plaintiff's claims also should be dismissed for the independent reason that the Complaint fails adequately to plead scienter. Here, too, the bar is high. Under the PSLRA, a plaintiff must plead "allegations of specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Metzler*, 540 F.3d at 1066. Deliberate recklessness is an "extreme departure from the standards of ordinary care," "which presents a danger of misleading [the market] that is either known to the defendant or is so obvious that the actor must have been aware of it." *Webb* v. *SolarCity Corp.*, 884 F.3d 844, 851 (9th Cir. 2018) (emphases omitted). Plaintiff's allegations must "giv[e] rise to a *strong inference* that the defendant acted with" scienter. *Metzler*, 540 F.3d at 1066. Such an inference exists "only if a reasonable person would deem the inference . . . cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

The Complaint relies on multiple kinds of factual allegations to try to plead scienter, but they are inadequate — indeed, the one way the Complaint undoubtedly succeeds is in its cataloguing of nearly every type of scienter allegation that courts in this Circuit have held inadequate.

### 1.    Signed or Certified SEC Filings Do Not Adequately Plead Scienter.

Plaintiff points to the fact that the individual Defendants signed and certified various SEC filings that contained certain challenged statements. (*E.g.*, AC ¶¶ 435-36. *See generally id.* Section V.) That does not suffice. Take Mr. Varma, for instance — who served as General Counsel beginning in November (not May, as Plaintiff alleges) 2022 and who is alleged to have signed Cutera's May 9, 2023 8-K. (*Id.* ¶¶ 41, 271.) Of the 492 paragraphs of the Complaint, only six so much as mention him and just two of those purport to plead scienter: Plaintiff points to Mr. Varma's signature on the 8-K — which contained certain of the restated financial metrics — and absolutely no other thing to allege that Mr. Varma knowingly made false statements about those metrics. (*See id.* ¶¶ 281, 443.) Courts, however, consistently hold that signing an SEC filing that turns out to be false or misleading does not even imply, let alone establish, that the signatory had any knowledge of the inaccuracy. *See*, *e.g.*, *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1160 (C.D. Cal. 2007) ("Without allegations that each of the Individual Defendants that signed various [company] public filings knew those public filings contained misstatements, the Individual Defendants' signatures on those public filings alone does not give rise to a strong inference of scienter[.]"). This is true even in cases involving restatements. *See DSAM*, 288 F.3d at 390 ("[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter."). Similarly, the SOX certifications of Messrs. Drummond, Harris, Mowry, and Seth, and Ms. Hopkins contain the sort of boilerplate language that "add[s] nothing substantial to the scienter calculus." *See Zucco Partners, LLC* v. *Digimarc Corp.*, 552 F.3d 981, 1003 (9th Cir. 2009) (allowing SOX certifications to establish scienter "in 'every case where there was an accounting error or auditing mistake' would 'eviscerat[e] the pleading requirements for scienter set forth in the PSLRA'").

### 2.    The Confidential Witnesses' Statements Do Not Adequately Plead Scienter.

Plaintiff relies on the allegations of eight CWs in support of scienter. Each of the CW allegations fails in numerous ways to plead scienter as to any Defendant.

***Temporal limitations.*** As a threshold matter, because each CW left Cutera before the end of the 24-month class period (AC ¶¶ 55-62), none can speak for that entire period. *See Police Ret. Sys. of St. Louis* v. *Intuitive Surgical, Inc.*, 2012 WL 1868874, at *20 (N.D. Cal. May 22, 2012) (giving "little weight" to witnesses who "were not employed at [the company] during the entire Class Period"). This is especially

-16-

true for the five CWs who left earlier than halfway through it.[7]

*Unreliable hearsay.*  The most (allegedly) talkative of Plaintiff's CWs appears to have been CW1. (AC ¶ 55.)  But CW1's allegations are riddled with unreliable hearsay.  For example, to assert that Mr. Mowry knew about Cutera's internal-controls issues, CW1 stated that three so-called "[r]elevant Non-Defendant Cutera Executives" — Caroline Batarseh, Shelby Eckerman, and John Sennett — "told CW1 that [they] had told Mowry that [Srinivas] Pinapati's inventory estimates were wrong" at some undisclosed point in time.  (*Id.* ¶¶ 45, 52-54.)  The problem for Plaintiff is that these allegations do not demonstrate, as they must, CW1's *personal knowledge* of Mr. Mowry's mental state.  Instead, CW1 based his or her knowledge on hearsay and double-hearsay, which the Ninth Circuit has held is unreliable and thus insufficient to plead scienter.  *See Zucco Partners*, 552 F.3d at 997-98 (rejecting multiple CW allegations layered with hearsay). So, too, are CW1's assertions that his or her "supervisor [Michael] Karavitis spoke to Mowry" about Mr. Karavitis's "concerns with Aviclear's poor financial performance," and that Mr. "Seth told" CW1 "that he had raised the same concerns to Mowry, also sometime in the first quarter of 2023."  (AC ¶ 114.)  These hearsay allegations, devoid of any sort of detail at all and no, or only the vaguest, description of *when* these supposed conversations occurred, are inadequate.  *Id.* at 997 (rejecting CW allegation relating to "sometime in 2003" because it "fail[ed] to provide specifics or dates").

