Michael P. Canty (*pro hac vice*)
Michael H. Rogers (*pro hac vice*)
Nicholas D. Manningham (*pro hac vice*)

**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, NY  10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: mcanty@labaton.com
        mrogers@labaton.com
        nmanningham@labaton.com

*Counsel for Lead Plaintiff and Lead Counsel
for the Class*

Lucas E. Gilmore (#250893)

**HAGENS BERMAN SOBOL SHAPIRO
LLP**
715 Hearst Avenue, Suite 300
Berkeley, California 94710
Telephone: (510) 725-3000
Fax: (510) 725-3001
Email: lucasg@hbsslaw.com

*Liaison Counsel for the Class*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| IN RE CUTERA, INC. SECURITES LITIGATION | **Case No.: 4:23-cv-02560-JST** |
| | **CLASS ACTION** |
| | **MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| | Date:      November 7, 2024 |
| | Time:      2:00 P.M. |
| | Location:  Courtroom 6 – Second Floor |
| | Judge:      Hon. Jon S. Tigar |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................................. ii

STATEMENT OF ISSUES TO BE DECIDED .......................................................................................... 1

I.     INTRODUCTION .......................................................................................................................... 1

II.    STATEMENT OF FACTS .............................................................................................................. 4

       A.     Company Background .................................................................................................... 4

       B.     Defendants Failed to Implement Adequate Internal Controls Over Inventory ........... 5

       C.     The Rushed Rollout of AviClear Harmed Cutera's Core Business and
              Exacerbated the Inventory Controls Problems .............................................................. 5

       D.     Investors Started to Learn the Truth About the Failed AviClear Rollout While
              Cutera Continued to Experience Inventory Control Problems ....................................... 6

       E.     Investors Learned the Truth When Cutera Restated Financial Statements Due
              to Material Weaknesses in Inventory Controls .............................................................. 7

III.   THE COMPLAINT STATES CLAIMS UNDER SECTION 10(b) ........................................................ 8

       A.     The Complaint Adequately Pleads Falsity ..................................................................... 8

              1.     Defendants' Financial Statements Were False ...................................................... 8

              2.     Defendants' SOX Certifications Were False and Misleading ................................ 9

              3.     Defendants' Statement About Designing Adequate Internal Controls
                     Was False and Misleading .................................................................................... 12

              4.     Defendants Misled Investors About the Success of AviClear ............................. 13

       B.     The Complaint Adequately Pleads Scienter ................................................................ 15

              1.     CW Allegations Support Scienter ......................................................................... 16

              2.     Defendants' Public Statements Support Scienter ............................................... 19

              3.     Defendants' Suspiciously Timed Departures Support Scienter .......................... 21

              4.     The AviClear Bonuses Support Scienter .............................................................. 23

              5.     Core Operations Allegations Support Scienter ................................................... 23

              6.     Viewing Allegations Holistically, Defendants' Innocent Inference
                     Fails ...................................................................................................................... 24

IV.    THE COMPLAINT STATES CLAIMS UNDER SECTION 20(A) ...................................................... 25

CONCLUSION .................................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alphabet, Inc. Sec. Litig.*,
 1 F.4th 687 (9th Cir. 2021)................................................................................................ 15

*In re Atossa Genetics, Inc. Sec. Litig.*,
 868 F.3d 784 (9th Cir. 2017)............................................................................................... 8

*Berson v. Applied Signal Tech., Inc.*,
 527 F.3d 982 (9th Cir. 2008)........................................................................................ 14, 19

*Bielousov v. GoPro, Inc.*,
 2017 WL 3168522 (N.D. Cal. 2017)................................................................................... 21

*In re BioMarin Pharm. Inc. Sec. Litig.*,
 2022 WL 164299 (N.D. Cal. 2022).................................................................................... 24

*Constr. Workers Pension Tr. Fun – Lake Cnty. v. Genoptix, Inc.*,
 2013 WL 12123841 (S.D. Cal. 2013) ................................................................................ 17

*Cullen v. RYVYL Inc.*,
 2024 WL 898206 (S.D. Cal. 2024) ...................................................................................... 9

*Curry v. Hansen Med., Inc.*,
 2012 WL 3242447 (N.D. Cal. 2012).................................................................................. 25

*In re Cylink Sec. Litig.*,
 178 F. Supp. 2d 1077 (N.D. Cal. 2001) ............................................................................... 9

*In re: Enzymotec Sec. Litig.*,
 2015 WL 8784065 (D.N.J. 2015)....................................................................................... 12

*Evanston Police Pension Fund v. McKesson Corp.*,
 411 F. Supp. 3d 580 (N.D. Cal. 2019) .......................................................................... 23, 25

*In re Gilead Scis. Sec. Litig.*,
 536 F.3d 1049 (9th Cir. 2008)............................................................................................. 8

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
 63 F.4th 747 (9th Cir. 2023)............................................................................................. 16

*Glazer Cap. Mgmt., LP v. Magistri*,
 549 F.3d 736 (9th Cir. 2008)........................................................................................ 18, 20

*Hatamian v. Advanced Micro Devices, Inc.*,
 87 F. Supp. 3d 1149 (N.D. Cal. 2015) ............................................................................... 17

*Howard v. Everex Sys., Inc.*,
 228 F.3d 1057 (9th Cir. 2000)........................................................................................... 10

*Huang v. Higgins*,
 2019 WL 1245136 (N.D. Cal. 2019).................................................................................. 23

*Jaeger v. Zillow Grp., Inc.*,
    644 F. Supp. 3d 857 (W.D. Wash. 2022)...............................................................................15

*Kovtun v. VIVUS, Inc.*,
    2012 WL 4477647 (N.D. Cal. 2012).....................................................................................23

*Limantour v. Cray Inc.*,
    432 F. Supp. 2d 1129 (W.D. Wash. 2006)..............................................................................9

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016)..........................................................................................8, 19

*M & M Hart Living Tr. v. Glob. Eagle Ent. Inc.*,
    2017 WL 5635424 (C.D. Cal. 2017).....................................................................................10

*In re McKesson HBOC, Inc. Sec. Litig.*,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000) ................................................................................18

*Middlesex Ret. Sys. v. Quest Software, Inc.*,
    527 F. Supp. 2d 1164 (C.D. Cal. 2007)................................................................................20

*Middlesex Ret. Sys. v. Quest Software, Inc.*,
    2008 WL 7084629 (C.D. Cal. 2008).....................................................................................10

*Mulderrig v. Amyris, Inc.*,
    492 F. Supp. 3d 999 (N.D. Cal. 2020) ..................................................................................11

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003)...........................................................................................8, 23

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
    780 F. App'x 480 (9th Cir. 2019)..........................................................................................19

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014)...............................................................................................24

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014)...........................................................................................19, 24

*Robb v. Fitbit Inc.*,
    2017 WL 219673 (N.D. Cal. 2017)........................................................................................19

*Roberti v. OSI Systems, Inc.*,
    2015 WL 1985562 (C.D. Cal. 2015)......................................................................................19

*Roberts v. Zuora, Inc.*,
    2020 WL 2042244 (N.D. Cal. 2020) ...............................................................................18, 19

*S. Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008)......................................................................................15, 22, 24

*Schueneman v. Arena Pharm., Inc.*,
    840 F.3d 698 (9th Cir. 2016)...........................................................................................14, 15

*Shenwick v. Twitter, Inc.*,
    282 F. Supp. 3d 1115 (N.D. Cal. 2017) ............................................................................................... 22

*Siracusano v. Matrixx Initiatives, Inc.*,
    585 F.3d 1167 (9th Cir. 2009) ................................................................................................. 13

*In re STEC Inc. Sec. Litig.*,
    2011 WL 2669217 (C.D. Cal. 2011) ......................................................................................... 15

