Michael P. Canty (*pro hac vice*)
Michael H. Rogers (*pro hac vice*)
Nicholas D. Manningham (*pro hac vice*)

**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: mcanty@labaton.com
mrogers@labaton.com
nmanningham@labaton.com

*Attorneys for Lead Plaintiff and the Class*

Lucas E. Gilmore (#250893)

**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 300
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: lucasg@hbsslaw.com

*Liaison Counsel for the Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

|  |  |
|---|---|
| IN RE CUTERA, INC. SECURITIES LITIGATION | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**Case No.: 4:23-cv-02560-JST**

**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**DEMAND FOR JURY TRIAL**

**Hon. Jon S. Tigar**

# TABLE OF CONTENTS

**Page**

I.  NATURE OF THE ACTION ............................................................................................ 2

A.  Defendants Failed to Implement, Monitor, and Maintain Internal Controls Over Cutera's Financial Reporting .................................................................. 5

B.  Against the Backdrop of Inadequate Internal Controls, Defendants Knew the AviClear Rollout Was an Abject Failure ............................................................ 7

C.  Notwithstanding Cutera's Ineffective Internal Controls and the Failed AviClear Rollout, Defendants Touted the Opposite to Investors ....................................... 10

D.  Cutera's Investors Were Injured When the Full Truth Was Revealed ................. 12

II.  JURISDICTION AND VENUE ...................................................................................... 14

III.  PARTIES ........................................................................................................................ 15

A.  Lead Plaintiff .................................................................................................... 15

B.  Defendants ........................................................................................................ 15

C.  Relevant Non-Defendant Cutera Executives ..................................................... 17

D.  Relevant Third Parties ....................................................................................... 20

IV.  SUBSTANTIVE ALLEGATIONS OF FRAUD ............................................................ 22

A.  Overview of Cutera's Business .......................................................................... 22

    1.  Cutera's Business Models ....................................................................... 22

        a.  Core Capital ................................................................................ 22

        b.  AviClear Business ....................................................................... 23

    2.  Cutera Was Required to Implement Internal Controls Over Financial Reporting ............................................................................... 24

B.  Ineffective Internal Controls and Problems Relating to Supply Chain and Quality Control Harmed Cutera's Business ........................................................ 27

    1.  Cutera Lacked Control Over Inventory, Supply Chain, and Internal Controls ................................................................................................... 27

        a.  Cutera's Inventory Controls Systems Were Initially Obsolete and Ineffective After Upgrading ................................................. 28

b.      Defendants' Controls Over Cutera's Physical Inventory Were Non-Existent or Inadequate ........................................................ 31

c.      Cutera's Lack of Adequate Inventory Control Systems Led to an Inability to Fulfill Customer Orders, Manage the Supply Chain, and Properly Account for Inventory................................. 32

2.      The AviClear Rollout Was a Disaster........................................................ 33

a.      Defendants Rushed the AviClear Rollout in Order to Maximize Their Personal Compensation ........................................................ 33

b.      As a Result of the Rushed AviClear Rollout, Customers Declined to Purchase and/or Returned the Devices...................... 37

c.      The AviClear Rollout Took Resources Away from Core Capital 39

C.      Defendants Touted Cutera's Ostensible Internal Controls and the Supposed Success of the AviClear Rollout ............................................................................ 39

D.      Cutera Announced Poor Financial Results, Partially Revealing the Company's Challenges with the AviClear Rollout, But Continued to Mislead Investors ....... 40

E.      Cutera Missed the Extended Filing Deadline and Disclosed an Additional Material Weakness, Yet Defendants Continued to Falsely Reassure Investors ... 44

1.      Cutera Missed the Extended Filing Deadline .......................................... 44

2.      Cutera Revealed Nasdaq's Notice of Delisting ...................................... 45

F.      The Board Fired Defendants Mowry and Plants with Cause................................ 45

G.      Cutera Again Revealed Poor Financial Results and Announced a Plant Shutdown and the Departure of CFO Seth ........................................................... 48

H.      The Truth Is Further Revealed When Cutera Announced Quality Problems and Poor Financial Results Related to the AviClear Rollout ..................................... 51

I.      Investors Continued to Learn the Truth When Cutera Disclosed the Severity of Its Inventory Problems and Revealed its Need to Restate Financial Statements.. 53

J.      Cutera's Internal Problems Ultimately Led to the Company's Restatement........ 55

1.      Cutera's Financial Statements Were Exposed to Misstatement from Material Weaknesses in Internal Control.................................................. 55

2.      Cutera's Restated Financial Statements and Lack of Internal Controls ... 57

3.      Cutera Severed Relationship with Third-Party Manufacturer, Jabil......... 60

4. Cutera's Inventory Woes Persisted, Leading to the Revelation of the Full Truth ...................................................................................... 61

V. FALSE AND MISLEADING STATEMENTS AND SCHEMES TO DEFRAUD ........ 62

    A. May 10, 2022 – 1Q 2022 Earnings Call ................................................ 62

    B. August 4, 2022 – Press Release and 2Q 2022 Earnings Call................................ 66

    C. August 5, 2022 – Form 8-K ..................................... 68

    D. November 3, 2022 – Press Release and 3Q 2022 Earnings Call .......................... 69

    E. February 28, 2023 – Form 8-K and 4Q 2022 Earnings Call................................ 70

    F. April 7, 2023 – 2022 Form 10-K ..................................... 72

    G. May 9-10, 2023 – 1Q 2023 Form 8-K (and 10-Q) and Earnings Call and Partial Disclosure / Materialization of the Risk ............................................ 79

    H. August 8-9, 2023 – 2Q 2023 Form 8-K (and 10-Q) and Earnings Call and Partial Disclosure / Materialization of the Risk .......................................... 85

VI. The Full Truth finally Emerges on March 21, 2024 ...................................... 91

VII. LOSS CAUSATION.................................................................. 92

    A. January 9, 2023 – First Partial Disclosure / Materialization of the Risk .............. 94

    B. March 16, 2023 – Second Partial Disclosure / Materialization of the Risk.......... 96

    C. April 12, 2023 – Third Partial Disclosure / Materialization of the Risk.............. 99

    D. May 9, 2023 – Fourth Partial Disclosure / Materialization of the Risk.............. 101

    E. August 8, 2023 – Fifth Disclosure / Materialization of the Risk ....................... 105

    F. November 8, 2023 – Sixth Disclosure / Materialization of the Risk .................. 109

    G. March 5, 2024 – Seventh Partial Disclosure / Materialization of the Risk......... 114

    H. March 21, 2024 – Final Disclosure / Materialization of the Risk...................... 118

VIII. ADDITIONAL INDICIA OF SCIENTER .................................................... 121

    A. Defendants Mowry, Plants, Seth, and Hopkins Were Aware of Problems with the AviClear Rollout and/or Weaknesses in Internal Controls.......................... 122

        1. Defendant Mowry ...................................................... 122

        2. Defendant Plants .................................................... 124

3.      Defendant Seth.................................................................................. 125

4.      Defendant Hopkins ........................................................................... 126

B.      Defendants Mowry and Plants' Involvement In the AviClear Rollout and Internal Control Procedures Supports an Inference of Scienter.......................... 127

C.      The Timing and Circumstances of Defendants Mowry's, Plants', and Seth's Departures Support a Strong Inference of Scienter ........................................... 128

D.      Defendants' Statements Themselves, Including Their SOX Certifications, Support a Strong Inference of Scienter............................................................. 130

1.      SEC Filings ...................................................................................... 130

a.      2022 10-K ...................................................................... 131

b.      Q1 2023 10-Q ................................................................ 132

c.      Q2 2023 10-Q ................................................................ 133

2.      Statements Regarding the Success of the AviClear Rollout................... 134

E.      Cutera's Control Over Inventory and Internal Controls and the AviClear Rollout Were Critical to Cutera's Core Operations......................................................... 135

F.      Defendants Were Financially Motivated to Commit Securities Fraud.............. 136

IX.     CONTROL PERSON ALLEGATIONS............................................................... 137

X.      THE STATUTORY SAFE HARBOR IS INAPPLICABLE....................................... 138

XI.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ...................................................................................... 139

XII.    CLASS ACTION ALLEGATIONS ...................................................................... 141

FIRST CLAIM FOR RELIEF  (For Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants)......................................... 143

SECOND CLAIM FOR RELIEF (For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants) ............................................................................. 145

XIII.   REQUEST FOR RELIEF ................................................................................... 146

XIV.    JURY DEMAND .............................................................................................. 146

Court-appointed Lead Plaintiff New England Teamsters Pension Fund ("Lead Plaintiff," "New England Teamsters," or the "Fund"), individually and on behalf of all persons and entities who or which, during the period from May 10, 2022 through March 21, 2024, inclusive (the "Class Period"), purchased the publicly traded common stock of Cutera, Inc. ("Cutera," "CUTR," or the "Company") and were damaged thereby (the "Class"),[1] brings this Second Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint") against Defendants Cutera and several of Cutera's former and current senior executives—former Chief Executive Officer ("CEO") David Mowry ("Mowry"), former Chief Financial Officer ("CFO") Rohan Seth ("Seth"), former Chairman of Cutera's Board of Directors (the "Board") and Executive Chairman J. Daniel Plants ("Plants"), former Interim CEO Sheila Hopkins ("Hopkins"), current CEO Taylor Harris ("Harris"), and current Interim CFO Stuart Drummond ("Drummond") (collectively, the "Individual Defendants," and together with Cutera, "Defendants").

Lead Plaintiff's claims are brought upon personal knowledge as to its own acts and upon information and belief as to all other matters, based upon, among other things, a review and analysis of: (i) reports and documents filed by Cutera with the Securities and Exchange Commission (the "SEC"); (ii) reports issued by analysts covering or concerning Cutera and its business; (iii) press releases, news articles, transcripts, videos, and other public statements issued by or about Cutera, its business, and the Individual Defendants; (iv) an investigation conducted by Lead Plaintiff's attorneys, including interviews with former Cutera employees ("CWs")[2]; and (v) other publicly available information concerning Cutera, its business, and the allegations contained herein. Lead Plaintiff believes that substantial additional evidentiary support exists for

---

[1] Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director, or control person of Cutera during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Cutera's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

[2] All CWs are former employees of Cutera.

the allegations herein and will continue to be revealed after Lead Plaintiff has a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This Action arises out of Defendants' undisclosed failure to monitor and maintain inventory and implement effective internal controls, while simultaneously misleading investors about the roll out of Cutera's new acne-treating laser device, AviClear. Cutera had long been known to the investing public as a company that provided laser-based and other aesthetic and dermatological solutions for medical practitioners, and the new AviClear initiative appeared to fit within that long-term paradigm.

2.    However, unbeknownst to investors, the primary motivation for the AviClear rollout was an executive compensation plan—known internally as the "Acne Equity Grant"—that moved Company stock to Defendants Mowry, Plants, and Seth in direct relation to (i) the number of AviClear devices placed with customers, and (ii) the speed with which such placements occurred. Given this, Defendant Plants personally demanded that Cutera offer AviClear through a new leasing model, whereby devices would be placed with customers with a minimal upfront cost (and sometimes for free). Under this model, Cutera would only start to generate profit primarily through a revenue sharing agreement with physicians.

3.    The AviClear leasing model was immediately met with internal derision at Cutera as not being aligned with the Company's financial interests. To wit, other companies had recently and unsuccessfully attempted the leasing model. Moreover, insurance did not cover the AviClear treatment and patients therefore needed to cover exorbitant out-of-pocket costs where other, far cheaper treatments were available—thereby generating little profit after the initial placement of the devices. These concerns were communicated to Defendant Mowry by numerous Cutera executives yet disregarded.

4.    While Cutera was initially able to place AviClear devices during its launch, which Defendants communicated with much fanfare to investors, its revenue-generating utilizations after the fact were abysmally below projections, which Defendants did not communicate to investors.

Indeed, unknown to investors, by the second quarter of 2022, AviClear's utilizations and revenue were far below internal projections. According to former Cutera employees, Defendants tracked AviClear's poor performance on a granular basis and discussed it at meetings attended by Defendants Mowry and Seth.

5. Despite AviClear's sluggish utilization and revenue generation, Defendants Mowry and Plants—guided by self-interest—personally caused Cutera to divert critical resources away from its core business segments (which, up to that point, had generated steady and reliable revenue for the Company and investors) to further boost AviClear device placements and collect substantial bonus compensation. This siphoning of sales personnel and other resources to AviClear, however, caused Cutera's core business to languish throughout the remainder of 2022 and into 2023.

6. At the same time as the failed AviClear rollout, Defendants had a complete lack of control over the Company's inventory. Throughout the Class Period, and notwithstanding Defendants' SOX certifications and other sanguine remarks about Cutera's internal control environment, Defendants consistently failed to control, monitor, and maintain inventory, largely related to problems associated with the failed AviClear rollout. Indeed, the internal control weaknesses had myriad operational consequences, including an extended inventory audit-related plant shutdown (which further negatively impacted Cutera's business) and rampant quality control, supply chain, and field service problems due to the Company's inability to forecast and track inventory.

7. This undisclosed failure of internal controls ultimately required Cutera to restate its financial statements for multiple quarters, particularly financial figures relating to inventory, cost of revenue, gross profit, gross margin, and operating loss. Indeed, Defendants eventually admitted that "we identified a significant issue with how the company has been managing inventory during 2023," and "there was a shortfall of inventory relative to the Company's system of record."

8. Moreover, Defendants' failure to execute the AviClear rollout—as explained above—exacerbated Cutera's internal control weaknesses, causing them to further deteriorate towards critical mass. But instead of curing such issues, Defendants continued to over-allocate the

Company's manufacturing and sales resources to AviClear at the expense of Cutera's core business segments. Indeed, Defendants Mowry and Plants personally directed resources to AviClear to achieve their substantial performance bonuses—in utter and intentional disregard as to whether it was in the best interest of the Company or its shareholders.

9. Defendants' fraudulent conduct during the Class Period ultimately resulted in the termination, with cause, of Defendants Mowry and Plants, and the resignation of Defendant Seth. As Cutera itself admitted, the Company was managed by "suboptimal leadership." In particular, the Board concluded that "Mr. Plants was far more interested in his own personal enrichment than in leading the Company for the benefit of all stakeholders."

10. Despite these undisclosed problems relating to non-functioning internal controls over inventory and poor financial performance because of the failed AviClear rollout, Defendants repeatedly misled investors throughout the Class Period by claiming the AviClear rollout was a resounding success, that Cutera's core revenue-generating business segments were flourishing, and falsely certifying to investors that the Company's internal controls were operating effectively. In fact, Defendants Mowry, Seth, Hopkins, Drummond, and Harris all signed Cutera's SEC filings and/or certified that they reviewed the Company's financial reporting and that all figures contained therein were accurate—figures which Defendants admit were materially false.

11. The underlying truth was ultimately revealed over a span of months during 2023 and 2024, whereby the Company disclosed: (i) material weaknesses over financial reporting; (ii) multiple poor earnings results caused by its failure to properly roll out AviClear; (iii) that it had fired Mowry and Plants "with cause;" (iv) the departure of Defendant Seth; (v) quality control problems leading to frequent equipment breakdowns and customer frustration; (vi) an extended plant shutdown caused by an inventory audit; (vii) poor AviClear utilization trends; (viii) numerous delays in making routine filings with the SEC; and (ix) restated financials for multiple quarters. In response, Cutera's stock plummeted—injuring shareholders.

12. Critically, the magnitude of harm inflicted on the Company because of the material information withheld from investors during the Class Period caused Cutera to file for bankruptcy one year later.

### A. Defendants Failed to Implement, Monitor, and Maintain Internal Controls Over Cutera's Financial Reporting

13. As a public company, Cutera must comply with the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7241 ("SOX"), which required Cutera's CEO and CFO to certify Cutera's quarterly and annual reports filed with the SEC and the procedures established by Cutera to prepare the financial statements and disclosures. Additionally, SOX required Cutera's management to establish and maintain a system of internal controls relating to, among other things, financial reporting. SOX also required Cutera's management to annually evaluate the effectiveness of the Company's internal controls over financial reporting and disclose the results of that evaluation, including any material weaknesses. However, Defendants failed to maintain adequate internal controls.

14. Since the beginning of the Class Period, Cutera faced multiple problems with its internal controls over inventory, including inventory-related information technology processes, inventory accounting, and supply chain management. Defendants, in fact, admitted as much when they ultimately disclosed in March 2024 that they failed to maintain adequate internal controls, and they were required to file restatements for the first and second quarters of 2023 (the "Restatement")—which by its very definition means such restated financial figures were materially false.

15. Indeed, in January and February of 2022, just preceding the start of the Class Period, Defendants attempted to implement formal enterprise resource planning systems to manage inventory, since the Company did not previously have any formal method of managing inventory. However, Defendants failed to properly implement these systems, which made the inventory problems far worse. This issue came to a head contemporaneous with the firing of Defendants Mowry and Plants during Cutera's 2022 year-end inventory audit. The audit resulted

in an extended shutdown of Cutera's operations in the beginning of 2023, which further harmed the Company's core business segments.

16. For example, according to CW 6,[3] while the company had an inventory system prior to the implementation of SAP and Salesforce (as defined below) in 2022, it was not a "formal" system. She recalled that Cutera had problems implementing its new Salesforce and SAP systems, adding that the company "went cheap," and the implementation went "catastrophically downhill" as a result.

17. Similarly, CW 8, Senior Director, Field Service, North America, explained that there were two to three months of using these new systems without any formal training. CW 8 further recalled that it was "almost like there was no oversight" for the first few months with the new systems. CW 8 stated the system would show that a particular part was available in the warehouse, when it was not. CW 8 explained that the problem of discrepancies between parts listed in the system with parts available in the warehouse was raised in meetings. CW 8 explained that the system was not properly accounting for the costs of the parts. CW 8 indicated that, by Q2 or Q3 of 2022, she saw the price discrepancies in SAP.

18. Furthermore, Cutera's upper management was aware of the lack of inventory controls. For example, CW 6 explained that Cutera's management—specifically Srinivas Pinapati,[4] the former Vice President of Operations and Supply Chain at Cutera—knew that anyone could walk into the warehouse area and take parts, as management's offices were in the same building. CW 6 indicated that Pinapati had been told several times about the inventory problems. CW 6 explained that the reason for the physical inventory count was because the company thought there was more inventory on hand than what was showing up in the ERP system; the physical count showed that Cutera had much less inventory on hand than it thought.

19. Likewise, CW 1, who was employed at Cutera from before the Class Period through the fall of 2023, most recently in an executive leadership role, indicated that the company struggled

---

[3] All CWs are described in detail in Section III.D ("Relevant Third Parties"), herein.

[4] CW 7 advised that Pinapati reported directly to Mowry, and that Pinapati had been hired by Mowry.

with supply chain and inventory issues throughout 2023. CW 1 added that these problems were known to Mowry, who appeared to protect Pinapati and refused to take action. CW 1 added that she raised these concerns herself to Defendant Mowry multiple times, both in-person and email, since 2022. CW 1 added that when Defendant Hopkins became Interim CEO, she also refused to take steps to correct the supply chain problems.

20.    Defendants' lack of control over inventory led to further problems. For example, Defendants were unable to account for the availability and demand for parts needed to service customer equipment, which led to supply chain constraints and delays in fulfilling orders.  This in turn angered Cutera's customers, severely undercutting the Company's reputation, and hampered revenue from device utilization as those customers could not operate their broken equipment. All the while, Defendants knew of these problems. For example, CW 8 indicated that some customers sent complaints about their downed systems to Mowry directly. CW 1 also recalled that many people raised concerns about supply chain problems to Mowry.

21.    Such problems involving Cutera's inventory management processes and material weaknesses in Cutera's information technology general controls ("ITGC") dovetailed to create the perfect storm of operational chaos and accounting inaccuracies. Ultimately, these internal control deficiencies caused the Company to restate its financial results for the first and second quarter of 2023, which financial results had been certified by Defendants Hopkins, Drummond, and Harris. Notably, despite the well-known lack of internal controls, Defendant Harris certified Cutera's second quarter 2023 financial results despite having only been CEO for two days.

**B.    Against the Backdrop of Inadequate Internal Controls, Defendants Knew the AviClear Rollout Was an Abject Failure**

22.    While business operations crumbled and logistical difficulties born out of material weaknesses in Cutera's internal controls proliferated, Defendants publicly rolled out their touted new product, AviClear. The rollout was rushed, premature, and effectuated not in a manner which would enhance shareholder value, but to instead maximize the chances of Defendants Mowry, Plants, and Seth securing for themselves the Acne Equity Grant.

23.     As part of the scheme deployed by Defendants Mowry, Plants, and Seth to personally enrich themselves, Defendant Plants demanded that Cutera adopt a new lease-based commercial model to get AviClear into doctors' offices as quickly as possible to meet compensation milestones. For example, CW 1 stated that the milestone was why management was trying to place as many units as possible "by hook or crook" in order to trigger the equity grant, regardless of whether customers paid zero or $5,000 for the placement, as the milestone was not based on revenue.

24.     Worse, Defendants misled investors about the success of the AviClear rollout and the new lease-based model. For example, on May 10, 2022 (the start of the Class Period), Defendant Mowry falsely assured investors that the leasing model "***serve[d] to perfectly align the goals and objectives of the company with those of the practice over the long term***," despite knowing the opposite was true. For example, CW 1 advised that at least four people told Mowry that the leasing model for AviClear would not work: Chief Technology Officer Michael Karavitis, Senior VP of Global Marketing Steve Crider, former CFO Rohan Seth, and CW 1 herself.

25.     Similarly, CW 3 characterized this sales practice as making it look like AviClear's sales were strong, but they were not, since the company was not making any money getting the equipment into doctors' offices; Cutera earned revenue only if the doctors / customers were using the product. Further, the problem with the new sales model for AviClear, according to CW 3, was that the doctors did not want to do it, explaining that the doctors preferred to pay approximately $100,000 to own the equipment outright and not to have to split fees. CW 3 added that, because there was no cost to the doctors to have the AviClear equipment, the doctors did not need to use it to make money.

26.     CW 2 summarized the problems with the AviClear rollout and customer pushback: the treatment was painful, contrary to Cutera's claims; it was expensive, especially compared to other forms of acne treatment; the results took too long to be noticeable; and Cutera's service support was very poor after the equipment was delivered. CW 2 indicated that some offices were so dissatisfied with AviClear that they tried to send it back. CW 2 added that there was "lots of

pushback" from medical dermatologists regarding treatment costs because those dermatologists could treat acne effectively with other products covered by insurance.

27. In furtherance of their scheme, Defendants Mowry and Plants chose to divert critical resources—principally sales teams—away from Cutera's once-strong and reliable business segments. CW 1 confirmed that the directive to move away from Cutera's core business to focus on AviClear came directly from Mowry and Plants, and was discussed openly in many AviClear meetings, which were also attended by Huffman. According to CW 2, Defendants intentionally undercut Cutera's AviClear-exclusive salesforce and diverted resources away from the capital equipment reps haphazardly to get all hands on deck selling AviClear, despite the fact that strategy hurt the selling prospects for both Core Capital and AviClear-exclusive reps alike.

28. Additionally, because Defendants were financially incentivized to do so, they were unconcerned whether customers actually used the AviClear device (which was how Cutera actually generates its AviClear revenue). The financial incentives had their intended effect—albeit at the expense of the rest of Cutera's businesses. In fact, the Board ultimately concluded, as one of the reasons for terminating Defendant Plants in April 2023, that "Mr. Plants was far more interested in his **own personal enrichment** than in leading the Company for the benefit of all stakeholders."

29. Defendants Mowry, Plants, and Seth's plan to rush the AviClear rollout resulted in Defendants using a leasing model that pumped out a product not fully tested, which led to AviClear device failures, upset customers, and returned devices—all of which contributed to inventory buildup and internal control problems. Indeed, CW 7 explained that AviClear's high failure rate was caused by the company's rushed timeline in pushing the new product to market.

30. Moreover, as the Company began rolling out AviClear, Cutera began experiencing significant inventory and quality control problems. As Defendant Hopkins ultimately admitted, "[o]n the reliability front, those issues really did begin to surface as we ramped up Avi." Defendant Hopkins similarly explained that "the organization was a bit overwhelmed and stretched and as the manufacturing organization ramped up Avi, reliability issues began to surface across the

portfolio of products." These quality control problems severely undercut Cutera's ability to generate revenue from customers' utilization of the AviClear device.

31.     Numerous CWs confirm that Defendants knew of the litany of problems with the AviClear rollout—which ultimately led to an overabundance of returns, contributing to the Company's inventory crisis. For example, CW 2, who was hired to sell AviClear exclusively, indicated that some offices were so dissatisfied with AviClear that they tried to send it back. CW 2 also noted that many of her contacts at doctor offices informed her that they would not deal with Cutera due to a reputation for poor customer support and questionable practices. CW 2 indicated that she and her colleagues communicated these concerns—and the issues raised by customers who were not responding positively to AviClear—to Anderson (who reported to Huffman) and Huffman (who reported directly to Mowry).

32.     Notably, in light of the growing number of returns, coupled with Cutera's lack of internal controls, Cutera's inventory counts were wildly inaccurate. For instance, Defendant Drummond even stated at the end of the Class Period, in response to an analyst's question surrounding Cutera's inventory problem, that "[i]t relates to a process happening in our [inventory management] system, whereby returns were ending up being doubled up in value." In fact, in describing the persisting internal control problems, Defendants ultimately admitted on the last day of the Class Period that "we've had too much inventory in certain areas, most notably AviClear."

**C.     Notwithstanding Cutera's Ineffective Internal Controls and the Failed AviClear Rollout, Defendants Touted the Opposite to Investors**

33.     During the Class Period, Defendants repeatedly represented to investors that the AviClear rollout was a success, that patient demand and interest were strong, and that Cutera's core businesses continued to deliver strong results. For example, in August 2022, Mowry touted that "*[d]uring the quarter, our team achieved the successful launch of AviClear.*" As noted above, and discussed in greater detail herein, those statements stood in marked contradiction to the (non-public) facts known and discussed within the Company, including by and with the Individual Defendants.

34.     In reality, AviClear's rollout was a disaster, and its performance was noticeably poor, beginning in the second quarter of 2022 and continuing throughout the rest of the Class Period. For example, CW 1 stated that the poor sales performance was clear internally. She added that management was concerned because AviClear was not meeting projections by the end of Q2 and "definitely" not by end of Q3 of 2022. CW 1 indicated that AviClear's poor financial performance would have been discussed in meetings with the "ELT," or Executive Leadership Team, which included former CFO Rohan Seth, CTO Karavitis, current Chief Information Officer Guy Thier, and possibly current VP of Corporate Development and Strategy Mindy Huynh.

35.     CW 1 noted that the numbers were off by "a lot," indicating that the projections were for approximately $20-25 million, but they wound up earning only about $6 million in revenue. CW 1 further noted that half of the $6 million was generated in Q4, so that between Q2 and Q3, AviClear only made $3 million in revenue. CW 1 commented that the company was seeing a "piss-poor return on investment" from AviClear, generating only approximately $3 million in revenue from a $75 million investment.

36.     CW 5 advised that, after AviClear was launched, she participated in weekly conference call meetings with Defendant Mowry, Austin Monroe, Amy Ables, and all the other Regional Managers. CW 5 added that these calls were held specifically to discuss AviClear's performance, including placement of the devices, utilization rates, and revenues for the product.

37.     Furthermore, Defendants affirmatively represented in Cutera's SEC filings throughout the Class Period that they "*[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under the [Company's] supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with [GAAP]*." Again, as noted above and discussed in detail herein, those statements were knowingly false when made or made with intentional recklessness.

**D.     Cutera's Investors Were Injured When the Full Truth Was Revealed**

38.     The truth regarding the Company's internal controls and the failed AviClear rollout emerged over the course of a series of corrective disclosures and/or materialization of the concealed risk events. Notably, the truth of Defendants' fraudulent misconduct was fully revealed on March 21, 2024.

39.     Indeed, despite the truth partially leaking out on each of the following dates, the Company's stock price remained artificially inflated after each date because, as further detailed in Sections IV, V, and VII, herein, Defendants continued reassuring the market that the AviClear rollout was a success, that the Company's Core Capital business ("Core Capital") was not hurting as a result of AviClear, and that there were no problems with Cutera's internal controls. In addition to Defendants' continued reassurances, not all of the concealed risks materialized until March 21, 2024—as evidenced not only by the actual news revealed on those dates and analyst reactions to such news, but notably, by the large stock price declines in response to each continuing corrective disclosure and/or materialization of the concealed risk event:

(a)     On January 9, 2023, the Company issued revenue projections below market expectations directly linked to the unsuccessful AviClear rollout. Indeed, according to analyst Piper Sandler's conversation with Cutera management, Piper Sandler reported that same day that Cutera's sales teams "spent the majority of time pushing AviClear," and "in doing so, the team took their eye off the ball for the rest of the business, primarily in the US and leading to a majority of the revenue shortfall we see here in the quarter." In response, Cutera's stock price fell **more than 23%**. However, Cutera's stock price remained artificially inflated as Defendants continued concealing from investors that the AviClear rollout was a failure, motivated primarily by the Individual Defendants' desire for personal compensation, and harmed Core Capital.

(b)     On March 16, 2023, Defendants announced Cutera would not meet the extended deadline for filing its Form 10-K for the year ended December 31, 2022 ("2022 Form 10-K") and disclosed a material weakness in internal controls over stock-based compensation,

causing a **12.5% drop** in Cutera's stock price. Still, the Company's stock price remained artificially inflated even after this news because many concealed risks had yet to materialize as of this date, including, among other things, that Cutera had experienced an extended plant shutdown due to the Company's ongoing inventory problems.

(c)    On April 12, 2023, the Company announced that the Board had terminated Defendants Plants and Mowry "with cause." In response, Cutera's stock price **fell more than 28%**. However, Defendants continued concealing the full truth from investors, which included, among other things, the extended plant shutdown, and related double counting returns on its subpar inventory management systems.

(d)    On May 9, 2023, the Company reported poor financial results linked to the plant shutdown (caused by Cutera's inventory control weaknesses) and "execution issues" with the AviClear rollout. The Company also announced that Defendant Seth had resigned as CFO. In response, Cutera's stock price **fell 30%**. Nonetheless, the Company's stock price remained artificially inflated as Defendant Hopkins assured investors of the ongoing success with Cutera's AviClear rollout, despite the fact that Defendants knew customers were dissatisfied with AviClear and often attempted to return it, as well as ongoing negative impact on Core Capital.

(e)    On August 8, 2023, the Company's stock **dropped over 25%** when the Company disclosed the severity of the quality control problems and the extent to which Core Capital suffered due to the diversion of resources to AviClear.

(f)    On November 8, 2023, the Company announced poor financial results and disclosed the severity of the Company's inventory and operational problems, including the Company's need to delay its Form 10-Q filing and restate the financial statements of multiple prior quarters—resulting in an **over 42.55% stock drop**. Despite Cutera's massive stock price decline, investors still had not learned the full truth as of this date because as would be later disclosed,

among other things, Cutera had identified an additional material weakness related to its inventory problems.

(g)     On March 5, 2024, the Company issued the long-promised Restatement for the first and second quarters of 2023, resulting in a **3.26% stock drop**. Yet, the full truth was still not known to investors since not all of the concealed risks had yet materialized, which included, among other things, that the failed AviClear rollout and expectations of a large number of product returns substantially contributed to Cutera's inventory buildup and related false accounting.

(h)     And finally, on March 21, 2024, the truth was fully revealed and/or materialized, when the Company announced poor financial results and finally disclosed that its **failure to maintain internal controls over inventory had <u>caused</u> an excessive level of inventory and negatively impacted gross margins** and directly linked its inventory problems, in part, to AviClear, as well as the fact that the Company expected even more product returns—all of which was not yet previously disclosed—causing Cutera's stock to **drop over 30%**.

## II.     JURISDICTION AND VENUE

40.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

41.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

42.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b)-(c), and Section 27 of the Exchange Act, because Cutera's headquarters are located in this District, the Company conducts substantial business in this District, and many of the acts and practices complained of herein occurred in substantial part in this District.