*Allegations that someone who worked for someone knew something.*  Plaintiff attempts to plead scienter as to Mr. Mowry based on information supposedly known to people who reported to Mr. Mowry or who reported to people who did.  As just one example, CW2 supposedly reported that "she and her colleagues communicated" to non-defendants, Austin Anderson (who reported to T.J. Huffman) and Mr. Huffman (who reported to Mr. Mowry), "the problems raised by customers who were not responding positively to AviClear."  (AC ¶ 117; *see also id.* ¶ 47 (CW7 stating that "she and other employees told Pinapati," who reported directly to Mr. Mowry, about Cutera's "enormous" "parts backlog"); *id.* ¶ 115 (CW3 claiming that "Huffman was aware of" the AviClear bundling practice).)  None of these allegations establishes (or even actually says) that any of this information supposedly known to his direct reports was known to Mr. Mowry.  *See City of Sunrise*, 2019 WL 6877195, at *19 (rejecting allegation that the CWs

---

[7]    CW2 and CW3 left Cutera with 15 months remaining in the class period (before Statements 21 to 44), CW4 and CW6 left with 13 months remaining (before Statements 26 to 44), and CW7 left with 18 months remaining (before Statements 13 to 44).  (*See* AC ¶¶ 56-58, 60-61.)

SULLIVAN & CROMWELL LLP

-17-

"saw 'presentations going to [defendant]'s direct reports'"). And to the extent that these allegations attempt to show that Mr. Mowry must have known something based on his position at Cutera, that sort of allegation has been held inadequate time and again. *See*, *e.g.*, *Brodsky* v. *Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1118 (N.D. Cal. 2009) (allegations that Yahoo!'s executives "must have known about problems" based on their "high level positions in the company do not provide a strong inference of scienter").

***A mismatch of inventory problems.*** According to CW1 and CW7, Mr. Pinapati — who was allegedly hired by and directly reported to Mr. Mowry — was the "source" of the inventory problems throughout 2023 because he was "asleep at the wheel." (AC ¶¶ 15 & n.4, 97.) CW6 allegedly stated that Cutera's management "knew that anyone could walk into the warehouse area and take parts" because "management's offices, including Mowry's," were "in the same building." (*Id.* ¶ 93.) And CW8 supposedly reported that "the problem of discrepancies between parts listed in the system with parts available in the warehouse was raised in meetings." (*Id.* ¶ 269.)

Putting to one side the obvious problems of how any of these CWs knew any of these vaguely described things (including what other unnamed people ("Cutera management") knew) or when exactly (or even generally) these things occurred, whatever inventory issue(s) these CWs have supposedly identified do not even appear to relate to the inventory issues that resulted in the Restatement or otherwise were the subject of any misstatement. Cutera explained to investors that the Restatement was "a result of an accounting error" identified during a physical inventory-count conducted at the end of Q3 2023. (Exs. X at 1, 8 & Y at 1, 9.) Cutera discovered that there was a "shortfall of inventory relative to the Company's system of record," which resulted in an overstatement of inventory for Q1 and Q2 2023 and a corresponding understatement of cost of revenue for those quarters. (Exs. X at 1, 8 & Y at 1, 9.) Cutera's gross profits and gross margins for both periods were less than was originally reported. (*See* AC ¶¶ 285, 300.) But the Complaint contains *no* allegations that the inventory problems that resulted in the Restatement have anything to do with the inventory problems identified by the CWs.

***Vague and otherwise conclusory assertions of scienter.*** In addition to the specific failings described above, the vast majority of CW allegations also fail utterly to provide the sort of detail that courts have required in order to credit CW allegations. According to CW1, for example, Cutera's "struggle with supply chain and inventory issues throughout 2023 were known to Mowry," and the "problems with physician and

SULLIVAN & CROMWELL LLP

patient uptake of AviClear" "were clear internally by at least the second or third quarters of 2022." (*Id.* ¶ 15.) When and how in 2023 did Mr. Mowry supposedly learn of what "inventory issues"? And the AviClear problems were clear to whom exactly (and when were they known) and how did whoever knew this come to know it? Was it the second or third quarter of 2022 and why can CW1 not do better than that at identifying the specific time? Such vague allegations do not suffice. *See Zucco Partners*, 552 F.3d at 997 (rejecting witness allegations devoid of "details describing which projects or what employees were affected"). The remaining CW allegations similarly, and similarly totally, fail to provide meaningful details:

- CW2 allegedly claimed that "Defendants knew of the litany of problems with the AviClear rollout," including the purported fact that "some customers were so dissatisfied with AviClear that they tried to send it back" and that the "forecast numbers for [AviClear] treatment revenue were overly inflated." (AC ¶¶ 23, 56, 116-17.) All Defendants knew this — including Mr. Harris, who did not move from outside director to Cutera's CEO until August 7, 2023? (*Id.* ¶ 40.) How did they all come to know this and when and how does CW2 know what they knew? What exactly are those "problems"? How many customers tried to return the AviClear devices (and why) and when and what does it mean to *try* to send a product back? What forecast numbers were inflated and by how much and why and how did any Defendant know this and how does CW2 know what they knew?