*Tellabs Inc. v. Makor Issuers & Rights, Ltd.*,
    551 U.S. 308 (2007) ............................................................................................ 8, 15, 23, 24

*Thomas v. Magnachip Semiconductor Corp.*,
    167 F. Supp. 3d 1029 (N.D. Cal. 2016) .............................................................................. 20, 21

*In re Toronto-Dominion Bank Sec. Litig.*,
    2018 WL 6381882 (D.N.J. 2018) ........................................................................................ 10, 11

*In re UTStarcom, Inc. Sec. Litig.*,
    617 F. Supp. 2d 964 (N.D. Cal. 2009) ...................................................................................... 21

*In re VeriFone Holdings, Inc. Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012) ...................................................................................................... 8

*Wanca v. Super Micro Computer, Inc.*,
    2018 WL 3145649 (N.D. Cal. 2018) .......................................................................................... 12

*Warshaw v. Xoma Corp.*,
    74 F.3d 955 (9th Cir. 1996) ........................................................................................................ 8

*Weston v. DocuSign, Inc.*,
    669 F. Supp. 3d 849 (N.D. Cal. 2023) ...................................................................................... 17

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) .................................................................................................. 14

*ZuccoPartners v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ................................................................................. 18, 21, 22, 23

**Statutes**

Sarbanes-Oxley Act ......................................................................................................................... 3, 10

Securities Exchange Act of 1934 ......................................................................................................... 3
    Securtities Exchange Act Section 10(b) ........................................................................... 1, 8, 25
    Securtities Exchange Act Section 20(a) ................................................................................ 1, 25

**Rules and Regulations**

SEC Rule 10b-5 ................................................................................................................................ 3, 8

Lead Plaintiff New England Teamsters Pension Fund ("Lead Plaintiff"), respectfully submits this Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 72).[1]

<b>STATEMENT OF ISSUES TO BE DECIDED</b>

Does Lead Plaintiff adequately allege claims under §§ 10(b) and 20(a) of the Exchange Act?

## I.   INTRODUCTION

This Action arises from Defendants' fraudulent statements that hid from investors major problems that would eventually cause Cutera's near total collapse. As everything was falling apart behind closed doors, Defendants publicly touted the strength of the Company's business and concealed significant problems facing the Company for as long as possible. By the time the truth was fully revealed, Cutera's stock price had declined ***94 percent*** from the first day of the Class Period, causing shareholders massive losses from Defendants' fraud.

Throughout the Class Period, Defendants failed to monitor and maintain adequate internal controls over inventory. Specifically, directly before the Class Period, Defendants implemented a formal enterprise resource planning ("ERP") system to automate its inventory management. However, this "upgrade" to an ERP system exacerbated the Company's existing problems. ¶¶86-88. For example, the ERP system was not properly utilized, and there was a mismatch between the amount of inventory the ERP system displayed and the actual amount at Cutera's facility. ¶¶86, 89. This mismatch became so severe, it caused a one-month shutdown of the Company's factory in January 2023. ¶136. Despite these problems, Defendants nonetheless certified to investors that Cutera had effective internal and disclosure controls and that the Company's financial statements were accurate. ¶¶287-88, 302-03. But unbeknownst to investors, the financial statements were not accurate, as Defendants' lack of control over its inventory had ***caused*** the Company to materially overstate its financial metrics, necessitating a restatement of the Company's financial statements for multiple quarters. ¶¶391, 397.

---

[1] Capitalized terms herein have the same meaning as set forth in the Amended Complaint for Violations of the Federal Securities Laws (ECF No. 59) ("Complaint"). Citations to "¶ __" refer to paragraphs of the Complaint. References to "MTD" and "Motion" are to Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint (ECF No. 72).

All the while, Defendants simultaneously rushed and failed to properly roll out Cutera's new acne-treating laser device, AviClear. Although the AviClear rollout was a complete disaster, Defendants publicly stated the opposite, calling it a success and touting the purportedly strong demand they were seeing from physicians and patients alike. ¶¶223, 229, 236, 240, 244, 248, 254, 256. In reality, though, demand was not strong. Although Defendants were able to place AviClear devices using the Company's new leasing model (which differed from Cutera's traditional business model), customers were largely dissatisfied with the product and did not use it, thereby failing to generate any revenue for the Company. ¶¶68, 106. Indeed, customers often accepted the AviClear device only because Cutera's sales teams gave it to them for free. ¶108. As a result, AviClear had poor utilization rates and high rates of failure, which caused many offices to return the devices to Cutera. ¶¶110-11. And because Defendants failed to maintain adequate internal controls over inventory, these returns were double counted in the Company's ERP system, which further exacerbated the Company's inventory problems. ¶112.

The truth regarding the failed AviClear rollout and the Company's internal controls emerged over the course of a series of corrective disclosures and/or materialization of the concealed risk events. ¶27. But despite the truth partially leaking out, the Company's stock price remained inflated after each disclosure because Defendants continued reassuring investors that the AviClear rollout was a success and that there were no problems with Cutera's internal controls. ¶28. After Cutera announced that it was restating its financial statements for the first and second quarters of 2023 due to "a significant issue with how the company has been managing inventory" (the "Restatement"), the full truth was revealed on March 21, 2024, when Company announced poor financial results and finally disclosed that its failure to maintain internal controls over inventory had caused an excessive level of inventory that caused the Restatement and directly linked its inventory problems, in part, to the failed AviClear rollout. ¶¶28, 196, 287.

In their Motion, Defendants try to portray this case as simply one of corporate mismanagement and argue investors "assume[d] the risk" of Cutera's failing business. However, investors are not required to assume the risk that Defendants would issue false financial statements and hide from investors the true state of the business. Indeed, when issuing their false statements, Defendants

showed a total disregard of their duties to investors as mandated by the Sarbanes-Oxley Act, which was meant to enhance the accountability of corporate executives like Defendants and make them more responsible for the accuracy and reliability of financial statements. Defendants flouted these obligations and falsely *certified* in mandated, public statements that the Company's financial statements were accurate and that Cutera had adequate internal controls when it did not.

Defendants' challenges to falsity in their Motion are unsuccessful. Defendants admit they falsely reported financial metrics in the Company's quarterly reports, yet still argue their statements certifying the accuracy of those same false financial statements are not actionably false or misleading because they purportedly did not know their certifications were false. Defendants are wrong. The federal securities laws do not protect corporate executives who are asleep at the wheel. In fact, the opposite is true. The federal securities laws—including the Sarbanes-Oxley Act—are designed to enhance an executive's accountability and hold them responsible for the accuracy of a company's public disclosures. Thus, Defendants' false certifications—which certified the accuracy of false financial statements and failed to disclose known internal control weakness—are actionably false and misleading.

Similarly, Defendants' argument that they did not mislead investors about the purportedly successful launch of AviClear is wrong. The Securities Exchange Act of 1934 and SEC Rule 10b-5 are designed to ensure that investors have access to material information necessary to make an informed investment decision. Here, Defendants robbed investors of that by falsely touting the AviClear rollout as a success and telling investors that Cutera had seen strong demand from both patients and doctors. Based on these statements, investors wrongly believed that the AviClear rollout was successful and driving additional revenue for Cutera. In reality, though, the AviClear rollout was a disaster that took away critical resources from Cutera's core business and led to the Company's poor financial performance.