43.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited

to the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.     PARTIES

### A.     Lead Plaintiff

44.     Lead Plaintiff New England Teamsters was established in 1958 to provide retirement income to eligible participants and their beneficiaries. New England Teamsters manages more than $2.4 billion in assets for the benefit of its approximately 72,000 participants. The Fund is jointly administered by an eight-member Board of Trustees—four Trustees representing the Local Unions and four Trustees representing the Contributing Employers. All claims are processed at the Fund Office, which is located in Burlington, MA. The Fund is qualified under Internal Revenue Code ("IRC") Section 401(a) and acts as a multi- employer, defined benefit plan within the meaning of IRC Sections 414(f) and (j). On August 30, 2023, the Court appointed New England Teamsters as Lead Plaintiff for this litigation. As set forth in its certification filed on May 10, 2024 (ECF No. 59-1), New England Teamsters purchased Cutera common stock during the Class Period and suffered damages as a result of Defendants' fraud.

### B.     Defendants

45.     Defendant Cutera is a Delaware corporation with its principal executive offices located at 3240 Bayshore Blvd., Brisbane, California. Cutera is a global provider of laser and other energy-based aesthetic and dermatology solutions for medical practitioners worldwide. Cutera's common stock trades in an efficient market on the Nasdaq Stock Market ("Nasdaq") under the symbol "CUTR."

46.     Defendant Mowry served as the Company's CEO during the Class Period until his termination, for cause, on April 11, 2023, and as a Director until his resignation from the Board on May 11, 2023. In his role as CEO, Defendant Mowry reviewed, approved, and signed Cutera's false and misleading SEC filings. During the Class Period, Defendant Mowry attended company-wide town hall Zoom meetings, weekly AviClear conference call meetings, executive team meetings, received customer complaints regarding AviClear, and frequently reviewed shipping

reports. Defendant Mowry also participated in earnings calls and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact relating to, among other things, the AviClear rollout and internal controls.

47. Defendant Plants, a member of the Board since 2015, served as the Company's Executive Chairman since May 19, 2021, and Chairman of the Board since October 2016, until his termination, for cause, from those positions on April 11, 2023. In his role as Executive Chairman and Chairman of the Board, Defendant Plants reviewed, approved, and signed Cutera's false and misleading SEC filings.

48. Defendant Seth served as the Company's CFO during the Class Period until his resignation on May 3, 2023. In his role as CFO, Defendant Seth reviewed, approved, and signed Cutera's false and misleading SEC filings.

49. Defendant Hopkins served as the Company's Interim-CEO from April 12, 2023, until August 7, 2023. Defendant Hopkins also served as a member of the Board from May 2021, until her resignation on June 6, 2024. In her role as Interim-CEO, Defendant Hopkins reviewed, approved, and signed Cutera's false and misleading SEC filings.

50. Defendant Drummond served as the Company's Interim-CFO, principal financial officer, and principal accounting officer from May 5, 2023, to the present. Defendant Drummond previously served as the Company's Vice President and Corporate Controller from July 2021 to May 2023. In his role as Interim CFO, Defendant Drummond reviewed, approved, and signed Cutera's false and misleading SEC filings.

51. Defendant Harris has served as the Company's CEO since August 7, 2023. Defendant Harris has also served as a member of the Board since June 2023. In his role as the CEO, Defendant Harris reviewed, approved, and signed Cutera's false and misleading SEC filings.

52. Defendants Mowry, Plants, Seth, Hopkins, Drummond, and Harris are collectively referred to herein as the "Individual Defendants."

53.    Cutera is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because each of the wrongful acts complained of herein was carried out within the scope of their employment.

54.    The scienter of each of the Individual Defendants and each of the other employees and agents of the Company is similarly imputed to Cutera under *respondeat superior* and agency principles.

55.    The Individual Defendants, because of their high-level positions of control and authority as senior executive officers of Cutera, possessed the power and authority to control, and did ultimately control, the contents of Cutera's SEC filings, press releases, content on the Company's website, and other market communications during the Class Period. The Individual Defendants were provided with copies of the Company's reports and other releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions within the Company and their access to material information available to them, the Individual Defendants knew that the adverse facts specified herein had not been adequately disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

C.    **Relevant Non-Defendant Cutera Executives**

56.    T.J. Huffman ("Huffman") served as the Company's Vice President, North American Sales from January 2020 to August 2024. According to CW 2, Huffman reported directly to Defendant Mowry. According to CW 1, the directive to move away from Cutera's core business to focus on Aviclear came directly from Mowry and Plants, and was discussed openly in many Aviclear meetings, which were also attended by Huffman. With respect to delivery problems for AviClear and other equipment, and customers canceling their AviClear orders because the delays were so long, CW 4 explained that it was "impossible" for Mowry and Huffman not to know about these companywide problems. Moreover, CW 4 indicated that these issues were raised

by many people, frequently, on company-wide townhall Zoom meetings where upper management was present. CW 4 recalled that Mowry, Huffman, Ables and Kreider were present on these townhall conferences. CW 1 recalled that many people raised concerns about supply chain problems, and Pinapati's performance, to Mowry. She elaborated that concerns were raised to Mowry by Huffman, Batarseh, Eckerman, Thier, Karavitis, and John Sennett.

57.    Michael Karavitis ("Karavitis") served as Cutera's Chief Technology Officer from August 2017 to September 2024. According to CW 8, Karavitis reported directly to Defendant Mowry. CW 1 recalled that many people raised concerns about supply chain problems, and Pinapati's performance, to Mowry. She elaborated that concerns were raised to Mowry by Huffman, Batarseh, Eckerman, Thier, Karavitis, and Sennett.

58.    Srinivas Pinapati ("Pinapati" or "S.P.") served as the Company's Vice President of Operations and Supply Chain from September 2019 to September 2023. According to CW 7, Pinapati reported directly to Defendant Mowry, and had been hired by Defendant Mowry. CW 7 elaborated that she and other employees told Pinapati about Cutera's parts backlog, which was "enormous."

59.    Guy Thier ("Thier") served as the Company's Chief Information Officer from October 2019 to October 2023. CW 1 recalled that many people raised concerns about supply chain problems, and Pinapati's performance, to Mowry. She elaborated that concerns were raised to Mowry by Huffman, Batarseh, Eckerman, Thier, Karavitis, and Sennett.

60.    Amy Ables ("Ables") served as the Company's Vice President, Customer Engagement and Sales Excellence from November 2021 to November 2023. According to CW 5, service problems with AviClear were discussed at weekly AviClear conference call meetings with Defendant Mowry, Monroe, Ables, and the Regional Managers.

61.    Austin Monroe ("Monroe") served as Director - Key Accounts North America from February 2022 to September 2022; Director, Product Marketing AviClear from September 2022 to March 2024; Director, Practice Marketing from March 2024 to August 2024; Director, Practice Development (Recurring Revenue Sales), North America from August 2024 to July 2025; and

Senior Director, Practice Development from July 2025 to present. According to CW 5, service problems with AviClear were discussed at weekly AviClear conference call meetings with Defendant Mowry, Monroe, Ables, and the Regional Managers.

62.    Austin Anderson ("Anderson") served as Regional Sales Manager at Cutera from February 2020 to May 2024. According to CW 2, Anderson reported directly to Huffman.

63.    Caroline Batarseh ("Batarseh") served as the Company's Senior Director of Over the Counter from May 2023 to June 2024. Prior to this, she served as Cutera's Manager of Sales Administration from July 2017 to August 2023. Batarseh also served as Cutera's Director of Order to Cash from May 2021 to April 2023. According to CW 1, Mowry knew about the inventory problems because Mowry was told by Batarseh, among others. Further, CW 1 recalled that Batarseh told CW 1 that she had told Mowry that Pinapati's inventory estimates were wrong.

64.    Shelby Eckerman ("Eckerman") served as Cutera's Vice President, Global Commercial Operations from 2019 through December 2021; Vice President, Global Commercial Operations and Business Development from January 2022 through December 2022; Vice President, Commercial Finance and Operations from January 2023 through June 2024; and Vice President, Finance from June 2024 to August 2025. According to CW 1, Mowry knew about the inventory problems because Mowry was told by Eckerman, among others. CW 1 also recalled that Eckerman told CW 1 that she had told Mowry that Pinapati's inventory estimates were wrong.

65.    John Sennett ("Sennett") served as Cutera's Senior Director of the Call Center from March 2021 to November 2023. According to CW 1, Mowry knew about the inventory problems because Mowry was told by Sennett, among others. Further, CW 1 recalled that Sennett told her that he had told Defendant Mowry that Pinapati's inventory estimates were wrong.

66.    Vikram Varma ("Varma") served as the Company's Senior Vice President, General Counsel, and Compliance Officer from May 2022 to June 2023. In his role as General Counsel, Varma reviewed, approved, and signed Cutera's false and misleading SEC filings.

### D.   Relevant Third Parties[5]

67.   CW 1 was employed at Cutera from before the Class Period through the fall of 2023 most recently in an executive leadership role. CW 1 was a member of ELT, attended ELT meetings, and worked on the AviClear program. CW 1 indicated that the company's supply chain problems started during the COVID epidemic, but continued afterwards, and the company struggled with supply chain and inventory issues throughout 2023. CW 1 added that these problems were known to Mowry, who appeared to protect Pinapati and refused to take action. Further, she recalled that many people raised concerns about supply chain problems, and Pinapati's performance, to Mowry. She elaborated that concerns were raised to Mowry by Huffman, Batarseh, Eckerman, Thier, Karavitis, and Sennett.

68.   CW 2 was employed at Cutera in Sales for the second half of 2022. She reported to Anderson. According to CW 2, Anderson reported directly to Huffman; Huffman reported directly to Defendant Mowry. CW 2 explained that she and the Therapeutic Specialty Representatives ("TSR"), were hired to sell AviClear exclusively. CW 2 added that she and most of the TSRs were laid off in December 2022 for failing to meet their sales quotas. According to CW 2, there was pushback from customers regarding AviClear, and some customers were so dissatisfied with AviClear that they tried to send it back.

69.   CW 3 was employed at Cutera as a Senior Sales Representative—Capital Sales from approximately August 2022 through December 2022. She reported to Anderson, who reported directly to Huffman. CW 3 previously worked in medical device sales and was recruited to join Cutera for its launch of the AviClear acne treatment product.

70.   CW 4 was employed as a Key Account Manager ("KAM") at Cutera from approximately March 2021 through February 2023. She was based in the Houston, Texas area. She reported to the former Regional Manager, Key Accounts, at Cutera, who in turn reported to Ables. With respect to delivery problems for AviClear and other equipment (i.e., the delivery times were "way too long" and that there were long delays after the promised delivery dates) and

---

[5] All CWs are described in the feminine to protect their identities.

customers canceling their AviClear orders because the delays were so long, CW 4 explained that it was "impossible" for Mowry and Huffman not to know about these companywide problems. She indicated that these issues were raised by many people, frequently, on company-wide townhall Zoom meetings where upper management, including Defendant Mowry, was present.

71.     CW 5 was employed at Cutera from approximately March 2020 through May 2023. Her title was Regional Manager, Key Accounts. During her employment, she reported to several different managers, in chronological order: Monroe; then to Ables; then, beginning in February 2023, she reported to Amanda Rodner, Vice President, Key Account Management Team, North America. She explained that, as Regional Manager, she managed 10 to 12 KAMs in their day-to-day duties, which included driving utilization of consumables and treatments by customers. CW 5 further advised that, after AviClear was launched, she participated in weekly conference call meetings with Defendant Mowry, Monroe, Ables, and all the other Regional Managers.

72.     CW 6 was employed as a Senior Field Service Engineer ("FSE") at Cutera from approximately October 2021 through February 2023. CW 6 described the company as having "no inventory control," advising that one could simply walk through the warehouse and "put stuff in your pocket" without any difficulty. She added that Cutera "supposedly" used SAP for inventory management, but the actual inventory was not kept behind closed doors or in a controlled environment. As a result, she explained, when Cutera had to conduct an inventory count, it effectively shut everything down at the company for a week or more, which was another "logistics nightmare."

73.     CW 7 was employed at Cutera from October 2003 until September 2022, ultimately working as Senior Director of Service, responsible for overseeing the Call Center, Tech Support, and Contract Sales departments. During the Class Period (and before), CW 7 reported to Pinapati.

74.     CW 8 was employed at Cutera from approximately October 2017 through October 2023. Her most recent title was Senior Director, Field Service, North America. CW 8 added that, over the last few years of her employment, she reported to Pinapati and then to Karavitis. CW 8

explained that the Field Service team was responsible for performing maintenance, repairs, upgrades, and related work on the equipment purchased by Cutera's customers.

## IV.    SUBSTANTIVE ALLEGATIONS OF FRAUD[6]

### A.    Overview of Cutera's Business

75.    Cutera, headquartered in Brisbane, California, is a global provider of laser and other energy-based aesthetic and dermatology solutions for medical practitioners worldwide. Cutera was formed in 1998 as a Delaware corporation. Cutera's operations are segregated into two reportable business segments: (i) Core Capital (which included core capital equipment and consumables), and (ii) AviClear.

#### 1.    Cutera's Business Models

##### a.    Core Capital

76.    Core Capital includes sales of non-AviClear equipment and related one-time use products necessary to perform treatments with the equipment. One-time products, referred to as consumables, include the sale cycles—the fees for system usage on a treatment-by-treatment basis—and consumable products, the physical materials used for each cycle, such as needle cartridges and sticky pads.

77.    Core Capital drives a substantial portion of Cutera's total revenue. In 2022, when Cutera first introduced AviClear, Core Capital accounted for 98% of total revenue. Almost two years after the AviClear rollout, in the quarter ended September 30, 2023, Core Capital still accounted for over 91% of total revenue.

78.    Core Capital also generates revenue from consumables. CW 3 indicated that the company makes more money on the sales of consumables than the devices themselves because the consumables were a constant revenue stream. Consumables were thus an important component of Cutera's business. Not only did consumables provide Cutera with a recurring revenue stream, but consumables were necessary for customers to be able to use the devices and capital equipment that

---

[6] Unless otherwise noted, all references to Cutera's business and operations refer to events that occurred during the Class Period as defined herein.

they bought or leased. That is, if Cutera did not have enough consumables to accompany the devices that Cutera sold to customers (as was the case here), then customers would not be able to use the devices and capital equipment. Worse, Cutera would not receive any recurring revenue from consumables, and, on top of that, be faced with angry customers who were left with useless equipment. Having control over its inventory was therefore critical to Cutera's financial performance.

### b.    AviClear Business

79.    During the Class Period, Cutera embarked on an all-hands-on-deck initiative to place its new acne treating device called AviClear into as many customers' offices as possible, no matter the cost. AviClear, as Cutera described, is a laser treatment that offers a prescription-free solution for acne. Cutera began a limited commercial launch of AviClear in April 2022. On April 5, 2022, Cutera issued a press release announcing that the first patient outside of clinical trials was treated with AviClear. And in November 2022, Cutera had its full commercial release of AviClear.

80.    Cutera developed a new AviClear leasing model (which differed from Cutera's other businesses), in part, to compete with a similar product called *Accure*, which was coming to market around the same time as AviClear. CW 2 confirmed that Cutera shifted to this lease or subscription model for AviClear in reaction to *Accure*, which the company knew would soon be entering the market. CW 2 indicated that Cutera wanted to get AviClear into the market as quickly as possible, and into as many customers' offices, to preempt that competition. This rush to beat competition, however, caused AviClear device failures due to Cutera's failure to test the equipment as much as it should have, as described further below.

81.    According to CW 1, the reason Cutera adopted the leasing model, in contrast to normal capital sales, was because "one executive chairman decided" that the leasing plan was a "great model," and no one could argue with him. That executive chairman, CW 1 added, was Defendant Plants. According to CW 1, the leasing model is not unique in the industry: it had been tried twice at two other aesthetic device companies, *Venus Concepts* and *Xtrac*. CW 1 advised that

at least four people told Defendant Mowry that the leasing model for AviClear would not work: Karavitis, Crider, Seth, and CW 1 herself.

82.     Further, the problem with the new sales model for AviClear, according to CW 3, was that the doctors did not want to do it, explaining that the doctors preferred to pay approximately $100,000 to own the equipment outright and not to have to split fees. CW 3 added that, because there was no cost to the doctors to have the AviClear equipment, the doctors did not need to use it to make money.

83.     Evidencing the importance Cutera placed on selling AviClear, Cutera not only assembled an AviClear-exclusive sales team (*i.e.*, TSRs), but Cutera also permitted capital equipment representatives to sell AviClear devices. In fact, they were not just permitted to do so, they were directed to do so by Defendants.

84.     CW 1 confirmed that the directive to move away from Cutera's core business to focus on AviClear came directly from Mowry and Plants, and was discussed openly in many AviClear meetings, which were also attended by Huffman.

85.     Regarding usage trends for AviClear, CW 2 understood that the company was falling far short of its goals. CW 2 stated that, to fix the shortfall, management authorized the capital equipment sales reps to move in and start selling AviClear to both medical and aesthetic dermatologists and med spas. According to CW 2, Defendants intentionally undercut Cutera's AviClear-exclusive salesforce and diverted resources away from the capital equipment reps haphazardly to get all hands on deck selling AviClear, despite the fact that strategy hurt the selling prospects for both Core Capital and AviClear-exclusive reps alike.

**2.      Cutera Was Required to Implement Internal Controls Over Financial Reporting**

86.     Federal law requires that the CEO and CFO of public companies, such as Cutera, certify their company's quarterly and annual reports filed with the SEC and the procedures established by those companies to prepare the financial statements and disclosures.

87.     Section 302 of SOX—designed to ensure that a public company's CEO and CFO take a proactive role in their company's public disclosures and to instill investors with confidence

concerning the accuracy, quality, and reliability of a company's periodic SEC reports—requires that a CEO and CFO of a public company address the following topics in annual SEC filings (*i.e.*, a Form 10-K for Cutera): (i) the material accuracy and fair presentation of the report's disclosures; (ii) establishment and maintenance of "disclosure controls and procedures" ("DCP"); and (iii) any material changes to the company's internal controls over financial reporting ("ICFR").

88.	Specifically, the CEO and CFO must certify that: (i) they have reviewed the periodic report; (ii) it does not contain any untrue statement of material fact or omit to state a material fact necessary to make any statements made not misleading; (iii) based on their knowledge, the financial statements and other financial information fairly present the financial condition and operations of the company; (iv) they have maintained disclosure controls and internal controls and have designed such controls to ensure that all material information is made known to them and to provide reasonable assurance regarding the reliability of financial information; and (v) they have disclosed to the audit committee and auditors all significant deficiencies and material weaknesses in the design or operation of internal controls. These certifications communicate to investors that all material information required to be disclosed is contained in the report.

89.	Section 404 of SOX requires management of public companies such as Cutera to establish and maintain a system of internal controls relating to, among other things, financial reporting. Section 404 further requires management to document, test, and maintain those controls and procedures to ensure their effectiveness, as well as to assess and report on the design and operating effectiveness of internal controls over financial reporting on an annual basis. Ultimately, Section 404 requires that management of a public company annually evaluates the effectiveness of the company's ICFR and discloses the conclusion, including any material weaknesses, to investors.

90.	Section 404 of SOX was "intended to bring information about material weaknesses in [internal controls] into public view." SEC Release 33-8810. Under Item 308 of Regulation S-K, 17 CFR § 229.308(a)(3), "[m]anagement is not permitted to conclude that the registrant's

internal control over financial reporting is effective if there are one or more material weaknesses in the registrant's internal control over financial reporting."

91.     A material weakness, as defined within Cutera's Forms 10-K, is "a deficiency, or combination of deficiencies, in [internal control over financial reporting] such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis."

92.     Section 404 of SOX requires management of public companies to select an internal control framework and then assess and report on the design and operating effectiveness of those internal controls on an annual basis. According to the Company's filings, Cutera adopted the "Committee of Sponsoring Organizations of the Treadway Commission (COSO) Internal Control Framework." The COSO Framework states: "[i]nternal control is a process, effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives" relating to (i) effectiveness and efficiency of operations; (ii) reliability of financial reporting; and (iii) compliance with applicable laws and regulations.

93.     COSO identifies five interrelated components of internal control: (i) control environment, (ii) risk assessment, (iii) control activities, (iv) information and communication, and (v) monitoring activities. COSO requires that: "[e]ach of the five components of internal control and relevant principles is present and functioning [and that] [t]he five components are operating together in an integrated manner." COSO also identifies that these components are relevant to an entire entity and to the entity level, its subsidiaries, divisions, or any of its individual operating units or functions.

94.     A "restatement" is "the process of revising previously issued financial statements to reflect the correction of an error in those financial statements." (ASC 250-10-20, Accounting Changes and Error Corrections.) When an error is identified that is material to previously issued financial statements, an entity is required to restate and reissue those financial statements. (ASC 250-10-45-27 and ASC 250-10-S99.)

95.     Under the above federal laws, Defendants were required to implement internal controls over Cutera's financial reporting, to certify the accuracy of such reporting and that no material weaknesses exist, and to issue a restatement for quarters where material errors in the financial reporting exist. As explained herein, Defendants failed to implement adequate internal controls for several quarters, as evidenced by Cutera restating its financials for the first and second quarters of 2023.

**B.      Ineffective Internal Controls and Problems Relating to Supply Chain and Quality Control Harmed Cutera's Business**

96.     Notwithstanding the above-referenced requirements, throughout the Class Period, Defendants concealed from investors a number of severe problems that contributed to Cutera's dramatic nosedive, including: (i) a lack of control over inventory and internal controls weaknesses; (ii) widespread supply chain problems leading to order fulfillment problems and parts availability backlogs; (iii) rampant quality control and reliability problems, equipment breakdowns, and unmet demands for equipment repairs and service; and (iv) managements' failure to effectively execute the AviClear rollout, including over-indexing resources to place AviClear devices at the expense of Cutera's core business.

**1.      Cutera Lacked Control Over Inventory, Supply Chain, and Internal Controls**

97.     Since the beginning of the Class Period, Cutera had no control over its ITGC or inventory controls, which worsened when Cutera tried to implement a formal ERP system. Generally speaking, an enterprise resource planning ("ERP") system helps a company manage each of its business operations from a single platform, which includes managing all aspects of the company's inventory in real time, including costs, orders, products and materials in stock, and supplier information.[7] All companies that deal with sales and inventory would therefore be expected to employ a robust ERP system.

---

[7] According to CW 8, SAP was the brand name for the ERP, or inventory control system, that Cutera was using. CW allegations use the terms "ERP" and "SAP" interchangeably, and are synonymous for purposes of this Action.

98.    Moreover, Cutera's version of Salesforce, a system designed to track Cutera's labor, travel time, and parts used on service calls was also obsolete and ineffective.[8] Indeed, CW 6 indicated that while the company had an inventory system prior to the implementation of SAP and Salesforce in 2022, it was not a "formal" system, which she described as a "very generic inventory" system.

99.    Cutera announced on February 22, 2022 that it would ramp-up investment in a long-awaited ERP system throughout the year to enable "long-term scalability" of the Company's operations, and finally took its new system live in the first quarter of 2022.[9] This upgrade to a new ERP system exacerbated the problems plaguing Cutera's information technology infrastructure related to the Company's internal controls over financial reporting and inventory count controls. Indeed, at least since the beginning of the Class Period, Cutera had extensive problems managing and controlling its inventory and maintaining adequate internal controls of its financial reporting and overseeing its operations.

### a.    Cutera's Inventory Controls Systems Were Initially Obsolete and Ineffective After Upgrading

100.    As investors later learned, the Company-wide weaknesses in ITGC went hand-in-hand with internal weaknesses in Cutera's inventory controls, which were exacerbated by the botched rollout of the ERP/SAP system. As Defendants admitted in April 2023, the material weaknesses over inventory controls "related to the completeness, existence, and cut-off of inventories held at third parties, inventories held by sales personnel, and inventories in transit, and

---

[8] Salesforce.com provides companies with software and applications focused on sales, customer service, marketing automation, analytics, and application development. Salesforce therefore helps companies store, organize, and track customer and product data.

[9] By way of background, on October 9, 2018, Cutera first announced it was considering implementing a unified ERP system. During an Investor Day presentation held on that day, Karavitis described the adoption of a new ERP as part of a larger effort to streamline the Company's operations, explaining: "On the operating side, we are focused on the operational improvement activities, which are outsourcing system assembly, the manufacturing footprint of the headquarters, establishing distribution centers, rightsizing inventory levels, and we are looking at a new ERP system." Prior to the ERP implementation, Cutera was, as former CFO James Reinstein explained during an investor call on August 7, 2018, "still in the manual world of processing orders and managing inventory."

controls related to the calculation of adjustments to inventory for items considered excessive and obsolete."

101.    Multiple CWs recalled that since the start of the Class Period, Cutera had problems controlling and overseeing its inventory, supply chain, and internal controls. For example, CW 8 recalled that Cutera never had a formal ERP system prior to the system implemented in January 2022. CW 8 indicated that the Field Service team used Salesforce to track its labor, travel time, and parts used on service calls. CW 8 added that the older version was not meeting certain compliance requirements, so the company upgraded. She commented, however, that Cutera invested just enough money in the systems to make them work, but not enough to make them work effectively. Likewise, CW 6 recalled that Cutera had problems implementing the new Salesforce and SAP systems. She added that the company "went cheap," and the implementation went "catastrophically downhill" as a result.

102.    CW 8 explained that the change to the new SAP system began in January 2022, and the change over to the new Salesforce system began in approximately February 2022. CW 8 indicated that the process to identify which parts were used or needed was not clearly defined in the system. As a result, she explained, parts would be used by the engineers but would still appear in the system as available. In other words, she added, the system would show that a particular part was available in the warehouse, when it was not.

103.    To make matters worse, Cutera employees were not formally trained on the new ERP/SAP and Salesforce systems until months after their implementation—meaning that even if the systems had worked properly (which they did not), the systems would still be ineffective since the workers were not trained on them. For example, CW 8 explained that there were two to three months of using these new systems without any formal training. CW 8 emphasized that even two to three months after implementation, during the training, the system was still not working correctly; it continued to not work correctly for a long time after. CW 8 commented that "it was a mess."

104.    Nor was there any oversight of these new systems when they were first implemented, which contravenes Defendants' obligations to monitor its inventory controls. Indeed, CW 8 commented that it was "almost like there was no oversight" for the first few months with the new systems. CW 8 also recalled that there was no process in place for management to review open work orders or to monitor whether work was completed. She noted that some work orders which were completed remained open in the system, because there was no process for entering that completed work order in the system, to show that it had been done, and to enter the parts and labor used in the work order properly.

105.    With no training on and no oversight of the ERP/SAP and Salesforce systems—systems whose primary responsibility was to manage the Company's inventory—problems with tracking inventory naturally occurred. One such problem was that the amount of inventory that the systems displayed never matched the actual physical inventory at Cutera's facility. Consequently, such a mismatch led to the inaccurate accounting of such inventory (and related financial metrics) on Cutera's financial statements—as Defendants later admitted was the case for several quarters during the Class Period.

106.    For instance, regarding the problem of the SAP system showing parts on hand in the warehouse when those parts in reality were unavailable, CW 8 explained that those problems started in approximately the second or third quarters of 2022. She also noted that there were "loads" of back-order parts in the system, and that logging the consumption of parts by the FSEs in the system was cumbersome, which contributed to the inventory counts being off.

107.    Critically, CW 8 recalled the problem of discrepancies between parts listed in the system with parts available in the warehouse was raised in meetings. She noted that the FSEs carried inventory, referred to as "trunk stock," with them for their work orders. Indeed, she added that the FSEs were required periodically to conduct an inventory count of their trunk stock and report the results to accounting, and that these counts were done at least annually, sometimes more frequently, and that there were occasional one-off or spot checks of trunk stock inventory. CW 8

added that Cutera's vice presidents reviewed that information, including Thier. Her understanding was that Rohan Seth also saw that information.

**b.    Defendants' Controls Over Cutera's Physical Inventory Were Non-Existent or Inadequate**

108.    In addition to the botched rollout of the ERP/SAP and Salesforce systems, Defendants also failed to establish any meaningful controls over the physical inventory stored in the Company's warehouse. For example, CW 6 explained that she had visited the warehouse facility in the company's headquarters, which is where the inventory was stored and where the company's main offices were also located. She recalled that while employees needed a key to enter the building itself, all Cutera employees had access to the building. Once inside, she added, there were no access controls for the warehouse section itself. Specifically, CW 6 explained that there were no designated rooms within the building to keep inventory securely; instead, inventory was everywhere, including in the hallways. She described how anyone could walk in, put parts in their pocket, and simply walk out without getting caught.

109.    Furthermore, CW 6 explained that Cutera's management—specifically Pinapati—knew that anyone could walk into the warehouse area and take parts, as management's offices were in the same building. CW 6 added that management's offices, including Mowry's, were on the first floor of the building, the same floor as the inventory, but then management's offices eventually moved to the second floor of the building.

110.    CW 6 indicated that Pinapati had been told several times about the inventory problems. CW 6 recalled that the FSEs raised their concerns about availability of parts to their managers and field directors, who in turn raised the concerns to Pinapati, who ran the Field Service group. She also recalled a conference call meeting with Pinapati and all the FSEs in June or July 2022 to discuss these problems. During that call, CW 6 recalled, Pinapati told the FSEs that everything would be fixed, and inventory processes brought under control within 30 days, and that it was his top priority. She added that, despite Pinapati's assurances, nothing changed.

111.    Furthermore, it was CW 6's understanding that Pinapati was part of regular meetings with Mowry and other Vice Presidents all the time, as she noted there were frequent

meetings of company management at its Brisbane headquarters. Cutera's senior executives, especially Mowry, therefore knew about the lack of control over inventory which ultimately caused the Company's internal controls to fail, or at the very least were reckless in not knowing about such problems considering, among other things, that they were explicitly told about inventory problems and worked in the very same building in which any Cutera employee could walk in and remove inventory. Yet Defendants did nothing to maintain adequate internal controls.

          **c.**      **Cutera's Lack of Adequate Inventory Control Systems Led to an Inability to Fulfill Customer Orders, Manage the Supply Chain, and Properly Account for Inventory**

112.     The problems with Cutera's ERP/SAP system and Defendants' lack of control over inventory created supply chain constraints and severely impacted Cutera's ability to fulfill customer orders, and thus harmed Cutera's business. In fact, as explained further below, these inventory problems ultimately resulted in an extended plant shutdown. For example, CW 5 noted that, at one point in late 2022 or early 2023, the company stopped shipping everything to customers, including consumables.

113.     CW 1 indicated that the company's supply chain problems started during the COVID epidemic, but continued afterwards, and the company struggled with supply chain and inventory issues throughout 2023. She explained that the source of the problem was Pinapati, whom CW 1 described as "asleep at the wheel." She added that there was also excess inventory on devices that Cutera barely sold, but minimal or lack of inventory for the company's top three sellers, including Tru Sculpt, AviClear (due to the push to place units), and Secret Pro. In contrast, CW 1 continued, there was excess inventory for products that barely sold.

114.     CW 1 added that these problems were known to Mowry, who appeared to protect Pinapati and refused to take action. She also recalled Mowry knew about the inventory problems because Mowry was told by Batarseh, Eckerman, and Sennett. She indicated that Batarseh, Eckerman, and Sennett told CW 1 that they had told Mowry that Pinapati's inventory estimates were wrong.

115. CW 1 further elaborated that many people raised concerns about supply chain problems, and Pinapati's performance, to Mowry. She elaborated that concerns were raised to Mowry by Huffman, Batarseh, Eckerman, Thier, Karavitis, and Sennett. Indeed, CW 1 indicated that she raised the same concerns to Mowry herself, and that these problems were discussed all throughout 2023. She added that when Defendant Hopkins became Interim CEO, she also refused to take steps to correct the supply chain problems and even gave Pinapati a retainer bonus to stay with Cutera.

116. Notably, as a result of Cutera's complete lack of internal controls over inventory and the supply chain (problems of which were worsened as a result of the AviClear rollout), Defendants filed several quarters of financial statements that contained materially false and misleading financial figures related to cost of revenue, gross profit, gross margin, operating loss, and inventory—which the Company admitted constituted material errors by the need to file a Restatement. Indeed, on March 5, 2024, Cutera confirmed "there was a shortfall of inventory relative to the Company's system of record." In other words, Cutera previously reported financial statements including inventory that simply did not exist. As a result of this accounting breakdown, Cutera overstated inventory and therefore understated cost of revenue in its previously issued financial statements for the first and second quarters of 2023.