- CW3 allegedly reported that "Cutera's top senior management, including Mowry, discussed AviClear's poor utilization rates internally on a regular basis." (*Id.* ¶ 115.) When did these alleged discussions occur and whom did they include and who said what and based on what and how does CW3 know any of this?

- CW4 allegedly stated that it was "impossible" for Mr. Mowry not to know about the AviClear "delivery problems" and the resulting cancellations because "these issues were raised by many people, frequently, on company-wide townhall Zoom meetings where upper management was present," including Mr. Mowry. (*Id.* ¶¶ 58, 419.) Raised by whom? People in a position to know these things? How does CW4 know that? When did these townhall meetings occur? Did CW4 attend them? What "delivery problems" are these and when did *they* occur? Do they relate to the inventory issues described elsewhere in the Complaint and, if so, how? (*Id.* ¶¶ 118, 419.)

- CW5 — alleged to be a Regional Manager from March 2020 through May 2023 — allegedly said that "service problems with AviClear were discussed at weekly AviClear conference call meetings with Defendant Mowry" and non-defendants. (*Id.* ¶ 49.) CW5 added that "[m]anagement held these calls specifically to discuss AviClear's performance, including placement of the devices, utilization rates, and revenues for the product." (*Id.* ¶ 115.) When did these meetings occur and who attended them (did CW5?)? What "service problems" were discussed? What was said about them (that they were a big deal or no problem at all or something else altogether)? What was said about "placement of the devices, utilization rates, and revenues"? Did those things change over time? How?

- CW6 allegedly asserted that it was his or her "understanding that Pinapati was part of regular meetings with Mowry and other Vice Presidents all the time." (*Id.* ¶ 95.) When were these meetings? What was discussed at them? How and what does CW6 know about these meetings?

- CW8 allegedly "indicated that some customers also sent complaints about their downed systems to Defendant Mowry directly" and "recall[s]" Mr. Mowry referring to such complaints as "noise." (*Id.* ¶¶ 114, 417.) As to Cutera's internal controls, CW8 added that "discrepancies between parts listed in the system with parts available in the warehouse w[ere] raised in meetings." (*Id.* ¶ 91.) CW8 also said that Field Service Engineers "were required periodically to conduct an inventory count of their trunk stock and report the results to accounting" and that "there were occasional one-off or spot

-19-

SULLIVAN & CROMWELL LLP

checks of truck stock inventory," and CW8 "understood that Defendant Seth and [Guy] Thier saw that information." (*Id.* ¶ 91.)  How many customers complained and when?  When did Mr. Mowry describe what customers' complaints as "noise" (and how does CW8 know what customers he was discussing?)?  What meetings and when and what were the results of these inventory counts/checks and how does CW8 know?

The CW allegations boil down to vague, speculative, and conclusory assertions about (mostly) Mr. Mowry's mental state, and are principally based on meetings or conversations held (or described to this or that CW) on unspecified dates in which Mr. Mowry supposedly participated.[8]  That fails to plead scienter.  *See Glazer Cap. Mgmt., LP* v. *Magistri*, 549 F.3d 736, 746 (9th Cir. 2008) ("[G]eneral allegations of defendants' hands-on management style, their interaction with other officers and employees, their attendance at meetings . . . are insufficient[] to create a strong inference of scienter.").  The few times that the CWs are alleged to mention someone other than Mr. Mowry, Plaintiff resorts to group pleading.  (*See*, *e.g.*, AC ¶ 417 (alleging that "*Defendants* knew" about Cutera's AviClear and internal controls issues but discussing only Mr. Mowry); *id.* ¶ 418 (alleging that "*management* — specifically Pinapati — knew that anyone could walk into the warehouse area and take parts" but discussing none of the individual Defendants) (emphases added).)  That, too, is insufficient.  *See Garcia* v. *J2 Glob., Inc.*, 2021 WL 1558331, at *18 (C.D. Cal. Mar. 5, 2021) ("the majority of district courts" in this Circuit "have concluded that the group-pleading doctrine is no longer available").

### 3. The Restatement Does Not Support a Strong Inference of Scienter.

Plaintiff contends that the fact that Cutera restated financial results for two quarters establishes scienter.  (AC ¶¶ 281-82, 296-97.)  The "mere publication of a restatement is not enough to create a strong inference of scienter."  *Zucco Partners*, 552 F.3d at 1000.  "[R]eporting false information will only be indicative of scienter where the falsity is patently obvious" — meaning that the "facts [are] prominent enough that it would be 'absurd to suggest' that top management was unaware of them."  *Id.* at 1001.  As Plaintiff barely acknowledges (AC ¶¶ 285, 300 & nn.11-12), Cutera explained that it adjusted the cost of revenue in both quarters to correct, among other things, (i) accounting errors concerning the overstatement of inventory; (ii) accounting errors related to AviClear devices; and (iii) AviClear capitalized labor costs.  (Exs. X at 10, 11 nn.(a)-(e) & Y at 12, 13-14 nn.(a)-(e), (j).)  Tellingly, the Complaint nowhere alleges that

---

[8]   The CWs allegedly said nothing at all about the mental state at any time of Defendants Drummond, Harris, Hopkins, and Varma.  As set forth above, Plaintiff's CW allegations are inadequate in any event, but as to these four Defendants, the CWs did not allege anything.