Defendants' challenges to scienter are equally unavailing. Defendants attack the Complaint's scienter allegations individually, arguing each allegation is insufficient by itself to allege scienter. However, when considered holistically, as the Court must, these allegations demonstrate that Defendants knew or were deliberately reckless in not knowing of Cutera's non-existent internal

controls over inventory and the failed AviClear rollout. For example, the Complaint contains corroborative accounts from several former Cutera employees ("CWs") that establish scienter. With respect to the internal control problems, four different CWs each independently described the inadequate or non-existent inventory controls at Cutera throughout the Class Period. ¶¶85-91, 96-99, 164-65. Indeed, CW1—who was employed in an executive leadership position—brought up the inventory problems directly to Defendant Mowry. ¶¶99, 114. With respect to the failed AviClear rollout, five CWs tell a cohesive narrative about Defendants' complete failure to rollout AviClear and explain how it was obvious to everyone within the Company that the AviClear launch was not successful. ¶¶106-21.

Importantly, these CW allegations are corroborated by several other facts establishing scienter. *First*, the inventory control problems—which the CWs allege were present at the start of the Class Period—were so severe they caused a four-week shutdown of the Company's factory in January 2023. ¶¶163-64. *Second*, Defendants later admitted that the poor AviClear performance and inventory control problems were "self-inflicted and can be attributed to suboptimal leadership direction." ¶161. *Third*, the abrupt departures of Defendants Plants, Mowry, and Seth support an inference of scienter because they show these Defendants were directly responsible for the botched AviClear rollout and the inventory controls failure. Indeed, the Company admitted that Defendant Mowry was fired for cause because he "had not effectively executed the limited commercial rollout of our Aviclear solution in the Fall of 2022." ¶156. *Fourth*, the Company's Restatement, which covered two quarters' worth of false financial reporting, adds to the inference of scienter because it was directly caused by Cutera's inadequate internal controls over inventory, which were prominent throughout the Class Period (since, for example, it caused a four-week shutdown of the Company's factory).

Because the Complaint adequately alleges both falsity and scienter, Defendants' Motion should be denied in its entirety.

## II.   STATEMENT OF FACTS

### A.   Company Background

Cutera is a global provider of aesthetic and dermatology solutions for medical practitioners worldwide. ¶63. During the Class Period, Defendants launched its new product, AviClear, and

embarked on an all-hands-on-deck initiative to place AviClear into as many offices as possible, no matter the cost. ¶67. Cutera developed a new leasing model (which differed from Cutera's other businesses), in part, to compete with a similar product called *Accure*, which was coming to market around the same time as AviClear. ¶68. Under this new leasing model, Core Capital salespeople gave the device away for free as an add-on, or bundled into the purchase of other capital equipment at no extra cost, and the customers would pay Cutera only the 50% of the treatment fee. ¶109.

### B.    Defendants Failed to Implement Adequate Internal Controls Over Inventory

Since the beginning of the Class Period, Cutera had no control over its information technology general controls ("ITGC") or inventory controls. In January and February of 2022, Defendants attempted to implement a formal enterprise resource planning ("ERP") software for the first time. ¶81.[2] In early 2022, Cutera changed to a formal software—SAP and Salesforce—to maintain and track its inventory. ¶86. However, this upgrade to a new ERP system exacerbated the problems plaguing Cutera's IT infrastructure related to the Company's internal controls over inventory. ¶83. Specifically, Defendants did not invest enough into the ERP and did not train employees on how to use the new systems until months after the implementation, both of which caused problems with how the Company maintained inventory. ¶¶85-87. As a result, around the second or third quarter of 2022, Cutera had problems with tracking inventory, causing a mismatch between the amount of inventory shown on the ERP system and actual physical inventory. ¶¶88-90.

### C.    The Rushed Rollout of AviClear Harmed Cutera's Core Business and Exacerbated the Inventory Controls Problems

While business operations crumbled and logistical difficulties born out of material weaknesses in Cutera's internal controls proliferated, Defendants publicly touted the rollout of Cutera's new product, AviClear. ¶18. In trying to achieve ostensibly performance-related equity grants related to the rollout of AviClear, Defendants (particularly Plants) rushed to place AviClear devices in as many offices as possible using the new lease-based model. ¶¶106-07. Defendants Plants and Mowry directed the sales teams to move away from the Company's Core Capital segment—which made up

---

[2] Generally speaking, an ERP system helps a company manage each of its business operations from a single platform, which includes managing all aspects of the company's inventory in real time, including costs, orders, products and materials in stock, and supplier information. *Id.*

more than 90% of the Company's revenue—and focus only on AviClear, which took critical resources away from Core Capital. ¶¶119, 121, 448.

Throughout the Class Period, Defendants touted the successful launch of AviClear and claimed they had already seen significant demand from both patients and physicians. *See, e.g.*, ¶¶223-24, 229, 230, 236, 240, 244, 254, 256. However, everyone within the Company knew that AviClear was struggling, and that the rollout was a failure. ¶114. Although Defendants' new sales-model may have made it look like AviClear's sales were strong, in reality, Cutera was not seeing much revenue from these placements. ¶¶108-09. Further, due to the lack of proper testing, the AviClear devices experienced higher than normal failure rates. ¶110. As a result, customers refused to buy or use AviClear and even returned some of the devices. ¶111. Without a functional ERP system, Cutera double counted many of those returns, which exacerbated the inventory problem. ¶112.

### D.   Investors Started to Learn the Truth About the Failed AviClear Rollout While Cutera Continued to Experience Inventory Control Problems

On January 9, 2023, Cutera disclosed disappointing preliminary financial results for 2022. ¶132. Specifically, Defendants admitted that Cutera "took its eye off the ball on the core business as it was pushing aggressively in [AviClear]." ¶¶316, 320. In response, Cutera's stock price fell more than 23%. ¶321. Still, Cutera's shares remained artificially inflated because, while touting the Company's success, Defendants continued hiding from investors the failed AviClear rollout, Core Capital's lack of resources, and the internal control failures. ¶¶323-24.

At the same time, material weaknesses in Cutera's ITGC and inventory controls ultimately caused a four-week shutdown of Cutera's warehouse in January 2023 due to an extended inventory audit stemming from inventory count inaccuracies, which was not only concealed at the time, but also further harmed Cutera's business. ¶17. As a result, Cutera stopped shipping everything to customers. ¶96. Immediately after, on February 28, 2023, Defendants announced that the Company had "**material weaknesses in its internal control over . . . ineffective inventory count controls**" and announced that it would delay filing its Form 10-K. ¶137.

Notwithstanding Cutera's disclosure of a material weakness in inventory controls, Defendants continued to falsely assure investors that the Company had adequate controls over its financial

reporting. For example, on April 7, 2023, Defendants Mowry and Seth signed SOX Certifications in the 2022 Form 10-K, falsely certifying the effectiveness of Cutera's internal controls. ¶¶263-66. Then, in May and August 2023, Defendants signed SOX Certifications that falsely certified the effectiveness of Cutera's internal controls and the accuracy of the financial statements in the Company's quarterly reports for the first and second quarters of 2023. ¶¶283-88, 298-302.

The truth continued slowly leaking out as Defendants continued misleading investors about the adequacy of Cutera's internal controls. For example, on April 12, 2023, Cutera announced that the Board of Directors terminated Defendants Mowry and Plants "with cause" ¶334. In response, Cutera's stock price fell more than 28%. ¶339. Then, on May 9, 2023, Cutera disclosed Defendant Seth's resignation, poor AviClear performance for the first quarter of 2023, and the plant shutdown. ¶¶343-47. In response, Cutera's shares dropped more than 30% in total. ¶352. On August 8, 2023, Cutera disclosed that it was experiencing reliability problems and poor AviClear utilization trends. ¶356. In response, the stock fell 22.52%. ¶367. Still, Defendants continued to conceal the full extent of the inventory control problems. ¶¶298-369.