### 2. The AviClear Rollout Was a Disaster

#### a. Defendants Rushed the AviClear Rollout in Order to Maximize Their Personal Compensation

117. In July 2021, per Cutera's May 2, 2022 SEC filing, Cutera's Compensation Committee granted performance share unit ("PSU") awards to the Company's then-named executive officers and certain other individuals and selected performance targets for these awards (the "AviClear Incentive Plan"). These PSU awards related to the commercialization of AviClear and were designed to incentivize and retain the key individuals involved in this program. Critically, the near-term achievement milestones were linked primarily to placing AviClear devices—not whether AviClear was actually used by practitioners or generating revenue for Cutera. In other words, throughout 2022 and 2023, Defendants were more financially motivated to place AviClear

devices, rather than ensure that practitioners used the devices. The following table shows the performance targets applicable to our AviClear Incentive Plan:

| Metric | Weighting of Goal | Achievement Timeframe |
|---|---|---|
| (1) FDA approval and first US placement of the AviClear device | 10% | FDA approval received in March 2022 and first placement in April 2022. |
| (2) Placing a predetermined quantity of devices | 20% | April 2023 |
| (3) Achieving a predetermined number of average treatments per device | 30% | October 2024 |
| (4) Exceeding a predetermined trailing 12-month revenue target | 40% | October 2025 |

118.   As the above chart illustrates, 10% of Defendants' bonuses hinged on getting the AviClear devices approved and placed in service by April 2022, and 20% of Defendants' PSU awards hinged on them placing a predetermined quantity of AviClear devices prior to April 2023.

119.   The shares of Cutera's common stock that were earned upon the successful achievement of a performance target were set to vest one year from the achievement date, subject to the named executive officer continuing to provide service to Cutera through the vesting date. The following table sets forth the grant date fair value of the performance-based awards granted to the named executive officers in July 2021:

| Name | Grant Quantity | Grant Date Value(1) |
|---|---|---|
| Mr. Mowry | 33,000 | $ 1,574,760 |
| Mr. Plants | 10,000 | $ 477,200 |
| Mr. Seth | 22,000 | $ 1,049,840 |
| Mr. Karavitis | 50,000 | $ 2,386,000 |
| Mr. Thier | 16,667 | $ 795,349 |

120.   As the tables demonstrate, before and throughout the Class Period, Defendants were incentivized to place as many AviClear devices as possible, as quickly as possible, and would not need to shift focus to utilization and achievement of the revenue targets until much later. Indeed, knowing that they would receive bonuses for placing a certain number of AviClear devices early on, certain Individual Defendants—particularly Mowry and Plants—directed all sales teams to focus only on AviClear—while knowing or recklessly disregarding that the rest of Cutera's businesses would continue to suffer as a result, which is exactly what transpired. In addition, these Individual Defendants were further motivated to conceal from the public the pushback Cutera was

receiving from customers concerning the AviClear device to prevent new customers from not leasing the AviClear device once learning about the underlying problems Cutera was facing.

121. Notably, as detailed below, the Board ultimately concluded, as one of the reasons for terminating Defendant Plants in April 2023, that "Mr. Plants was far more interested in his own personal enrichment than in leading the Company for the benefit of all stakeholders."

122. In trying to achieve ostensibly performance-related equity grants, Defendants (particularly, Defendant Plants) decided to adopt a new lease-based commercial model to get AviClear devices into customers' offices as quickly as possible. However, such a plan had unintended (yet internally known) consequences, which included using a leasing model that customers rejected and pumping out a product not fully tested, which led to AviClear device failures, upset customers, and returned devices—all of which contributed to inventory buildup.

123. Indeed, CW 1 advised that at least four people told Defendant Mowry that the leasing model for AviClear would not work: Karavitis, Crider, Seth, and CW 1 herself. According to CW 1, people could not convince Plants and Mowry that the AviClear model was failing. As she explained, Plants and Mowry only wanted to place more and more devices in customers' offices, claiming that doing so would get them "over the hump." CW 1 elaborated that Plants and Mowry emphasized placement of AviClear devices because they were aiming for a performance objective milestone which would "fetch" them another 20% in performance stock units, which was called an "Acne Equity Grant."

124. CW 1 stated that the poor sales performance was clear internally. She added that management was concerned because AviClear was not meeting projections by the end of Q2 and "definitely" not by end of Q3 of 2022. CW 1 indicated that AviClear's poor financial performance would have been discussed in meetings with the "ELT," or Executive Leadership Team, which included Defendant Seth, as well as Karavitis, Their, and Crider, and possibly current VP of Corporate Development and Strategy Mindy Huynh. CW 1 added that she joined the ELT at one point, so she was present for at least some of the meetings in which AviClear's poor performance was discussed. CW 1 noted that the numbers were off by "a lot," indicating that the projections

were for approximately $20-25 million, but they wound up earning only about $6 million in revenue. CW 1 further noted that half of the $6 million was generated in Q4, so that between Q2 and Q3, AviClear only made $3 million in revenue.

125.   In fact, often the only reason customers' offices accepted the AviClear device in the first place was because the Company's sales teams gave the offices the device for free. For example, CW 2 advised that Cutera was able to place units in customers' offices, especially since many capital equipment sales reps were allowed to give the equipment away for free, bundled into other equipment purchases. She noted, however, that Cutera was not seeing much revenue from those placements. Regarding usage trends for AviClear, CW 2 understood that the company was falling far short of its goals, and that its forecast numbers for treatment revenue were overly inflated. She stated that she and other TSRs tried to communicate their concerns about inflated forecasts to Huffman and Anderson, but their warnings were disregarded.

126.   Similarly, CW 3 explained that Cutera's existing capital equipment sales reps, who sold the company's other products, were also selling AviClear. She explained that the capital sales reps had more success than the exclusive AviClear reps because the capital reps gave the device away for free as an add-on, or bundled into the purchase of other capital equipment, at no extra cost; the customers would pay Cutera only the 50% of the treatment fee. CW 3 characterized this sales practice as making it look like AviClear's sales were strong, but they were not, since the company was not making any money getting the equipment into doctors' offices; Cutera earned revenue only if the doctors / customers were using the product.

127.   Because of Defendants' rush to get AviClear devices into the market, Defendants cut corners with testing the product, leading to the AviClear device frequently failing. For example, CW 7 advised that the AviClear product had a "higher than normal" failure rate when it was launched compared to Cutera's other products. CW 7 explained that AviClear's high failure rate was caused by the company's rushed timeline in pushing the new product to market.

128.   CW 2 summarized the problems with the AviClear rollout and customer pushback: the treatment was painful, contrary to Cutera's claims; it was expensive, especially compared to

other forms of acne treatment; the results took too long to be noticeable; and Cutera's service support was very poor after the equipment was delivered. CW 2 indicated that some offices were so dissatisfied with AviClear that they tried to send it back. CW 2 added that there was "lots of pushback" from medical dermatologists regarding treatment costs because those dermatologists could treat acne effectively with other products covered by insurance.

### b.    As a Result of the Rushed AviClear Rollout, Customers Declined to Purchase and/or Returned the Devices

129.    Consequently, the problems that arose out of the rushed AviClear rollout manifested into poor AviClear sales and utilization rates. That is, customers did not want to buy or use AviClear. Worse, CW 2 explained that some offices were so dissatisfied with AviClear that they tried to send it back.

130.    And when customers inevitably returned products, since Cutera did not have a working ERP system, Cutera ultimately double-counted many of those returns, further contributing to its internal controls problems that required Restatement. Despite the massive investments in AviClear, Defendants were overpromising and underdelivering on associated revenue returns, and everyone at Cutera—including the Company's highest-ranking executives—was aware.

131.    Indeed, multiple CWs confirm that the problems with physician and patient uptake of AviClear were apparent to employees at all stages of AviClear's rocky rollout. For example, CW 1 noted that poor sales performance was clear internally. She added that management was concerned because AviClear was not meeting projections by the end of Q2 and "definitely" not by end of Q3 of 2022.

132.    CW 1 further described that "everyone in the company" knew that AviClear was struggling. She indicated that she **personally raised the problem to Mowry** in or around January 2023. CW 1 also recalled others telling her that they had also spoken to Mowry about their concerns with AviClear's poor financial performance as well, adding that she knew specifically that her supervisor Karavitis spoke to Mowry about it. She further noted that Seth told her that he had raised the same concerns to Mowry, also sometime in the first quarter of 2023. CW 8 indicated

that **some customers also sent complaints about their downed systems to Defendant Mowry directly**. CW 8 recalled Defendant Mowry referred to customer complaints as "noise."

133.    Indeed, these were not one-off conversations; Cutera's top senior management, including Mowry, discussed AviClear's poor utilization rates internally on a regular basis. For example, CW 5 advised that, after AviClear was launched, she participated in weekly conference call meetings with Mowry, Monroe, Ables, and all the other Regional Managers. Management held these calls specifically to discuss AviClear's performance, including placement of the devices, utilization rates, and revenues for the product. CW 3 confirmed that Huffman was aware of the practice of giving away the AviClear equipment for free as part of a purchase of other equipment. She advised that he encouraged the practice of doing so to create a "buzz" for the product, which never happened. She reiterated her understanding that usage rates for AviClear were low; doctors were not using it.

134.    Regarding usage trends for AviClear, CW 2 understood that the company was falling far short of its goals, and that its forecast numbers for treatment revenue were overly inflated. She reiterated that she and the TSRs tried to communicate their concerns about inflated forecasts to Huffman and Anderson, but their warnings were disregarded. She added that those warnings were based on feedback that the reps were getting from their customers, and those concerns were raised to Huffman and Anderson from the start of her employment. CW 2 indicated that management refused to listen to that feedback or try to address it. CW 2 added that TSRs who raised these concerns were attacked and criticized during meetings.

135.    CW 2 noted that many of her contacts informed her that they would not deal with Cutera due to a reputation for poor customer support and questionable practices. CW 2 indicated that she and her colleagues communicated these concerns—and the problems raised by customers who were not responding positively to AviClear—to Anderson and Huffman. She added that these concerns were raised with Anderson and Huffman early, and repeated frequently, during weekly sales team conference calls. She recalled that Huffman and Anderson "didn't want to hear" their feedback, disregarded their concerns, and chastised the sales staff for voicing those concerns.

136.    Moreover, with respect to delivery problems for AviClear and other equipment (i.e., the delivery times were "way too long" and that there were long delays after the promised delivery dates) and customers canceling their AviClear orders because the delays were so long, CW 4 explained that it was "impossible" for Defendant Mowry and Huffman not to know about these companywide problems. She indicated that these issues were raised by many people, frequently, on company-wide townhall Zoom meetings where upper management was present. She recalled that Defendant Mowry, Huffman, Ables, and Kreider were present on these townhall conferences.

### c.    The AviClear Rollout Took Resources Away from Core Capital

137.    Once the Company began rolling out AviClear, Defendants allocated too many resources to placing AviClear devices in customers' offices, and Cutera's other main divisions, such as Core Capital, suffered as a result. Notably, Defendants admitted that Cutera was "utilizing the same sales force to place AviClear and sell our core capital equipment," and that the "North American capital team focused its efforts on driving AviClear bookings and perhaps over-index[ed] some of their efforts."

138.    Defendants admitted that Cutera "took its eye off the ball on the core business as it was pushing aggressively in acne," *i.e.*, AviClear, and that "[sales] team took their eye off the ball for the rest of the business, primarily in the US and leading to a majority of the revenue shortfall we see here in the quarter."

139.    Multiple CWs similarly confirm that Defendants' decision to pour Cutera's resources into AviClear severely harmed Cutera's legacy business segments, especially with respect to the dramatic shift in the sales organization. Critically, CW 1 confirmed that the **directive to move away from Cutera's core business to focus on AviClear came directly from Mowry and Plants**, and was discussed openly in many AviClear meetings, which were also attended by Huffman.

### C.    Defendants Touted Cutera's Ostensible Internal Controls and the Supposed Success of the AviClear Rollout

140.    As described above, Cutera experienced multiple challenges involving its internal controls, inventory, supply chain, and AviClear rollout. Nonetheless, Defendants concealed these

problems from investors. Throughout the Class Period, Defendants concealed the fact they had a complete lack of discipline over Cutera's business operations and were not designing or implementing effective internal control measures. Specifically, Cutera had extensive problems maintaining effective internal controls over its inventory and overseeing its operations, which included implementing a complete failure of a new ERP system and Salesforce system, which were riddled with bugs, did not work properly, and were only a testing/training version—systems on which there was no formal training given for months after their implementation in the beginning of 2022.

141.    Once AviClear was launched, Defendants began misrepresenting the AviClear rollout's success. For example, on August 4, 2022, Defendant Mowry falsely touted that "***[d]uring the quarter, our team achieved the successful launch of AviClear***," despite the fact that the AviClear launch was a failure. As outlined by several former employees, in the second quarter of 2022 through the end of 2022, AviClear's performance was extremely poor, which was frequently discussed in meetings and known to Defendants.

142.    Although Defendant Mowry's statement led investors to believe that AviClear's launch was a success, in reality, the Company's strategy to rush AviClear into customers' offices at a rapid pace caused the Company's poor financial performance during the Class Period as it pulled too many resources away from Core Capital. Additionally, despite Defendants pushing AviClear onto customers, many of them were so dissatisfied with AviClear that they attempted to send them back. Critically, Defendants concealed these problems from investors.

143.    Moreover, on November 7, 2022, Cutera had its full commercial release of AviClear, announcing that AviClear was now broadly available to physicians treating patients throughout North America. However, CW 2 indicated that some offices were so dissatisfied with AviClear that they tried to send it back.

**D.    Cutera Announced Poor Financial Results, Partially Revealing the Company's Challenges with the AviClear Rollout, But Continued to Mislead Investors**

144.    The Company could keep its charade going only for so long before the truth began leaking into the market. Indeed, Cutera was an entirely different company than how Defendants

made it appear in the public eye. Not only were Cutera's financials hurting from the Company's unsustainable and improper business maneuvering, but those who were leading the charge were starting to see the writing on the wall (or more accurately, were forced to see the writing when faced with increased pressure from the Board).

145. For example, on January 4, 2023, a few days before Cutera announced its poor earnings results, Defendant Mowry informed the Board internally that he was planning to retire. Notably, the Company's Board had later explained that, "[a]s a Board, including Mr. Plants, we determined that we needed to hire a new Chief Executive for the Company and ramped up that process in late 2022" because "as a Board, we concluded that Mr. Mowry had not effectively executed the limited commercial rollout of our AviClear solution in the Fall of 2022." In fact, the Company explained that the Board's independent directors began exploring a CEO transition in November 2022—months before Defendant Mowry's announced his retirement plan. In other words, there is no question that the decision to replace Defendant Mowry as CEO was directly linked to his improper behavior relating, in part, to the failed AviClear rollout.

146. Investors began to learn the true state of the Company's financial condition and AviClear rollout on January 9, 2023 when the Company announced its preliminary financial results for the full-year 2022. In particular, despite assuring investors just two months earlier that the Company would finish the year "at the upper end of revenue guidance of $255 million to $260 million," Defendants revealed that the Company now expected revenue between $252 million and $253 million. Additionally, Cutera held meetings with analysts that same day, whereby Cutera specifically linked the earnings announcement to the unsuccessful AviClear rollout.

147. For example, on January 9, 2023, Piper Sandler reported that "[w]e and investors were clearly surprised with the announcement this morning of a revenue miss," and that they spoke with Cutera management and that Cutera **"took its eye off the ball on the core business as it was pushing aggressively in acne,"** *i.e.*, **AviClear**. Based on Piper Sandler's same conversation with Cutera management, Piper Sandler further reported: **"The sales team has understandably spent the majority of time pushing AviClear. However in doing so, the team took their eye**

**off the ball for the rest of the business, primarily in the US and leading to a majority of the revenue shortfall we see here in the quarter**."

148.    In response, Cutera's stock price fell $9.41 per share, or more than 23%, from a close of $40.45 per share on January 6, 2023, to close at $31.04 per share on January 9, 2023.

149.    Yet, the Company's stock price remained artificially inflated even after this news because not all of the concealed risks of Defendants' fraudulent conduct had materialized and investors still had not learned the full truth, and because Defendants continued to reassure the investors that the AviClear rollout was a success. For instance, Defendant Mowry touted on February 28, 2023, among other things, that "*we successfully launched and scaled operations of AviClear*"—despite the fact that the AviClear rollout was a complete failure, as set forth in ¶¶232-46, 248-54, 275.

150.    Then, during those first few weeks of January 2023, Cutera shut down one of its production facilities for three weeks as a result of problems related to an inventory audit, which Defendants did not disclose to investors until later in the Class Period. Defendant Hopkins later explained that the extended plant shutdown "impacted our ability to build inventory and ship product for a period of time."

151.    On February 28, 2023, the Company filed with the SEC a Notification of Late Filing, which explained that Cutera is unable, "without unreasonable effort and expense," to file its Form 10-K for the year ended December 2022, by the March 1, 2023 filing deadline. Cutera further stated within that notice that "the Company has identified and expects to disclose in the Form 10-K material weaknesses in its internal control over financial reporting related to ineffective information technology general controls and ineffective inventory count controls."

152.    On that same day, February 28, 2023, Defendants held an earnings call with investors to discuss the 2022 full-year financial results ("4Q 2022 Earnings Call"), where they further confirmed that the Company's revenue shortfall was caused by the Company's failed AviClear rollout.

153.    Specifically, Defendants explained the reasons for the miss on the earnings call:

Top line shortfall in the period was driven by a miss on the North American core capital equipment sales and, to a lesser extent, North American core consumable product sales. Both of which were directly impacted by the extend in volume of AviClear activity in the period as key account managers focused on promoting, placing and supporting the increased customer demand for AviClear. As previously disclosed, we are utilizing the same sales force to place AviClear and sell our core capital equipment. In fourth quarter 2022, the North American capital team focused its efforts on driving AviClear bookings and perhaps over-index[ed] some of their efforts.

154.    Cutera similarly explained during the 4Q 2022 Earnings Call that there was "a decline in Consumable revenue, which came in at $4.2 million down 22% as reported and 18% on a constant currency basis, driven by our clear account onboarding activities, diverting the attention of our sales team away from core promotional events."

155.    Thus, the poor financial results that were initially announced on January 9, 2023, which were attributed to the AviClear rollout and caused the Company's stock to drop were unquestionably a result of the failed AviClear rollout.

156.    Yet, despite the Company having just announced that its businesses were suffering due to the AviClear rollout, the Company reassured investors that they remedied the allocation of resources problem. For example, on the same 4Q 2022 Earnings Call, Defendant Mowry touted that "**strong underlying interest in AviClear quickly converted into customer demand that occupied our sales team throughout November and most of December**." At the same time, Defendants further reassured the market that impacts on Core Capital were tailwinds, as at that time "**sales reps finally pivoted back to their core capital pipeline**."

157.    However, not only were Defendants' reassurances false and misleading for the reasons set forth in ¶¶262-65, 268-271, but analysts were also misled to believe that Defendants had already addressed the problems. For example, Piper Sandler reported on February 28, 2023 that "**[Cutera] has addressed the root issue pertaining to the revenue miss from the core business** by changing its sales comp structure and tracking sales rep activities."

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS    43
CASE NO. 4:23-CV-02560-JST

**E.   Cutera Missed the Extended Filing Deadline and Disclosed an Additional Material Weakness, Yet Defendants Continued to Falsely Reassure Investors**

**1.   Cutera Missed the Extended Filing Deadline**

158.   Despite Defendants' attempt to hide the problems resulting from the AviClear rollout, the truth continued to leak out. Still faced with challenges related to AviClear—which Defendants had told the market were no longer challenges—Cutera announced on March 16, 2023 that it would not meet the extended deadline for filing its 2022 annual report, and would endeavor to file its 2022 annual report "as soon as practicable." The Company also announced that, in addition to the material weaknesses previously identified, Cutera had identified material weaknesses related to stock-based compensation. In response, Cutera's stock price fell $3.49 per share, or approximately 12.5%, from a close of $27.85 per share on March 16, 2023, to close at $24.36 per share on March 17, 2023.

159.   Still, the Company's stock price remained artificially inflated even after this news as the full truth had not yet been revealed and/or materialized. For example, as of this date, not all of the concealed risks of Defendants' fraudulent conduct had materialized and investors still had not learned the full truth, which included the terminations with cause of Defendants Mowry and Plants, the resignation of Defendant Seth, an extended plant shutdown that resulted from the Company's inventory problems and led to poor financial performance, that the AviClear rollout caused reliability problems and poor utilization trends, and that the Company's problems would cause Cutera to delay its Form 10-K filing in light of the reality that Cutera had been double counting returns on its subpar ERP system. Additionally, as of this date, investors had not learned about an additional material weakness related to Cutera's failure "to design, maintain and monitor a risk assessment program at a sufficiently precise level." Furthermore, as of this date, investors had not yet learned that a large contributor to Cutera's inventory buildup was related to AviClear devices.

160.   As detailed below, the Board's Special Committee (the "Special Committee") later linked the Company's late Form 10-K filing announcement to Defendant Mowry's poor AviClear rollout execution and leadership—explaining in April 2023 that the "Company's inability to

execute well was evident even from the outside; for example, Cutera filed its Form 10-K late." Additionally, also during April 2023, the Board terminated Defendant Plants, with cause, reasoning in part that "Mr. Plants was far more interested in his own personal enrichment than in leading the Company for the benefit of all stakeholders."

### 2. Cutera Revealed Nasdaq's Notice of Delisting

161. On March 24, 2023, Cutera filed a Form 8-K regarding a "Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing" with the SEC, disclosing that Cutera had received "a notice . . . from the Listing Qualifications Department of [Nasdaq] on March 21, 2023 indicating that the Company is not currently in compliance with Nasdaq's Listing Rules . . . due to the Company's inability to timely file its Form 10-K for the year ended December 31, 2022 . . . with the [SEC]." The Form 8-K further stated that the Nasdaq required the Company to submit a plan to regain compliance on or before May 22, 2023.

162. On April 7, 2023, the Company finally filed its late 2022 Form 10-K, and the Company announced on April 10, 2023 that it received a notice from the Nasdaq that Nasdaq has determined that the Company is now in compliance with the periodic filing requirement of Nasdaq Listing Rule 5250(c)(1).

### F. The Board Fired Defendants Mowry and Plants with Cause

163. On April 11, 2023, Cutera's directors decided to oust Plants as Chairman, terminate his employment as Executive Chairman, and to fire Mowry as CEO. On April 12, 2023, the truth was further partially revealed when the Company announced that, on April 11, 2023, the Board had terminated Plants as Cutera's Executive Chairman and Chairman of the Board and Mowry as Cutera's CEO "**with cause**." The Company also disclosed that the Board had simultaneously appointed Defendant Hopkins to serve as the Interim-CEO, effective immediately.

164. Cutera explained that the terminations of Mowry and Plants "follow[ed] joint and unanimous recommendations from a special committee comprising all members of the Board's Governance and Corporate Responsibility Committee and the majority of the members of the board of Directors." The Company further revealed that Plants "strongly recommended" the

termination of Defendant Mowry in November 2022. In connection with these disclosures, the Company announced that "it is withdrawing its full-year 2023 outlook."

165. In response, Cutera's stock price fell $7.63 per share, or more than 28%, from a close of $27.07 per share on April 11, 2023 to close at $19.44 per share on April 12, 2023.

166. Analysts were shocked and linked the stock drop to the news. For example, that same day, April 12, 2023, Piper Sandler suspended its rating, price target, and EPS estimates of Cutera following the Company's leadership change announcements. William Blair likewise issued a report on April 12, 2023, expressing that "the removal of CEO Mowry and chairperson Plants was a surprise to us after 10 Cutera executives (including the CFO and senior leaders in global marketing, strategy/corporate development, operations, FP&A, capital sales, and key account management) submitted a letter of support for Mowry and Plants on Tuesday night."

167. Still, the Company's stock price remained artificially inflated even after this news as the full truth had not yet been revealed and/or materialized. For example, as of this date, not all of the concealed risks of Defendants' fraudulent conduct had materialized and investors still had not learned the full truth, which included the resignation of Defendant Seth, an extended plant shutdown that resulted from the Company's inventory problems and resulted in poor financial performance, that the AviClear rollout caused reliability problems and poor AviClear utilization trends, and that the Company's problems would cause Cutera to delay its Form 10-K filing in light of the reality that Cutera had been double counting returns on its subpar ERP system. Additionally, as of this date, investors had not learned about an additional material weakness related to the Company's failure "to design, maintain and monitor a risk assessment program at a sufficiently precise level." Also, as of this date, investors had not yet learned that a large contributor to Cutera's inventory buildup was related to AviClear devices.

168. On April 17, 2023, the Special Committee issued a press release on behalf of the Special Committee, which elaborated on their terminations. The Special Committee explicitly linked Defendant Mowry's termination to the failed AviClear rollout, explaining that it terminated Defendant Mowry "[d]ue to [p]oor [e]xecution and [i]neffective [l]eadership." The Special

Committee stated that, "during 2022, it became apparent to the Board that he was neither executing well nor enabling the Company to capitalize on its significant opportunities." Specifically, the Special Committee explained:

> The Board, including Mr. Plants, was concerned about Mr. Mowry's ability to build and retain a world-class executive team. Then, as a Board, we concluded that **Mr. Mowry had not effectively executed the limited commercial rollout of our AviClear solution** in the Fall of 2022. In our view, Mr. Mowry failed to appropriately train and incentivize our sales teams, accurately forecast demand and usage, or precisely develop commercial terms that our customers would accept. These missteps were unforced errors that diminished our confidence in Mr. Mowry's ability to execute our attractive AviClear strategy.

> In the months that followed, Mr. Mowry was not able to develop a budget for the business that was grounded on supportable assumptions in a timely fashion, and the budget process dragged into the new year. **The Company's inability to execute well was evident even from the outside; for example, Cutera filed its Form 10-K late**.

> As a Board, including Mr. Plants, we determined that we needed to hire a new Chief Executive for the Company and ramped up that process in late 2022.

169.     With respect to Defendant Plants, the Special Committee explained that Defendant Plants had a strong desire to become CEO and seize control of the Company and that, in late 2022, "it became apparent during our discussions that **Mr. Plants was far more interested in his own personal enrichment than in leading the Company for the benefit of all stakeholders**." The Special Committee further noted that Defendant Plants sought an unreasonably high compensation package and certain terms for governance that would have impaired the Board's oversight abilities. Thus, the Special Committee concluded the following:

> The Five independent Directors were surprised and disappointed by Mr. Plants' persistent demands for special treatment in matters of company policy, compensation and governance. But we found those conversations with Mr. Plants to be revelatory: while Mr. Plants vigorously negotiated matters of compensation and personal privilege, he showed little concern for the cultural impact his demands for special treatment would likely engender. **His focus was overwhelmingly on compensation and much less on developing a plan for the Company**. In our experience, those are not the qualities or focus of great leaders.

170.     The Special Committee further explained that as a result of the Board concluding in February 2023 that Defendant Plants was not the appropriate permanent replacement for

Defendant Mowry as CEO, "Mr. Plants (according to information shared by Mr. Mowry) stopped showing up at the Company and pulled back from his duties as Executive Chairman, further validating his lack of regard for either his fiduciary duties or the welfare of the stockholders."

171.    Defendant Plants' termination thus reflected, in part, the fact that he emphasized his own financial enrichment over the shareholders and recklessly disregarded his duties to monitor Cutera's business operations by failing to show up at the Company for work. Tellingly, it was clear to the Board when it decided Defendant Plant was not fit to become CEO that Defendant Plants only focused on his own benefit and not on developing a plan for Cutera. However, the deceit did not end with Defendants Mowry's and Plants' terminations. Instead, it continued as senior management remained largely the same, including the then-newly appointed Interim CEO, Defendant Hopkins. Indeed, as CW 1 recalled, when Defendant Hopkins became Interim CEO, she also refused to take steps to correct the supply chain problems and even gave Pinapati a retainer bonus to stay with Cutera longer.

**G.      Cutera Again Revealed Poor Financial Results and Announced a Plant Shutdown and the Departure of CFO Seth**

172.    On May 9, 2023, the truth was further partially revealed when the Company reported disappointing financial results for the first quarter of 2023. Specifically, the Company issued a press release that explained that "[f]irst quarter performance was below expectations due to execution challenges in the business and certain operational events including an undue focus on AviClear placements that diverted attention from North America core capital sales, as well as an extended plant shutdown that affected sales and margin." The Company's press release further disclosed that Defendant Seth had stepped down as the Company's CFO.

173.    That same day, the Company held an earnings call with analysts to discuss the first quarter financial results. Defendant Hopkins disclosed, among other things:

> [W]e have not executed particularly well, as evidenced by our results in recent quarters, including the disappointing first quarter 2023 results being reported today. As the Special Committee of the Board has said publicly, the Board realized in the fourth quarter of last year that Cutera needed a new CEO to help improve execution. The significant execution challenges and our results in the first quarter actually reinforce that fact. But let me be clear, **our challenges in the quarter were mostly**

**self-inflicted and can be attributed to suboptimal leadership direction that led to execution issues that can and will be solved**.

174.    Defendant Hopkins also stated, compared to the rate of placement of AviClear devices, "we have not done as well in driving treatment and utilization." Defendant Hopkins acknowledged that the training of Cutera employees had to improve when she noted that "[w]e will also fine-tune training for our key account managers, or KAMs, to help them work even more effectively with clinicians to drive treatment volume and utilization."

175.    With respect to the plant shutdown, Defendant Hopkins stated that the "second operational challenge we faced during the quarter traces to an extended plant shutdown that impacted our ability to build inventory and ship product for a period of time." Defendant Hopkins explained that "there's typically a 1-week shutdown of our production facilities during the first week of January to enable a physical count of inventory," but that, "[t]his year, to comply with audit requirements, the year-end physical inventory count took longer than expected, and our production facilities were shut down by an additional 3 weeks." Defendant Hopkins disclosed that "[t]his extended shutdown negatively impacted our ability to build and ship the product required to fully meet demand in the core business during the quarter."

176.    Indeed, Cutera's extended plant shutdown was directly linked to the mismatch between Cutera's physical inventory and the faulty ERP system. CW 6 recalled that in January 2023, Cutera's plant was shut down for approximately one month to conduct an inventory audit. She noted that she was working in the field and was told that the company would not be shipping any parts at all to FSEs, and also recalled that the company sent its plant workers home during the shutdown.

177.    CW 6 added that she had to wait three to four weeks for parts to be shipped out during the shutdown while plant inventory was counted. She explained that the shutdown and inventory count was run by Pinapati. She advised that, after the inventory count was completed and the plant reopened, she and the other FSEs were told only that the audit was complete and to get back to work, and that the reason for the audit was because the inventory numbers in the SAP

system did not match the physical inventory. CW 6 observed that the audit did not solve any of the parts supply chain problems.

178. In fact, CW 6 added that, every quarter, even before the extended plant shutdown in the first quarter of 2023, the trunk stock inventory counts were usually off, because the company did not know where the parts were going or how many parts it had left. She again attributed that to the company having "no controls." She further explained that, with the inventory counts off and no controls, the company could not conduct an accurate forecasting of its supply chain and parts needs.

179. In response to the news announced on May 9, 2023, the price of Cutera common stock fell $6.06 per share over two trading sessions, or 30%, from a close of $20.20 per share on May 9, 2023, to close at $14.14 per share on May 11, 2023.

180. Analysts were disappointed and linked the poor financial performance to the failed AviClear rollout. For example, on May 9, 2023, Stephens stated that the first quarter results "disappointed" the market. On May 10, 2023, William Blair reported: "Operational concerns in the quarter called out included misaligned sales initiatives for reps (similar to the fourth quarter), audit-related inventory counting challenges (leading to a $2.8 million loss of revenues for orders on hand), and a plant shutdown." Indeed, William Blair explained that the North America Capital miss was caused by "two key dynamics: sales rep comp issues and inventory challenges."

181. William Blair further reported that "[m]anagement partially attributed the $2.9 million miss to $1.8 million of orders that were related to inventory challenges as the orders were in hand but could not be filled as a result of a lack of finished goods inventory," and that "[t]his was due to the regularly scheduled one-week shutdown that turned into a three-week shutdown to comply with audit requirements (the company had a delayed 10-K filing earlier this year)." With respect to AviClear specifically, William Blair reported, "[a]s for AviClear, the team seemed to be unsuccessful so far in turning the rapidly increasing installed base into treatments that would meet Street expectations, as utilization continues to vary greatly among different accounts according to management."