SULLIVAN & CROMWELL LLP

anyone knew anything about these specific facts or accounting errors more generally at any time, let alone that any of them was obvious.

### 4.    The "AviClear Bonuses" Do Not Support a Strong Inference of Scienter.

According to the Complaint, from April 2022 until April 2023, Messrs. Mowry, Seth, and Plants were financially motivated to defraud investors given Cutera's AviClear Incentive Plan, a bonus "designed to incentivize and retain the key individuals involved" in the "commercialization of AviClear." (AC ¶ 101.) As Plaintiff describes it, Messrs. Mowry, Seth, and Plants "stood to gain" (but are nowhere alleged actually to have gained) "$472,428," "$314,952," and "$143,160," respectively, if Cutera achieved two milestones: (i) obtain FDA approval and place the first AviClear device by April 2022, and (ii) place an unspecified quantity of devices by April 2023. (*Id.* ¶ 452.) Plaintiff alleges that this bonus "motivated" these Defendants "to rush the AviClear rollout" and "conceal from investors the truth about the failed [AviClear] strategy." (*Id.* ¶ 451.)

It is not clear at all how these bonuses motivated Defendants to "conceal" anything from investors — according to Plaintiff, Cutera did, in fact, obtain FDA approval and place numerous AviClear devices and none of this needed to be done secretly. But in any event, "for executive compensation to support the inference of scienter, 'the allegations in the complaint must demonstrate a strong correlation — including comparisons to previous years' [compensation] — between the [compensation] and the company's 'bottom line.'" *In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, at *29 (N.D. Cal. Mar. 21, 2018). The Complaint makes no reference to such a correlation, let alone a "strong" one. Plaintiff's own allegations also belie Plaintiff's theory. The purported "rush" to launch AviClear was to do with "beat[ing] out [Cutera's] competitor, *Accure*," which CW2 confirmed. (AC ¶¶ 68, 237.) In addition, most of the financial incentives (some 70%) required customers actually *to use* AviClear. (*Id.* ¶ 101 (30% of bonus based on "[a]chieving a predetermined number of average treatments per device" and 40% on "[e]xceeding a predetermined trailing 12-month revenue target").[9] *See In re Accuray, Inc. S'holder Derivative Litig.*, 757 F. Supp. 2d 919, 933 (N.D. Cal. 2010) (that the CEO's "bonus compensation was tied to the inflated backlog

---

[9]    Plaintiff points to the Cutera Board's special committee's determination that Mr. Plants "was far more interested in his own personal enrichment than in leading the Company for the benefit of all stakeholders." (AC ¶ 20.) Plaintiff has taken this, too, out of context. The special committee's letter to investors makes no reference to Mr. Plants's attempting to place AviClear devices too quickly or to his being improperly motivated by an AviClear bonus. (Ex. AA.) Rather, the letter discusses Mr. Plants's desire to become Cutera's next CEO and increase his compensation that way. (*Id.* at 5.)

-21-

SULLIVAN & CROMWELL LLP

does not necessarily raise a strong inference of scienter, especially because the amount that was tied to the backlog accounted for only 20% of a potential bonus"). The AviClear bonus also was a fraction of these Defendants' total compensation (roughly 12% for Mr. Mowry and 14% for Messrs. Seth and Plants), further undermining Plaintiff's theory that these Defendants were incentivized to dupe investors about AviClear. (*See* Ex. Z at 51 (reflecting bonus structure); *id.* at 54 (reflecting compensation figures). *See In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 526-27 (S.D.N.Y 2020) (concluding that incentive-based bonuses for CEO (roughly 71% of salary) and COO (roughly 36% of salary) were not indicative of scienter).

### 5. Executive Departures Do Not Support a Strong Inference of Scienter.

Plaintiff alleges that the timing and circumstances of the departures of Messrs. Seth, Mowry, and Plants establish scienter. In this Circuit, only allegations that a departure "was uncharacteristic when compared to the defendant's typical hiring and termination patterns or was accompanied by suspicious circumstances" evidence scienter. *Zucco Partners*, 552 F.3d at 1002. Plaintiff pleads neither. As to Mr. Seth, who resigned as CFO, Plaintiff alleges that his departure coincides with the May 9, 2023 disclosure that Cutera's "challenges in the quarter were mostly self-inflicted and can be attributed to suboptimal leadership direction that led to execution issues." (AC ¶ 433.) Plaintiff does not even try to compare Mr. Seth's resignation with Cutera's termination patterns. And Plaintiff never explains why the resignation is suspicious. The conclusory allegation that the resignation "is temporally connected to disclosures of the Company's fraud" fails to plead scienter. It is not unusual for a CFO to depart following the discovery of an accounting issue serious enough to require a restatement; such a departure does not give rise to a strong inference of scienter absent much more. *See Zucco Partners*, 552 F.3d at 1002 (former CFO's departure "just prior to the disclosure of [the company]'s improper accounting and lack of financial controls during his tenure" did not establish scienter).