### E. Investors Learned the Truth When Cutera Restated Financial Statements Due to Material Weaknesses in Inventory Controls

On November 8, 2023, the Company announced that due to "a significant issue with how the company has been managing inventory during 2023," it would restate its financial statements for the first and second quarter of 2023. ¶¶371-80. On this news, Cutera's shares dropped approximately 42.55%. ¶384. However, the Company's stock price remained artificially inflated because the risk of additional material weakness had not materialized, and investors had not learned that the botched AviClear initiative was a large contributor to the inventory problems. ¶388. On March 5, 2024, Cutera finally issued the Restatement. ¶¶390-92. On March 21, 2024, investors learned the full scope of facts underlying Defendants' fraud. On that day, Cutera announced poor financial results for both AviClear and Core Capital and disclosed that its failure to maintain inventory controls had caused an excessive level of inventory. ¶404. On this news, Cutera's stock price dropped 30.43%. ¶413. The stock fell an additional 10.63% at the close the next trading day on March 25, 2024. *Id.*

## III.   THE COMPLAINT STATES CLAIMS UNDER SECTION 10(b)

In a motion to dismiss a § 10(b) action, courts must consider the complaint in its entirety and accept all the allegations as true. *Tellabs Inc. v. Makor Issuers & Rights, Ltd.,* 551 U.S. 308, 322 (2007). Courts should deny the motion to dismiss "unless it appears beyond a doubt that the plaintiff cannot prove any set of facts in support of the claim that would entitle him or her to relief." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 931 (9th Cir. 2003). Indeed, "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings[.]" *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

To a claim for securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5, the plaintiff must allege: "(1) a material misrepresentation or omission [i.e., falsity]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Atossa Genetics, Inc. Sec. Litig.*, 868 F.3d 784, 793 (9th Cir. 2017). Defendants only challenge the first two elements, falsity and scienter. As discussed below, the Complaint adequately alleges both of these elements, and the Court should deny the Motion.

### A.   The Complaint Adequately Pleads Falsity

A complaint alleges falsity when it "'specifi[es] each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading.'" *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). A statement is false and misleading if it gives investors the "impression of a state of affairs that differs in a material way from the one that actually exists." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016). On a motion to dismiss, a court should dismiss the complaint "only if reasonable minds could not disagree that the challenged statements were not misleading." *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996).

### 1.   Defendants' Financial Statements Were False

The financial figures in Cutera's quarterly results for the first and second quarters of 2023 (the "Quarterly Reports") were materially false. ¶¶281, 282, 296, 297. Defendants concede this fact (as they must given the Restatement). MTD at 6. During these quarters, Defendants overstated Cutera's

inventory, which caused many of the Company's financial metrics to be materially false. ¶¶391, 397. As a result, in the Quarterly Reports, Defendants falsely reported the Company's financial condition, which hid from investors the negative performance trends the Company was experiencing. ¶¶285, 300. Defendants corrected this material misstatement on March 5, 2024, when the Company restated several of its financial metrics, including its gross profits and gross margins. *Id.* This is sufficient to allege falsity, as "the mere fact that the statements were restated at all supports . . . an inference [of falsity]." *In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1084 (N.D. Cal. 2001). Moreover, since Defendants made these admittedly false statements with scienter, *see* Section IV(B), the Court must sustain the Complaint.

### 2. Defendants' SOX Certifications Were False and Misleading

Moreover, and in connection with the falsely stated financial results, Defendants' SOX Certifications from the Quarterly Reports were materially false and misleading. ¶¶287-88, 302-03.[3] When issuing the Quarterly Reports, Defendants Harris, Hopkins, and Drummond certified that the financial statements contained therein were accurate. *Id.* These Defendants also certified that Cutera had effective internal and disclosure controls over financial reporting, which assured the reliability of the Company's financial reporting. *Id.* However, as explained above, the Company's financial reporting was not accurate during these two quarters, and Cutera already had inadequate inventory count controls that directly caused the Company's financial reporting to be overstated. *See* ¶255.

These certifications, therefore, were materially false and misleading when made because, contrary to Defendants' statements, the Quarterly Reports did not "fairly present" the Company's financial condition. As explained above—and as Defendants admit—the financial statements in the Quarterly Reports were materially false. This is enough to allege falsity. *See, e.g.*, *Cullen v. RYVYL Inc.*, 2024 WL 898206, at *12-13 (S.D. Cal. 2024) (SOX certifications false and misleading when defendants later admitted material weakness in internal controls); *Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1158-60 (W.D. Wash. 2006) (SOX certifications "false or misleading based on the

---

[3] Defendants Hopkins and Drummond signed false SOX Certifications in connection with the First Quarter 2023 Quarterly Report, and Defendants Harris and Drummond signed false SOX Certifications in connection with the Second Quarter 2023 Quarterly Report.

[subsequent] disclosure . . . that there were material weaknesses in [the company's] internal controls and procedures").

Defendants argue they cannot be held liable for these false certifications because, according to them, they did not know their certifications were false at that time. MTD at 8-9. This argument is more properly addressed in connection with scienter. *See In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at \*10 (D.N.J. 2018). Even so, Defendants' argument is unpersuasive because it flies in the face of Defendants' obligations under the Sarbanes-Oxley Act. The Act, which Congress passed in 2002 in response to several corporate fraud scandals, was meant to rebuild confidence in the public securities markets by improving the accuracy and reliability of financial reporting and other corporate disclosures.

As such, corporate executives are now required to sign certain SEC filings and certify that the financial statements are accurate and that no material weaknesses exist that could undermine the accuracy of such reporting. ¶¶70-79. These SOX Certifications give investors confidence that the Company's executives are presenting an accurate picture of the Company's operations. For these reasons, other courts have rejected similar arguments that Defendants make here about their supposed lack of knowledge as to the falsity of their certifications. As courts have noted, the executive's "signature is meaningless if [he or she] can avoid responsibility by saying that he [or she] signed without actually verifying anything." *Middlesex Ret. Sys. v. Quest Software, Inc.*, 2008 WL 7084629, at \*11 (C.D. Cal. 2008); *see also Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 (9th Cir. 2000) (officer's signature in SEC filings "will be rendered meaningless unless the officer believes that the statements in the documents are true").

Importantly, rather than pled fraud by hindsight, the Complaint adequately alleges that the weaknesses in inventory controls were present ***before*** Defendants falsely certified their financial statements in the Quarterly Reports.[4] Specifically, by the time Defendants signed their SOX Certifications, Cutera had already experienced an extended plant shutdown of Cutera's warehouse

---

[4] For this reason, Defendants' reliance on *M & M Hart Living Tr. v. Glob. Eagle Ent. Inc.*, 2017 WL 5635424 (C.D. Cal. 2017) is misplaced. There, the court noted that "it is unclear whether the weaknesses arose before the . . . certifications were made." *Id.* at \*9. Here, the Complaint alleges weaknesses in internal controls over inventory before the false certifications in May and August 2023.

due to inventory count inaccuracies, which was directly linked to the inconsistencies between Cutera's physical inventory and the faulty ERP system. ¶164. Indeed, CW8 explained that inventory problems started in approximately the second or third quarter of 2022. ¶90. CW8 explained that the amount of inventory that the ERP systems displayed never matched the actual physical inventory at Cutera's facility because the process to identify which parts were used or needed was not clearly defined in the system (so, for example, parts used by engineers would still appear in the system as available, when they were not). ¶86. Such a mismatch led to the inaccurate accounting of such inventory (and related financial metrics) on Cutera's financial statements. ¶89.

For these reasons, Defendants' certifications contained in Cutera's 2022 Annual Report were also false and misleading. ¶¶264-65. On April 7, 2023, Cutera filed its Annual Report, and Defendants Mowry and Seth stated they had "*[e]valuated the effectiveness of the [Company's] disclosure controls*" and certified that the Annual Report "*does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading*." ¶264. These statements were false and misleading because Cutera did not have "effective" disclosure controls at that time. Indeed, by then, Cutera already identified a material weakness in the Company's inventory controls that caused Cutera to overstate its financial position. *See, e.g.*, ¶137. Indeed, Defendants later admitted that "this variance" between physical inventory and the ERP system "began to accumulate prior to the third quarter [2023]," ¶372, which corroborates the CW allegations that the Company had problems managing its inventory throughout 2022 and into 2023. ¶220.