182. Additionally, on May 9, 2023, Defendants filed Cutera's Form 8-K and on May 10, 2023 its Form 10-Q, which contained materially false and misleading financial figures related to cost of revenue, gross profit, gross margin, operating loss, and inventory.

183. On July 27, 2023, the Company announced that Defendant Harris has been appointed CEO, effective August 7, 2023. The Company further explained that Defendant Harris would succeed Defendant Hopkins, and that Defendants Harris and Hopkins would both continue serving as members of the Board.

**H.     The Truth Is Further Revealed When Cutera Announced Quality Problems and Poor Financial Results Related to the AviClear Rollout**

184. On August 8, 2023, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were further revealed and/or partially materialized. On that date, the Company announced poor financial results and disclosed that the Company was experiencing reliability problems (i.e., quality problems) and poor AviClear utilization trends, meaning trends showing that customers were not actually using AviClear devices.

185. During an earnings call discussing the second quarter of 2023 financial results on August 8, 2023 ("2Q 2023 Earnings Call"), with respect to the quality problems, Defendant Hopkins disclosed, among other things, that "[o]n the operational front, core capital has been hampered by parts-driven service delays and increased reliability issues" and "[t]hese issues reflect growing pains, our supply chain and production facilities have faced as they ramped up AviClear production, while at the same time working to meet the needs of our core capital business." Defendant Hopkins further disclosed, in response to an analyst's question about Cutera's quality problems, "we really flooded the engines with AviClear" and it "really stretched the organization."

186. In response to another analyst's question about when Cutera's quality problems were identified, and whether they resulted with the "commencement of the placement of the AviClear systems or [were] service issues starting to crop up before that," Defendant Hopkins disclosed that, "[o]n the reliability front, those issues really did begin to surface as we ramped up Avi," and that "the organization was a bit overwhelmed and stretched then. And as the

manufacturing organization ramped up Avi, reliability issues began to surface across the portfolio of products." In response to an analyst's questions about AviClear's utilization rate, Defendant Harris stated that "utilization rates have declined. And we've really seen that across the user base." In response to another analysts' concern about the utilization rate, Defendant Harris further stated that "what we saw as we progressed through the first half of the year and even into the start of the third quarter is utilization rates not where we want them to be."

187.    In response, the price of Cutera's stock price fell $3.89 per share, or 22.52%, to close at $13.38 per share on August 9, 2023.

188.    Analysts were disappointed upon learning of this news and recognized Cutera's poor performance was linked directly to the AviClear rollout. For example, on August 8, 2023, Piper Sandler reported that "Taylor Harris, CUTR's new CEO, outlined the near-term **need to improve the product reliability and service levels as it relates to the company's capital systems**" and that "AviClear (which was a key reason Harris took the role in the first place) requires additional support in order to maximize the current installed base." Also on August 8, 2023, Stephens reported that "the company reported 2Q23 AviClear revenue of $4.0 mil. which came in below our $5.4 mil. estimate as the company placed <200 AviClear devices (vs. our 250 unit estimate) and **utilization underperformed**." Stephens further reported that "**AviClear underperformed as utilization was weaker than we expected**."

189.    Still, the Company's stock price remained artificially inflated even after this news, as Defendants failed to disclose the severity of the Company's internal control problems. However, as set forth in ¶¶232-46, 248-54, and 275, such statements were false and misleading as Defendants' AviClear rollout in reality was a complete failure and harmed Cutera's business.

190.    Additionally, on August 8, 2023, Defendants caused Cutera to file its Form 8-K and on August 9, 2023 its Form 10-Q with materially false and misleading financial figures related to cost of revenue, gross profit, gross margin, operating loss, and inventory.

**I.     Investors Continued to Learn the Truth When Cutera Disclosed the Severity of Its Inventory Problems and Revealed its Need to Restate Financial Statements**

191.     On November 8, 2023, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were further revealed and/or partially materialized. On that date, the Company announced poor financial results and disclosed the severity of the Company's inventory and operational problems, including the Company's need to delay its Form 10-Q filing and restate the financial statements of multiple prior quarters.

192.     Specifically, Cutera filed with the SEC its Form 8-K ("3Q 2023 Form 8-K"), which disclosed that the Company's inventory problems were much worse than previously disclosed and that the Company would need to delay its third quarter of 2023 Form 10-Q ("3Q 2023 Form 10-Q") filing, explaining, among other things, that "[t]he Company performed a physical inventory count at the end of the third quarter of 2023. The results of this count identified a shortfall of inventory relative to the system of record in the range of $8 million to $9 million."

193.     Indeed, Defendant Harris acknowledged the severity of the Company's inventory and financial problems and even announced Cutera's plans to lay off approximately 25% of its employees in light of the Company's problems. Moreover, the 3Q 2023 Form 8-K finally disclosed publicly that the initial business model for leasing the AviClear devices was not working, and instead revealed the new business model for AviClear.

194.     That same day, the Company held an earnings call with analysts to discuss the third quarter financial results ("3Q 2023 Earnings Call"), whereby Defendants reiterated much of what they disclosed in their Form 8-K. Indeed, Defendant Harris reiterated the Company's inventory problems and disclosed that Cutera will need to restate certain quarters' financial statements, explaining that "[w]e believe that these issues will lead to the need to restate Q1 and Q2 results, which we will do prior to filing the third quarter 10-Q."

195.     Furthermore, Defendant Drummond stated, in response to an analyst's question to "provide a little bit more detail and maybe timing on when you expect that [inventory problem] to

kind of be solved," that "[i]t relates to a process happening in our ERP system, whereby returns were ending up being doubled up in value."

196.    Analysts were disappointed upon learning this news. For example, on November 8, 2023, Piper Sandler rated Cutera "Neutral" due to its concerns: "While we continue to like the AviClear franchise (especially the commercial shift to upfront box sales), the combination of a new management team, core business challenges (clearly evident today), and cash burn simply create too many unknowns for us to feel confident in getting constructive despite our affinity for the new CEO." The next day, November 9, 2023, William Blair rated Cutera as "Underperform" in light of the Company's November 8 news and reported that it was "disappointing" that Cutera "announced that due to an inventory recognition issue ($8 million-$9 million inventory shortfall), it will need to delay its filing for the quarter and restate filings from earlier this year." William Blair further reported that, "[w]hile we continue to view the appointment of new CEO Harris as a positive development, this quarter continued to show the challenges the company is facing in AviClear/its core business and the management transition."

197.    Still, the Company's stock price remained artificially inflated even after this news as the full truth had not yet been revealed and/or materialized. For example, as of this date, not all of the concealed risks of Defendants' fraudulent conduct had materialized and investors still had not learned the full truth, which included, as Cutera disclosed within its March 5, 2024 Restatement, an additional material weakness: "the Company failed to design, maintain and monitor a risk assessment program at a sufficiently precise level and therefore failed to identify new and evolving risks related to accounting policies, procedures and related controls performed over areas including, but not limited to inventory, revenues and lease income, costs for leased devices, and testing of certain key reports used in controls." Additionally, as of this date, investors had not yet learned that a large contributor to Cutera's inventory buildup was related to AviClear devices.

**J.      Cutera's Internal Problems Ultimately Led to the Company's Restatement**

**1.      Cutera's Financial Statements Were Exposed to Misstatement from Material Weaknesses in Internal Control**

198.    A material weakness, as defined within Cutera's Form 10-K, is "a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis."

199.    By way of background, and as explained elsewhere herein, on April 7, 2023, Cutera filed its 2022 Form 10-K, where the Company disclosed three material weaknesses in its ICFR. One of Cutera's material weaknesses related to inventory controls. Specifically, these deficient inventory controls "related to the completeness, existence, and cut-off of inventories held at third parties, inventories held by sales personnel, and inventories in transit . . . ." For financial statement purposes, the term "existence" refers to whether an asset exists at the date of the financial statements (*e.g.*, did the entity hold the inventory?). Nevertheless, at that time, Cutera assured investors that it had begun the process of designing and implementing improvements to remediate those material weaknesses.

200.    It is not common for public companies in the United States to disclose a material weakness. In 2022, for example, only 6% of companies reported a material weakness. It is even more uncommon for a company to disclose more than one material weakness. Only 1% of companies reported three or more material weaknesses in KPMG's most recent study of ICFR-related disclosures, which is what Cutera reported in its Restatement. (KPMG, 2022 Trends in material weaknesses for non-IPO companies, at 3, 9). In part for this reason, Cutera disclosed that its stock price may be adversely affected if it was unable to successfully remediate its material weaknesses.

201.    Furthermore, with respect to Cutera's accounting for inventory in accordance with GAAP, Cutera told investors that inventory management was a top priority of its manufacturing operation, explaining within its 2022 Form 10-K, "Quality control, cost reduction and inventory management are top priorities of the manufacturing operations."

202.    Generally Accepted Accounting Principles ("GAAP") in the United States are promulgated by the Financial Accounting Standards Board ("FASB"). FASB standards are set forth in the Accounting Standards Codification ("ASC"). GAAP states, "A major objective of accounting for inventories is the proper determination of income through the process of matching appropriate costs against revenues." (ASC 330-10-10-1.)

203.    In this regard, at the time a product sale occurred, Cutera disclosed within its 2022 Form 10-K that a reduction in inventory was recorded with a corresponding increase to cost of revenue (i.e., cost of goods sold). In Cutera's financial statements each period, gross margin was presented as the profit measure reflecting sales minus cost of revenue. Cutera also supplemented its reported financial results with non-GAAP performance measures.[10] Specifically, Cutera reported within its May 9, 2023 Form 8-K non-GAAP gross margin and gross margin rate (gross margin divided by sales), and non-GAAP operating income.

204.    On May 9, 2023, during its earnings call, Cutera reported the financial results for its first quarter of 2023. Cutera reported GAAP gross margin of $24.9 million, non-GAAP gross margin of $27.0 million or 49.1% of sales, and a non-GAAP operating loss of $14.5 million. Defendant Drummond attributed the downturn in Cutera's results to the Company's inability to accurately count inventory as during this time the production line was closed. In fact, Defendant Drummond disclosed during the earnings call that Cutera required four weeks to count inventory during the first quarter of 2023. On this basis, however, investors had every reason to believe that Cutera had finally gotten a correct count at that time.

205.    On August 8, 2023, during its earnings call, Cutera reported the financial results for its second quarter of 2023. Cutera reported GAAP gross margin of $28.1 million, non-GAAP gross margin of $30.8 million or 50.3% of sales, and a non-GAAP operating loss of $11.6 million. These results in each of these quarters were dependent on Cutera's ability to accurately track and report

---

[10] A non-GAAP measure must be reconcilable to a GAAP measure. Companies that disclose non-GAAP measures are required to include a reconciliation of the non-GAAP and GAAP measure. SEC Release No. 33-8176.

the value of inventory that existed at that time. If Cutera had been unable to do so, it would have failed a major objective of GAAP—matching appropriate costs against revenues.

### 2. Cutera's Restated Financial Statements and Lack of Internal Controls

206. As mentioned above, a "restatement" is "the process of revising previously issued financial statements to reflect the correction of an error in those financial statements." (ASC 250-10-20, Accounting Changes and Error Corrections). When an error is identified that is material to previously issued financial statements, an entity is required to restate and reissue those financial statements. (ASC 250-10-45-27 and ASC 250-10-S99).

207. On November 8, 2023, during its earnings call, Cutera reported that it had "identified a significant issue with how the company has been managing inventory during 2023." Consequently, Cutera disclosed that it would be unable to provide its financial results for the third quarter of 2023 on a timely basis. Cutera further disclosed that it would need to restate its previously reported financial results for the first and second quarters of 2023 to correct an overstatement of inventory. Cutera attributed the overstatement to a failure of internal controls related to product returns, as well as a "laundry list" of other items.

208. On December 21, 2023, Cutera filed with the SEC a Form 8-K providing a status update on its inventory problems. Cutera confirmed that its previously reported financial statements, as well as earnings releases and other investor communications for the first and second quarter of 2023 should no longer be relied upon pending a restatement. Specifically, Cutera announced:

> In preparing its Quarterly Report on Form 10-Q for the period ended September 30, 2023, management of Cutera, Inc. (the "Company") performed a physical inventory count and identified material errors in the Company's accounting for physical inventory and deficiencies in the related internal controls (collectively, the "Inventory Issues"), which the Company believes impacted (i) the Company's previously issued condensed consolidated financial statements as of and for the three months ended March 31, 2023 (the "Q1 Financial Statements") and (ii) the Company's previously issued condensed consolidated financial statements as of and for the three and six months ended June 30, 2023 (the "Q2 Financial Statements" and, together with the Q1 Financial Statements, the "Prior Financial Statements").

209.    The Company further stated that it is "also evaluating a potential reclassification error between cash flow from operating activities and cash flows from investing activities in the Q1 and Q2 Financial Statements," and that it "believes the error will result in an increase in net cash used in operating activities and a corresponding decrease in net cash provided by investing activities of approximately $2 million in the six months ended June 30, 2023."

210.    The Company explained:

As a result of the Inventory Issues, the Company identified that the inventory balance in its system of record as of September 30, 2023 was overstated relative to the result of the physical inventory count. The Company has not fully completed its review of the Inventory Issues but believes that the inventory balances in the Q1 Financial Statements and Q2 Financial Statements were overstated (the "Inventory Overstatements") by approximately $3 million as of March 31, 2023 and approximately $5 million as of June 30, 2023. The Inventory Overstatements resulted in a corresponding material understatement of (i) the associated costs of revenue disclosed on the condensed consolidated statements of operations, and (ii) the Company's net loss for each of the Prior Financial Statements. The expected financial impact of the errors described above is preliminary and subject to change.

211.    Similarly, the Company further explained:

Due to the Inventory Issues, on December 21, 2023, the Audit Committee of the Board of Directors of the Company, after discussion with management, and its independent registered public accounting firm, BDO USA, P.C. ("BDO"), concluded that (i) the Q1 Financial Statements, included in the Company's Quarterly Report on Form 10-Q filed with the Securities and Exchange Commission (the "SEC") on May 10, 2023, and (ii) the Q2 Financial Statements included in the Quarterly Report on Form 10-Q filed with the SEC on August 9, 2023 should no longer be relied upon. Similarly, any previously furnished or filed reports, related earnings releases, investor presentations or similar communications of the Company describing the Prior Financial Statements should no longer be relied upon.

212.    The Company noted that it "is currently in the process of identifying and evaluating the magnitude and severity of internal control deficiencies that resulted in the matters above," and that it "intends to file a Form 10-Q/A for each of the periods impacted by the above (the 'Amended Reports') and intends to include restated Q1 Financial Statements and restated Q2 Financial Statements, as applicable, with each Amended Report." The Company likewise stated that it "intends to file the Amended Reports shortly before its Quarterly Report on Form 10-Q for the three and nine months ended September 30, 2023," and that it "anticipates filing a Form 10-Q/A

for the period ended March 31, 2023, and for the period ended June 30, 2023, and a Form 10-Q for the period ended September 30, 2023, in January 2024."

213.    However, notwithstanding Cutera's representation that it would restate its financial statements in January 2024, Cutera did not restate its financial statements until March 2024.

214.    Indeed, on March 5, 2024, Cutera filed with the SEC a Form 10-Q/A, whereby it finally restated its financial statements for the first and second quarters of 2023.

215.    Specifically, on March 5, 2024, Cutera confirmed "there was a shortfall of inventory relative to the Company's system of record." In other words, Cutera had previously reported financial statements including inventory that simply did not exist. As a result of this accounting breakdown, Cutera overstated inventory and understated cost of revenue in its previously issued financial statements. As a result, the Restatement was necessary for Cutera to correct these and other misstatements in those previously issued financial statements.

216.    The Restatement also identified an additional material weakness related to the Company's failure "to design, maintain and monitor a risk assessment program at a sufficiently precise level." Moreover, Cutera's Restatement corrected financial figures for the first and second quarters of 2023 related to cost of revenue, gross profit, gross margin, operating loss, and inventory, as further detailed in Section VII.

217.    Moreover, Cutera explained that its Core Capital and AviClear segments performed poorly, which included both decreases in revenue and increases in losses from operations.

218.    The changes to GAAP and non-GAAP gross margin are summarized in the following charts, which counsel has created:




219.    As described above, Cutera's Restatement acknowledged that these errors were material to its financial statements.

220.    As a result, on March 5, 2024, the price of Cutera common stock fell $0.07 per share, or 3.26%, to close at $2.08 per share.

221.    Still, the Company's stock price remained artificially inflated even after this news as the full truth had not yet been revealed and/or materialized. For example, as of this date, not all of the concealed risks of Defendants' fraudulent conduct had materialized and investors still had not learned the full truth, which included that a large contributor to Cutera's inventory buildup was related to AviClear devices, that Cutera was expecting a large amount of product returns, and the Company would soon implement, among other things, a material control team to ensure inventory is tracked properly.

### 3.    Cutera Severed Relationship with Third-Party Manufacturer, Jabil

222.    Also on March 5, 2024, Cutera filed a Form 8-K with the SEC, announcing the termination of its manufacturing service agreement and the entry into a subsequent settlement agreement with Jabil Inc ("Jabil"), a third-party manufacturing provider that manufactured AviClear devices for the Company. According to CW 1, the company started working with a contract manufacturer called Jabil in 2023. Within a year, in November 2023, Cutera decided not to renew its existing manufacturing service agreement with Jabil. Due to the non-renewal, Cutera estimated that it must purchase unshipped inventory from Jabil. The Company subsequently entered into settlement discussions with Jabil to settle additional claims from Jabil related to other amounts associated with the termination.

223.    On February 28, 2024, Cutera and Jabil signed a settlement agreement for the abrupt termination of the service agreement. As a result of the settlement agreement, Cutera agreed to pay Jabil $19.5 million, which was offset by $1.3 million in amounts owed by Jabil. Specifically, the payment to Jabil included the Company's receipt of $13.5 million of inventories and $0.3 million of equipment and the payment of $5.7 million as compensation for expenses either

previously incurred by Jabil or associated with the termination. Cutera also wrote off approximately $1.1 million of costs that were capitalized during the manufacturing service agreement period.

224. On March 21, 2024, during the earnings call with analysts to discuss the fourth quarter financial results ("4Q 2023 Earnings Call"), Defendant Harris disclosed that the termination of the manufacturing service agreement with Jabil would further exacerbate the excessive level of inventory. Specifically, Defendant Harris stated, "the main transition now is simply going to be bringing back the inventory that Jabil had purchased. So we had to purchase that and then we're going to restock our warehouses. That's going to be a—it's a big project for our distribution organization . . . ."

### 4. Cutera's Inventory Woes Persisted, Leading to the Revelation of the Full Truth

225. Cutera's inventory problems continued in the third and fourth quarters of 2023. Specifically, Cutera did not have functional internal controls to ensure that its purchases of inventory were aligned with demand for its products. For example, on March 21, 2024, Cutera disclosed that it had to revise its inventory planning controls because the Company "had too much inventory in certain areas, most notably AviClear and too little in other areas." The consequence of these deficient procedures was that Cutera was forced to record a "high level of inventory reserves," negatively impacting then-reported gross margin. Defendants explained, "In the fourth quarter alone, we took approximately $8 million of excess and obsolete inventory reserves." Moreover, Cutera disclosed that customers would return an additional 175 AviClear devices— bringing the total number of returned devices to 300 out of 1,200 total machines sold to-date. These additional devices added to Cutera's inventory glut, necessitating further increases to inventory reserves.

226. Had Cutera appropriately designed and implemented effective internal controls over financial reporting or properly remediated the material weaknesses that it initially identified, its material misstatements included in its financial statements for the first two quarters of 2023

may have been avoided and the Company may have been able to issue financial statements that accurately reflected its operations instead of results that misled investors.

227.   In response, the price of Cutera common stock fell $0.70 per share, or 30.43%, to close at $1.60 per share on March 22, 2024. In addition, Cutera common stock fell an additional 10.63% the next trading day to close at $1.43 on March 25, 2024—totaling a 37.83% stock price decline from the March 21, 2024 announcement.

## V.   FALSE AND MISLEADING STATEMENTS AND SCHEMES TO DEFRAUD

228.   Lead Plaintiff alleges that the statements highlighted in bold and italics within this section were knowingly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing. As alleged herein, such statements artificially inflated or maintained the price of Cutera's publicly traded common stock and operated as a fraud or deceit on all persons and entities that purchased common stock during the Class Period.

229.   Throughout the Class Period, Defendants made a series of misrepresentations concerning the Company's internal controls, financial condition, and AviClear rollout. Specifically, Defendants made material misstatements and omissions concerning: (i) Cutera's internal controls and control over inventory; (ii) Cutera's financial performance in relation to the AviClear rollout; and (iii) the purported success of the AviClear rollout itself.

### A.   May 10, 2022 – 1Q 2022 Earnings Call

230.   On May 10, 2022, the Company participated on an earnings call with analysts to discuss the first quarter of 2022 financial results ("1Q 2022 Earnings Call"). During the 1Q 2022 Earnings Call, Defendants Mowry and Seth discussed the initial release of AviClear at length, which was a primary focus of analyst questions.

231.   Defendant Mowry lauded the lease-based payment system for AviClear as "perfectly align[ed] [with] the goals and objectives of the company [and] those of the practice," stating:

> In addition to the radical technological innovations that the AviClear product represents. Our partnership agreement defines a new and innovative business arrangement structuring the relationship between the company and the AviClear

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS   62
CASE NO. 4:23-CV-02560-JST

practice. ***This new agreement will serve to perfectly align the goals and objectives of the company with those of the practice over the long term***.

At a high level, the partnership models work as follows. In consideration of the company's placement of an AviClear device into the practice, the provider will pay the company an annual license fee as well as a fee for each patient treated with the device.

232.     The foregoing statement by Defendant Mowry was materially false and misleading when made because AviClear's leasing model was not aligned with the goals and objectives of Cutera or its customers. Rather, Defendants Mowry, Plants, and Seth chose the leasing model because it allowed them to place as many devices as possible and secure performance-based compensation for themselves, even though they knew that the leasing model was not in the best interests of the Company. Instead of disclosing the full truth to investors, Defendants Mowry, Plants, and Seth ignored and silenced internal red flags regarding the effectiveness of the leasing model as part of their scheme to meet performance-based compensation milestones tied to AviClear device placements by any means necessary.

233.     Specifically, Defendant Mowry had pushed the AviClear leasing model and rushed it to market despite: (i) known industry trends that such business model had failed in the past; (ii) internal pushback by numerous Cutera executives against the model as not in Cutera's best interests; and (iii) known customer pushback as to the efficacy, cost, and customer service of AviClear, which was not covered by patient insurance. Accordingly, by touting AviClear's business model as "***perfectly align[ed]***" with the interests of Cutera and its customers, while concealing the above material adverse facts, Defendant Mowry deceived investors into thinking AviClear's prospects were greater than in reality, thereby artificially maintaining Cutera's share price.

234.     CW accounts establish that at the time the above statement was made, Defendant Mowry knew that AviClear's leasing model was not aligned with the best business interests of Cutera or its customers.

235.     According to CW 1, the reason Cutera adopted the leasing model, in contrast to normal capital sales, was because "one executive chairman decided" that the leasing plan was a

"great model," and no one could argue with him. That executive chairman, CW 1 added, was Defendant Plants. According to CW 1, the leasing model is not unique in the industry: it had been tried twice at two other aesthetic device companies, *Venus Concepts* and *Xtrac*. CW 1 advised that at least four people told Defendant Mowry that the leasing model for AviClear would not work: Karavitis, Crider, Seth, and CW 1 herself.

236.    CW 1 elaborated that Defendants Plants and Mowry emphasized placement of AviClear devices because they were aiming for a performance objective milestone which would "fetch" them another 20% in performance stock units, which was called an "Acne Equity Grant." CW 1 added that the milestone was why management was trying to place as many units as possible "by hook or crook" in order to trigger the equity grant, regardless of whether customers paid zero or $5,000 for the placement, as the milestone was not based on revenue.

237.    In a further effort to place as many AviClear devices as possible, regardless of the benefits to the Company, CWs have confirmed that the $5,000 placement fee was frequently waived. CW 3 explained that capital sales reps gave the device away for free as an add-on, or bundled into the purchase of other capital equipment, at no extra cost. CW 3 confirmed that Huffman was aware of the practice of giving away the AviClear equipment for free as part of a purchase of other equipment. CW 3 characterized this sales practice as making it look like AviClear's sales were strong, but they were not, since the company was not making any money getting the equipment into doctors' offices; Cutera earned revenue only if the doctors / customers were using the product.

238.    CW 1 further indicated that the Acne Equity Grant was part of the reason why Plants wanted to move into management from corporate governance/the board: specifically, Plants wanted to share in the compensation for AviClear placements. CW 1 noted that Plants was violating his own rules in doing so, which had previously prohibited individuals from serving as both management and an independent board member. CW 1 added that Plants had used that rule to oust a director, David Gollnick, several years prior but commented that Plants did not apply those rules to himself.

239. Tellingly, Defendant Plants was terminated for cause by the Board in April 2023, their reasoning being he was "far more interested in his own personal enrichment than in leading the Company for the benefit of all stakeholders." Defendant Mowry was also terminated for cause at this time.

240. CW 2 summarized the problems with the AviClear rollout and customer pushback: the treatment was painful, contrary to Cutera's claims; it was expensive, especially compared to other forms of acne treatment; the results took too long to be noticeable; and Cutera's service support was very poor after the equipment was delivered. CW 2 indicated that some offices were so dissatisfied with AviClear that they tried to send it back. CW 2 added that there was "lots of pushback" from medical dermatologists regarding treatment costs because those dermatologists could treat acne effectively with other products covered by insurance.

241. Further, the problem with the new sales model for AviClear, according to CW 3, was that the doctors did not want to do it, explaining that the doctors preferred to pay approximately $100,000 to own the equipment outright and not to have to split fees. CW 3 added that, because there was no cost to the doctors to have the AviClear equipment, the doctors did not need to use it to make money.

242. CW 3 stated that AviClear was supposed to be painless, but many patients complained it was painful. As a result, CW 3 continued, doctors were not using AviClear very much. Similarly, CW 2 explained that Cutera claimed the treatment did not hurt and that pain medication was not necessary, but that was not accurate; the treatment was painful, and patients often needed Pro-Nox (a nitrous oxide anesthetic used during medical procedures) to tolerate it.

243. With respect to delivery problems for AviClear and other equipment (i.e., the delivery times were "way too long" and that there were long delays after the promised delivery dates) and customers cancelling their AviClear orders because the delays were so long, CW 4 explained that it was "impossible" for Defendant Mowry and Huffman not to know about these Companywide problems.

244. Similarly, CW 7 advised that the AviClear product had a "higher than normal" failure rate when it was launched compared to Cutera's other products.

245. Such customer pushback was well-known to Defendant Mowry based on his participation in weekly meetings following the AviClear launch. For example, CW 5 advised that, after AviClear was launched, she participated in weekly conference call meetings with Defendant Mowry, Austin Monroe, Amy Ables, and all the other Regional Managers. CW 5 added that these calls were held specifically to discuss AviClear's performance, including placement of the devices, utilization rates, and revenues for the product.

246. Notably, the leasing model was such a failure that Cutera was ultimately forced to pivot back to a traditional sales model. Specifically, Defendant Harris announced on November 8, 2023, that in an attempt to cure the botched AviClear rollout, the Company was now offering "the option to purchase the device upfront with a corresponding reduction in ongoing treatment costs to the practitioner."

**B.     August 4, 2022 – Press Release and 2Q 2022 Earnings Call**

247. On August 4, 2022, the Company issued a press release announcing second quarter 2022 financial results. Within that press release, Defendant Mowry unequivocally claimed that the AviClear launch was a success:

> ***During the quarter, our team achieved the successful launch of AviClear,*** our first-mover product for the treatment of acne. In the first three months of our limited commercial release of AviClear, we were able to validate successful clinical outcomes in the hands of our customers, [and] verify patient satisfaction with AviClear post-treatment patient survey data . . . .

248. The foregoing statement was materially false and misleading when made by Defendant Mowry because the launch of AviClear was not even remotely a success, as Defendant Mowry publicly claimed. As outlined by several former employees, in the second quarter of 2022 through the end of 2022, AviClear's performance was extremely poor, which was known to Defendants Mowry, Plants, Seth, and Hopkins, as well as Cutera management and the Cutera Board, and frequently discussed in meetings. These CW accounts confirm that by the second

quarter 2022, AviClear's revenue was significantly underperforming internal projections, which was closely monitored and discussed by Cutera management.

249.   CW 1 stated that the poor sales performance was clear internally. She added that management was concerned because AviClear was not meeting projections by the end of Q2 and "definitely" not by end of Q3 of 2022.

250.   CW 1 indicated that AviClear's poor financial performance would have been discussed in meetings with the "ELT," or Executive Leadership Team, which included Defendant Seth, as well as Karavitis, Their, and possibly Huynh. CW 1 noted that Steve Crider also attended the ELT meetings. CW 1 added that she joined the ELT at one point, so she was present for at least some of the meetings in which AviClear's poor performance was discussed. CW 1 confirmed that, prior to joining the ELT, she was told that the performance issues were discussed at the meetings by people who were in attendance, specifically Seth, Karavitis, Crider, and possibly Thier.

251.   CW 1 elaborated that, by "poor financial performance," she meant poor revenue results in terms of projections versus actual revenue. CW 1 noted that revenue in this case referred primarily to utilization of the AviClear units, as the management team did not look at placements as often in terms of revenue. CW 1 noted that the numbers were off by "a lot," indicating that the projections were for approximately $20-25 million, but they wound up earning only about $6 million in revenue. CW 1 further noted that half of the $6 million was generated in Q4, so that between Q2 and Q3, AviClear only made $3 million in revenue. CW 1 commented that the company was seeing a "piss-poor return on investment" from AviClear, generating only approximately $3 million in revenue from a $75 million investment.

252.   CW 1 elaborated that management instructed sales personnel to focus only on AviClear, in order to meet the 1,200 units milestone, but that doing so caused Cutera's core business to suffer. As a result, she continued, the company had its weakest Q4 in terms of year over year performance, as both its core business and AviClear performed poorly by Q4. CW 1 reiterated that management wanted to place AviClear units "by hook or by crook" to obtain the

20% Acne Equity grant, and that management told employees that they had to "get over the hump" of placing 1,200 units for utilization numbers to go up.

253. CW 1 continued to note that everyone at the company could see the "cash burn happening quarter over quarter" and that AviClear was not "up to the mark." She added that everyone at the company knew, and every "rational person" had concerns.

254. Regarding usage trends for AviClear, CW 2 understood that the company was falling far short of its goals, and that its forecast numbers for treatment revenue were overly inflated. She reiterated that she and other TSRs tried to communicate their concerns about inflated forecasts to Huffman and Anderson, but their warnings were disregarded. She added that those warnings were based on feedback that the reps were getting from their customers, and those concerns were raised to Huffman and Anderson from the start of her employment. She indicated that management refused to listen to that feedback or try to address it. She added that TSRs who raised these concerns were attacked and criticized during meetings.

255. Based on Defendants' false and misleading statements, analysts were bullish on the prospect of AviClear and its ability to deliver additional revenue. For instance, on August 4, 2022, Piper Sandler noted that, "our view[] is that the AviClear rollout is going well . . . We believe AviClear could deliver $20M in sales during '23 and even more. With the traditional business continuing to perform well and a major revenue catalyst in AviClear, there is a lot to like about the name." On August 5, 2022, Maxim Group noted that "[b]ased on the strong demand for CUTR's capital equipment portfolio, building momentum from the KOL launch of AviClear, and positive early results; we reiterate our Buy rating."

**C.    August 5, 2022 – Form 8-K**

256. On August 5, 2022, Cutera filed with the SEC a Form 8-K, which was signed by Defendant Seth, thereby adopting the statements therein as his own. The Form 8-K appended the August 4, 2022 press release, discussed *supra* Section V.B, thereby repeating Defendant Mowry's statement:

> ***During the quarter, our team achieved the successful launch of AviClear,*** our first-mover product for the treatment of acne. In the first three months of our limited commercial release of AviClear, we were able to validate successful clinical

outcomes in the hands of our customers, verify patient satisfaction with AviClear post-treatment patient survey data . . . .

257.    The foregoing statement was materially false and misleading when made by Defendant Seth for the same reasons discussed in ¶¶248-54.