Plaintiff's allegations as to Messrs. Mowry and Plants are no better. The Complaint alleges that the Board's decision to terminate their employment alleges scienter because both departures were "temporally" and "explicitly connected to" disclosures of Cutera's alleged fraud. (AC ¶ 429.) Plaintiff points to the conclusions that Mr. Mowry "fail[ed] to properly roll out AviClear and support Core Capital" and that Mr. Plants's "focus was overwhelmingly on compensation." (*Id.* ¶¶ 431-32.) But Plaintiff's own allegations suggest that the more plausible inference is that Cutera's Board believed that these Defendants had

performed worse than expected. "[P]oor business performance," however, "is not securities fraud." *Jiu-Yang Hong* v. *Extreme Networks, Inc.*, 2017 WL 1508991, at *24 (N.D. Cal. Apr. 27, 2017).

### 6. The "Core Operations" Theory Does Not Support a Strong Inference of Scienter.

Finally, as many securities plaintiffs do, Plaintiff alleges that this is one of those rare cases where scienter "can be inferred because" certain alleged facts "were critical to Cutera's core operations." (AC ¶ 445.) "The core operations theory posits that 'facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers.'" *Bodri*, 252 F. Supp. 3d at 932 (citation omitted). "Proof under this theory is not easy." *Police Ret. Sys. of St. Louis* v. *Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014). Plaintiff alleges no facts (certainly not adequately) to invoke it.

As to the Launch, Plaintiff relies on Mr. Plants's comment that the placement model was "going to transform every single aspect of [the] business," CW1's assertion that "the directive to move away from Cutera's core business to focus on AviClear came directly from Mowry and Plants," and CW2's statement that "it was of the utmost importance for Cutera to rollout AviClear before its competitor's product, *Accure*." (AC ¶¶ 445-46.) Plaintiff also points to a research analyst's note that AviClear "should drive over 50% of company growth in the next two years." (*Id.* ¶ 447.)

These allegations are not remotely adequate to invoke the core-operations theory. Mr. Plants's alleged admission that AviClear would "transform" Cutera's business hardly "detail[s]," as is required, his "involvement in the minutia" of Cutera's operations. *See Intuitive Surgical*, 759 F.3d at 1062 (rejecting core-operations theory, in part, because the "complaint lack[ed] allegations of specific admissions by the individual defendants regarding their involvement with [the company]'s operations"). The CW allegations also miss the mark, as they merely concern "the impressions of witnesses who lacked direct access to the executives." *Id.* And the outside analyst says absolutely nothing about any Defendant's mental state. But the real problem with Plaintiff's attempt to invoke the core operations doctrine is its failure to identify what went wrong with AviClear that was "so apparent" to management. AviClear undoubtedly is very important to Cutera but, as described above, the Complaint describes the alleged problems with it inconsistently and without sufficient detail such that it is impossible to tell whether this is the rare case where an issue, in fact, implicates a "core operation." (*Compare*, *e.g.*, AC ¶ 97 (AviClear was a "top three seller[]") *with* AC ¶ 259

SULLIVAN & CROMWELL LLP

("there was never a 'strong underlying interest in AviClear'").)  As for internal controls, Plaintiff alleges that those "were likewise critical aspects of Cutera's business," given statements in Cutera's 2022 10-K and other SEC filings that "inventory management are top priorities of the manufacturing operations" and that Cutera's "success depend[s] on the quality and reliability of its products."  (*Id.* ¶ 449.)  This does not square with the facts that the Restatement amounts were, in fact, quite small and that the Restatement resulted from the sort of inventory problems that may not have anything to do with the CW and "relevant non-defendants" allegations.  (*See* Exs. X at 8, 11 nn.(a)-(h) & Ex. Y at 9, 13 nn.(a)-(g).)  Without more, Plaintiff cannot rely on the core-operations theory.

### 7.    Plaintiff Fails Adequately To Plead Scienter as to Cutera.

Multiple challenged statements were not even made by an individual speaker but instead come from disclosures and press releases issued by Cutera.  (Statements 1, 11, 18, 29, 33, 37, 41; AC ¶¶ 219, 240, 248, 281, 296.)  "'[A] corporation can only act through its employees and agents'" and can likewise "only have scienter through them."  *Prodanova* v. *H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1108 (9th Cir. 2021).  Trying to link an individual Defendant to the challenged corporate statements, Plaintiff points to the signatories of certain SEC filings.[10]  As discussed above (*supra* Section C.1), however, Plaintiff fails adequately to allege that these persons acted with scienter.  Thus, Plaintiff necessarily fails to plead scienter as to Cutera as well.