Defendants argue the April 7, 2023 certifications were not false because the 2022 Annual Report did not contain any falsely reported financial statements. MTD at 9. This argument misses the mark, as there is no requirement that the report must contain false financial statements. Rather, "SOX certifications are typically actionable when either the financial figures are inaccurate *or when there is an allegation that the internal controls within a company were deficient*." *In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at *10 (D.N.J. 2018) (emphasis added). Here, Defendants knew (or recklessly disregarded) that Cutera had inadequate inventory controls, which made their SOX Certifications misleading. *See Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1024 (N.D. Cal. 2020) (holding that a SOX certification "attesting to the accuracy of the reports, the

disclosure of any weakness or change in the company's internal controls over financial reporting" was false or misleading where in fact the internal controls were deteriorating).

Defendants' reliance on *Wanca v. Super Micro Computer, Inc.*, 2018 WL 3145649 (N.D. Cal. 2018) is distinguishable. Unlike here, the *Wanca* case did not involve a restatement. Moreover, in *Wanca*, the plaintiff did not allege any facts demonstrating why the SOX Certifications were false. *Id.* at 6. For example, the court noted that all of the CW statements there related to "other topics." *Id.* Here, on the other hand, the Complaint explains that the SOX Certifications were false because Cutera had inadequate internal controls over its inventory, which caused the Company to overstate several of its financial metrics, and the CW allegations demonstrate that these inventory problems were widespread and known by Defendants. Therefore, Defendants' SOX Certifications are actionable. *See In re: Enzymotec Sec. Litig.*, 2015 WL 8784065, at *16 (D.N.J. 2015) ("Given the early stage of the litigation and the requirement that it must give all inferences in favor of the plaintiff, the Court finds that Lead Plaintiffs have adequately pled that Defendants . . . each falsely certified that [the Company] maintained effective internal controls over financial reporting").

### 3. Defendants' Statement About Designing Adequate Internal Controls Was False and Misleading

Defendants' statement on March 1, 2022 that it was "***designing and implementing effective internal control measures to improve its internal controls over financial reporting and remediate this material weakness***"—i.e., the material weakness related to ineffective information technology general controls—was similarly materially false and misleading because, at that time, Defendants had not designed or implemented effective internal control measures. ¶¶219-20.

Although Defendants attempted to remediate the weakness by upgrading to a former ERP system, they did nothing to ensure the effectiveness of that system. For example, CW6 and CW8 both stated that Cutera did not invest enough money in the new ERP systems to make them work effectively. ¶85. To make matters worse, Cutera employees were not formally trained on the new systems until months after their implementation—meaning that even if the systems had worked properly (which they did not), the systems would still be ineffective since the workers were not trained

on them. ¶87. Nor was there any oversight of these new systems when they were first implemented, which contravenes Defendants' obligations to monitor its inventory controls. ¶88.

Therefore, Defendants' reassurance that they had implemented effective internal controls to improve its controls over financial reporting was materially false and misleading because once Defendants chose to "'tout'" Cutera's internal controls, there were "bound to do so in a manner that wouldn't mislead investors . . . ." *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009). Defendants' statements made it seem like Defendants were implementing effective controls, when in reality, they had not.

### 4.      Defendants Misled Investors About the Success of AviClear

Defendants' failure to control, monitor, and maintain inventory was largely related to problems associated with a disastrous rollout of Cutera's new product, AviClear. In early 2022, Defendants rushed to rollout AviClear to maximize their personal compensation. ¶¶101-10. In trying to achieve this ostensibly performance-related equity, Defendants (particularly, Plants) chose to adopt a new lease-based model to get AviClear devices into customers' offices as quickly as possible. ¶106. However, although this strategy put devices in customers' offices, the Company was not seeing much revenue from these placements. ¶108. Moreover, because Defendants rushed AviClear to market, several problems arose with the device which manifested into poor sales and utilization rates. ¶110-11. Worse, some offices tried to send back the AviClear device. ¶111. And since Cutera did not have a properly functioning ERP system, Curta would double-count many of those returns, which further contributed to the Company's inventory problems that led to the Restatement. ¶112.

Despite these problems, Defendants touted the purported success of the AviClear rollout and the demand they were seeing for it. Throughout the Class Period, Defendants repeatedly touted the purportedly "***successful launch of AviClear***" and stated they were seeing "***strong***," "***broadening***," and "***widespread***" demand from both patients and physicians. ¶¶223, 229, 236, 240, 244, 248, 254, 256. Similarly, Defendants asserted that "***the physician feedback has been phenomenal***" (¶244) and claimed the purportedly strong demand they were seeing "***validate[d] successful clinical outcomes in the hands of our customers***." ¶236. Such statements were false and misleading because they gave investors an "impression of a state of affairs that differ[ed] in a material way from the one that actually

exist[ed]." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). Specifically, Defendants' misstatements led investors to believe that the AviClear launch was an overwhelming success when, in reality, it was a failure that took resources away from and harmed the Company's Core Capital business segment, which, up to that point, had generated steady and reliable revenue.

Defendants' statements were misleading for the additional reason that, while Defendants touted the purportedly successful AviClear launch, they failed to disclose material information that cut against their positive statements. Under Ninth Circuit law, even absent a duty to speak, "once defendants choose to tout positive information," such as the launch of a new product, they must "do so in a manner that wouldn't mislead investors." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016). Here, Defendants repeatedly touted the AviClear launch without disclosing that Cutera had already experienced major quality, reliability, and order fulfillment problems affecting AviClear and non-AviClear devices. ¶226. Moreover, Defendants did not disclose that: (i) many customers did not use the devices (i.e., poor utilization rates) and indeed tried to return them (¶¶111-18); (ii) the AviClear product had a high failure rate (¶110); and (iii) many customers accepted the AviClear device only because the Company's sales teams gave the device for free (¶233).

Defendants spill much ink arguing that Defendants' statements are not actionable because they were "consistent with Cutera's disclosed business strategy to focus *first* on placing AviClear devices through year-end-2022, *then* pivot to utilization." MTD at 10. This is a red herring. It does not matter whether Defendants were focusing on utilization. What matters is Defendants publicly touted customers' ***use*** of AviClear. *See, e.g.*, ¶223 ("***broadening customer acceptance***"); ¶236 ("***we were able to . . . verify patient satisfaction with AviClear***"); ¶248 ("***AviClear has seen widespread interest from physicians and patients***")' ¶250 ("***people are really doing exceptionally well with the AviClear device and the AviClear procedure***"); ¶256 ("***strong underlying interest in AviClear quickly converted into customer demand***"). Because Defendants chose to tout AviClear's launch and the demand they had already seen, they were required to do so in a manner that would not mislead investors. They did not.[5]

---

[5] For this reason, Defendants' citation to *Wochos v. Tesla, Inc.*, 985 F.3d 1180 (9th Cir. 2021) is misplaced. There, the plaintiff challenged forward-looking statements about Tesla's progress towards

Footnote continued on next page

Indeed, based on Defendants' false and misleading statements, investors wrongly believed that the AviClear rollout was a success and driving additional revenue for the Company. For example, on August 4, 2022, Piper Sandler noted that, "in our view . . . the AviClear rollout is going well" which led them to "**believe AviClear could deliver $20M in sales during '23 and even more**" and "[w]ith the traditional business continuing to perform well and a major revenue catalyst in AviClear, there is a lot to like about the name." ¶234. Similarly, on August 5, 2022, Maxim Group reiterated its buy rating on Cutera's stock "based on . . . building momentum from the [] launch of AviClear," (¶239), and on November 3, 2022, Piper Sandler wrote "we believe the performance of AviClear will . . . push shares higher." ¶247. The commentary from these analysts supports the falsity of Defendants' statements, as "the perceptions of analysts are an acceptable measure of what reasonable investors would have understood." *Jaeger v. Zillow Grp., Inc.*, 644 F. Supp. 3d 857, 872 (W.D. Wash. 2022); *In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at *8 (C.D. Cal. 2011) ("statements made by analysts underscore the plausibility and reasonableness of the false impression that [p]laintiffs allege [d]efendants' statements conveyed").