**D.    November 3, 2022 – Press Release and 3Q 2022 Earnings Call**

258.    On November 3, 2022, during the Company's quarterly earnings call with investors ("3Q 2022 Earnings Call") Defendant Mowry represented in response to an analyst's questions about physician uptake of AviClear that "*the physician feedback has been phenomenal.*" Defendant Mowry further stated that "*[p]ractice performance indicators such as patient cues, appointment cancellation rates also continue to track with prior quarter rates instilling confidence in the core capital equipment and consumable run rates as we bring in the full year results.*"

259.    The foregoing statements were materially false and misleading when made by Defendant Mowry because as discussed in ¶¶248-54, in second quarter of 2022 through the end of 2022, AviClear's performance was extremely poor, which was known to Defendants Mowry, Plants, Seth, and Hopkins, as well as Cutera management and the Cutera Board, and frequently discussed in meetings. Additionally at this time, at the direction of Defendants Mowry and Plants, sales resources were being siphoned from Core Capital to AviClear, *en masse*, thereby harming the Core Capital segment.

260.    Accordingly, by touting (i) physician feedback and performance indicators for AviClear; and (ii) claiming AviClear was accretive to Core Capital prospects, while at the same time concealing the above material adverse facts, Defendant Mowry deceived investors into believing Cutera's financial results and prospects were far greater than reality, thereby artificially maintaining Cutera's share price.

261.    Moreover, as discussed in ¶¶232-46, 248-54, at the time such statement was made, Defendants Mowry, Plants, and Seth were engaged in a scheme to secure performance-based compensation for themselves at the expense of investors through: (i) unsustainable AviClear sales practices that were not in the best interests of the Company; and (ii) the concealment of poor

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS     69
CASE NO. 4:23-CV-02560-JST

AviClear launch results. As part of this scheme, Defendants Mowry, Plants, and Seth misallocated Core Capital resources to AviClear to achieve their performance compensation tied to AviClear placements.

262. Indeed, at the time the foregoing statements were made, CWs indicate that Mowry and Plants had increased their push to place AviClear devices by any means necessary, directing the entirety of the Cutera salesforce to do so.

263. CW 1 confirmed that the directive to move away from Cutera's core business to focus on AviClear came directly from Mowry and Plants, and was discussed openly in many AviClear meetings, which were also attended by Huffman.

264. Regarding usage trends for AviClear, CW 2 understood that the company was falling far short of its goals. CW 2 stated that, to fix the shortfall, management authorized the capital equipment sales reps to move in and start selling AviClear to both medical and aesthetic dermatologists and med spas.

265. According to CW 2, Defendants intentionally undercut Cutera's AviClear-exclusive salesforce and diverted resources away from the capital equipment reps haphazardly to get all hands on deck selling AviClear, despite the fact that this strategy hurt the selling prospects for both Core Capital and AviClear-exclusive reps alike.

266. Defendants' misstatements had their intended effect as analysts were convinced that Cutera's traditional business was strong and the successful AviClear rollout would further boost the bottom line. For instance, on November 3, 2022, Piper Sandler echoed the bullish sentiment, noting, "we believe the performance of AviClear will . . . push shares higher. Reiterate OW."

**E.    February 28, 2023 – Form 8-K and 4Q 2022 Earnings Call**

267. On February 28, 2023, Cutera filed with the SEC a Notification of Late Filing, which explained that Cutera is unable, "without unreasonable effort and expense," to file its Form 10-K for the year ended December 2022 by the March 1, 2023 filing deadline. Cutera further stated within that notice that "the Company has identified and expects to disclose in the Form 10-K

material weaknesses in its internal control over financial reporting related to ineffective information technology general controls and ineffective inventory count controls." Notwithstanding, Defendants reassured investors that they had nothing to worry about.

268.    That same day Cutera held its 4Q 2022 Earnings Call. During that call, Defendant Mowry assured investors that Cutera was addressing the problem of over-indexing on AviClear with a new sales strategy. Specifically, Defendant Mowry stated:

> In fourth quarter 2022, the North American capital team focused its efforts on driving AviClear bookings and perhaps over-index[ed] some of their efforts. Following the full North American AviClear launch, ***strong underlying interest in AviClear quickly converted into customer demand that occupied our sales team throughout November and most of December***. The higher-than-anticipated volume of deals diverted much attention away for routine processing of core capital deals and left a significantly shortened time frame to close deals when ***sales reps finally pivoted back to their core capital pipeline***.

269.    The foregoing statement was materially false and misleading when made by Defendant Mowry because it led investors to believe that the Company had reallocated its salespeople back to their core capital pipeline, which was not true.

270.    Contrary to Defendant Mowry's statements to the public, Cutera's AviClear tunnel vision did not abate, however, as the very next quarter (first quarter of 2023), Defendants disclosed a continued lack of resources allocated to Core Capital during the Company's May 9, 2023 earnings call. Such development sparked analyst confusion given Defendant Mowry's above statement to the contrary.

271.    For instance, during the May 9, 2023 earnings call, analyst Jon Block from Stifle stated: "I'm just a little confused on the sales reps' marching orders. So if I recall correctly in the fourth quarter call, the prior management, you talked about a new incentive program which was supposed to help refocus the reps attention, sort of properly allocate their time between AviClear and Capital. And again, that was on the fourth quarter call, and it was conveyed as if it had already taken place." In response, Defendant Hopkins, as Interim CEO following the termination of Mowry, answered that "[w]hat appears to have happened is that there was a direction to the capital sales organization to place AviClear devices as a number one priority."

272. Moreover, Defendant Mowry's statement was materially false and misleading when made because "***strong underlying interest in AviClear***" while assuring investors "***sales reps [had] pivoted back to core capital***," Defendant Mowry deceived investors into believing Cutera's financial results and prospects were far greater than reality, thereby artificially maintaining Cutera's share price.

273. As discussed in ¶¶232-46, 248-54, 262-65, at the time such statement was made, Defendants Mowry, Plants, and Seth were engaged in a scheme to secure performance-based compensation for themselves at the expense of investors through unsustainable AviClear sales practices that were not in the best interests of the Company. As part of their scheme, Defendants Mowry, Plants, and Seth misallocated Core Capital resources to AviClear to meet performance-based compensation milestones tied to AviClear device placements by any means necessary.

274. Further, in addition to the numerous meetings attended by Defendants Mowry and Seth where AviClear's poor results were discussed in detail, *supra* in ¶¶248-54, even more people personally approached Mowry regarding the issue at the time the above statement was made.

275. For example, CW 1 described that "everyone in the company" knew that AviClear was struggling. She indicated that she **personally raised the problem to Mowry** in or around January 2023. CW 1 also recalled others telling her that they had also spoken to Mowry about their concerns with AviClear's poor financial performance as well, adding that she knew specifically that her supervisor Karavitis spoke to Mowry about it. She further noted that Seth told her that he had raised the same concerns to Mowry, also sometime in the first quarter of 2023.

276. These misstatements had their intended effect as analysts believed that the changes that Cutera implemented made its sales staff more effective. For example, Piper Sandler reported on February 28, 2023, that "CUTR has addressed the root issue pertaining to the revenue miss from the core business by changing its sales comp structure and tracking sales rep activities."

**F.    April 7, 2023 – 2022 Form 10-K**

277. On April 7, 2023, Cutera filed its 2022 Form 10-K, which was signed by Defendants Mowry, Seth, Plants, and Hopkins. In connection with the Company's 2022 Form

10-K, Defendants Mowry and Seth signed SOX Certifications. Pursuant to Section 302 of SOX, Defendants Mowry and Seth certified that they had designed and evaluated effective internal and disclosure controls over financial reporting, which assured the reliability of financial reporting, and also that the financial statements fairly and accurately presented the financial condition of the Company.

278.   For example, in the Company's 2022 Form 10-K, Defendants Mowry and Seth each certified, *inter alia*, as follows:

*2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;*

*3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;*

*4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d- 15(f)) for the registrant and have:*

*(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under the Company's supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to the Company by others within those entities, particularly during the period in which this report is being prepared;*

*(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under the Company's supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;*

*(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report the Company's conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation . . .*

*5. The registrant's other certifying officer and I have disclosed, based on the Company's most recent evaluation of internal control over financial reporting,*

*to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):*

*(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and*

*(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.*

279. Defendants Mowry and Seth also signed SOX Certifications pursuant to Section 906 of SOX, whereby they each certified, *inter alia*, that "***the information contained in the annual report fairly presents, in all material respects, the financial condition and results of operations of Cutera, Inc. for the periods presented therein***."

280. Defendants' April 7, 2023 SOX Certifications were materially false and misleading for the reasons discussed herein. Indeed, Defendants' above representations, including that Defendants "***[e]valuated the effectiveness of the registrant's disclosure controls and procedures***" and "***[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under the Company's supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements***" were materially false and misleading because in reality Defendants completely lacked control over its inventory and business operations, which ultimately led to Defendants having to restate the financial statements for the first and second quarters of 2023—the very next two quarters.

281. The attestations and certifications by Defendants Mowry, Plants, Seth, and Hopkins set forth above were materially false and misleading when made. Specifically, since the start of the Class Period, Cutera's controls over its inventory were grossly inadequate, and only worsened after the introduction of the new SAP and Salesforce systems in early 2022. These issues were self-inflicted and well known to Defendants Mowry, Plants, Seth, and Hopkins.

282. The accounts of CWs confirm that from the beginning of the Class Period, and at all relevant times, Cutera's internal controls over its inventory and supply chain were rife with

material weakness. For example, CW 1 indicated that the company's supply chain problems started during the COVID epidemic, but continued afterwards, and the company struggled with supply chain and inventory issues throughout 2023. CW 1 added that these problems were known to Mowry, who appeared to protect Pinapati and refused to take action.

283. CW 7 advised that Pinapati reported directly to former CEO Dave Mowry, and that Pinapati had been hired by Mowry.

284. CW 1 stated there was also excess inventory on devices that Cutera barely sold, but minimal or lack of inventory for the company's top three sellers, including Tru Sculpt, AviClear (due to the push to place units), and Secret Pro. In contrast, she continued, there was excess inventory for products that barely sold.

285. CW 1 further elaborated Mowry knew about the inventory problems because Mowry was told by Senior Director of Order to Cash Operations Caroline Batarseh, Vice President of Commercial Finance and Operations Shelby Eckerman, and Senior Director of Call Center John Sennett. She indicated that Batarseh, Eckerman, and Sennett told CW 1 that they had told Mowry that Pinapati's inventory estimates were wrong.

286. CW 1 recalled that many people raised concerns about supply chain problems, and Pinapati's performance, to Mowry. CW 1 elaborated that concerns were raised to Mowry by current Vice President of Sales TJ Huffman, current Senior Director of Order to Cash Caroline Batarseh, current Vice President, Commercial Finance and Operations Shelby Eckerman, Guy Thier, Karavitis, and former Senior Director of Call Center John Sennett.

287. CW 1 indicated that she raised the same concerns to Mowry herself, and that these problems were discussed all throughout the last year. CW 1 added that she raised these concerns herself to Mowry multiple times, both in-person and email, since 2022. CW 1 added that when Sheila Hopkins became Interim CEO, she also refused to take steps to correct the supply chain problems and even gave Pinapati a retainer bonus to stay with Cutera longer.

288. CW 1 explained that Cutera had not changed its suppliers during 2021 through 2022, but instead that that Pinapati would not order sufficient quantities of the parts and materials

needed but would then order too much of other materials which were not in short supply. She reiterated her characterization of Pinapati as "incompetent," and elaborated that it was not a supplier problem.

289.    CW 1 noted that Cutera used a contract manufacturing company called Jabil to manufacture its systems, which Pinapati persisted in using even though the costs were higher and there were quality control issues. CW 1 described Jabil as "another disaster," explaining that the company spent $3,000-$4,000 extra per system using Jabil instead of manufacturing in-house. CW 1 added that the additional expense meant about 20% higher total cost of goods. Regarding quality control issues, CW 1 indicated that Jabil could not provide working systems for the products it made, which was the XLV system.

290.    CW 6 recalled that in January 2023, Cutera's plant was shut down for approximately one month to conduct an inventory audit. CW 6 noted that she was working in the field and was told that the company would not be shipping any parts at all to field service engineers. CW 6 also recalled that the company sent its plant workers home during the shutdown. CW 6 added that she had to wait three to four weeks for parts to be shipped out during the shutdown while the plant inventory was counted. CW 6 explained that the shutdown and inventory count was run by Srinivas Pinapati.

291.    CW 6 commented that she had visited the warehouse facility in the company's headquarters, which is where the inventory was stored and where the company's main offices were also located. CW 6 recalled that while employees needed a key to enter the building itself, all Cutera employees had access to the building. Once inside, CW 6 added, there was no access control for the warehouse section itself. CW 6 explained that there were no designated rooms within the building to keep inventory securely; instead, inventory was everywhere, including in the hallways. CW 6 described how anyone could walk in, put parts in their pocket, and simply walk out without getting caught.

292.    CW 6 explained that the reason for the physical inventory count was because the company thought there was more inventory on hand than what was showing up in the ERP system;

the physical count showed that Cutera had much less inventory on hand than it thought. CW 6 noted that Cutera conducted an inventory count usually the first week of every quarter, during which time the company did not ship parts for inventory. CW 6 further explained that that quarterly shutdown was why field service engineers frequently would not return any extra parts they had on hand in their "trunk stock," because the engineers knew that there would be delays in getting new parts. CW 6 indicated also that the field service engineers would hoard parts whenever they could get them, because they never knew when they would be able to get those parts again.

293.   CW 6 added that, every quarter, even before the extended plant shutdown in the first quarter of 2023, the trunk stock inventory counts were usually off, because the company did not know where the parts were going or how many parts it had left. CW 6 again attributed that to the company having "no controls."

294.   CW 6 explained that Cutera's management – specifically Pinapati – knew that anyone could walk into the warehouse area and take parts, as management's offices were in the same building. CW 6 added that management's offices, including the VPs' and Dave Mowry's, were on the first floor of the building, the same floor as the inventory, but then management's offices eventually moved to the second floor of the building. CW 6 indicated that Pinapati had been told several times about the inventory problems. CW 6 recalled a conference call meeting with Pinapati and all the field service engineers in June or July 2022 to discuss these problems.

295.   CW 5 noted that, at one point in late 2022 or early 2023, the company stopped shipping everything to customers, including consumables. CW 5 added that she only learned about the inventory problem from customers who had not received their orders. When CW 5 inquired at the company about what was happening, she recalled, CW 5 was told only that the company's inventory counts were off, so Cutera had to review all its inventory, and that is what caused the shipping shutdown and a delay of a few additional weeks.

296.   CW 4 explained that it was "impossible" for Huffman and Mowry not to know about these Companywide problems. She indicated that these issues were raised by many people, frequently, on company-wide townhall Zoom meetings where upper management was present. She

recalled that Mowry, Huffman, Ables, and Steve Kreider, current Senior Vice President of Marketing at Cutera, were present on these townhall conferences.

297.    Under Pinapati's management, CW 7 explained that there were constant shortages, so that parts would not be available for four or more days. CW 7 confirmed that the shortfalls were "across the board," meaning that the parts shortages included repair and replacement parts as well as Consumables (one-time use items needed to treat patients, such as needles, sticky pads, and similar items).

298.    CW 7 explained that she attended weekly Operations meetings with Pinapati and other employees who reported to Pinapati. CW 7 elaborated that she and other employees told Pinapati about the parts backlog, which was "enormous."

299.    CW 7's understanding was that these issues had been escalated to Mowry, because she knew that there were at least one or two customers who reached out to Mowry directly to complain. She recalled one customer, whom she characterized as a "luminary" for Cutera, had contacted Cutera's executive management directly to complain. CW 7 identified that customer as Dr. Tahl Humes, owner of Vitahl Medical Aesthetics, which has two locations in Colorado.

300.    CW 8 further noted that the inventory system, SAP, had an additional flaw: it failed to provide the proper profit mark-up for the parts that were sold and not covered under warranties. CW 8 explained that the system was not properly accounting for the costs of the parts. CW 8 indicated that, by Q2 or Q3 of 2022, she saw the price discrepancies in SAP. She added that the pricing problems continued through approximately the first half of 2023.

301.    CW 8 explained that under the new systems, however, there was another problem: the orders were not being processed automatically, so the requests were not seen and the parts were not being shipped. CW 8 added that, for the orders to be processed, the Order group employees had to manually check for each order and then fill them. As a result, CW 8 continued, many orders were missed and not shipped. CW 8 could not recall the timing of when this problem was first recognized. CW 8 indicated that the underlying problem in SAP had not been fixed by the time she left the company.

302.    CW 8 elaborated that the process to identify which parts were used or needed was not clearly defined in the system. As a result, she continued, parts would be used by the engineers but would still appear in the system as available. In other words, she added, the system would show that a particular part was available in the warehouse, when it was not. CW 8 explained that the problem of discrepancies between parts listed in the system with parts available in the warehouse was raised in meetings.

303.    CW 8 noted that the field service engineers carried inventory with them for their work orders; that inventory was referred to as "trunk stock." CW 8's understanding was that there were physical audits of inventory to check for accuracy, but she had no visibility into those audits. She added that Cutera's vice presidents reviewed that information, including Thier. Her understanding was that Rohan Seth also saw that information.

304.    CW 8 indicated that Cutera had a policy that if a system had a problem that could not be resolved through repairs, or if a system required an excessive number of service calls, then that system could be swapped out for a replacement. In other words, she advised, if it was too costly to continue servicing a machine, then Cutera would swap out the device. CW 8 reiterated, however, that "now" (meaning the last two years or so of her employment) she would request to swap out devices not because servicing them was too costly, but because there was no other way to fulfill the service contract for those customers, as her team could not get the parts they needed.

305.    CW 8 explained that she would sign off on the swap requests made by her team, and that those requests would be approved and processed by Caroline Batarseh, currently Senior Director, Order-to-Cash, at Cutera. CW 8 further noted that CEO Mowry was aware of the number of device swaps, since Mowry saw regular shipping reports which listed which devices were new sales and which were swaps. CW 8 added that Pinapati also saw those reports.

**G.    May 9-10, 2023 – 1Q 2023 Form 8-K (and 10-Q) and Earnings Call and Partial Disclosure / Materialization of the Risk**

306.    On May 9, 2023, the truth concerning the underlying problems with Cutera's rollout of its AviClear device was partially revealed and/or materialized. On that date, during its earnings call with analysts to discuss the first quarter financial results ("1Q 2023 Earnings Call") and in its

Form 8-K filed with the SEC, signed by Varma ("1Q 2023 Form 8-K"), the Company reported disappointing financial results for the first quarter 2023 that were "below expectations due to execution challenges in the business" and announced that Defendant Seth had resigned as the Company's CFO.

307.    With respect to the cause of the revenue miss, Defendant Hopkins stated:

> As discussed on our last quarterly call, the volume of AviClear deals in the fourth quarter diverted sales attention away from core capital deals. This trend actually continued in the first quarter as the capital team was directed to maintain focus on AviClear placements as a [number] one priority and as a result, fewer core capital deals were closed. As mentioned, we are now shifting our AviClear commercial emphasis towards device utilization, which is driven by our key account manager or KAM organization. Moving forward, this should allow our capital reps to return their primary focus to the sale of our core capital products, while simultaneously securing new, attractive AviClear placements at a more measured pace. With these recent changes and the successful implementation of retention incentives, we've reenergized our sales force.

308.    In response, the price of Cutera common stock fell $6.06 per share over two trading sessions, or 30%, from a close of $20.20 per share on May 9, 2023, to close at $14.14 per share on May 11, 2023.

309.    Analysts were disappointed and linked the poor financial performance to the poor AviClear rollout. For example, on May 9, 2023, Stephens stated that the first quarter results "disappointed" the market. On May 10, 2023, William Blair reported: "Operational concerns in the quarter called out included misaligned sales initiatives for reps (similar to the fourth quarter), audit-related inventory counting challenges (leading to a $2.8 million loss of revenues for orders on hand), and a plant shutdown." Indeed, William Blair explained that the North America Capital miss related "to two key dynamics: sales rep comp issues and inventory challenges."

310.    Additionally, on May 9, 2023, Cutera filed its 1Q 2023 Form 8-K, signed by Varma, and on May 10, 2023, Cutera filed its Form 10-Q, signed by Defendant Drummond ("1Q 2023 Form 10-Q"), which contained materially false and misleading financial figures. In particular, Cutera's Form 8-K for the first quarter of 2023 ("1Q 2023 Form 8-K") and 1Q 2023 Form 10-Q, emphasized the following reported financial results:

| 1Q 2023 Financial Metrics | As Originally Reported |
| --- | --- |

| GAAP Cost of Revenue | *$30.1 million* |
|---|---|
| GAAP Gross Profit | *$24.9 million* |
| Non-GAAP Gross Profit | *$27 million* |
| GAAP Gross Margin | *45.3%* |
| Non-GAAP Gross Margin | *49.1%* |
| GAAP Operating Loss | *$23.6 million* |
| Non-GAAP Operating Loss | *$14.5 million* |
| Inventory | *$71.8 million* |

311. Defendant Drummond similarly announced during its 1Q 2023 Earnings Call that the Company's "*[n]on-GAAP gross profit for the first quarter of fiscal 2023 was $27 million, with a gross margin of 49.1%*." Furthermore, Defendant Drummond stated during the 1Q 2023 Earnings Call, "For the first quarter of 2023 Non-GAAP operating income, which we refer to as adjusted EBITDA, was a loss of *$14.5 million*."

312. In connection with the Company's 1Q 2023 Form 10-Q, Defendant Hopkins—who had been Cutera's Interim CEO for less than one month—and Defendant Drummond—who had been Cutera's Interim CFO for less than one week—signed SOX Certifications pursuant to Section 302 and 906 of SOX, whereby they certified, among other things, that "*the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report*" and that Defendants had "*[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under the [Company's] supervision*."

313. Moreover, by signing these SOX Certifications, Defendants Hopkins and Drummond certified that they had "*[e]valuated the effectiveness of the registrant's disclosure controls and procedures and presented in this report [the Company's] conclusions about the effectiveness of the disclosure controls and procedures*."

314.    The foregoing attestations regarding Cutera's internal controls and financial results by Defendants Hopkins and Drummond were false and misleading when made, or at minimum made with intentional recklessness because, as discussed in ¶¶282-305, the Company had grossly inadequate internal controls which directly caused the Company to restate the financial statements as discussed herein ¶¶428-40.

315.    Specifically, since the start of the Class Period, Cutera's controls over its inventory were abysmal, and only worsened after the introduction of the new SAP and Salesforce systems in early 2022. These issues were self-inflicted and well known to Defendants Hopkins and Drummond, and if not, Defendants Hopkins and Drummond were intentionally reckless in certifying Cutera's internal controls and financial statements.

316.    Indeed, Defendants Hopkins's and Drummond's certifications attesting to the accuracy of financial reporting and the adequacy of Cutera's internal controls were made with knowledge or, at a minimum, were highly unreasonable and represented an extreme departure from the standards of ordinary care. Defendant Drummond and Hopkins were the Company's Interim CFO and Interim CEO, respectively, for less than one month, yet approved and certified to the accuracy of statements that were false. Had either Defendant Drummond or Hopkins talked to *anyone* with knowledge of the Company's complete lack of control over inventory, they would have known the statements were false and misleading. As the Company's Interim CEO and Interim CFO, they had a responsibility to make reasonable inquiries before falsely certifying the Company's SEC filings, and their failure to do so created a clear danger of misleading investors that they must have known.

317.    Moreover, statements made during the Company's contemporaneous May 9, 2023 earnings call indicate that Defendants Hopkins and Drummond knew of problems with internal controls and the extended year-end inventory audit. For example, Defendant Hopkins stated:

> The second operational challenge we faced during the quarter traces to an extended plant shutdown that impacted our ability to build inventory and ship product for a period of time. So there's typically a one-week shutdown of our production facilities during the first week of January to enable a physical count of inventory.
>
> This year to comply with audit requirements, the year-end physical inventory count took longer than expected and our production facilities were shut down by an

additional three weeks. This extended shutdown negatively impacted our ability to build and ship the product required to fully meet demand in the core business during the quarter.

318.   Additionally, Defendant Drummond attributed increased year-over-year costs to the extended inventory audit and the new SAP system:

Non-GAAP G&A expenses for the first quarter of 2023 were $10.1 million compared to $7.1 million in the same period last year. More than half of the increase was driven by fees associated with the extended audit and the rest primarily relates to increased legal expenses and IT costs to support our recently implemented ERP system.

319.   Defendant Drummond also identified that inventory count inaccuracies, which were now purportedly tailwinds, were the cause of the extended inventory audit:

This year's count was more challenging than the past. We implemented a new ERP in 2022, plus we had increased levels of inventory. Due to some identified count inaccuracies, we'd performed numerous recounts and ultimately had to recount our third-party warehouse.

320.   Notably, Defendants' May 9-10, 2023 above-referenced financial figures and SOX Certifications were materially false and misleading for additional reasons. In particular, the Company admitted as much when it later reported on March 5, 2024 that the Company was required to and did amend and restate certain items from its previously reported 1Q 2023 financial results. Among other things, the Company admitted that, "as a result of an accounting error identified by the physical inventory count, there was a shortfall of inventory relative to the Company's system of record," and that "[t]he effect of this error was an overstatement of $1.2 million of inventory on the condensed consolidated balance sheet as of March 31, 2023." Additionally, the Company restated many of its financial metrics as detailed in the chart below, which renders Defendants' statements materially false and misleading. Indeed, as seen in the financial metrics highlighted in the table below, the magnitude of these misstatements was significantly in excess of the generally accepted quantitative threshold used in evaluating financial statement materiality of 5% of reported income. (ASC 250-10-S99.) Moreover, the Restatement corrected errors that were qualitatively material. For example, as restated, Cutera's financial results illuminated that negative performance trend that the Company was eroding more swiftly than what was revealed in the originally reported results. (ASC 250-10-S99.)

| 1Q 2023 Financial Metrics | As Originally Reported | As Restated | % Change |
|---|---|---|---|
| GAAP Cost of Revenue | *$30.1 million* | $32.9 million[11] | 9.3% |
| GAAP Gross Profit | *$24.9 million* | $21.6 million | (13.3%) |
| Non-GAAP Gross Profit | *$27 million* | $23.7 million | (12.2%) |
| GAAP Gross Margin | *45.3%* | 39.7% | (12.4%) |
| Non-GAAP Gross Margin | *49.1%* | 43.5% | (12.2%) |
| GAAP Operating Loss | *$23.6 million* | $26.6 million | 12.7% |
| Non-GAAP Operating Loss | *$14.5 million* | $17.5 million | (20.9% |
| Inventory | *$71.8 million* | $69.8 million | (2.8%) |

321.    Defendants' May 9-10, 2023 above-referenced financial figures and SOX Certifications were therefore unequivocally materially false and misleading. Indeed, a "restatement" is "the process of revising previously issued financial statements to reflect the correction of an error in those financial statements." (ASC 250-10-20, Accounting Changes and Error Corrections.) When an error is identified that is material to previously issued financial statements, an entity is required to restate and reissue those financial statements. (ASC 250-10-45-27 and ASC 250-10-S99.) A restatement of prior financial statements to correct material errors is required because the financial markets depend on high quality financial reporting, and a fundamental pillar of high quality public financial reporting is reliable, comparable financial statements that are free from material misstatement. Similarly, a company that re-issues prior financial statements to correct errors demonstrates that the error is material to the prior period financial statements because the company is required to restate and reissue its previously issued

[11] The change in cost of revenue included adjusting for the following errors: (a) Correction of the accounting error for the overstatement of inventory identified as a result of the physical inventory count ($1.2 million); (b) Correction of the accounting error related to AviClear devices identified as a result of the physical inventory count ($1.0 million); (c) Correction of the overstatement of demonstration and field inventory, net of quarterly amortization ($0.4 million); (d) Correction of the overstatement of demonstration and field inventory ($0.4 million); and (e) Correction of AviClear capitalized labor cost incorrectly expensed in previous period ($0.2 million).

financial statements to reflect the correction of the error in those financial statements only when the errors are material.

322.    That was the case here. Despite Defendants' express representations in their SOX Certifications, among other things, that "*the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report*" and that Defendants had "*[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under the [Company's] supervision*," the opposite was true, as the Company admitted on March 5, 2024 when it issued its Restatement. In fact, Defendant Harris even admitted in November 2023 that "we identified a significant issue with how the company has been managing inventory during 2023."

323.    Moreover, by signing these SOX Certifications, Defendants certified that Defendants had "*[e]valuated the effectiveness of the registrant's disclosure controls and procedures and presented in this report the [Company's] conclusions about the effectiveness of the disclosure controls and procedures*," evidencing their access and review of Cutera's financial data as well as the materially false and misleading statements set forth above. Contrary to Defendants' representations, Cutera suffered from severe internal control deficiencies and deficient disclosure controls and procedures, as evidenced by the fact that, as alleged herein, the Company was required to restate certain financial figures. Had Defendants actually conducted the evaluations required, they would have discovered the material errors contained within their public statements, including the Company's lack of internal controls. Accordingly, Defendants knew, or at the very least, were severely reckless in not knowing of the facts which rendered their public statements materially false and misleading.

**H.    August 8-9, 2023 – 2Q 2023 Form 8-K (and 10-Q) and Earnings Call and Partial Disclosure / Materialization of the Risk**

324.    On August 8, 2023, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were further revealed and/or partially materialized. On that date, during Cutera's 2Q 2023 Earnings Call

and in Cutera's Form 8-K filed with the SEC, signed by Defendant Drummond ("2Q 2023 Form 8-K"), Defendant Hopkins revealed that the disappointing financial results were related to ongoing problems within the sales organization. Indeed, despite the Company's many assurances to investors regarding the all-around success of the AviClear rollout, Defendant Harris disclosed that Cutera had been experiencing quality and reliability problems with the AviClear devices, explaining:

> I think that what we're seeing here is part of the fact that **we really flooded the engines with AviClear.** And so, we saw a lot of capital go out, a lot of production volume through our facility, and **it really stretched the organization.** And so, it's hard to link it, link some of the challenge we're having directly to that or full proof of that, but the **timing would indicate that that had a meaningful role to play**.

325.    In response to an analyst's question about when Cutera's quality problems were identified, and whether they resulted with the "commencement of the placement of the AviClear systems or were service issues starting to crop up before that," Defendant Hopkins disclosed that: "[o]n the reliability front, those issues really did begin to surface as we ramped up Avi." Defendant Hopkins revealed that "the organization was a bit overwhelmed and stretched then. And as the manufacturing organization ramped up Avi, reliability issues began to surface across the portfolio of products. It is not entirely broad scale. The reliability issues are focused on three to four systems. But once again these are issues that we own and that we will be dealing with post haste."

326.    On this shocking news, the price of Cutera's stock fell more than 27%, from a closing price of $18.36 per share on August 7, 2023, to a closing price of $13.38 on August 9, 2023.

327.    Analysts understood that the drop in Cutera's stock price was caused by the aforementioned disclosures and revelations. For example, on August 9, 2023, William Blair explained Cutera's "Capital sales of $37.9 million [came in] $4.7 million below our estimate . . . with weakness attributed to 1) macro pressure/tightened capital environment impacting financing and ASPs particularly at med spas, and 2) reliability/service issues related to Cutera's devices as the supply chain and production facilities have focused on AviClear resulting in backlogged supply chain dynamics and servicing delays."

328.    On August 8, 2023, Cutera filed its 2Q 2023 Form 8-K Form, and on August 9, 2023, Cutera filed its Form 10-Q ("2Q 2023 Form 10-Q"), both of which were signed by Defendant Drummond containing materially false and misleading financial figures. In particular, Cutera's 2Q 2023 Form 8-K and 2Q 2023 Form 10-Q, reported the following:

| 2Q 2023 Financial Metrics | As Originally Reported |
|---|---|
| GAAP Cost of Revenue | *$33.2 million* |
| GAAP Gross Profit | *$28.1 million* |
| Non-GAAP Gross Profit | *$30.8 million* |
| GAAP Gross Margin | *45.8%* |
| Non-GAAP Gross Margin | *50.3%* |
| GAAP Operating Loss | *$29.5 million* |
| Non-GAAP Operating Loss | *$11.6 million* |
| Inventory | *$68.7 million* |

329.    Defendant Drummond similarly announced during its 2Q 2023 Earnings Call that the Company's "***Non-GAAP gross profit for the first quarter of 2023 was $30.8 million with a gross margin of 50.3%***." Furthermore, Defendant Drummond stated during the 2Q 2023 Earnings Call, "For the second quarter of 2023, our non-GAAP operating income, which we refer to as adjusted EBITDA, was a loss of $***11.6 million***."