\*       \*       \*

Plaintiff's various scienter allegations, taken separately or together, are plainly inadequate.  There is a far more compelling inference here:  Defendants made good-faith statements about their excitement for the Launch, Cutera's ability to continue to deliver strong results, and ongoing efforts to improve the Company's internal controls.  As it happened, Cutera failed to realize its vision for AviClear and business declined.  Add to that the leadership changes in mid-2023 and the discovery of accounting errors and a Restatement months later, and that is a recipe for a difficult year.  Without much more, it is not securities fraud.

---

[10]    *See* AC ¶ 219 (alleging that Messrs. Mowry, Seth, Plants, and Ms. Hopkins signed the 2021 10-K); *id.* ¶ 281 (alleging that Mr. Varma signed the 5/9/2023 8-K and that Mr. Drummond signed the Q1 2023 10-Q); *id.* ¶ 296 (alleging that Mr. Drummond signed both the 8/8/2023 8-K and Q2 2023 10-Q).

-24-

## II.    PLAINTIFF DOES NOT STATE A CLAIM UNDER SECTION 20(A).

To plead a Section 20(a) claim, Plaintiff must allege "'(1) a primary violation of federal securities laws' and '(2) that the defendant exercised actual power or control over the primary violator.'"  *Webb*, 884 F.3d at 858.  Because Plaintiff has failed adequately to plead a primary violation as to any individual Defendant, Plaintiff's claims under Section 20(a) fail as a matter of law.

### CONCLUSION

The Court should dismiss the Amended Complaint.

Dated:   July 8, 2024

/s/ Brendan P. Cullen
Brendan P. Cullen (SBN 194057)
(cullenb@sullcrom.com)
Alexis C. Holmes (SBN 321393)
(holmesa@sullcrom.com)
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, California 94301
Telephone:    (650) 461-5600
Facsimile:    (650) 461-5700

*Counsel for Defendants Cutera, Inc., David H. Mowry, Rohan Seth, J. Daniel Plants, Sheila Hopkins, Taylor Harris, Stuart Drummond, and Vikram Varma*

APPENDIX 1:  CHALLENGED STATEMENTS ALLEGED IN THE AMENDED COMPLAINT

| Statement No. | Amended Complaint Reference | Challenged Statement | Neither False Nor Misleading | Immaterial | Inadequate Scienter Allegations |
|---|---|---|---|---|---|
| March 1, 2022 – 2021 Form 10-K (Ex. A) | | | | | |
| 1 | AC ¶ 219 | "designing and implementing effective internal control measures to improve its internal controls over financial reporting and remediate this material weakness"[1] | ✓ | | ✓ |
| May 10, 2022 – First Quarter 2022 Earnings Conference Call (Ex. B) | | | | | |
| 2 | AC ¶ 221 | "we have joint—if you will, joint arrival at the practice between the consumable and the capital rep, right?  This is really a full company sale process. . . . . So the sales process, we've got it.  We've aligned it.  We're working through it.  We've trained to it." | ✓ | ✓ | ✓ |
| 3 | AC ¶ 222 | "The investments we've made in the key account managers have continued to pay off . . . ." | ✓ | ✓ | ✓ |
| 4 | AC ¶ 223 | "[w]ith AviClear, we have a strong first-mover advantage and broadening customer acceptance based on exceptional clinical data" | ✓ | ✓ | ✓ |
| 5 | AC ¶ 223 | "Given our strong balance sheet, we are well positioned to continue supporting the growth of our core business while ensuring the successful launch of AviClear" | ✓ | ✓ | ✓ |
| August 4, 2022 – Press Release (Ex. C) | | | | | |
| 6 | AC ¶ 228 | " . . . the momentum we continue to see in our core business . . . ." | ✓ | ✓ | ✓ |

---

[1]     Language bolded in this Appendix is also bolded and italicized in the Amended Complaint.  At paragraph 217, Plaintiff states that "the statements highlighted in bold and italics within this section were knowingly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing."  Defendants understand that Plaintiff intends to challenge Statements 34-36 and 42-44 even though Plaintiff did not bold or italicize any of its allegations as to those statements.