## B.    The Complaint Adequately Pleads Scienter

Scienter is "a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Schueneman*, 840 F.3d at 706. Deliberate recklessness is "an extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 701 (9th Cir. 2021) (emphasis in original). The test is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 322-23. Under this "holistic" approach, courts "consider the totality of circumstances" and "need not close their eyes to circumstances that are probative of scienter." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).

---

its production goal for producing a certain number of cars. Here, on the other hand, Defendants touted the successful launch of AviClear and the demand they had already seen or were presently seeing. Thus, Defendants' statements were not forward-looking aspirational statements like in the *Tesla* case.

### 1.    CW Allegations Support Scienter

The CW allegations demonstrate the Individual Defendants knew, or were deliberately reckless in not knowing, that the Company had inadequate internal controls over inventory.[6] For instance, CW1 ***personally*** raised Cutera's inventory and supply chain problems to Defendant Mowry in or around January 2023. ¶¶99, 114. According to CW1, many other high-ranking employees also raised concerns to Mowry about these problems, including incorrect inventory estimates. ¶¶97-99. CW1 added that after Defendant Hopkins became Interim-CEO, she did not correct the supply chain problems, but rather, gave the Company's VP of Operations and Supply Chain, Srinivas Pinapati, a retainer bonus to stay on despite the fact that Pinapati knew of and was largely responsible for the inventory problems. ¶¶94, 99, 159, 417.

Likewise, the CW allegations demonstrate the Individual Defendants knew, or were deliberately reckless in not knowing, of AviClear's botched rollout and failed sales strategy that took resources from Core Capital and caused AviClear's financial debacle. For instance, CW1 confirmed that the directive to move away from Cutera's core business to focus on AviClear came directly from Defendants Mowry and Plants. ¶121. After AviClear launched, CW5 participated in weekly meetings with Defendant Mowry and others to discuss AviClear's performance, including placement of the devices, utilization rates, and revenues for the product. ¶115. According to CW1, management was concerned that AviClear was not meeting projections by the end of the second quarter 2022. ¶113. Moreover, many people brought up AviClear's poor performance to Defendant Mowry. For example, CW1 ***personally*** raised concerns to Mowry in the first quarter of 2023. ¶114. Similarly, CW1 explained that Cutera's Chief Technology Officer raised AviClear's poor performance to Mowry in the first quarter of 2023. ¶114. Further, according to CW8, some customers sent complaints to Defendant Mowry directly, which he referred to as simply "noise." ¶114.

These CW allegations are corroborative and tell a plausible and coherent narrative. *See Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 772 (9th Cir. 2023) (crediting allegations

---

[6] Contrary to Defendants' argument (*see* MTD at 20) and as demonstrated below, the Complaint does not rely on group pleading because the scienter allegations tie the Individual Defendants to their knowledge of, or deliberate recklessness as to not knowing, the Company's complete lack of inventory controls and failed AviClear rollout.

where there was "consistency between the [CW's] statements" and where CWs told "a reasonably plausible story about [the company's] state of affairs"); *see also Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 882 (N.D. Cal. 2023) (CWs "corroborating allegations [] support their reliability and personal knowledge"). Specifically, CWs 1, 5, 6, 8 each independently described the inadequate or non-existent inventory controls at Cutera in 2022 and into 2023. ¶¶85-91, 96-99, 164-65. Indeed, these persistent inventory control failures caused the month-long plant shutdown in January 2023. *Id.* Moreover, the CW accounts are consistent with Defendants' admission that "this variance [between physical inventory and the ERP system] began to accumulate prior to the third quarter [of 2023]" (¶372).[7] *See Constr. Workers Pension Tr. Fun – Lake Cnty. v. Genoptix, Inc.*, 2013 WL 12123841, at *6 (S.D. Cal. 2013) (crediting CW allegations when CW and defendants' post-class period admission described the same event).

Likewise, CWs 1, 2, 3, 4, and 8 tell a cohesive narrative about the botched AviClear rollout, which further exacerbated Cutera's inventory and internal control problems. ¶¶106-21. Specifically, although Defendants created the false appearance of demand by giving away devices, AviClear was not generating much revenue from those devices because of low utilization, and customers were returning the devices due to their high failure rate. *Id.* According to CW2, Cutera was falling short of its revenue forecasts, which was brought up to management during meetings. ¶116. These allegations are consistent with Defendants' later admissions that "Mowry had not effectively executed the limited commercial rollout of our Aviclear solution in the Fall of 2022." ¶156; *see Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1160 (N.D. Cal. 2015) ("later admissions also make plausible plaintiffs' allegations that statements touting strong [a product's] supply . . . were false when made").

Defendants make several unpersuasive attempts to convince the Court to disregard the CW allegations. For example, Defendants argue the CW allegations are unreliable because they are "vague

---

[7] Defendants' argument that the CW allegations have nothing to do with the Restatement is meritless. *See* MTD at 18. As discussed herein, the CW allegations demonstrate that Cutera's lack of internal controls over inventory—including the fact that there was a mismatch between the physical inventory and what the ERP systems show as early as the second quarter of 2022 (¶¶89-91)—ultimately caused the Company to materially overstate its inventory in the Quarterly Reports, which directly led to the Restatement.

and [] conclusory." MTD at 18-20. In so arguing, Defendants isolate each CW allegation and try to impose a much higher pleading standard. For instance, Defendants argue the Court should ignore the CW allegations because they do not include the exact time or place of meetings, the exact words that were used in those meetings, or the exact number of "customers [that] tried to return the AviClear devices." *See* MTD at 19-20. Despite Defendants' best efforts, however, Lead Plaintiff is not required to plead "admissible evidence" at this early stage. *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000); *see also Zucco Partners v. Digimarc Corp.*, 552 F.3d 981, 997 n.4 (9th Cir. 2009) (rejecting "any standard which would 'transpose to the pleading stage the test that is used at the summary judgment and judgment-as-a-matter-of-law stages'"). Rather, the Complaint simply must "plead facts[.]" *McKesson HBOC*, 126 F. Supp. 2d at 1272. The Complaint meets that requirement.[8]

Similarly, Defendants argue that the Court should reject the CW allegations because the CWs were not employed at Cutera for the ***entire*** Class Period. MTD at 16. Again, Defendants are imposing a higher standard than what is required—there is no requirement that the CW must have been employed for the entire Class Period. *See Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *11 (N.D. Cal. 2020) (even if "none of the CWs was employed . . . during the entire Class Period does not in itself render their statements unreliable as a matter of law"). Here, the CWs were employed during the Class Period, and thus were in a position to know what was happening at Cutera during that time, which is particularly relevant to falsity and scienter for statements made in 2022 and early to mid-2023. *See* ¶¶85-91, 96-99, 164-65.

Finally, Defendants argue that CW1's allegations are inherently unreliable because she does not have "personal knowledge of Mr. Mowry's mental state," and her allegations are based on

---

[8] Defendants' citation to *Glazer Cap. Mgmt., LP v. Magistri* is distinguishable. 549 F.3d 736, 746 (9th Cir. 2008); *see* MTD at 20. There, the court found that the defendants were unlikely to be aware of illegal, secret payments by sale agents operating in foreign regions. *Magistri*, 549 F.3d at 746-47. In contrast, as discussed herein, the inventory and AviClear problems were widespread and known by the Individual Defendants.