330.    In connection with the Company's 2Q 2023 Form 10-Q, Defendants Harris and Drummond signed SOX Certifications pursuant to Section 302 and 906 of SOX, whereby they certified that among other things, "***the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report***" and that Defendants had "***[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under [the Company's] supervision***."

331. Moreover, by signing these SOX Certifications, Defendants Harris and Drummond certified that they had "*[e]valuated the effectiveness of the registrant's disclosure controls and procedures and presented in this report the [Company's] conclusions about the effectiveness of the disclosure controls and procedures*."

332. The foregoing attestations regarding Cutera's internal controls and financial results by Defendants Drummond and Harris were knowingly false and misleading when made, or at minimum made with severe recklessness because, as discussed in ¶¶282-305, the Company had grossly inadequate internal controls which directly caused the Company to restate the financial statements as discussed herein ¶¶428-40.

333. Specifically, since the start of the Class Period, Cutera's controls over its inventory were abysmal, and only worsened after the introduction of the new SAP and Salesforce systems in early 2022. These issues were self-inflicted and well known to Defendants Drummond and Harris, and if not, Defendant Drummond and Harris were intentionally reckless in certifying Cutera's internal controls and financial statements.

334. During the analyst call held that same day, Defendant Harris revealed this was his "second day on the job," meaning he had at minimum intentionally and recklessly certified Cutera's financial results and internal controls without having been in the role of CEO for two full days. Dovetailing on this point, in the Company's prior quarter earnings call, Defendant Hopkins stated that the Board was "in the process of sourcing external candidates" for CEO, meaning the determination to hire Harris was a recent one.

335. Later admissions by Defendant Drummond and Harris indicate that the inventory problems identified in the 2022 year-end audit had not been resolved, and indeed had worsened since the prior quarter at the time Defendants made the above statements. Based on these admissions, Defendants Drummond and Harris either knowingly certified Cutera's internal controls and financial results, or did so with intentional recklessness.

336. For example, during the earnings call on November 8, 2023 Defendant Harris revealed that inventory management issues had persisted throughout all of 2023:

> In inventory management, we have assembled a materials control team and are retraining operations personnel on utilization of our ERP system. As Stuart will describe later, we identified a significant issue with how the company has been managing inventory during 2023. We will conduct another physical inventory count at year-end and plan to fully remediate our challenges by mid-2024. On the cost front, Cutera has been overspending in operations in recent periods due to a lack of process and discipline exacerbated by the stress that the AviClear launch placed on the organization and the supply chain. The company has not had effective processes for either repairing and reusing components that are returned from field service calls or for checking the quality of purchased materials and rejecting those that aren't usable.

337. Moreover, Defendant Drummond revealed that same day that Cutera had been forced to conduct another full inventory count in 3Q 2023 in continued efforts to cure inventory issues identified in the 2022 year-end audit, meaning just issues had been constant throughout 2023:

> We are unable to provide full financial results for the third quarter at this time due to an issue we identified with inventory accounting. We performed the full physical count at September 30 to assess the effectiveness of our efforts to remediate the inventory-related material weakness disclosed in our 2022 10-K.

338. Notably, Defendants' August 8 and 9, 2023 above-referenced financial figures and SOX Certifications were materially false and misleading for additional reasons. In particular, as the Company reported on March 5, 2024, the Company was required to and did amend and restate certain items from its previously reported 2Q 2023 financial results. Among other things, the Company admitted that "as a result of an accounting error identified by the physical inventory count, there was a shortfall of inventory relative to the Company's system of record. The effect of this error was an overstatement of $3.6 million of inventory on the condensed consolidated balance sheet as of June 30, 2023." Additionally, the Company restated many of its financial metrics as detailed in the chart below, which renders Defendants' statements materially false and misleading. Indeed, the magnitude of these misstatements was significantly in excess of the generally accepted threshold used in evaluating financial statement materiality of 5% of reported income. (ASC 250-10-S99.)

| 2Q 2023 Financial Metrics | As Originally Reported | As Restated | % Change |
|---|---|---|---|
| GAAP Cost of Revenue | *$33.2 million* | $35.7 million[12] | 7.5% |
| GAAP Gross Profit | *$28.1 million* | $26.1 million | (7.1%) |
| Non-GAAP Gross Profit | *$30.8 million* | $28.8 million | (6.5%) |
| GAAP Gross Margin | *45.8%* | 42% | (8.3%) |
| Non-GAAP Gross Margin | *50.3%* | 46.6% | (6.4%) |
| GAAP Operating Loss | *$29.5 million* | $31.2 million | 5.8% |
| Non-GAAP Operating Loss | *$11.6 million* | $13.2 million | 14.1% |
| Inventory | *$68.7 million* | $64.2 million | (6.6%) |

339.   Defendants' August 8 and 9, 2023 above-referenced financial figures and SOX Certifications were therefore unequivocally materially false and misleading. Indeed, as explained above, a "restatement" is "the process of revising previously issued financial statements to reflect the correction of an error in those financial statements." (ASC 250-10-20.) When an error is identified that is material to previously issued financial statements, an entity is required to restate and reissue those financial statements. (ASC 250-10-45-27 and ASC 250-10-S99.) A restatement of prior financial statements to correct material errors is required because the financial markets depend on high quality financial reporting, and a fundamental pillar of high quality public financial reporting is reliable, comparable financial statements that are free from material misstatement. Similarly, a company that re-issues prior financial statements to correct errors demonstrates that the error is material to the prior period financial statements because the company is required to restate and reissue its previously issued financial statements to reflect the correction of the error in those financial statements only when the errors are material.

---

[12] The change in cost of revenue included adjusting for the following errors: (a) Correction of the accounting error for the overstatement of inventory identified as a result of the physical inventory count ($2.4 million and $3.6 million for three and six months ended June 30, 2023, respectively); (b) Correction of the overstatement of demonstration and field inventory ($0.4 million), net of quarterly amortization ($0.1 million); (c) Correction of the overstatement of demonstration and field inventory ($0.1 million and $0.5 million for three and six months ended June 30, 2023, respectively); and (d) Correction of unapplied inventory prepayment upon receipt of inventory ($0.1 million).

340.    That was the case here. Despite Defendants' express representations in their SOX Certifications that, among other things, that "*the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report*" and that Defendants had "*[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under the [Company's] supervision*," the opposite was true, as the Company admitted on March 5, 2024 when it issued its Restatement. In fact, Defendant Harris even admitted in November 2023 that "we identified a significant issue with how the company has been managing inventory during 2023."

341.    Moreover, as explained above, by signing these SOX Certifications, Defendants certified that Defendants had "*[e]valuated the effectiveness of the registrant's disclosure controls and procedures and presented in this report the [Company's] conclusions about the effectiveness of the disclosure controls and procedures*," evidencing their access and review of Cutera's financial data as well as the materially false and misleading statements set forth above. Contrary to Defendants' representations, Cutera suffered from severe internal control deficiencies and deficient disclosure controls and procedures, as evidenced by the fact that, as alleged herein, the Company was required to restate certain financial figures. Had Defendants actually conducted the evaluations required, they would have discovered the material errors contained within their public statements, including the Company's lack of internal controls. Accordingly, Defendants, knew, or at the very least, were severely reckless in not knowing, the facts which rendered their public statements materially false and misleading.

## VI.    THE FULL TRUTH FINALLY EMERGES ON MARCH 21, 2024

342.    On March 21, 2024, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were fully revealed and/or materialized. On that day, the Company held its 4Q 2023 Earnings Call where Cutera announced poor financial results and finally disclosed that its failure to maintain internal

controls over inventory had caused an excessive level of inventory and negatively impacted gross margin.

343.    Additionally, Cutera disclosed that it had to revise its inventory planning controls because the Company "had too much inventory in certain areas, most notably AviClear and too little in other areas." The consequence of these deficient procedures was that Cutera was forced to record a "high level of inventory reserves," negatively impacting then-reported gross margin. Defendants explained, "In the fourth quarter alone, we took approximately $8 million of excess and obsolete inventory reserves." Moreover, Cutera disclosed that an additional 175 AviClear devices would be returned by customers—bringing the total number of returned devices to 300 out of 1,200 total devices that had been sold to-date.

344.    In response, the price of Cutera common stock fell $0.70 per share, or 30.43%, to close at $1.60 per share on March 22, 2024. In addition, Cutera common stock fell an additional 10.63% the next trading day to close at $1.43 on March 25, 2025—totaling a 37.83% stock price decline from the March 21, 2024 announcement.

## VII.    LOSS CAUSATION

345.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Cutera common stock and operated as a fraud or deceit on Class Period purchasers of Cutera common stock by failing to disclose and misrepresenting the adverse facts detailed herein.

346.    Class members unknowingly and in reliance upon Defendants' materially false or misleading statements and/or omissions purchased Cutera common stock at artificially inflated prices. But for Defendants' misrepresentations, omissions, and fraudulent scheme, Lead Plaintiff and other Class members would not have purchased Cutera stock at the artificially inflated prices at which it traded during the Class Period.

347.    The truth regarding Defendants' fraud was revealed in a series of partial corrective disclosures and/or materializations of concealed risk that occurred between January 9, 2023 and March 21, 2024. During this period, Cutera's stock fell precipitously as the artificial inflation

caused by Defendants' unlawful conduct exited Cutera's stock price. It was not until the final corrective disclosure and/or materialization of concealed risk on March 21, 2024 that the full truth was known to the market, such that there was no longer any artificial inflation in Cutera's stock price attributable to the fraud.

348. The declines in Cutera's stock price during this period, including the declines summarized below, are directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by Defendants' material misrepresentations or omissions. As a result of their purchases of Cutera common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss (i.e., damages) under the federal securities laws. Defendants' materially false and misleading statements had that intended effect, and caused Cutera common stock to trade at artificially inflated levels throughout the Class Period.

349. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Cutera's business. As the truth about the Company and the extent of the fraud was revealed to the market, the price of Cutera common stock fell significantly. These declines removed the inflation from the price of Cutera common stock, causing real economic loss to investors who had purchased Cutera common stock during the Class Period.

350. Each decline in the price of Cutera common stock, as detailed below, was a direct or proximate result of the nature and extent of Defendants' fraudulent misrepresentations and/or omissions being revealed to investors and the market.

351. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Cutera common stock, and by the subsequent significant decline in the value of Cutera common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

352. The market for Cutera common stock was open, well-developed, and efficient at all relevant times, with an average daily trading volume of approximately 776,983 shares during the Class Period. As a result of Defendants' misstatements and material omissions, as alleged herein, Cutera's common stock traded at artificially inflated prices. Lead Plaintiff and other Class

members purchased Cutera common stock relying upon the integrity of the market relating to Cutera common stock and suffered economic losses as a result thereof.

353. The declines in Cutera's common stock price on January 9, 2023, March 17, 2023, April 12, 2023, May 10-11, 2023, August 9, 2023, November 8, 2023, March 5, 2024, and March 21-25, 2024 were a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors before market hours on January 9, 2023, after market hours on March 16, 2023, April 12, 2023, May 9, 2023, August 8, 2023, November 8, 2023, March 5, 2024, and March 21, 2024. The timing and magnitude of Cutera's stock price declines evidence the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

**A.    January 9, 2023 – First Partial Disclosure / Materialization of the Risk**

354. On January 9, 2023, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were revealed and/or partially materialized when the Company announced its preliminary financial results for full-year 2022 ("4Q 2022 Form 8-K"). Specifically, despite assuring investors just two months earlier that the Company would finish the year "at the upper end of revenue guidance of $255 million to $260 million," Defendants revealed that the Company now expected revenue between $252 million and $253 million.

355. The January 9, 2023 disclosures about Cutera's earnings results were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning the Company's internal controls and the AviClear rollout.

356. Moreover, the 4Q 2022 Form 8-K revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market. The 4Q 2022 Form 8-K partially (but incompletely) revealed some of the relevant

truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding Cutera's rollout of its AviClear device and performance of its other divisions, such as Core Capital.

357.   The 4Q 2022 Form 8-K stated, "Cutera Management – Dave Mowry, CEO; J. Daniel Plants, Executive Chairman; and Rohan Seth, CFO – will be hosting a series of individual investor meetings over the course of January 10 – 12, 2023 at the Nasdaq Offices at 505 Howard St, Suite 4200 in downtown San Francisco." Cutera held meetings with analysts that same day, whereby Cutera further explained the reasons for the Company's poor financial performance. Specifically, Cutera linked the earnings announcement to the unsuccessful AviClear rollout.

358.   For example, on January 9, 2023, Piper Sandler reported that they spoke with Cutera management and that Cutera **"took its eye off the ball on the core business as it was pushing aggressively in acne," *i.e.*, AviClear**. Based on Piper Sandler's same conversation with Cutera management, Piper Sandler further reported: "**The sales team has understandably spent the majority of time pushing AviClear. However in doing so, the team took their eye off the ball for the rest of the business, primarily in the US and leading to a majority of the revenue shortfall we see here in the quarter**."

359.   As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Cutera common stock fell $9.41 per share, or more than 23%, from a close of $40.45 per share on January 6, 2023, to close at $31.04 per share on January 9, 2023.

360.   Upon learning this news, analysts were disappointed and surprised by the revenue miss and attributed Cutera's poor performance to its AviClear rollout. For example, on January 9, 2023, Piper Sandler reported that "[w]e and investors were clearly surprised with the announcement this morning of a revenue miss," and Stephens similarly reported that the "top-line results are disappointing." And on January 31, 2023, William Blair's report stated, "[m]anagement is adamant that it does not believe [the lower domestic capital sales] is macro-related, instead attributing the miss to the concurrent ramp-up in its new AviClear device."

361.   Still, the Company's stock price remained artificially inflated even after this news, as not all of the concealed risks of Defendants' fraudulent conduct had materialized and investors still had not learned the full truth, and because Defendants continued to reassure the market that the AviClear rollout was a success, that the Company's other businesses, such as Core Capital, were not hurting as a result of AviClear, and that there were no problems with Cutera's internal controls. For example, Defendants reassured investors, among other things, that "***sales reps finally pivoted back to their core capital pipeline***." *See* ¶¶262-65, *supra*. However, Defendants' reassurances still concealed, among other things, that not only was the AviClear rollout a failure and harmed Core Capital, but Cutera was experiencing an undisclosed internal control crisis—part of which was caused by a buildup of AviClear inventory (also still concealed from investors).

362.   Indeed, as alleged in ¶¶268-71, Defendants' reassurances were materially false and misleading because, among other things, as revealed on February 28, 2023 and May 9, 2023, Defendants still had not addressed the problem of allocating too many resources to AviClear at the expense of Core Capital.

**B.    March 16, 2023 – Second Partial Disclosure / Materialization of the Risk**

363.   On March 16, 2023, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were revealed and/or partially materialized when the Company announced that it would not meet the extended deadline for filing its 2022 annual report, and would endeavor to file its 2022 annual report "as soon as practicable" ("March 16 Form NT 10-K/A"). Cutera also revealed that it had identified material weaknesses related to stock-based compensation.

364.   Specifically, the Company stated: "[B]ecause of further delays and additional work required to complete the financial statements filed as part of the Form 10-K and management's assessment of the Company's internal control over financial reporting, the Company no longer anticipates that it will file the Form 10-K by March 16, 2023. The Company will file the Form 10-K as soon as practicable." The Company further stated: "The Company has identified and expects to disclose in the Form 10-K material weaknesses in its internal control over financial reporting

related to ineffective information technology general controls, ineffective inventory count controls and stock-based compensation."

365. The March 16, 2023 disclosures about the Company not being able to meet its extended filing deadline and the stock-based compensation material weakness were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning the Company's internal controls and the AviClear rollout.

366. Moreover, the March 16 Form NT 10-K/A revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market. The March 16 Form NT 10-K/A partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding Cutera's rollout of its AviClear device and performance of its other divisions, such as Core Capital.

367. As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Cutera common stock fell $3.49 per share, or approximately 12.5%, from a close of $27.85 per share on March 16, 2023, to close at $24.36 per share on March 17, 2023.

368. The Special Committee undeniably linked the Company's late Form 10-K filing (which included the stock-based compensation material weakness) announcement to Defendant Mowry's poor AviClear rollout execution and leadership—explaining in April 2023 that the "Company's inability to execute well was evident even from the outside; for example, Cutera filed its Form 10-K late." Additionally, also during April 2023, the Board terminated with cause Defendant Plants, reasoning in part that "Mr. Plants was far more interested in his own personal enrichment than in leading the Company for the benefit of all stakeholders." Such timing leads to the reasonable inference that Defendant Plants' self-financial motivation was related to the Company's declaration of a stock-based compensation material weakness.

369. Upon learning this news, analysts were disappointed and acknowledged that this further delay in fact disclosed new information. For example, Piper Sandler's March 16, 2023

report stated that "we and investors" are "disappointed" that Cutera delayed its 10-K filing yet again. Piper Sandler further reported that "there was an addition to the 'material weakness' disclosures this evening to include stock-based compensation." Likewise, on March 17, 2023, William Blair reported that it the additional delay was "disappointing," and that "the reason behind the delay seems to be related to internal controls over the ineffective information technology, inventory count controls, and stock-based compensation."

370. Still, the Company's stock price remained artificially inflated even after this news as the full truth had not yet been revealed and/or materialized. For example, as of this date, not all of the concealed risks of Defendants' fraudulent conduct had materialized and investors still had not learned the full truth, which included the terminations with cause of Defendants Mowry and Plants, the resignation of Defendant Seth, an extended plant shutdown that resulted from the Company's inventory problems and led to poor financial performance, that the AviClear rollout caused reliability problems and poor utilization trends, and that the Company's problems would cause Cutera to delay its Form 10-K filing in light of the reality that Cutera had been double counting returns on its subpar ERP system. *See* Sections VII.C-F, *infra*. Additionally, as of this date, investors had not learned about an additional material weakness that Cutera disclosed within its March 5, 2024 Restatement: "the Company failed to design, maintain and monitor a risk assessment program at a sufficiently precise level and therefore failed to identify new and evolving risks related to accounting policies, procedures and related controls performed over areas including, but not limited to inventory, revenues and lease income, costs for leased devices, and testing of certain key reports used in controls." *See* ¶¶428-40, *infra*.

371. Furthermore, as of this date, investors had not yet learned that a large contributor to Cutera's inventory buildup was related to AviClear devices. Specifically, on March 21, 2024, Defendant Harris finally revealed that "we've had too much inventory in certain areas, most notably AviClear and too little in other areas" and that "[w]e've assembled a material control team, which has implemented daily reviews to ensure that inventory movements are being transacted appropriately. We've also opened our own warehouse, which allows us to consolidate more

expensive third-party warehouses with better control while also providing room for the significant amount of AviClear and excel V+ inventory that we will be bringing in from Jabil." *See* ¶¶443-453, *infra*.

**C.    April 12, 2023 – Third Partial Disclosure / Materialization of the Risk**

372.    On April 12, 2023, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were revealed and/or partially materialized when the Company announced that, on April 11, 2023, the **Board had terminated Defendant Plants as Cutera's Executive Chairman and Chairman of the Board "with cause" and Defendant Mowry as Cutera's CEO "with cause"** ("April 12 Press Release"). The Company also disclosed that the Board had simultaneously appointed Defendant Hopkins to serve as the Interim-CEO, effective immediately. The Company explained that the terminations of Defendants Plants and Mowry came "following joint and unanimous recommendations from a special committee comprising all members of the Board's Governance and Corporate Responsibility Committee and the majority of the members of the Board of Directors."

373.    The Company further revealed that Defendant Plants "strongly recommended" the termination of Defendant Mowry in November 2022, explaining:

> In November 2022, the Board's independent directors began exploring a CEO transition. Mr. Plants strongly recommended the immediate termination of Mr. Mowry and indicated that he wanted to succeed him as the Company's next CEO. This followed a previous attempt by Mr. Plants to gain the CEO role in February 2021 by recommending removing Mr. Mowry. After serious consideration, the Board instead decided to seek an external CEO candidate with the assistance of an executive search firm. Following that decision, in an apparent campaign to seize control of the Company, Mr. Mowry and Mr. Plants issued a press release in which they disclosed – and blatantly mischaracterized in a defamatory manner – highly confidential internal deliberations of the Board in direct violation of their employment agreements and their fiduciary duties as directors and officers under Delaware law.

374.    In connection with these announcements, the Company announced that "it is withdrawing its full-year 2023 outlook."

375.    The April 12, 2023 disclosures about terminating Defendants Plants and Mowry with cause were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning the Company's internal controls and the AviClear rollout.

376.    Moreover, the April 12 Press Release revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market. The April 12 Press Release partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding Cutera's rollout of its AviClear device and performance of its other divisions, such as Core Capital.

377.    As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Cutera common stock fell $7.63 per share, or more than 28%, from a close of $27.07 per share on April 11, 2023 to close at $19.44 per share on April 12, 2023.

378.    Upon learning this news, analysts were shocked and linked the stock drop to the news. For example, that same day, April 12, 2023, Piper Sandler suspended its rating, price target, and EPS estimates of Cutera following the Company's leadership change announcements. William Blair likewise issued a report on April 12, 2023, expressing that "[the removal of CEO Mowry and chairperson Plants was a surprise to us after 10 Cutera executives (including the CFO and senior leaders in global marketing, strategy/corporate development, operations, FP&A, capital sales, and key account management) submitted a letter of support for Mowry and Plants on Tuesday night." Cantor Fitzgerald also reported on April 12, 2023 that "[a]s a result of the news and headlines in the press that followed, CUTR's stock closed down almost 30%." Cantor Fitzgerald further listed several questions that investors had and wanted the Company to address, including, "How can CUTR help alleviate investor concerns that there could be fraud at the company?" and "Why are there so many conflicting headlines in the press today, and what really happened at CUTR that drove the company's decisions?"

379.    Still, the Company's stock price remained artificially inflated even after this news as the full truth had not yet been revealed and/or materialized as investors were still in the dark about many of the undisclosed problems or not-yet-materialized risks. For example, as of this date, not all of the concealed risks of Defendants' fraudulent conduct had materialized and investors still had not learned the full truth, which included the resignation of Defendant Seth, an extended plant shutdown that resulted from the Company's inventory problems and resulted in poor financial performance, that the AviClear rollout caused reliability problems and poor AviClear utilization trends, and that the Company's problems would cause Cutera to delay its Form 10-K filing in light of the reality that Cutera had been double counting returns on its subpar ERP system. Additionally, as of this date, investors had not learned about an additional material weakness that Cutera disclosed within its March 5, 2024 Restatement: "the Company failed to design, maintain and monitor a risk assessment program at a sufficiently precise level and therefore failed to identify new and evolving risks related to accounting policies, procedures and related controls performed over areas including, but not limited to inventory, revenues and lease income, costs for leased devices, and testing of certain key reports used in controls."

380.    Also, as of this date, investors had not yet learned that a large contributor to Cutera's inventory buildup was related to AviClear devices. Specifically, on March 21, 2024, Defendant Harris finally revealed that "we've had too much inventory in certain areas, most notably AviClear and too little in other areas" and that "[w]e've assembled a material control team, which has implemented daily reviews to ensure that inventory movements are being transacted appropriately. We've also opened our own warehouse, which allows us to consolidate more expensive third-party warehouses with better control while also providing room for the significant amount of AviClear and excel V+ inventory that we will be bringing in from Jabil."

**D.    May 9, 2023 – Fourth Partial Disclosure / Materialization of the Risk**

381.    On May 9, 2023, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were revealed and/or partially materialized when the Company reported disappointing financial results for the

first quarter 2023 in its 1Q 2023 Form 8-K. Specifically, the Company issued its 1Q 2023 Form 8-K that explained that "[f]irst quarter performance was below expectations due to execution challenges in the business and certain operational events including an undue focus on AviClear placements that diverted attention from North America core capital sales, as well as an **extended plant shutdown** that affected sales and margin." The 1Q 2023 Form 8-K further disclosed that **Defendant Seth had stepped down as the Company's CFO**.

382. That same day, the Company held 1Q 2023 Earnings Call. During the 1Q 2023 Earnings Call, Defendant Hopkins explained:

> [W]e have not executed particularly well, as evidenced by our results in recent quarters, including the disappointing first quarter 2023 results being reported today. As the Special Committee of the Board has said publicly, the Board realized in the fourth quarter of last year that Cutera needed a new CEO to help improve execution. The significant execution challenges and our results in the first quarter actually reinforce that fact. But let me be clear, our challenges in the quarter were mostly self-inflicted and can be attributed to suboptimal leadership direction that led to execution issues that can and will be solved.

383. Defendant Hopkins also stated, in comparing the Company's placement of AviClear devices, that "we have not done as well in driving treatment and utilization." Defendant Hopkins acknowledged that the training of Cutera employees had to improve when she noted that "[w]e will also fine-tune training for our key account managers, or KAMs, to help them work even more effectively with clinicians to drive treatment volume and utilization."

384. Defendant Hopkins similarly disclosed:

> Lower-than-expected capital equipment revenues in North America were the result of 2 operational factors. First, our capital sales team's continued focus on driving placements for AviClear. And second, the company faced challenges completing its audit-related inventory count, which resulted in a 4- week plant shutdown and a loss of production output.

385. Furthermore, Defendant Hopkins explained:

> As discussed on our last quarterly call, the volume of AviClear deals in the fourth quarter diverted sales attention away from core capital deals. This trend actually continued in the first quarter as the capital team was directed to maintain focus on AviClear placements as a #1 priority, and as a result, fewer core capital deals were closed.

386. With respect to the plant shutdown Defendant Hopkins stated that the "second operational challenge we faced during the quarter traces to an extended plant shutdown that impacted our ability to build inventory and ship product for a period of time." Defendant Hopkins explained that "there's typically a 1-week shutdown of our production facilities during the first week of January to enable a physical count of inventory," but that, "[t]his year, to comply with audit requirements, the year-end physical inventory count took longer than expected, and our production facilities were shut down by an additional 3 weeks." Defendant Hopkins disclosed that "[t]his extended shutdown negatively impacted our ability to build and ship the product required to fully meet demand in the core business during the quarter."

387. Regarding the financial impact that the plant shutdown had on Cutera, Defendant Drummond explained that "[w]e estimate $2.8 million was lost in revenue for products, which we had orders on hand and weren't able to fulfill due to the lack of finished goods inventory, with an estimated split of $1.8 million in North America and $1 million internationally." Defendant Drummond stated that this loss was "in addition to other deals which orders we never received as our customers were aware that we didn't have the relevant inventory."

388. The May 9, 2023 disclosures about Cutera's poor financial performance and Defendant Seth stepping down as CFO were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning the Company's internal controls and the AviClear rollout.

389. Moreover, the 1Q 2023 Form 8-K and 1Q 2023 Earnings Call revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market. The 1Q 2023 Form 8-K and 1Q 2023 Earnings Call partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding Cutera's rollout of its AviClear device and performance of its other divisions, such as Core Capital.

390. As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Cutera common

stock fell $6.06 per share over two trading sessions, or 30%, from a close of $20.20 per share on May 9, 2023, to close at $14.14 per share on May 11, 2023.

391.   Upon learning this news, analysts were disappointed and linked the poor financial performance to Cutera's inventory challenges and plant shutdown. For example, on May 9, 2023, Stephens stated that the first quarter results "disappointed" the market. On May 10, 2023, William Blair reported: "Operational concerns in the quarter called out included misaligned sales initiatives for reps (similar to the fourth quarter), audit-related inventory counting challenges (leading to a $2.8 million loss of revenues for orders on hand), and a plant shutdown." Indeed, William Blair explained that the North America Capital miss related "to two key dynamics: sales rep comp issues and inventory challenges." William Blair further reported that "[m]anagement partially attributed the $2.9 million miss to $1.8 million of orders that were related to inventory challenges as the orders were in hand but could not be filled as a result of a lack of finished goods inventory," and that "[t]his was due to the regularly scheduled one-week shutdown that turned into a three-week shutdown to comply with audit requirements (the company had a delayed 10-K filing earlier this year)." With respect to AviClear, specifically, William Blair reported, "[a]s for AviClear, the team seemed to be unsuccessful so far in turning the rapidly increasing installed base into treatments that would meet Street expectations, as utilization continues to vary greatly among different accounts according to management." William Blair also noted that "former CFO Rohan Seth, who was one of 10 senior leaders to publicly support former CEO Dave Mowry and Chairperson of the Board J. Daniel Plants, has stepped down from Cutera."

392.   Still, the Company's stock price remained artificially inflated even after this news, as not all of the concealed risks of Defendants' fraudulent conduct had materialized and investors still had not learned the full truth. Specifically, May 9, 2023 Defendants caused Cutera to file its Form 8-K and on May 10, 2023 to file its Form 10-Q, which contained materially false and misleading financial figures related to cost of revenue, gross profit, gross margin, operating loss, and inventory—which the Company even admitted were material errors by its need to file the

Restatement for such figures. Therefore, at this time, investors were also still in the dark about Cutera's lack of adequate internal controls.

### E. August 8, 2023 – Fifth Disclosure / Materialization of the Risk

393. On August 8, 2023, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were further revealed and/or partially materialized. On that date, the Company announced poor financial results and disclosed that the Company was experiencing reliability problems and poor AviClear utilization trends.

394. During the 2Q 2023 Earnings Call, with respect to the service delays and reliability problems, Defendant Hopkins stated:

Our Core Capital business was down minus 13% as reported and 11% in constant currency. Now some of the declines reflect challenging year-over-year comparisons as our Q2 2022 revenues were a high watermark. However, a clear-eyed assessment of this business shows that it also faces operational and macroeconomic headwinds. **On the operational front, Core Capital has been hampered by parts-driven service delays and increased reliability issues.**

**These service and reliability hiccups don't fit well with our customers and are making it much more difficult to close deals. These issues reflect growing pains, our supply chain and production facilities have faced as they ramped up AviClear production, while at the same time working to meet the needs of our Core Capital business.**

**Having said that, we own this problem, and we're working diligently to mitigate and then solve it, so that we meet our standards and the expectations of our customers.**

395. During the 2Q 2023 Earnings Call, Defendant Harris also stated, in response to an analyst's question about Cutera's quality problems:

I think that what we're seeing here is part of the fact that **we really flooded the engines with AviClear**. And so, we saw a lot of capital go out, a lot of production volume through our facility, and **it really stretched the organization.** And so it's hard to link some of the challenge we're having directly to that or full proof of that, but the **timing would indicate that that had a meaningful role to play**.

And so I fully agree with your assessment of the Company over its history, and I also believe that we can and will get back to being known for quality and service. But the fact is we've got a lot more devices out in the field across the core as well as across with Avi, and so it stretched the organization. So, I think what we need to

do is – and this is – we talked about this, but we're bringing the new deployments of AviClear effectively to a halt as we pause here.

Now, we do have scheduled installations. We've made commitments to customers, we're going to fulfill those. But we're going to give the organization some breathing room to refocus on service levels and on quality across the entire portfolio. That won't be easy. How long is it going to take? I can't give you a promise there. What I can tell you is that it's the organization's top priority right now, and there's a clear commitment.

396. In response to another analyst's question about when Cutera's quality problems were identified, and whether they resulted from the "commencement of the placement of the AviClear systems, or were service issues starting to crop up before that," Defendant Hopkins disclosed that, "[o]n the reliability front, those issues really did begin to surface as we ramped up Avi." Defendant Hopkins similarly explained:

[T]he organization was a bit overwhelmed and stretched then. And as the manufacturing organization ramped up Avi, reliability issues began to surface across the portfolio of products. It is not entirely broad scale. The reliability issues are focused on three to four systems. But once again these are issues that we own and that we will be dealing with post haste.

397. Defendant Hopkins also stated during the 2Q 2023 Earnings Call: "Turning to AviClear, we have more work to do here also, but the biggest challenge being increasing utilization and the percent of installed offices that are contributing. Key to success will be practice business development and more effectively holding utilization rates and existing offices as new offices are onboarded."