**APPENDIX 1:  CHALLENGED STATEMENTS ALLEGED IN THE AMENDED COMPLAINT**

| Statement No. | Amended Complaint Reference | Challenged Statement | Neither False Nor Misleading | Immaterial | Inadequate Scienter Allegations |
|---|---|---|---|---|---|
| 7 | AC ¶ 229 | "**During the quarter, our team achieved the successful launch of AviClear . . . . In the first three months of our limited commercial release of AviClear, we were able to validate successful clinical outcomes in the hands of our customers, [and] verify patient satisfaction with AviClear post-treatment patient survey data . . . .**" | ✓ | ✓ | ✓ |
| **August 4, 2022 – Second Quarter Earnings Conference Call (Ex. D)** | | | | | |
| 8 | AC ¶ 230 | " . . . **strong position at the midpoint of 2022, fortified by the strength of our core business performance backed by a strong balance sheet and energized by the building momentum of the AviClear opportunity**" | ✓ | ✓ | ✓ |
| **August 4, 2022 – Press Release Attached to Form 8-K (Ex. E)[2]** | | | | | |
| 9 | AC ¶ 235 | Same as Challenged Statement No. 6. | ✓ | ✓ | ✓ |
| 10 | AC ¶ 236 | Same as Challenged Statement No. 7. | ✓ | ✓ | ✓ |
| **September 8, 2022 – Press Release (Ex. F)** | | | | | |
| 11 | AC ¶ 240 | "**AviClear has seen growing physician adoption and steadily increasing patient demand since its launch in April 2022**" | ✓ | ✓ | ✓ |
| 12 | AC ¶ 240 | ". . . **speed of integration of this novel device into dermatology practices across the country**" | ✓ | ✓ | ✓ |
| **November 3, 2022 – Press Release Attached to Form 8-K (Ex. G)** | | | | | |
| 13 | AC ¶ 242 | ". . . **the momentum we continue to see in our core business . . . .**" | ✓ | ✓ | ✓ |

[2]    Although the Amended Complaint alleges that Cutera's Form 8-K is dated August 5, 2022 (¶ 235), in fact, that current report was filed with the SEC on, and is dated, August 4, 2022.

**APPENDIX 1:  CHALLENGED STATEMENTS ALLEGED IN THE AMENDED COMPLAINT**

| Statement No. | Amended Complaint Reference | Challenged Statement | Neither False Nor Misleading | Immaterial | Inadequate Scienter Allegations |
|---|---|---|---|---|---|
|  November 3, 2022 – Third Quarter 2022 Earnings Conference Call (Ex. H) |
| 14 | AC ¶ 243 | "strong capital and consumable product sales" | ✓ | ✓ | ✓ |
| 15 | AC ¶ 243 | "underlying treatment and procedure volumes were steady and that the customer demand for capital remains strong" | ✓ | ✓ | ✓ |
| 16 | AC ¶ 244 | "the physician feedback has been phenomenal" | ✓ | ✓ | ✓ |
| 17 | AC ¶ 244 | "[p]ractice performance indicators such as patient cues, appointment cancellation rates also continue to track with prior quarter rates instilling confidence in the core capital equipment and consumable run rates as we bring in the full-year results" | ✓ | ✓ | ✓ |
|  November 7, 2022 – Press Release (Ex. I) |
| 18 | AC ¶ 248 | "AviClear has seen widespread interest from physicians and patients following its FDA clearance in March 2022" | ✓ | ✓ | ✓ |
|  November 30, 2022 – Piper Sandler Healthcare Conference Call (Ex. J) |
| 19 | AC ¶ 250 | "[p]eople are really doing exceptionally well with the AviClear device and the AviClear procedure . . . ." | ✓ | ✓ | ✓ |
| 20 | AC ¶ 251 | Analyst: "Have you seen any customer stop using AviClear?" Mowry: "No." Analyst: "Okay." Mowry: "Yeah, no one has ever asked me that question." Analyst: "Glad I could be the first." Mowry: "Yeah. No, we haven't seen that yet." | ✓ | | ✓ |

**APPENDIX 1:  CHALLENGED STATEMENTS ALLEGED IN THE AMENDED COMPLAINT**

| Statement No. | Amended Complaint Reference | Challenged Statement | Neither False Nor Misleading | Immaterial | Inadequate Scienter Allegations |
|---|---|---|---|---|---|
| February 28, 2023 – Press Release Attached to Form 8-K (Ex. K) | | | | | |
| 21 | AC ¶ 254 | "**we successfully launched and scaled operations for AviClear . . . .**" | ✓ | ✓ | ✓ |
| 22 | AC ¶ 258 | "**[i]n just three quarters since our North American introduction we have begun to see green shoots of the financial profile transformation we envision with the application of our novel AviClear business model.**" | ✓ | ✓ | ✓ |
| February 28, 2023 – Fourth Quarter 2022 Earnings Conference Call (Ex. L) | | | | | |
| 23 | AC ¶ 256 | "**. . . strong underlying interest in AviClear quickly converted into customer demand that occupied our sales team throughout November and most of December**" | ✓ | ✓ | ✓ |
| 24 | AC ¶ 256 | "**. . . sales reps finally pivoted back to their core capital pipeline**" | ✓ | ✓ | ✓ |
| 25 | AC ¶ 257 | "**Meanwhile, our sales managers are delivering a strong accountability message that efforts must be applied across both segments . . . .**" | ✓ | ✓ | ✓ |
| April 7, 2023 – SOX certifications attached to 2022 Form 10-K (Ex. M) | | | | | |
| 26 | AC ¶ 265 | "**the information contained in the annual report fairly presents, in all material respects, the financial condition and results of operations of Cutera, Inc. for the periods presented therein**" | ✓ | | ✓ |
| 27 | AC ¶ 266 | "**Evaluated the effectiveness of the registrant's disclosure controls and procedures**" | ✓ | | ✓ |
| 28 | AC ¶ 266 | "**Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under the Company's**" | ✓ | | ✓ |