"hearsay and double-hearsay."[9] MTD at 17. However, Defendants ignore that CW1 ***personally*** raised the supply chain, inventory controls, and AviClear problems to Defendant Mowry. ¶¶99, 114. Moreover, CW1 worked in an executive leadership role at Cutera and worked on the AviClear program. Given this, Defendants' "quibbl[ing] that these witnesses weren't in a position to see the [information] first-hand" fails. *Berson*, 527 F.3d at 985. Even if CW1's other allegations—detailing how other high-level employees raised the supply chain and inventory problems to Mowry—are considered hearsay, the Court may still consider them, as there is no per se bar to hearsay allegations at the pleading stage. *See Lloyd*, 811 F.3d at 1208 (crediting CW hearsay). CW1's allegations are reliable because, as an executive leader, she was in a position to know what other high-level employees discussed with Mowry. *See Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484 n.5 (9th Cir. 2019) (CW hearsay reliable because "CW[] was 'in a position to be personally knowledgeable' that [non-defendant employee] met with [the individual defendant] and discussed the report"). Indeed, other courts have credited similar CW "allegations tracing the knowledge of [non-defendant executive] to the individual defendants." *Robb v. Fitbit Inc.*, 2017 WL 219673, at *6 n.6 (N.D. Cal. 2017).

### 2.     Defendants' Public Statements Support Scienter

Defendants' public statements also strengthen the inference of scienter. Throughout the Class Period, Defendants repeatedly touted the purportedly successful launch of AviClear, including its financial performance and demand they saw for it. *See supra*, Section IV(A)(4); *see also Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014) (inference of scienter bolstered by defendant's statements "specifically addressing" allegedly misstated facts); *see also Roberti v. OSI Systems, Inc.*, 2015 WL 1985562, at *12 (C.D. Cal. 2015) (scienter established where defendants' public statements "touched on the specific issue" that made representations false). These statements suggest Defendants had access to the disputed information, as they either knew of what they spoke or were reckless in speaking on a subject without being appropriately informed.

---

[9] There is no per se requirement of direct communication with the individual defendants to credit CW allegations. *See Roberts*, 2020 WL 2042244, at *10 (scienter pled based on CWs who had no "direct contact with the defendants").

Any doubt about Defendants' scienter with respect to the AviClear misstatements is erased by their later statements admitting they failed to properly allocate resources within the sales organization. For instance, on May 9, 2023, Defendant Hopkins explained that Cutera's first quarter 2023 results were "below expectations" because "the volume of Aviclear deals in the fourth quarter diverted sales attention away from core capital deals." ¶¶271-72. Defendant Hopkins went as far as admitting that the poor AviClear performance and the inventory control problems were "self-inflicted and can be attributed to suboptimal leadership direction." ¶161. And on August 9, 2023, Defendant Harris explained the Company's poor performance was due to the fact they "really flooded the engines with AviClear." ¶289. Moreover, when the Board fired Defendant Mowry, they admitted that Mowry "had not effectively executed the limited commercial rollout of our Aviclear solution in the Fall of 2022." ¶156. These later admissions, which contradict the earlier misstatements, support scienter—especially when considered with the Complaint's other allegations demonstrating that these issues were present before Defendants made their misstatements. *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1043 (N.D. Cal. 2016); *Middlesex Ret. Sys. v. Quest Software, Inc.*, 527 F. Supp. 2d 1164, 1189 (C.D. Cal. 2007) ("a later statement may suggest that a defendant had . . . knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier statement").

Defendants' SOX Certifications also support an inference of scienter. In April, May and August of 2023, Defendants falsely certified that the Company has adequate "***internal control over financial reporting***," despite knowing, or recklessly disregarding, that Cutera had a complete lack of control over its inventory and financial reporting, which ultimately led to the Restatement. ¶¶266, 287, 302. Contrary to Defendants' argument, these SOX Certifications are probative of scienter because "the person signing the certification was severely reckless in certifying the accuracy of the financial statements." *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 747 (9th Cir. 2008). Defendants were at least deliberately reckless when signing their SOX Certifications because, by that point, the Company had already shut down its plant due to a mismatch between physical inventory and the ERP system, had already identified a material weakness over "inventory count controls," and had already delayed filing its 2022 Annual Report (due to that weakness). ¶¶96, 137, 164.

Even if the SOX Certifications cannot establish scienter on their own, combined with other scienter allegations alleged herein, they "are part of a broader picture which a court may, at the initial pleading stage, infer a compelling claim of scienter." *Magnachip Semiconductor Corp.*, 167 F. Supp. 3d at 1043. For example, the Complaint contains detailed allegations demonstrating the inventory problems—which ultimately caused the Restatement—were present before Defendants falsely certified the Quarterly Reports. ¶¶89-91. By signing the SOX Certifications, Defendants Hopkins, Seth, Mowry, Harris, and Drummond certified that the Company's internal controls over financial reporting and disclosure controls and procedures were effective, evidencing their access and purported review of Cutera's financial data as well as the materially false and misleading statements set forth above. ¶¶269, 436.

### 3.    Defendants' Suspiciously Timed Departures Support Scienter

The proximity of the abrupt departures of Defendants Plants, Mowry, and Seth to the corrective disclosures adds "one more piece to the scienter puzzle." *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009); *see Bielousov v. GoPro, Inc.*, 2017 WL 3168522, at *7 (N.D. Cal. 2017) (scienter "bolstered" by defendant's "resignation"). Within two months of each other, and just as the truth about the botched AviClear rollout and non-existent internal controls was starting to be revealed, three of the Individual Defendants left the Company in quick succession under suspicious circumstances.[10] ¶¶428-33. Indeed, on April 11, 2023, the Board unanimously terminated Defendants Mowry and Plants *with cause*. ¶151. Their terminations immediately followed Cutera's announcement that it would delay filing its Form 10-K due to material weakness in its internal controls related to ineffective inventory count controls and stock-based compensation. ¶¶137, 146. Indeed, the Board linked Defendant Mowry's termination to the failed AviClear rollout. ¶156. The Company also admitted that the Board began exploring a CEO transition in November 2022, which shows the decision to replace Mowry as CEO was directly linked to his improper behavior relating, in part, to the failed AviClear rollout in 2022. ¶131.

---

[10] Defendants' reliance on *Zucco* is inapposite. *See* MTD 22. In *Zucoo*, the Ninth Circuit found the departures were not unusual because the plaintiffs failed to allege anything suspicious with the defendant's retirement and "mundane turnover" of two controllers. *Zucco*, 552 F.3d at 1002. Here, Plants and Mowry were terminated with cause, and Seth resigned under suspicious circumstances.