398. In response to an analyst's questions about AviClear's utilization rate, Defendant Harris stated that "utilization rates have declined. And we've really seen that across the user base." In response to another analysts' concern about the utilization rate, Defendant Harris further stated that "what we saw as we progressed through the first half of the year and even into the start of the third quarter is utilization rates not where we want them to be."

399. Defendant Harris similarly explained, in response to an analyst's question about utilization trends, that "second quarter utilization was down compared to the previous couple of quarters" and "that likely reflects a couple of factors," one factor of which was "simply the number

of machines out in the field, some of which aren't performing at all but also that's stretching our organization then in terms of being able to support them."

400. In addition, Defendant Hopkins even admitted that the Company's improper strategy to push AviClear onto doctors at a rapid pace was the cause of the Company's Class Period poor performance as it pulled too many resources away from other areas. For example, Defendant Hopkins explained: "the shift to a more measured booking pace for AviClear address[ed] the problem that we had faced from October through March with the capital selling organization being somewhat distracted by steep AviClear booking targets."

401. Defendant Harris likewise stated:

[T]his initial demand [for AviClear] stretched the organization too far in some areas to the detriment of our core business. So earlier this year we began to slow the pace of new AviClear bookings and we're now focusing our capital organizations priority squarely on the core business, as we develop the tools to drive greater treatment session utilization with AviClear.

402. The August 8, 2023 disclosures about poor financial results, reliability problems, and poor AviClear utilization trends were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning the Company's internal controls and the AviClear rollout.

403. Moreover, the August 8, 2023 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market. These disclosures partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding Cutera's rollout of its AviClear device and performance of its other divisions, such as Core Capital.

404. As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Cutera's stock price fell $3.89 per share, or 22.52%, to close at $13.38 per share on August 9, 2023.

405. Upon learning this news, analysts were disappointed and recognized Cutera's poor performance was linked directly to the AviClear rollout. For example, on August 8, 2023, Piper

Sandler reported that "Taylor Harris, CUTR's new CEO, outlined the near-term need to improve the product reliability and service levels as it relates to the company's capital systems" and that "AviClear (which was a key reason Harris took the role in the first place) requires additional support in order to maximize the current install base." Also on August 8, 2023, Stephens reported that "the company reported 2Q23 AviClear revenue of $4.0 mil. which came in below our $5.4 mil. estimate as the company placed <200 AviClear devices (vs. our 250 unit estimate) and utilization underperformed."

406.   Stephens further reported that "**AviClear underperformed as utilization was weaker than we expected**." On August 9, 2023, William Blair reported: "Capital sales of $37.9 million ($4.7 million below our estimate) declined over 11% year-over-year (down 13% reported) with weakness attributed to 1) macro pressure/tightened capital environment impacting financing and ASPs particularly at med spas, and 2) **reliability/service issues related to Cutera's devices as the supply chain and production facilities have focused on AviClear resulting in backlogged supply chain dynamics and servicing delays**." William Blair further stated that "[l]ower-than-expected AviClear sales of $4.0 million were down sequentially versus the $4.4 million in the first quarter and roughly $1.5 million below our estimate **as increasing utilization rates remains a challenge**."

407.   Still, the Company's stock price remained artificially inflated even after this news, as Defendants failed to disclose the severity of the Company's internal control problems. To wit, Defendants' above statements were materially false and misleading because the restated 2Q 2023 10-Q revealed material inventory control problems with AviClear. Moreover, on August 8, 2023, Defendants caused Cutera to file its Form 8-K and on August 9, 2023 its Form 10-Q, which contained materially false and misleading financial figures related to cost of revenue, gross profit, gross margin, operating loss, and inventory—which the Company even admitted were material errors by its need to file the Restatement for such figures. Thus, as with the prior quarter, Defendants continued concealing Cutera's severe internal control problems.

**F.    November 8, 2023 – Sixth Disclosure / Materialization of the Risk**

408.    On November 8, 2023, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were further revealed and/or partially materialized. On that date, the Company announced poor financial results and disclosed the severity of the Company's inventory and operational problems, including the Company's need to delay its Form 10-Q filing and restate the financial statements of multiple prior quarters.

409.    Specifically, Cutera filed with the SEC its 3Q 2023 Form 8-K, which disclosed that the Company's inventory problems were much worse than previously disclosed and that the Company would need to delay its 3Q 2023 Form 10-Q filing:

> The Company performed a physical inventory count at the end of the third quarter of 2023. The results of this count identified a shortfall of inventory relative to the system of record in the range of $8 million to $9 million. The Company believes that this variance began to accumulate prior to the third quarter and is in the process of determining the amounts attributable to prior 2023 periods. The Company expects to complete the analysis of the inventory variance within the next few weeks, at which point full third quarter financial results will be published on Form 10-Q.

410.    Indeed, Defendant Harris acknowledged the severity of the Company's inventory and financial problems and even announced Cutera's plans to lay off approximately 25% of its employees in light of the Company's out-of-control problems:

> "Third quarter results were disappointing, as we faced more significant macroeconomic and Company-specific headwinds than anticipated," commented Taylor Harris, Chief Executive Officer of Cutera, Inc. "However, we are taking decisive steps to address these challenges and to build the foundation for future growth at Cutera. Our operations team has made solid progress in remediating our field service challenges. We have also initiated a global restructuring that will reduce our headcount by close to 25%, helping both to right-size our cost structure and optimize our business performance."

411.    The 3Q 2023 Form 8-K also announced the Company's poor financial performance:

> Consolidated revenue for the third quarter of 2023 was $46.5 million, a decrease of 26% compared to the third quarter of 2022. Revenue related to capital equipment systems declined 36%, while recurring sources of revenue declined 7%. On a year-to-date basis, consolidated revenue of $162.7 million decreased 12%, consisting of a 20% decline in capital equipment system revenue and a 12% decline in recurring revenue.

412.     Moreover, the 3Q 2023 Form 8-K finally disclosed publicly that the leasing model for AviClear devices was not working, and instead revealed a new business model: "The Company will offer a new business model for AviClear, providing the option to purchase the device upfront, with a corresponding reduction in ongoing treatment costs."

413.     That same day, the Company held its 3Q 2023 Earnings Call. During the 3Q 2023 Earnings Call, Defendant Harris reiterated the Company's poor financial performance, explaining that "[r]evenue for the third quarter of 2023 was $46.5 million, a decrease of 26% compared to the third quarter of 2022" and that "[r]evenue related to capital equipment systems declined 36%, while recurring sources of revenue declined 7%"—all of which "was below what we had projected internally and assumed as part of our previous guidance."

414.     Defendant Drummond similarly noted that "[m]ost of our revenue shortfall came from the core capital business, where we faced heavier macroeconomic pressures and impact from our company-specific operational challenges than we had anticipated." In fact, Defendant Harris noted that the "challenges we've experienced on service and reliability have dampened our ability to grow and will likely continue to do so during 2024."

415.     Moreover, Defendant Harris reiterated the Company's inventory problems and disclosed that Cutera will need to restate certain quarters' financial statements: "Due to an issue identified with inventory control and accounting, we are unable to provide full financial statements today, and we will be late filing our 10-Q. We believe that these issues will lead to the need to restate Q1 and Q2 results, which we will do prior to fi ling the third quarter 10-Q."

416.     Defendant Drummond similarly stated: "We performed a full physical count at September 30 to assess the effectiveness of our efforts to remediate the inventory-related material weakness disclosed in our 2022 10-K. Unfortunately, this count indicated the value of our inventory on hand was around $8 million to $9 million lower than our recorded value." In response to an analyst's question to "provide a little bit more detail and maybe timing on when you expect that [inventory problem] to kind of be solved," Defendant Drummond responded:

So we did a count on September 30 at three locations, covering about 80%, 90% of our total inventory. And so, the amount we counted was around $8 million to $9 million lower than what was being recorded in our ERP system.

So now it's going through the process of assigning the $8 million to $9 million to prior quarters to assess whether there's a material misstatement in previously filed quarterly numbers in 2023. We think about half of that difference we've identified. **It relates to a process happening in our ERP system, whereby returns were ending up being doubled up in value**. And then the residual balance is – there's really a laundry list of individual items that we're still assessing.

So we think, to your second question around timing, we indicated it could take up to three weeks. That's an estimate. As I say, we need to continue this assessment and then we need to get our auditors through our assessment as well.

417.    Defendant Harris also explained that shortly after Defendant Harris had started, the Company hired Jeff Jones as its Chief Operating Officer (i.e., August 2023), whereby "we consolidated several functions underneath him, including production, supply chain, quality and field service." Defendant Harris revealed that the "team has identified the key root causes for challenges that we have in five areas: product reliability, field service delays, lack of inventory control, supply-demand mismatches, and excessive cost of operations." Defendant Harris then touched upon a few problems that the Company was trying to remedy:

In the area of field service, our backlog in open cases had reached an all-time high as of mid-2023. Over the last few months, though, that backlog has already been reduced by 80%, with most of the remaining cases depending on spare parts availability to resolve. The team believes that it can substantially clear this backlog by year-end, while also returning to industry standard response times for new service calls and then to exceed industry standards by the second quarter of 2024.

In inventory management, we have assembled a materials control team and are retraining operations personnel on utilization of our ERP system. As Stuart will describe later, **we identified a significant issue with how the company has been managing inventory during 2023**. We will conduct another physical inventory count at year-end and plan to fully remediate our challenges by mid-2024.

On the cost front, Cutera has been overspending in operations in recent periods due to a lack of process and discipline, exacerbated by the stress that the AviClear launch placed on the organization and the supply chain. The company has not had effective processes for either repairing and reusing components that are returned from field service calls or for checking the quality of purchased materials and rejecting those that aren't usable. We are implementing these processes in the fourth quarter.

418. Defendant Harris also further detailed the Company's new business model for AviClear: "This new business model offers the option to purchase the device upfront with a corresponding reduction in ongoing treatment costs to the practitioner."

419. Furthermore, Defendant Harris explained that "[i]n October, we initiated a global restructuring program," and that "[t]hrough the end of the fourth quarter, the restructuring program is expected to reduce head count by close to 25%, resulting in personnel-related savings of over $20 million on an annualized basis."

420. Defendant Harris also provided additional detail surrounding the number of AviClear returns the Company anticipated:

> Now, let's talk about the existing customer base. So, a little too early to give specific numbers on leased versus owned, but if you look at our overall base, we still have about 1,250 devices, AviClear devices in the field. That's about the same level as at the end of the second quarter. So there were some additional installations, but there were some returns.
>
> We already have 200 scheduled returns, and I think it's possible that up to 50% would end up coming back due to just lack of engagement. And so then you're left with, call it, half of that 1,250, and we'll see. I think there will be a mix. It's not going to be uniform in terms of lease versus purchase, but we think that both options can work for customers. When we did the market research, it would indicate that more customers over time would want to own versus lease, but we'll let the data speak for itself as we go out to customers.

421. As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Cutera common stock fell $1.37 per share, or approximately 42.55%, from a close of $3.22 per share on November 8, 2023, to close at $1.85 per share on November 9, 2023.

422. Analysts were disappointed upon learning of this news. For example, on November 8, 2023, Piper Sandler rated Cutera "Neutral" due to Piper Sandler's concerns over the Company's announcements: "While we continue to like the AviClear franchise (especially the commercial shift to upfront box sales), the combination of a new management team, core business challenges (clearly evident today), and cash burn simply create too many unknowns for us to feel confident in getting constructive despite our affinity for the new CEO, so we have an N [i.e., Neutral] rating

on the name with a lower $3 PT." Indeed, Piper Sandler noted that a "10-Q filing delay (due to inventory miscounting) and restatement of Q1 & Q2 results further muddy the waters going forward." Similarly, Piper Sandler reported that "[o]ne area of internal weakness includes the 10-Q delay which is a result of inventory accounting principals."

423.   Piper Sandler also noted the Company's disclosure about expected AviClear device returns: "Additionally, of the ~1250 systems in the field the company expects ~50% to be returned due to lack of service (due to lack of engagements) when their lease comes up from renewal (based on the fact 200 are currently due to be returned, and 40% of their installation base did no procedure in Q3)."

424.   The next day, November 9, 2023, William Blair rated Cutera as "Underperform" in light of the Company's November 8 news. William Blair reported that it was "disappointing" that Cutera "announced that due to an inventory recognition issue ($8 million-$9 million inventory shortfall), it will need to delay its filing for the quarter and restate filings from earlier this year." William Blair similarly reported on Cutera's anticipated AviClear device returns: "As of quarter-end, the installed base was flat sequentially at about 1,250 devices still in service. However, management noted that nearly 40% of its current installed base did not book any procedures last quarter, suggesting that as many as half of the installed base could be 'returned' over time (200 have already expressed interest in returning their devices)." William Blair further reported that, "[w]hile we continue to view the appointment of new CEO Harris as a positive development, **this quarter continued to show the challenges the company is facing in AviClear/its core business and the management transition**. We look for more evidence of traction on key issues and initiatives over the next four to six quarters."

425.   Also on November 9, 2023, Maxim Group issued an analyst report, reporting that "we expect macro headwinds and operational challenges to continue to weigh on sales" and that "[t]herefore, based on our risk/reward analysis, we do not recommend that investors purchase CUTR shares at this time." Maxim Group reported that Cutera "performed a physical inventory count at the end of 3Q23 that identified a shortfall of inventory relative to the system of record in

the range of $8M–$9M" and that Cutera "believes that this variance began to accumulate prior to the third quarter and is in the process of determining the amounts attributable to prior periods."

426. Still, the Company's stock price remained artificially inflated even after this news as the full truth had not yet been revealed and/or materialized. For example, as of this date, not all of the concealed risks of Defendants' fraudulent conduct had materialized and investors still had not learned the full truth, which included that an additional material weakness that Cutera disclosed within its March 5, 2024 Restatement: "the Company failed to design, maintain and monitor a risk assessment program at a sufficiently precise level and therefore failed to identify new and evolving risks related to accounting policies, procedures and related controls performed over areas including, but not limited to inventory, revenues and lease income, costs for leased devices, and testing of certain key reports used in controls." Additionally, as of this date, investors had not yet learned that a large contributor to Cutera's inventory buildup was related to AviClear devices.

427. Specifically, on March 21, 2024, Defendant Harris finally revealed that "we've had too much inventory in certain areas, most notably AviClear and too little in other areas" and that "[w]e've assembled a material control team, which has implemented daily reviews to ensure that inventory movements are being transacted appropriately. We've also opened our own warehouse, which allows us to consolidate more expensive third-party warehouses with better control while also providing room for the significant amount of AviClear and excel V+ inventory that we will be bringing in from Jabil."

**G.    March 5, 2024 – Seventh Partial Disclosure / Materialization of the Risk**

428. On March 5, 2024, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were further revealed and/or partially materialized when the Company filed Forms 10-Q/A, restating its financial statements for 1Q and 2Q 2023.

429. The Company explained within its Form 10-Q/A for 1Q 2023 ended March 31, 2023 ("Restated 1Q 2023 Form 10-Q") that:

> [Cutera] is filing this Amendment No. 1 to Form 10-Q (this "Amendment" or "Form 10-Q/A") to amend and restate certain items in its Quarterly Report on Form 10-Q for the quarter ended March 31, 2023 originally filed with the Securities and

Exchange Commission (the "SEC") on May 10, 2023 (the "Original 10-Q", and, as amended by this Amendment, the "Quarterly Report") to reflect the restatement of the Company's financial statements as of and for the quarter ended March 31, 2023 contained in the Original 10-Q (the "Restatement").

430.   The Restated 1Q 2023 Form 10-Q identified and confirmed two accounting errors:

1. **The Company determined that, as a result of an accounting error identified by the physical inventory count, there was a shortfall of inventory relative to the Company's system of record. The effect of this error was an overstatement of $1.2 million of inventory on the condensed consolidated balance sheet as of March 31, 2023. This error resulted in an associated understatement of $1.2 million of cost of revenue on the condensed consolidated statement of operations for the three months ended March 31, 2023.**

2. The Company corrected certain other errors that were deemed immaterial to the related interim period and restated the financial statements for the quarter ended March 31, 2023. The details of these corrections are noted in the footnotes to the tables below.

The Company's basic and diluted losses per share for the three months ended March 31, 2023, increased by $0.16 per share.

431.   Indeed, the Company restated its previously reported GAAP gross profit and margin, non-GAAP gross profit and margin, non-GAAP operating loss, and inventory figures. In particular, for the first quarter of 2023, Cutera's Restatement reduced previously reported GAAP gross margin by 13% to $21.6 million and non-GAAP gross margin by 12% to $23.7 million. Additionally, the Restatement increased the previously reported GAAP and non-GAAP operating loss. Specifically, the non-GAAP operating loss increased 20.9% to $17.5 million for the first quarter of 2023. The magnitude of these misstatements was significantly in excess of the generally accepted threshold used in evaluating financial statement materiality of 5% of reported income.

432.   The Company's Restated 1Q 2023 Form 10-Q also disclosed the poor financial performance of Core Capital and AviClear in light of the Restatement.

433.    For example, with respect to Core Capital, the Company stated:

The Cutera **Core segment's revenue decreased by $7.4 million in the three months ended March 31, 2023**, compared to the three months ended March 31, 2022. This decrease reflected a decrease in system sales of $3.2 million due mainly to ASP and unit volume decreases in North America and a decrease in Skincare revenue of $3.5 million due to the weakening Japanese Yen and a combination of lower unit volumes and ASPs.

The Cutera **Core segment recorded a loss from operations of $17.4 million in the three months ended March 31, 2023**, compared to a loss from operations of $4.9 million in the three months ended March 31, 2022. This $12.5 million adverse change mainly reflects a decrease in gross margin contribution of $12.2 million because of the increase in the cost of service parts; the effect of the weakening Japanese Yen on Skincare revenue; a decrease in North American System ASPs; a decrease in overhead absorption due to lower than planned production; and an unfavorable shift in Systems customer and region sales mix.

434.     Similarly, with respect to AviClear, the Company stated:

The **AviClear segment recorded a loss from operations of $9.2 million in the three months ended March 31, 2023**, compared to a loss from operations of $8.3 million in the three months ended March 31, 2022. This $0.9 million adverse change reflects an increase in operating expenses of $3.0 million, partially offset by an increase of $2.2 million in gross margin contribution. The increase in operating expenses reflects additional sales and marketing headcount associated with the commercialization of the AviClear device.

435.     Cutera likewise explained within its Form 10-Q/A for 2Q 2023 ended June 30, 2023 ("Restated 2Q 2023 Form 10-Q") that:

[Cutera] is filing this Amendment No. 1 to Form 10-Q (this "Amendment" or "Form 10Q/A") to amend and restate certain items in its Quarterly Report on Form 10-Q for the quarter ended June 30, 2023 originally filed with the Securities and Exchange Commission (the "SEC") on August 9, 2023 (the "Original 10-Q", and, as amended by this Amendment, the "Quarterly Report") to reflect the restatement of the Company's financial statements as of and for the quarter ended June 30, 2023 contained in the Original 10-Q (the "Restatement").

436.     The Restated 2Q 2023 Form 10-Q identified and confirmed two accounting errors:

The accompanying unaudited condensed consolidated financial statements have been restated to correct errors related to (1) an accounting error identified as a result of a physical inventory count performed by the Company and (2) other accounting adjustments identified that were deemed immaterial. The details of the errors are further described below:

**1. The Company determined that, as a result of an accounting error identified by the physical inventory count, there was a shortfall of inventory relative to the Company's system of record. The effect of this error was an overstatement of $3.6 million of inventory on the condensed consolidated balance sheet as of June 30, 2023. This error resulted in an associated understatement of $2.4 million and $3.6 million of cost of revenue on the condensed consolidated statement of operations for the three and six months ended June 30, 2023, respectively.**

2. The Company corrected certain other errors that were deemed immaterial to the related interim period and restated the financial statements for the quarter ended June 30, 2023. The details of these corrections are noted in the footnotes to the tables below.

The Company's basic and diluted losses per share increased by $0.08 and $0.24 per share for the three and six months ended June 30, 2023, respectively.

437.   Indeed, the Company restated its previously reported GAAP gross profit and margin, non-GAAP gross profit and margin, non-GAAP operating loss, and inventory figures. In particular, for the second quarter of 2023, Cutera's Restatement reduced previously reported GAAP gross margin by 7% to $26.1 million and non-GAAP gross margin by 6% to $28.8 million. Additionally, the Restatement increased the previously reported GAAP and non-GAAP operating loss. Specifically, the non-GAAP operating loss increased 14.1% to $13.2 million for the second quarter of 2023. Cumulatively, Cutera's inventory was reduced 6.6% or $4.5 million to $64.1 million as of June 30, 2023.

438.   Furthermore, the Restated 1Q 2023 Form 10-Q and Restated 2Q 2023 Form 10-Q revealed that on top of the material weaknesses identified in the 2022 Form 10-K, the Company "identified an additional material weakness":

In connection with the Company's review and preparation of its financial statements leading to the Restatement, **management identified an additional material weakness**. Specifically, the Company failed to design, maintain and monitor a risk assessment program at a sufficiently precise level and therefore failed to identify new and evolving risks related to accounting policies, procedures and related controls performed over areas including, but not limited to inventory, revenues and lease income, costs for leased devices, and testing of certain key reports used in controls. Consequently, the Company failed to timely implement new controls to respond to changes in the business and leadership.

439.   The March 5, 2024 disclosures regarding Defendants' failure to implement internal controls and the accounting errors relating to inventory count were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning the Company's internal controls and the AviClear rollout.

440.   Moreover, the March 5, 2024 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed

and/or obscured from the market. These disclosures partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding the true state of the Company's financial health and the AviClear rollout.

441.    As a direct and proximate result of this partial corrective disclosure and/ or materialization of foreseeable risks concealed by Defendants' fraud, the price of Cutera common stock fell $0.07 per share, or 3.26%, to close at $2.08 per share on March 5, 2024.

442.    Still, the Company's stock price remained artificially inflated even after this news as the full truth had not yet been revealed and/or materialized. For example, as of this date, not all of the concealed risks of Defendants' fraudulent conduct had materialized and investors still had not learned the full truth, which included that a large contributor to Cutera's inventory buildup was related to AviClear devices, that Cutera was expecting a large amount of product returns, and the Company would soon implement, among other things, a material control team to ensure inventory is tracked properly. Specifically, on March 21, 2024, Defendant Harris finally revealed that "we've had too much inventory in certain areas, most notably AviClear and too little in other areas" and that "[w]e've assembled a material control team, which has implemented daily reviews to ensure that inventory movements are being transacted appropriately. We've also opened our own warehouse, which allows us to consolidate more expensive third-party warehouses with better control while also providing room for the significant amount of AviClear and excel V+ inventory that we will be bringing in from Jabil."

**H.    March 21, 2024 – Final Disclosure / Materialization of the Risk**

443.    On March 21, 2024, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were fully revealed and/or materialized. On that day, the Company held its 4Q 2023 Earnings Call. The Company announced poor financial results and finally disclosed that its failure to maintain internal controls over inventory had caused an excessive level of inventory and negatively impacted gross margin.

444. During the 4Q 2023 Earnings Call, Defendant Harris announced that total revenue for the quarter was $49.5 million, a $17.8 million or 26% decrease from the fourth quarter of 2022, "due mainly to a $14 million decline in capital equipment revenue." AviClear revenue was "stable sequentially, but it included that lower procedural revenue" because "by the fourth quarter, [Cutera] had approximately 55% of the account base that did not do a procedure."

445. On the same earnings call, Defendant Harris also revealed that the excessive level of inventory reserves had significantly depressed the Company's gross margin, gross profit, and gross margin rate:

Throughout 2023, our gross margin was depressed due to reduced volume, the array of company-specific issues that we've highlighted previously, and a high level of inventory reserves. **In the fourth quarter alone, we took approximately $8 million of excess and obsolete inventory reserves**. Note that we are not scrapping this inventory, and will attempt to utilize it over time, but the appropriate accounting treatment is to put reserves in place given the excess position we have, particularly of AviClear.

Adjusting for these reserves, as well as our other non-GAAP items, our normalized gross margin was around 37% in Q4.

446. On the same earnings call, Defendant Drummond stated:

Non-GAAP gross profit for the fourth quarter of 2023 was $9.9 million, with a gross margin rate of 20% compared to a gross margin rate of 59.4% for the fourth quarter of 2022. **The primary driver of this 39 percentage point decrease is a 19 percentage point impact from the increase in our reserve for excessive inventory, reflecting the decline in our capital equipment sales forecasts and a provision for AviClear materials and finished goods. Other contributors to this gross margin decrease include** an approximate 10 percentage point impact from lower manufacturing and sales volume, **as well as inventory variances identified through our annual physical count and write-offs of demo equipment and Skincare product**.

447. Additionally, Defendant Harris stated that the elevated inventory reserves would likely continue because the Company "[did] have a list of another 175 that will be returned, so that's 300 total out of the 1,200."

448. During the same earnings call, Defendant Harris admitted to the lack of internal controls over inventory management and announced that the Company had implemented

mechanisms to remediate the previous internal control failures that led to the excessive inventory buildup:

> In terms of inventory management where we experienced significant challenges last year, we ended on a high note with our year-end physical inventory count proceeding much faster than at year-end 2022 and with no count-related issues identified in the audit. **We've assembled a material control team, which has implemented daily reviews to ensure that inventory movements are being transacted appropriately. We've also opened our own warehouse, which allows us to consolidate more expensive third-party warehouses with better control, while also providing room for the significant amount of AviClear and excel V+ inventory that we will be bringing in from Jabil**.

449.    Further, Defendants Harris admitted that Cutera had allocated too many resources to AviClear and had to revise the Company's inventory planning controls:

> On the planning front, **we've introduced a new process in Q4 to better match supply and demand. As a reminder, we've had too much inventory in certain areas, most notably AviClear and too little in other areas**. We are still building inventory in the first half of the year due to purchase commitments and the need to remediate shortages of certain key components. But after that, we should begin working down the inventory, creating a cash tailwind for the company.

450.    Finally, Defendants disclosed that they would work on improving the cost and process of repairing and updating faulty AviClear devices because "a few challenges, limited utilization in 2023." Specifically, Defendant Harris stated that:

> On the cost front, **we've implemented key processes for repairing and reusing components, as well as checking the quality of purchased materials and rejecting those that aren't usable. We've also reviewed vendors for certain key components in an effort to reduce scrap rates**. And we're now producing all AviClear and excel V+ in-house, thereby better leveraging our fixed overhead expense while at the same time improving quality. **The operations team has also implemented new controls and processes around shipping, which has already begun to reduce freight expense**.

> *        *        *

> Our primary focus with AviClear in all geographies is on partnering with our customers to build franchises with healthy utilization. We believe a few challenges, limited utilization in 2023, each of which we plan to address this year. On the service front, we've already made significant progress, and we have hardware and software updates that address the majority of issues that customers have seen since launch.

451.    The March 21, 2024 disclosures fully revealed the relevant truth concerning the true extent of the problems—namely the failed AviClear rollout and the lack of effective internal controls—that had significantly undermined the health of the Company. The disclosures of the excessive inventory reserve and declining gross profit and gross margin rate were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning the Company's internal controls and the AviClear rollout.

452.    As a direct and proximate result of this partial corrective disclosure and/ or materialization of foreseeable risks concealed by Defendants' fraud, the price of Cutera common stock fell $0.70 per share, or 30.43%, to close at $1.60 per share on March 22, 2024. In addition, Cutera common stock fell an additional 10.63% the next trading day to close at $1.43 on March 25, 2025—totaling a 37.83% stock price decline from the March 21, 2024 announcement.

453.    The market was shocked to learn the news. An article from Business Insider attributed the 30% stock drop to "worse-than-expected fourth quarter adjusted EPS results." Maxim Group was "concerned with the underutilization of AviClear devices in the field (~55% of devices were not utilized in procedures during 4Q23." Maxim Group also noted that "[f]ull-year 2023 GAAP loss per share of ($7.59) was significantly wider than the 2022 GAAP loss per share of ($4.39), mainly due to lower revenues and gross margin compression associated with non-cash expenses relating to obsolete inventory."

## VIII.   ADDITIONAL INDICIA OF SCIENTER

454.    Defendants were active and culpable participants in the fraud, as evidenced by their knowing and reckless issuance and/or ultimate authority over Cutera's materially false or misleading statements and omissions. The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements, more specifically set forth in Section V, *supra*, were materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws. In addition to the specific facts alleged above, Defendants' scienter is further evidenced by the following facts.

## A.    Defendants Mowry, Plants, Seth, and Hopkins Were Aware of Problems with the AviClear Rollout and/or Weaknesses in Internal Controls

455.    The Individual Defendants' awareness of the problems raised by Cutera's own employees and customers in connection with the AviClear rollout and its negative effect on the rest of Cutera's operations and the Company's inadequate internal controls supports a strong inference of scienter. Indeed, multiple former employees of the Company recall that Cutera's key executives were notified about the problems in the sales organization related to AviClear, complaints and negative feedback from customers, as well as inventory and quality control problems throughout the Class Period.

### 1.    Defendant Mowry

456.    CW 1 advised that at least four people told Mowry that the leasing model for AviClear would not work: Karavitis, Crider, Seth, and CW 1 herself. CW 1 confirmed that the other individuals told CW 1 personally that they had spoken to Mowry about this issue multiple times.

457.    CW 1 elaborated that Plants and Mowry emphasized placement of AviClear devices because they were aiming for a performance objective milestone which would "fetch" them another 20% in performance stock units, which was called an "Acne Equity Grant."

458.    CW 1 confirmed that the directive to move away from Cutera's core business to focus on AviClear came directly from Mowry and Plants, and was discussed openly in many AviClear meetings, which were also attended by Huffman.

459.    CW 1 further added that "everyone in the company" knew that AviClear was struggling. She indicated that she personally raised the issue to Mowry in or around January 2023. CW 1 recalled others telling her that they had also spoken to Mowry about their concerns with AviClear's poor financial performance as well, adding that she knew specifically that her supervisor Karavitis spoke to Mowry about it. She further noted that CFO Seth told her that he had raised the same concerns to Mowry, also sometime in the first quarter of 2023.

460.    Moreover, CW 1 described how people could not convince Plants and Mowry that the AviClear model was failing. According to CW 1, Plants and Mowry only wanted to place more and more devices in customers' offices, claiming that doing so would get them "over the hump."

461.    CW 1 indicated that the company's supply chain problems started during the COVID epidemic, but continued afterwards, and the company struggled with supply chain and inventory issues throughout 2023. CW 1 added that these problems were known to Mowry, who appeared to protect Pinapati and refused to take action. CW 7 advised that Pinapati reported directly to former CEO Dave Mowry, and that Pinapati had been hired by Mowry.

462.    CW 1 recalled that many people raised concerns about supply chain problems, and Pinapati's performance, to Mowry. She elaborated that concerns were raised to Mowry by current Vice President of Sales TJ Huffman, current Senior Director of Order to Cash Caroline Batarseh, current Vice President, Commercial Finance and Operations Shelby Eckerman, Guy Thier, Karavitis, and former Senior Director of Call Center John Sennett. CW 1 also indicated that she raised these concerns herself to Mowry multiple times, both in-person and email, since 2022.

463.    CW 4 stated that customers cancelled their AviClear orders because the delays were so long. CW 4 explained that it was "impossible" for Huffman and Mowry not to know about these Companywide problems. CW 4 indicated that these issues were raised by many people, frequently, on company-wide townhall Zoom meetings where upper management was present. CW 4 recalled that Mowry, Huffman, Ables, and Kreider, current Senior Vice President of Marketing at Cutera, were present on these townhall conferences.

464.    CW 6 explained that Cutera's management – specifically Pinapati – knew that anyone could walk into the warehouse area and take parts, as management's offices were in the same building. She added that management's offices, including the VPs' and Dave Mowry's, were on the first floor of the building, the same floor as the inventory, but then management's offices eventually moved to the second floor of the building.

465.    CW 5 advised that, after AviClear was launched, she participated in weekly conference call meetings with former Mowry, Austin Monroe, Amy Ables, and all the other

Regional Managers. She added that these calls were held specifically to discuss AviClear's performance, including placement of the devices, utilization rates, and revenues for the product.

466. CW 7's understanding was that these issues had been escalated to Mowry, because she knew that there were at least one or two customers who reached out to Mowry directly to complain. She recalled one customer, whom she characterized as a "luminary" for Cutera, had contacted Cutera's executive management directly to complain. CW 7 identified that customer as Dr. Tahl Humes, owner of Vitahl Medical Aesthetics, which has two locations in Colorado.