-4-

**APPENDIX 1:  CHALLENGED STATEMENTS ALLEGED IN THE AMENDED COMPLAINT**

| Statement No. | Amended Complaint Reference | Challenged Statement | Neither False Nor Misleading | Immaterial | Inadequate Scienter Allegations |
|---|---|---|---|---|---|
| | | supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements" | | | |
|  | | **May 9, 2023 – Press Release Attached to Form 8-K (Ex. N)** | | | |
| 29 | AC ¶ 281 | First Quarter 2023 Financial Metrics:<br>• GAAP Cost of Revenue:  **$30.1 MM**<br>• GAAP Gross Profit:  **$24.9 MM**<br>• Non-GAAP Gross Profit:  **$27 MM**<br>• GAAP Gross Margin:  **45.3%**<br>• Non-GAAP Gross Margin:  **49.1%**<br>• GAAP Operating Loss:  **$23.6 MM**<br>• Non-GAAP Operating Loss: **$14.5 MM**<br>• Inventory:  **$71.8 MM** | | | ✓ |
| | | **May 9, 2023 – First Quarter 2023 Earnings Conference Call (Ex. O)** | | | |
| 30 | AC ¶ 275 | **"what we've done is a great job of placing devices, which enables us to take advantage of a first mover position in the marketplace"** | ✓ | ✓ | ✓ |
| 31 | AC ¶ 282 | **"[n]on-GAAP gross profit for the first quarter of fiscal 2023 was $27 million, with a gross margin of 49.1%"** | | | ✓ |
| 32 | AC ¶ 282 | **"$14.5 million"** | | | ✓ |
| | | **May 10, 2023 – First Quarter 2023 Form 10-Q (Ex. P)** | | | |
| 33 | AC ¶ 281 | Same as Challenged Statement No. 29. | | | ✓ |

**APPENDIX 1:  CHALLENGED STATEMENTS ALLEGED IN THE AMENDED COMPLAINT**

| Statement No. | Amended Complaint Reference | Challenged Statement | Neither False Nor Misleading | Immaterial | Inadequate Scienter Allegations |
|---|---|---|---|---|---|
|  | **May 10, 2023 – SOX certifications attached to First Quarter 2023 Form 10-Q (Ex. Q)** | | | | |
| 34 | AC ¶ 287 | "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report" | ✓ | | ✓ |
| 35 | AC ¶ 287 | "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under the [Company's] supervision" | ✓ | | ✓ |
| 36 | AC ¶ 288 | "[e]valuated the effectiveness of the registrant's disclosure controls and procedures and presented in this report the [Company's] conclusions about the effectiveness of the disclosure controls and procedures" | ✓ | | ✓ |
|  | **August 8, 2023 – Form 8-K (Ex. R)** | | | | |
| 37 | AC ¶ 296 | Second Quarter 2023 Financial Metrics:<br>• GAAP Cost of Revenue: **$33.2 MM**<br>• GAAP Gross Profit: **$28.1 MM**<br>• Non-GAAP Gross Profit: **$30.8 MM**<br>• GAAP Gross Margin: **45.8%**<br>• Non-GAAP Gross Margin: **50.3%**<br>• GAAP Operating Loss: **$29.5 MM**<br>• Non-GAAP Operating Loss: **$11.6 MM**<br>• Inventory: **$68.7 MM** | | | ✓ |

**APPENDIX 1:  CHALLENGED STATEMENTS ALLEGED IN THE AMENDED COMPLAINT**

| Statement No. | Amended Complaint Reference | Challenged Statement | Neither False Nor Misleading | Immaterial | Inadequate Scienter Allegations |
|---|---|---|---|---|---|
| colspan-header: **August 8, 2023 – Second Quarter 2023 Earnings Conference Call (Ex. S)** | | | | | |
| 38 | AC ¶ 293 | "[w]e've obviously been really successful in placing AviClear out into the field, and that just indicates a lot of demand, a lot of interest, and it gives us a good degree of optimism about the future of Avi. So, we've now got over 1,250 devices in the field as of the end of the second quarter. Our training programs have ramped as well, so the vast majority of those units have been placed" | ✓ | | ✓ |
| 39 | AC ¶ 297 | "Non-GAAP gross profit for the first quarter of 2023 was $30.8 million with a gross margin of 50.3%" | | | ✓ |
| 40 | AC ¶ 297 | "$11.6 million" | | | ✓ |
| colspan-header: **August 9, 2023 – Second Quarter 2023 Form 10-Q (Ex. T)** | | | | | |
| 41 | AC ¶ 296 | Same as Challenged Statement No. 37. | | | ✓ |
| colspan-header: **August 9, 2023 – SOX certifications attached to Second Quarter 2023 Form 10-Q (Ex. U)** | | | | | |
| 42 | AC ¶ 302 | Same as Challenged Statement No. 34. | ✓ | | ✓ |
| 43 | AC ¶ 302 | Same as Challenged Statement No. 35. | ✓ | | ✓ |
| 44 | AC ¶ 303 | Same as Challenged Statement No. 36. | ✓ | | ✓ |