Similarly, Defendant Plants was terminated for focusing "overwhelmingly on compensation and much less on developing a plan for the Company" and for completely disregarding his duties to monitor Cutera's business operations. ¶157-59. A few weeks later, Defendant Seth resigned on the same day the Company disclosed the extended plant shutdown. ¶¶160-66. Defendant Hopkins admitted that operational challenges in the first quarter of 2023, including the material weakness in Cutera's internal controls, "were mostly self-inflicted and can be attributed to suboptimal leadership direction." ¶¶161-63. These admissions strengthen the inference that Defendants Mowry, Plants, and Seth were directly responsible for the botched AviClear rollout and the inventory controls failure. ¶¶156-59, 161-63. Thus, these departures support an inference of scienter. *See Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1148 (N.D. Cal. 2017) (resignations or terminations "constitute evidence of scienter" when "accompanied by additional evidence of [D]efendant[s'] wrongdoing").[11]

Moreover, the Restatement, which covered two quarters' worth of false financial reporting, also adds to the inference of scienter. Although a restatement is often insufficient to allege scienter ***on its own***, the Complaint links the restatement with the inadequate controls over inventory, which were present from the start of the Class Period. Thus, "the nature of the [inventory problems] is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *S. Ferry*, 542 F.3d at 786. Defendants' reliance on *Zucco* to refute this argument is misplaced. *See* MTD 20-21. *Zucco* involved accounting errors which were not "operationally visible to executives" and "would not be immediately obvious to corporate management." *Zucco*, 552 F.3d 981 at 1001. In contrast, here, the inventory controls problems were immediately obvious. Indeed, in January 2023, the inventory problems forced Defendants to shut down their plant for approximately one month to conduct a physical inventory audit, and Cutera was forced to stop shipping to customers

---

[11] Defendants argue that these departures were not suspicious because they were related to poor performance, and poor business performance is not securities fraud. MTD at 22-23. Essentially, Defendants argue that because they messed things up so badly, they cannot be liable for securities fraud. However, their incompetence does not immunize them from the consequences of misleading investors. For example, Defendants Mowry and Seth misled investors about the Company's internal controls on April 7, 2023, just a few days before they were fired. ¶¶264-65. By that point, the Company identified a material weakness in ineffective inventory count controls (¶137), and yet Mowry and Seth falsely assured investors they had designed and evaluated effective internal and disclosure controls over financial reporting. ¶264-65.

and sent Cutera's plant workers home. ¶¶96, 164-65. These facts were immediately obvious to Cutera's corporate management. Therefore, the Restatement supports an inference of scienter.

### 4.     The AviClear Bonuses Support Scienter

Although not required to plead scienter, "personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 310. Further, executive compensation plans can support an inference of scienter if the allegations demonstrate "how intimately the bonus were tied to the company's financials." *Zucco*, 552 F.3d at 1004; *see also Am. W. Holding Corp.*, 320 F.3d at 944 (finding "executive bonuses [] based principally on the company's financial performance" support a strong inference of scienter). Here, the AviClear Bonus is further evidence of scienter because its achievement milestones were linked primarily to the placement of AviClear devices and AviClear's financial performance, which incentivized the Individual Defendants to perpetuate the fraud. ¶¶101-10. *See Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 603 (N.D. Cal. 2019) (defendants' compensation structure supported scienter because it was correlated to the company's financial performance); *Huang v. Higgins*, 2019 WL 1245136, at *13 (N.D. Cal. 2019) (financial motives considered as part of scienter analysis "because the [complaint] adequately alleges a link between Defendants' compensation and specific corporate objectives").

### 5.     Core Operations Allegations Support Scienter

The Complaint's core operations allegations also add to an inference of scienter. In cases like this one, the "knowledge of facts critical to a business's core operations" may be "impute[d] to a company's key officers." *Kovtun v. VIVUS, Inc.*, 2012 WL 4477647, at *19 (N.D. Cal. 2012). The Individual Defendants' knowledge of the problems related to inventory, internal controls, and the AviClear rollout (including its effect on Core Capital) can be inferred because these facts were critical to Cutera's core operations. For example, Defendants stated that "Aviclear placements [was] a #1 priority" and told investors that AviClear would transform the Company's business. ¶¶347, 445. Although Core Capital made up over 90% of the Company's total revenue, Defendants led investors to believe that AviClear "should drive over 50% of company growth in the next two years." ¶¶447-48. Defendants even concede that AviClear "undoubtedly is very important to Cutera." (MTD at 23). Thus, "it would be absurd to suggest [that] management was without knowledge" of the AviClear,

rollout and its performance. *Reese* 747 F.3d at 577; *see In re BioMarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at \*14 (N.D. Cal. 2022) ("that valrox was going to be a significant and lucrative product" "reinforce[s]" scienter inference).

Additionally, contrary to Defendants' argument (MTD at 23), the CW allegations and later admissions from Defendants (*see supra*, Section (III)(B)(1)-(2)) demonstrate their "detailed involvement in the minutia of [Cutera's] operations" and reinforce the inference that Defendants knew, or were deliberately reckless in not knowing, of the failed AviClear rollout and the lack of inventory controls. *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014). For example, Defendant Plants admitted that he was "heavily involved in the development of [AviClear's] new commercial model and product strategy." ¶421. Further, Cutera specifically admitted that Defendant Mowry was directly responsible for "execut[ing] the limited commercial rollout of . . . AviClear," "train[ing] and incentiviz[ing] [Cutera's] sales teams, accurately forecast[ing] demand and usage, [and] precisely develop[ing] commercial terms that [Cutera's] customers would accept." ¶156.

Similarly, the CW allegations establish that Defendants Mowry and Plants were closely involved with the AviClear rollout. According to CW1, the directive to move away from Cutera's core business to focus on AviClear came directly from Mowry and Plants. ¶121. CW5 noted that after AviClear was launched, Defendant Mowry attended weekly conference call meetings where AviClear's performance was discussed. ¶115. Thus, the core operations allegations support an inference of scienter. *S. Ferry*, 542 F.3d at 785 (core operations theory supports scienter when combined with "specific allegations about management's exposure to factual information").

### 6. Viewing Allegations Holistically, Defendants' Innocent Inference Fails

When viewed holistically, the Complaint's scienter allegations demonstrate a strong inference that the Individual Defendants were at least deliberately reckless. *Tellabs*, 551 U.S. at 326. Defendants' competing inference—the failed AviClear rollout, the material weakness with inventory controls, and the resulting restatement were unexpected results of Cutera's unsuccessful strategy and market conditions (MTD at 24)—is belied by the facts. The Complaint lays out a strong inference that the Individual Defendants touted the success of AviClear and the rigor of Cutera's internal

controls while the AviClear strategy was actively failing and the Company was experiencing significant inventory problems due to its ineffective controls. Even if these competing inferences present a close question—which they do not—at this stage, weighing of the inferences must be resolved in Lead Plaintiff's favor.[12]

## IV. THE COMPLAINT STATES CLAIMS UNDER SECTION 20(A)

The Complaint states a Section 20(a) claim against the Individual Defendants because Lead Plaintiff adequately alleges a primary violation of Section 10(b) against Cutera, and the Individual Defendants do not contest that they are "control person[s]." *See McKesson Corp.*, 411 F. Supp. 3d at 605 (sustaining Section 20(a) claims where defendants' "only argument" was that plaintiffs failed to allege a primary Section 10(b) violation against company).

### CONCLUSION

For all these reasons, Defendants' Motion should be denied in its entirety.

Dated: September 9, 2024

**LABATON KELLER SUCHAROW LLP**

By: */s/Michael P. Canty*_____
Michael P. Canty (*pro hac vice*)
Michael H. Rogers (*pro hac vice*)
Nicholas D. Manningham (*pro hac vice*)
140 Broadway
New York, NY  10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: mcanty@labaton.com
        mrogers@labaton.com
        nmanningham@labaton.com

*Counsel for Lead Plaintiff and Lead Counsel for the Class*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Lucas E. Gilmore (#250893)
715 Hearst Avenue, Suite 300
Berkeley, California 94710

_____

[12] Because the Complaint alleges scienter against the Individual Defendants, Lead Plaintiff pleads scienter as to Cutera. *Curry v. Hansen Med., Inc.*, 2012 WL 3242447, at *13 (N.D. Cal. 2012) (quoting *In re Cylink Securs. Litig.*, 178 F.Supp.2d at 1088) ("[s]o long as scienter is appropriately alleged for the officers and directors of a company, then it is appropriately alleged for the company itself").

Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: lucasg@hbsslaw.com

*Liaison Counsel for the Class*