467. Defendant Mowry's own statements on August 4, 2022 indicate that AviClear metrics and performance were closely tracked by Defendants, including Defendant Mowry:

> [We] do have a lot of metrics that we track. I can tell you that this launch far exceeds any other launch in Cutera's history in the amount of focus, energy and data that we're collecting along the way. Each and every site is monitored, our devices are kind of tracked individually. So we know firsthand when treatments are happening and how they're happening, to the point where we can see not only a patient but a patient being -- whether it's their second or their third treatment starting in the process, if you will. Keeping in mind, there's 3 treatments to each and every patient procedure. So we can track that detail. And we know when it's then the first treatment and when it's a repeat treatment.

468. Relatedly, CW 3 also explained that Cutera tracked the usage of AviClear closely. Her understanding was that, to use the equipment, doctors would scan a QR code or something similar for each treatment or operation of the device; the fee for the treatment would be paid directly to Cutera, and Cutera would then pay the doctors or providers for their share of the fee.

## 2. Defendant Plants

469. According to CW 1, the reason Cutera adopted the leasing model, in contrast to normal capital sales, was because "one executive chairman decided" that the leasing plan was a "great model," and no one could argue with him. That executive chairman, she added, was J. Daniel Plants, former Executive Chairman of the Board of Directors. She further clarified that Plants became aware of the leasing model after running "spreadsheet math," with optimistic projections and a lot of procedural fees assumed. She further noted that these assumptions were "taken as gospel" and no one could challenge Plants.

470.    Moreover, CW 1 described how people could not convince Plants and Mowry that the AviClear model was failing. According to CW 1, Plants and Mowry only wanted to place more and more devices in customers' offices, claiming that doing so would get them "over the hump." CW 1 elaborated that Plants and Mowry emphasized placement of AviClear devices because they were aiming for a performance objective milestone which would "fetch" them another 20% in performance stock units, which was called an "Acne Equity Grant." CW 1 further indicated that the Acne Equity Grant was part of the reason why Plants wanted to move into management from corporate governance/the board: specifically, Plants wanted to share in the compensation for AviClear placements.

471.    CW 1 confirmed that the directive to move away from Cutera's core business to focus on AviClear came directly from Mowry and Plants, and was discussed openly in many AviClear meetings, which were also attended by Huffman.

### 3.    Defendant Seth

472.    CW 1 advised that at least four people told Mowry that the leasing model for AviClear would not work: Karavitis, Crider, Seth, and CW 1 herself.

473.    CW 1 indicated that AviClear's poor financial performance would have been discussed in meetings with the "ELT," or Executive Leadership Team, which included former CFO Rohan Seth, CTO Karavitis, current Chief Information Officer Guy Thier, and possibly current VP of Corporate Development and Strategy Mindy Huynh.

474.    CW 1 added that she joined the ELT at one point, so she was present for at least some of the meetings in which AviClear's poor performance was discussed. She confirmed that, prior to joining the ELT, she was told that the performance issues were discussed at the meetings by people who were in attendance, specifically Seth, Karavitis, Crider, and possibly Thier.

475.    CW 1 further added that "everyone in the company" knew that AviClear was struggling. She indicated that she personally raised the issue to Mowry in or around January 2023. She further noted that CFO Seth told her that he had raised the same concerns to Mowry, also sometime in the first quarter of 2023.

476.   CW 8 indicated that some customers also sent complaints about their downed systems to Mowry directly. CW 8 recalled Mowry referred to customer complaints as "noise." CW 8 advised that she tried to schedule a meeting with Mowry to discuss customer service issues, but Mowry refused to meet with her. CW 8 elaborated that she was based in Texas and had travelled to Cutera's headquarters in California for meetings; prior to this trip, she had emailed Mowry to request a meeting with him directly. CW 8 recalled that she made the request in March or April 2023, but Mowry ignored her.

477.   CW 8 further noted that CEO Mowry was aware of the number of device swaps, since Mowry saw regular shipping reports which listed which devices were new sales and which were swaps.

478.   CW 8 explained that the problem of discrepancies between parts listed in the system with parts available in the warehouse was raised in meetings. She noted that the field service engineers carried inventory with them for their work orders; that inventory was referred to as "trunk stock." Her understanding was that Rohan Seth also saw that information.

### 4.   Defendant Hopkins

479.   CW 1 stated that when Sheila Hopkins became Interim CEO, she also refused to take steps to correct the supply chain problems and even gave Pinapati a retainer bonus to stay with Cutera longer.

480.   In addition, as a member of the Cutera Board, Hopkins was aware of the poor performance of AviClear during its rollout. For example, CW 1 explained that the Board saw the same numbers as management and the company employees, and yet they did not raise alarm bells when they saw that the numbers were "way off." She added that the Board did not act, even though they had fiduciary responsibilities to do so.

481.   CW 1 clarified that by "numbers," she was referring to revenue from AviClear utilization. He noted that the numbers were off by "a lot," indicating that the projections were for approximately \$20-25 million, but they wound up earning only about \$6 million in revenue. She

further noted that half of the $6 million was generated in Q4, so that between Q2 and Q3, AviClear only made $3 million in revenue.

**B.      Defendants Mowry and Plants' Involvement In the AviClear Rollout and Internal Control Procedures Supports an Inference of Scienter**

482.    Defendants Plants and Mowry were the architects of Cutera's efforts to roll out AviClear, including through personally developing and implementing the novel commercial model and sales strategy. Indeed, there is no question that Defendants Mowry and Plants were directly and personally involved in designing the AviClear sales strategy and managing the allocation of resources between Core Capital and AviClear.

483.    For example, in a Joint Press Release issued by Defendants Plants and Mowry on April 10, 2023, Defendant Plants plainly stated: "I have been heavily involved in the development of the new commercial model and product strategy that has the potential to be transformative for the Company and unlock substantial value for its shareholders."

484.    Additionally, the Special Committee specifically attributed Cutera's poor performance and the problems with the AviClear rollout to Defendant Mowry. In April 2023, the Special Committee "concluded that Mr. Mowry had not effectively executed the limited commercial rollout of our AviClear solution in the Fall of 2022. In our view, Mr. Mowry failed to appropriately train and incentivize our sales teams, accurately forecast demand and usage, or precisely develop commercial terms that our customers would accept. These missteps were unforced errors that diminished our confidence in Mr. Mowry's ability to execute our attractive AviClear strategy."

485.    Moreover, Defendant Mowry was not only directly involved in crafting a plan to remediate problems in the sales organization whereby sales reps were directed to over-index on selling AviClear devices, but also admitted that part of the issue with capital equipment and consumables sales was that the sales reps were not being sufficiently monitored during the AviClear rollout. Indeed, Defendant Mowry stated during the Company's 4Q 2022 Earnings Call that, in addition to remedying the sales commission and incentive structures to fix the underlying problems, "[t]he other element is actually monitoring time and attention of our sales reps, so that

we can actually see what's the outcome and output of different processes, how many calls they're taking, how many meetings they're setting up, et cetera, et cetera. And the intent is not to micromanage reps, but rather notice and identify patterns and coach to best practice, if you will, with that data."

486.    At the very least, Defendants' recklessness can be inferred from Defendant Mowry's concession that the Company had not been paying attention to their sales teams while making misrepresentations about the success of the AviClear rollout and strength of Core Capital.

487.    Furthermore, CW 1 confirmed that the directive to move away from Cutera's core business to focus on AviClear came directly from Mowry and Plants, and was discussed openly in many AviClear meetings, which were also attended by Huffman.

488.    In addition, according to Cutera's very own "Charter for the Audit Committee of the Board of Directors of Cutera, Inc." (as approved, October 25, 2013), Cutera's management was required to be made aware of internal controls-related problems. For example, one of the responsibilities of the audit committee was to meet periodically with Cutera management "to review the adequacy of such controls and to review, before its release, the disclosure regarding such system of internal controls required under SEC rules to be contained in the Company's periodic filings and the attestations or reports by the Accounting Firm relating to such disclosure."

489.    Defendant Mowry and Seth's direct involvement in crafting and overseeing the AviClear rollout, designing the Company's internal controls, and making certifications as to the accuracy of Cutera's financial reporting in light of material weaknesses in the Company's internal control procedures, thus support a strong inference of scienter.

**C.    The Timing and Circumstances of Defendants Mowry's, Plants', and Seth's Departures Support a Strong Inference of Scienter**

490.    The terminations and resignations of key employees during the Class Period support an inference that Defendants acted with scienter. In this case, the departure of the Company's top executives within a short period of time is particularly striking. Between April 11, 2023 and May 9, 2023, Cutera announced the departure of Defendants Mowry, Plants, and Seth.

491.    Moreover, Defendants Mowry's and Plants' terminations are not only temporally but also explicitly connected to disclosures of the Company's fraud, which further support an inference of scienter. Indeed, Defendants Mowry and Plants were terminated on April 11, 2023, in the midst of the Company's disclosures regarding the failed AviClear rollout, the underperformance of Core Capital, and the operational fallout from the material weaknesses in Cutera's internal controls.

492.    Specifically, on April 11, 2023, the Board terminated Defendant Plants as Cutera's Executive Chairman and Chairman of the Board and Defendant Mowry as Cutera's CEO—both "with cause." The Company explained that the terminations of Defendants Plants and Mowry came "following joint and unanimous recommendations from a special committee comprising all members of the Board's Governance and Corporate Responsibility Committee and the majority of the members of the Board of Directors."

493.    Furthermore, as mentioned above, in April 2023, the Special Committee also directly linked Defendant Mowry's termination to his failure to properly roll out AviClear and support Core Capital, concluding that Defendant Mowry "had not effectively executed the limited commercial rollout of our AviClear solution in the Fall of 2022. In our view, Mr. Mowry failed to appropriately train and incentivize our sales teams, accurately forecast demand and usage, or precisely develop commercial terms that our customers would accept," adding "[t]hese missteps were unforced errors that diminished our confidence in Mr. Mowry's ability to execute our attractive AviClear strategy." The Special Committee further stated: "The Company's inability to execute well was evident even from the outside; for example, Cutera filed its Form 10-K late."

494.    With respect to Defendant Plants, the Special Committee explained that "Plants was far more interested in his own personal enrichment than in leading the Company for the benefit of all stakeholders." The Special Committee further noted that Defendant Plants sought an unreasonably high compensation package and certain terms for governance that would have impaired the Board's oversight abilities. The Special Committee explained that Defendant Plants'

"focus was overwhelmingly on compensation and much less on developing a plan for the Company."

495.    Further, Defendant Seth's departure is temporally connected to disclosures of the Company's fraud. Specifically, on May 9, 2023, the Company's 1Q 2023 Form 8-K disclosed that Defendant Seth had stepped down as the Company's CFO. That same day, the Company held an earnings call with analysts to discuss the first quarter financial results, where Defendant Hopkins stated with respect to the Company's dismal financial performance that Cutera's "challenges in the quarter were mostly self-inflicted and can be attributed to suboptimal leadership direction that led to execution issues that can and will be solved."

496.    The proximity of this management shakeup to news that (i) the AviClear rollout was a failure; (ii) the Core Capital segment was suffering; and (iii) the Company's internal control weaknesses were materializing—coupled with the fact that the Company explicitly tied these problems to management's failures—demonstrates that the two developments were related and therefore further support a strong inference of scienter.

**D.    Defendants' Statements Themselves, Including Their SOX Certifications, Support a Strong Inference of Scienter**

**1.    SEC Filings**

497.    Accompanying Cutera's 2022 Form 10-K, 1Q 2023 Form 10-Q, 2Q 2023 Form 10-Q, which contained materially false and misleading statements, Defendants Mowry and Seth (10-K), Hopkins and Drummond (1Q), and Harris and Drummond (2Q) executed certifications pursuant to SOX Section 302 attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud. The certifications stated that Defendants Hopkins, Harris, and Drummond were "responsible for establishing and maintaining disclosure controls and procedures" and evaluated and presented the "effectiveness of the disclosure controls and procedures."

498.    The SOX Section 302 certifications further stated that Defendants Hopkins, Harris, and Drummond "evaluat[ed] [] internal control over financial reporting," and that "th[e] report does not contain any untrue statement of a material fact or omit to state a material fact necessary

to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by th[e] report." Defendants Mowry, Seth, Hopkins, Harris, and Drummond also executed certifications pursuant to SOX Section 906, which accompanied Cutera's 2022 10-K, 1Q 2023 Form 10-Q and 2Q 2023 Form 10-Q, attesting to the accuracy of the Company's financial reporting.

499.    By signing these certifications, Defendants Mowry, Seth, Hopkins, Harris, and Drummond certified that the Company's internal controls over financial reporting and disclosure controls and procedures were effective, evidencing their access and review of Cutera's financial data as well as the materially false and misleading statements set forth above.

500.    Contrary to Defendants Mowry, Seth, Hopkins, Harris, and Drummond's representations, Cutera suffered from severe internal control deficiencies and deficient disclosure controls and procedures, as evidenced by the fact that, as alleged herein, the Company was required to restate certain financial figures for the first and second quarters of 2023. These SEC filings, which were each signed by one or more of the Individual Defendants, contained materially false and misleading financial figures related to cost of revenue, gross profit, gross margin, operating loss, and inventory—which the Company admitted were material errors.

501.    Had Defendants Mowry, Seth, Hopkins, Harris, and Drummond actually conducted the evaluations required, they would have discovered the material errors contained within their public statements, including the Company's lack of internal controls. Accordingly, Defendants Mowry, Seth, Hopkins, Harris, and Drummond, knew, or at the very least, were severely reckless in not knowing of the facts which rendered their public statements materially false and misleading.

**a.    2022 10-K**

502.    On April 7, 2023, Cutera filed its 2022 Form 10-K, which was signed by Defendants Mowry, Seth, Plants, and Hopkins. In connection with the Company's 2022 Form 10-K, Defendants Mowry and Seth signed SOX Certifications. Pursuant to Section 302 and 906 of SOX, Defendants Mowry and Seth certified that they had designed and evaluated effective internal and disclosure controls over financial reporting, which assured the reliability of financial

reporting, and also that the financial statements fairly and accurately presented the financial condition of the Company. As alleged *supra* Section VIII.A, Defendants Mowry, Seth, Plants, and Hopkins each had personal knowledge regarding the failed AviClear rollout and supply chain problems within the Company.

### b.      Q1 2023 10-Q

503.    On May 9, 2023, Cutera filed its 1Q 2023 Form 8-K, signed by Varma, and on May 10, 2023, Cutera filed its 1Q 2023 Form 10-Q, signed by Defendant Drummond, which contained materially false and misleading financial figures. In connection with the Company's 1Q 2023 Form 10-Q, Defendants Hopkins and Drummond signed SOX Certifications pursuant to Section 302 and 906 of SOX, whereby they certified that they had designed and evaluated effective internal and disclosure controls over financial reporting, which assured the reliability of financial reporting, and also that the financial statements fairly and accurately presented the financial condition of the Company. As alleged *supra* Section VIII.A, Hopkins had personal knowledge of the failed AviClear rollout and supply chain issues at all relevant times.

504.    Moreover, statements made during the Company's contemporaneous May 9, 2023 earnings call indicate that Defendants Hopkins and Drummond were well-aware of issues with the extended year-end inventory audit. At worst, such statements indicate that Defendants Hopkins and Drummond signed the 1Q 2023 SOX certification with intentional recklessness. For example, Defendant Hopkins stated:

> The second operational challenge we faced during the quarter traces to an extended plant shutdown that impacted our ability to build inventory and ship product for a period of time. So there is typically a one-week shutdown of our production facilities during the first week of January to enable a physical count of inventory.
>
> This year to comply with audit requirements, the year-end physical inventory count took longer than expected and our production facilities were shut down by an additional three weeks. This extended shutdown negatively impacted our ability to build and ship the product required to fully meet demand in the core business during the quarter.

505.    Additionally, Defendant Drummond attributed increased year-over-year costs to the extended inventory audit and increased costs to the new SAP system:

Non-GAAP G&A expenses for the first quarter of 2023 were $10.1 million compared to $7.1 million in the same period last year. More than half of the increase was driven by fees associated with the extended audit and the rest primarily relates to increased legal expenses and IT costs to support our recently implemented ERP system.

506. Defendant Drummond also identified that inventory count inaccuracies, which were now purportedly tailwinds, were the cause of the extended inventory audit:

This year's count was more challenging than the past. We implemented a new ERP in 2022 plus we had increased levels of inventory. Due to some identified count inaccuracies, we'd performed numerous recounts and ultimately had to recount our third-party warehouse.

### c.    Q2 2023 10-Q

507. On August 8, 2023, Cutera filed its 2Q 2023 Form 8-K, and on August 9, 2023, Cutera filed its 2Q 2023 Form 10-Q, both of which were signed by Defendant Drummond containing materially false and misleading financial figures. In connection with the Company's 2Q 2023 Form 10-Q, Defendants Harris and Drummond signed SOX Certifications pursuant to Section 302 and 906 of SOX, whereby they certified that they had designed and evaluated effective internal and disclosure controls over financial reporting, which assured the reliability of financial reporting, and also that the financial statements fairly and accurately presented the financial condition of the Company.

508. On the contemporaneous August 8, 2023 earnings call Defendant Harris stated this was only his "second day on the job," meaning he had intentionally and recklessly certified Cutera's financial results and internal controls without having been in the role of CEO for two full days. Dovetailing on this point, in the Company's prior quarter earnings call Defendant Hopkins stated that the Board was "in the process of sourcing external candidates" for CEO, meaning the determination to hire Harris was a recent one.

509. Later admissions made by Defendants Drummond and Harris indicate that the inventory issues identified in the 2022 year-end audit had not been resolved, but worsened since the prior quarter at the time the above statements were made. Based on these admissions, Defendants Drummond and Harris either knowingly certified Cutera's internal controls and financial results, or did so with intentional recklessness.

510.   For example, during the earnings call on November 8, 2023 Defendant Harris revealed that inventory management issues had persisted throughout all of 2023:

> In inventory management, we have assembled a materials control team and a retraining operations personnel on utilization of our ERP system. As Stuart will describe later, we identified a significant issue with how the company has been managing inventory during 2023. We will conduct another physical inventory count at year-end and plan to fully remediate our challenges by mid-2024. On the cost front, Cutera has been overspending in operations in recent periods due to a lack of process and discipline exacerbated by the stress that the AviClear launch placed on the organization and the supply chain. The company has not had effective processes for either repairing and reusing components that are returned from field service calls or for checking the quality of purchased materials and rejecting those that aren't usable.

511.   Moreover, Defendant Drummond revealed that same day that Cutera had been forced to conduct another full inventory count in 3Q 2023 in continued efforts to cure inventory issues identified in the 2022 year-end audit, meaning just issues had been constant throughout 2023:

> We are unable to provide full financial results for the third quarter at this time due to an issue we identified with inventory accounting. We performed the full physical count at September 30 to assess the effectiveness of our efforts to remediate the inventory-related material weakness disclosed in our 2022 10-K.

### 2.    Statements Regarding the Success of the AviClear Rollout

512.   Throughout the Class Period, Defendant Mowry also spoke repeatedly on the success of the AviClear rollout, the strength of Core Capital, and the completeness and accuracy of Cutera's public statements regarding its financial condition in light of the many weaknesses in its internal controls. These false and misleading statements themselves provide a strong inference that Defendant Mowry was aware of or, at the very least, were reckless in not knowing that Cutera was unable to successfully rollout AviClear without adversely affecting the rest of the Company's business. Accordingly, Defendant Mowry breached his duty under the federal securities laws by speaking about these topics and failing to fully disclose all relevant material information while doing so.

513.   With respect to properly scaling and "aligning" the sales force to both AviClear and Core Capital, Defendant Mowry claimed frequently during the Class Period that the Company was thoughtfully and successfully balancing its sales approach across Company segments.

514. In sum, Defendants' repeated assurances to investors about the AviClear rollout, Core Capital, and the Company's internal controls, inventory, and affected financial figures demonstrate that they **either** knew the AviClear rollout was failing while simultaneously destroying Core Capital and that the Company's internal controls were failing and causing material financial errors, **or** at the very least were reckless in not knowing or investigating that this was the case. In either scenario, there is a strong inference that Defendants made these statements with scienter.

**E.  Cutera's Control Over Inventory and Internal Controls and the AviClear Rollout Were Critical to Cutera's Core Operations**

515. The Individual Defendants' knowledge of the problems related to inventory, internal controls, and the AviClear rollout (including its effect on Core Capital) can be inferred because these facts were critical to Cutera's core operations. The Company admitted as much at multiple points throughout the Class Period that the AviClear device would transform Cutera's business. For example, during a Stifel Healthcare Conference held on November 15, 2022, Defendant Plants, referring to the AviClear placement model, explained: "the placement based model is . . . going to transform every single aspect of our business." The importance of AviClear was further evidenced by the Company dedicating virtually all of its resources on it at the expense of the rest of its business, as discussed at length above. Indeed, CW 1 confirmed that the directive to move away from Cutera's core business to focus on AviClear came directly from Mowry and Plants.

516. Additionally, according to multiple CWs, it was of the utmost importance for Cutera to rollout AviClear before its competitor's product, *Accure*. For example, CW 2 explained that Cutera shifted to this lease or subscription model for AviClear in reaction to *Accure*, which the company knew would soon be entering the market.

517. Analysts were aware that the AviClear rollout and revenue model represented a total transformation of the Company's business. For example, on January 31, 2023, William Blair analysts noted: "Cutera's new AviClear device should drive over 50% of company growth in the next two years and it represents a potential platform product for the company."

518.    Similarly, Core Capital was undoubtedly critical to Cutera's financial success. For example, in 2022, when Cutera first introduced AviClear, Core Capital accounted for 98% of the total revenue. Almost two years after the AviClear rollout, in the quarter ended September 30, 2023, Core Capital still accounted for over 91% of the total revenue.

519.    Inventory management and quality control were likewise critical aspects of Cutera's business. The Company even stated within its 2022 Form 10-K that "[q]uality control, cost reduction and inventory management are top priorities of the manufacturing operations." Indeed, Defendants consistently reminded investors that "[t]he Company's success depend[ed] on the quality and reliability of its products" in the Company's 2022 Form 10-K and other SEC filings.

520.    Given the importance of the AviClear rollout and internal controls to Cutera's business, knowledge of the underlying problems associated with the AviClear rollout and internal controls, including the inventory problems, can therefore be imputed to the Individual Defendants.

### F.    Defendants Were Financially Motivated to Commit Securities Fraud

521.    Defendants Mowry, Plants, and Seth were all motivated to rush the AviClear rollout and misrepresent the success of the AviClear strategy and efficacy of the placement-based commercial model because they received large grants of performance stock units tied to the **timing** of FDA approval and limited commercial rollout of the AviClear device, and the **number** of AviClear devices placed during the first year of the AviClear release. Through Cutera's grant of AviClear-related performance stock unit awards, the AviClear Incentive Plan, these Defendants stood to receive bonuses tied to the **timing and quantity of devices placed** from April 2022 to April 2023. Thus, Defendants Mowry, Plants, and Seth were motivated to conceal from investors the truth about the failed strategy to get as many AviClear devices into customers' offices as quickly as possible until they reached the "achievement timeframe" for device placement in April 2023.

522.    Specifically, under the terms of the AviClear Incentive Plan, as specified above, Defendant Mowry stood to gain $472,428 in incentive awards (based on grant date fair value) if Cutera achieved FDA approval and placed the first AviClear device in service by April 2022, and

placed a certain quantity of devices by April 2023. Defendant Plants stood to gain $143,160 if these targets were reached, and Defendant Seth stood to gain $314,952, as outlined in the Company's proxy materials filed with the SEC on May 2, 2022.

523.     In other words, the fact that Defendants knew they could rush the AviClear rollout, exhaust Core Capital's resources by over-indexing on AviClear placements, collect a large portion of their AviClear bonuses, and leave investors holding the bag when promises of future treatment revenue never materialized, supports a strong inference that Defendants knew the AviClear strategy was a failure from the start, but nonetheless misled investors about this reality.

524.     Likewise, CW 1 elaborated that Defendants Plants and Mowry emphasized placement of AviClear devices because they were aiming for a performance objective milestone which would "fetch" them another 20% in performance stock units, which was called an "Acne Equity Grant."

## IX.     CONTROL PERSON ALLEGATIONS

525.     The Individual Defendants, by virtue of their high-level and controlling positions at Cutera, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition as alleged herein. As set forth herein, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

526.     Defendants Mowry, Seth, Plants, Hopkins, Drummond, and Harris, as senior officers of Cutera—a publicly-held company whose common stock was, and is, traded on the Nasdaq, and governed by the federal securities laws—had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Cutera's

publicly traded common stock would be based on accurate information. Each of the Individual Defendants violated these requirements and obligations during the Class Period.

527.    Defendants Mowry, Seth, Plants, Hopkins, Drummond, and Harris, because of their positions of control and authority as senior executive officers of Cutera, were able to and did control the content of Cutera's SEC filings, press releases, and other public statements issued by or on behalf of Cutera during the Class Period. Each would have been provided with copies of the statements made in the SEC filings at issue in this action before they were issued to the public and would have had the ability to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants were responsible for the accuracy of the public statements alleged herein.

528.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Cutera common stock by disseminating materially false and misleading information and concealing and omitting material adverse facts. The scheme deceived the investing public regarding Cutera's business, operations, and management, and the intrinsic value of Cutera's common stock, and caused Lead Plaintiff and members of the Class to purchase Cutera common stock at artificially inflated prices.

## X.    THE STATUTORY SAFE HARBOR IS INAPPLICABLE

529.    The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this pleading. First, many of the statements alleged to be false and misleading relate to historical facts or existing conditions. Second, to the extent any of the allegedly false and misleading statements may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made. Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because, among other reasons, the risks that Defendants warned of had already come to pass.

530.    To the extent any statements alleged to be false and misleading may be construed to discuss future intent, they are mixed statements of present or historical facts and future intent

and are not entitled to PSLRA safe-harbor protection—at least with respect to the part of the statement that refers to the present.

531.   In addition, the PSLRA imposes an additional burden on oral forward-looking statements, requiring Defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement." 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii). Defendants failed to both identify certain oral statements as forward-looking and include the cautionary language required by the PSLRA.

532.   Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ materially from any results projected. To the extent Defendants included any cautionary language, that language was not meaningful because, among other reasons, any potential risks identified by Defendants had already passed or manifested.

533.   In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Cutera who knew that the statement was false when made.

## XI.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

534.   Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   The omissions and misrepresentations were material;

(c)   The Company's stock traded in an efficient market;

(d)      The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)      Lead Plaintiff and other members of the Class purchased Cutera's publicly traded common stock between the time Defendants misrepresented or failed to disclose material facts and the time the facts were disclosed, without knowledge of the misrepresented or omitted facts.

535.    At all relevant times, the market for Cutera shares was efficient for the following reasons, among others:

(a)      Cutera's common stock met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient and automated market;

(b)      As a regulated issuer, Cutera filed periodic public reports with the SEC and the Nasdaq;

(c)      Cutera regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and

(d)      Cutera was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms. Each of those reports was publicly available and entered the public marketplace.

536.    As a result of the foregoing, the market for Cutera's securities promptly digested current information regarding Cutera from publicly available sources and reflected such information in Cutera's securities price(s). Under these circumstances, all persons and entities who or which purchased or otherwise acquired Cutera's common stock during the Class Period suffered

similar injuries through their purchase of Cutera common stock at artificially inflated prices and thus, the presumption of reliance applies.

537.   The material misrepresentations and omissions alleged herein would induce a reasonable investor to misjudge the value of Cutera common stock.

538.   Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased shares of Cutera's common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

539.   To the extent that Defendants concealed or improperly failed to disclose material facts with respect to Cutera's business, Lead Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

## XII.   CLASS ACTION ALLEGATIONS

540.   Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class all persons and entities who or which, during the period from May 10, 2022 through March 21, 2024, inclusive, purchased the publicly traded common stock of Cutera and were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director, or control person of Cutera during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Cutera's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

541.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Cutera had between approximately 18 million and 19.9 million shares of common stock outstanding, which were actively traded on the Nasdaq. The average daily trading volume during the Class Period was approximately 776,983 shares. While the exact number of Class members is unknown to Lead Plaintiff at this time, Lead Plaintiff

believes that there are at least thousands of members of the proposed Class. Record owners and other members of the Class may be identified from records maintained by Cutera or its transfer agent and can be notified of the pendency of this action by mail and publication using forms of notice similar to those customarily used in securities class actions.

542. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were similarly damaged by Defendants' wrongful conduct as complained of herein.

543. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

544. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Cutera;

(c)     whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(d)     whether Defendants engaged in a scheme to defraud investors;

(e)     whether the prices of Cutera's securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

545. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expenses and burden of individual litigation make it practically impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

546.    Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine, as discussed in Section XI, *supra*.

547.    Based upon the foregoing, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

### FIRST CLAIM FOR RELIEF
### (For Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants)

548.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

549.    This Count is asserted against Cutera and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(b) promulgated thereunder by the SEC.

550.    During the Class Period, Cutera and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded or were deliberately reckless in disregarding were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

551.    During the Class Period, Cutera and the Individual Defendants, individually and in concert, carried out a plan, scheme, and course of conduct that was intended to and throughout the Class Period, did: (a) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (b) artificially manipulate the price of Cutera common stock; and (c) cause economic harm to Lead Plaintiff and other members of the Class.

552. Cutera and the Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and/or (c) engaged in acts, practices and a course of conduct that operated as a fraud and deceit upon purchasers of Cutera common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

553. Cutera and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Cutera were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants, by virtue of their receipt of information reflecting the true facts of Cutera, their control over, and/or receipt and/or modification of Cutera's allegedly materially misleading statements, and/or their associations with the Company which made them privy to material concerning Cutera, participated in the fraudulent scheme alleged herein.

554. The Individual Defendants, who are the senior officers and/or directors of the Company as participants in the fraudulent scheme and course of conduct that operated as a fraud or deceit on the Class members, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Cutera personnel to members of the investing public, including Lead Plaintiff and the Class.

555. As a result of the foregoing, the market price of Cutera securities was artificially inflated during the Class Period. In ignorance of the falsity of Cutera's and the Individual Defendants' statements, Lead Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Cutera securities during the Class Period

in purchasing Cutera securities at prices that were artificially inflated as a result of Cutera's and the Individual Defendants' false and misleading statements.

556.    Had Lead Plaintiff and the other members of the Class been aware that the market price of Cutera securities had been artificially and falsely inflated by Cutera's and the Individual Defendants' misleading statements and by the material adverse information which Cutera and the Individual Defendants did not adequately disclose to market professionals, they would not have purchased Cutera's securities at the artificially inflated prices that they did, or at all.

557.    As a result of the wrongful conduct alleged herein, Lead Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

558.    By reason of the foregoing, Cutera and the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder and are liable to the Lead Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Cutera securities during the Class Period.

**SECOND CLAIM FOR RELIEF**
**(For Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants)**

559.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

560.    During the Class Period, the Individual Defendants participated in the operation and management of Cutera. The Individual Defendants conducted and participated, directly and indirectly, in the conduct of Cutera's business affairs. Because of their senior positions, they knew the material information regarding the Company's operations including in its clinical trial program.

561.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Cutera's financial condition and results of operations, and to correct promptly any public statements issued by Cutera which had become materially false or misleading.

562.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and

public filings which Cutera disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Cutera to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Cutera within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Cutera securities.

563. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Cutera.

## XIII. REQUEST FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment on behalf of itself and the Class, as follows:

(1) Determining that this action is a proper class action and certifying Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

(2) Awarding compensatory damages in favor of Lead Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(3) Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(4) Such other and further relief as the Court may deem just and proper.

## XIV. JURY DEMAND

Lead Plaintiff demands a jury trial as to all issues so triable.

Dated: October 30, 2025                    Respectfully submitted,


By: */s/ Michael P. Canty*
Michael P. Canty (*pro hac vice*)
Michael H. Rogers (*pro hac vice*)
Nicholas D. Manningham (*pro hac vice*)
**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: mcanty@labaton.com
mrogers@labaton.com

nmanningham@labaton.com

***Attorneys for Lead Plaintiff and the Class***

Lucas E. Gilmore (#250893)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 300
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: lucasg@hbsslaw.com

***Liaison Counsel for the Class***