UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE CUTERA, INC. SECURITIES
LITIGATION

Case No. 23-cv-02560-JST

**ORDER GRANTING MOTION TO DISMISS**

Re: ECF No. 90

Before the Court is Defendants' motion to dismiss all claims in the Second Amended Complaint ("SAC"). ECF No. 90. The Court will grant the motion.

**I.     BACKGROUND**

**A.     Summary of Allegations in the SAC**

For the purpose of resolving this motion, the Court accepts as true the factual allegations in the SAC, ECF No. 87.

Lead Plaintiff New England Teamsters Pension Fund (hereinafter, "Plaintiff") brings this securities fraud proposed class action against Defendants Cutera, Inc. ("Cutera" or "the company"), and several of its former and current officers: David Mowry, former Chief Executive Officer ("CEO"); J. Daniel Plants, former Chairman of the Board; Rohan Seth, former Chief Financial Officer ("CFO"); Sheila Hopkins, former Interim CEO; Stuart Drummond, Interim CFO; and Taylor Harris, CEO (collectively, "Individual Defendants"). *Id.* ¶¶ 45–55. Plaintiff alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as Rule 10b–5(b), on its own behalf and on behalf of a proposed class of shareholders who purchased Cutera common stock from May 10, 2022, through March 21, 2024, inclusive ("Class Period").

United States District Court
Northern District of California

Cutera is a global provider of laser and other energy-based dermatology solutions for medical practitioners worldwide. *Id.* ¶ 75. Cutera's operations are segregated into two business segments. The first business segment, Core Capital, is comprised of medical equipment offerings and related one-time use products (i.e., "consumables"), which are necessary to perform treatments with the Core Capital medical equipment. *Id.* ¶ 76. During the Class Period, the Core Capital segment drove the majority of Cutera's revenue. *See id.* ¶¶ 75–85.

The second business segment, AviClear, is a prescription-free, laser-based treatment solution for acne. *See id.* ¶¶ 75–85, 126. It was launched initially in April 2022 and was fully commercially released in November 2022 using a leasing model. Under that leasing model, customers do not own the AviClear devices outright as customers of Core Capital equipment do. Once the AviClear devices are placed with customers, Cutera makes money through licensing fees and additional fees it earns for each patient treated with the devices (i.e., through utilization). *See id.* ¶¶ 80, 231. Cutera adopted a leasing model to compete with similar products that were coming to market at the same time as AviClear. *See id.* ¶ 80. The company also adopted that model because Defendant Plants allegedly demanded its adoption on the ground that it would allow Cutera to place a greater number of AviClear devices with customers, which, in turn, would allow Defendants Mowry, Plants, and Seth to receive higher stock-based compensation under what was known internally as the Acne Equity Grant. *See id.* ¶¶ 2, 8. The Acne Equity Grant tied Cutera executives' stock-based compensation to whether a predetermined number of AviClear devices were placed in physicians' offices by a particular date. *See id.* ¶¶ 117–20. Guided by a desire to receive higher stock-based compensation, Defendants Mowry and Plants allegedly directed the company's sales personnel to focus on AviClear device placements and to de-prioritize Core Capital, which caused the Core Capital segment to languish in late 2022 and into 2023. *See id.* ¶¶ 5, 8. Revenue from AviClear also languished. By the second quarter of 2022, AviClear revenue began to fall below projections. *See id.* ¶ 4.

During the Class Period, Cutera allegedly lacked effective controls over its inventory, which caused an extended plant shutdown in January 2023, as well as various supply chain problems. *See id.* ¶ 6. In March 2024, Cutera had to restate its financial results for Q1 2023 and

2

Q2 2023 because a physical inventory count performed at the end of Q3 2023 revealed accounting errors caused by a shortfall of inventory relative to the company's system of record. *See id.* ¶¶ 7, 208, 430.

Plaintiff alleges that, throughout the Class Period, Defendants made 24 statements to investors that were false or misleading. *Id.* ¶¶ 228–344. For example, Defendants made statements that led investors to believe, incorrectly, that the company's reported financial results for Q1 2023 and Q2 2023 were accurate even though they were not, as those financial results had to be restated in March 2024. Defendants also made statements that led investors to believe, incorrectly, that the company's launch of AviClear had been successful and that there was strong demand from customers for the product even though, in reality, revenues for AviClear were not meeting projections.

Plaintiff alleges that the truth emerged over the course of multiple months in 2023 and 2024, when the company disclosed: material weaknesses over the company's internal controls; poor earnings results; the firing of Defendants Mowry and Plants for cause; the departure of Defendant Seth; an extended plant shutdown that took place in January 2023 because of inventory problems; delayed SEC filings; and the restatement of financial results for Q1 2023 and Q2 2023 because of accounting errors identified during a physical inventory count conducted at the end of Q3 2023. *See id.* ¶¶ 11, 345–453. Although the truth was partially revealed to investors by way of those disclosures, the company's stock price remained inflated after each disclosure. *See id.* The full truth was revealed on March 21, 2024, when the company announced poor financial results and disclosed that it had carried too much inventory in certain areas, including AviClear. *Id.* ¶¶ 342–44.

### B.    Procedural History

Plaintiff filed this lawsuit on May 24, 2023. ECF No. 1. On March 3, 2025, Defendants filed a suggestion of Cutera's bankruptcy and a notice of an automatic bankruptcy stay, ECF No. 79, and the Court thereafter administratively closed the case, ECF No. 80. Plaintiff then filed a notice explaining that the stay applied only to Defendant Cutera, Inc. and its subsidiary Crystal Sub, LLC, but not to the Individual Defendants, who are non-debtors. *See* ECF No. 81. On May

9, 2025, the Court directed the Clerk to administratively re-open the case given that the action could proceed against the Individual Defendants. *See* ECF No. 85.

On September 30, 2025, the Court granted Defendants' motion to dismiss all claims asserted against the Individual Defendants in the amended complaint, with leave to amend. ECF No. 86.

On October 30, 2025, Plaintiff filed the SAC. On December 15, 2025, Defendants filed the present motion to dismiss all claims in the SAC, ECF No. 90, which Plaintiff opposes, ECF No. 91.

## II.    REQUEST FOR JUDICIAL NOTICE

Federal Rule of Evidence 201 permits a court to notice an adjudicative fact if it is "not subject to reasonable dispute." Fed. R. Evid. 201(b). A fact is "not subject to reasonable dispute" if it is "generally known," or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1)–(2). "Accordingly, '[a] court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment[,]" but a "court cannot take judicial notice of disputed facts contained in such public records." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (citation omitted).

Defendants request that the Court take judicial notice of 23 documents, which are SEC filings, transcripts of calls with investors, press releases, a letter from the Special Committee of Cutera's Board of Directors to the company's investors, and filings in Cutera's bankruptcy case. *See* ECF No. 90–28.

The Court grants Defendants' request for judicial notice of the SEC filings, transcripts of calls with investors, and press releases in question, which are Exhibits B, C, E, H, L, M, N, O, P, Q, R, S, T, U, W, X, Y, and Z. It is routine for a court to take judicial notice of those types of documents for the purpose of determining what information was available to the market. *See, e.g.*, *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (holding that the district court properly took judicial notice of publicly available financial documents and SEC filings); *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir.

2009) (holding that courts "may take judicial notice of publications introduced to indicate what was in the public realm at the time, not whether the contents of those articles were in fact true") (citation and internal quotation marks omitted); *Wochos v. Tesla, Inc.*, No. 17-CV-05828-CRB, 2018 WL 4076437, at *2 (N.D. Cal. Aug. 27, 2018) (taking judicial notice of earnings call transcript "for the sole purpose of determining what representations [defendants] made to the market"). The Court will take judicial notice of the statements in these documents for the purpose of determining what information was available to the market, but not for the truth of the matters asserted therein or for the purpose of resolving factual disputes. *See Khoja*, 899 F.3d at 999–1001.

The Court also grants Defendants' request for judicial notice of the filings in Cutera's bankruptcy case, *In re Cutera, Inc.*, Case No. 25-90088 (ARP) (Bankr. S.D. Tex.), which are Exhibits BB, CC, DD, and EE. A court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (citation and internal quotation marks omitted). Here, the bankruptcy filings in question are relevant to the resolution of Defendants' motion to dismiss because, as discussed below, Defendants contend, and Plaintiff does not dispute, that Cutera's bankruptcy proceeding is dispositive of Plaintiff's claims against Cutera.

The Court declines to take judicial notice of Exhibit AA, which is a letter from the Special Committee of Cutera's Board of Directors to the company's investors, because that document is not relevant to the resolution of the present motion. *See Pac. Gas & Elec. Co. v. Lynch*, 216 F. Supp. 2d 1016, 1025 (N.D. Cal. 2002) ("A judicially noticed fact may not be subject to reasonable dispute and must be relevant.").

### III.   JURISDICTION

The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

### IV.   LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter that, when accepted as true, states a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual

5

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While this standard is not a probability requirement, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks and citation omitted). In determining whether a plaintiff has met this plausibility standard, the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the plaintiff. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

A complaint that sounds in fraud must satisfy the requirements of Rule 9(b). Rule 9(b) provides that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *See* Fed. R. Civ. P. 9(b). "To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 765 (9th Cir. 2023) (citation and internal quotation marks omitted). "The complaint must specify such facts as the times, dates, places, benefits received, and other details of the alleged fraudulent activity." *Id.* (citation and internal quotation marks omitted).

"If a claim alleges securities fraud, the Private Securities Litigation Reform Act ('PSLRA'), 15 U.S.C. § 78u–4, also applies." *Khoja*, 899 F.3d at 1008.

## V. DISCUSSION

As noted, Plaintiff asserts a securities fraud claim under Section 10(b) and Rule 10b–5(b) and a derivative claim under Section 20(a) premised on 24 allegedly false or misleading statements made during the Class Period. Defendants move to dismiss all claims in the SAC on the grounds discussed below.

### A. Claims Against Cutera

Defendants argue that Plaintiff's claims against Cutera must be dismissed with prejudice because they were discharged in bankruptcy. *See* ECF No. 90 at 31–32. Defendants contend that Cutera's Plan of Reorganization, which became effective on April 16, 2025, discharged any claims against Cutera arising from the purchase or sale of Cutera common stock. *See id.* (citing Ex. CC §

United States District Court
Northern District of California

1.1 & Ex. DD at 10).

Plaintiff does not respond to Defendants' arguments in its opposition to the motion. *See generally* ECF No. 91.

The Court finds that, by failing to respond to Defendants' arguments, Plaintiff has abandoned all claims against Cutera. *See Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 888 (9th Cir. 2010) (holding that the plaintiff "abandoned" a claim by failing to respond to the defendant's motion to dismiss that claim).

Accordingly, the Court grants Defendants' motion to dismiss all claims against Cutera WITHOUT LEAVE TO AMEND.

### B.    Claim Under Section 10(b) and Rule 10b–5(b) Against the Individual Defendants

Section 10(b) of the Exchange Act declares it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary." 15 U.S.C. § 78j(b). "SEC Rule 10b–5 implements [Section 10(b)] by making it unlawful to . . . 'make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) (quoting 17 C.F.R. § 240.10b–5(b)). "Thus, to prevail on a claim for violations of either Section 10(b) or Rule 10b–5, a plaintiff must prove six elements: (1) a material misrepresentation or omission by the defendant [falsity]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1051–52 (9th Cir. 2014) (citation and internal quotation marks omitted).

### 1.    Material Misrepresentation or Omission (Falsity)

The first element of a claim under Section 10(b) and Rule 10b–5(b) requires a plaintiff to show that the defendant made a statement that was false or misleading as to a material fact. *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988). This requires, in relevant part, "specify[ing] each

statement alleged to have been misleading [and] the reason or reasons why the statement is misleading[.]" *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 321 (2007) (quoting 15 U.S.C. § 78u–4(b)(1)). "In setting forth the reasons why they contend that each challenged statement is misleading, securities plaintiffs may rely on either an affirmative misrepresentation theory or an omission theory." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1188 (9th Cir. 2021) (citation omitted). "[A]n affirmative misrepresentation is an 'untrue statement of a material fact,' and a fraudulent omission is a failure to 'state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *Id.* (citation omitted).

"Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time." *Khoja*, 899 F.3d at 1008 (citation omitted). "Even if a statement is not false, it may be misleading if it omits material information." *Id.* at 1008–09 (citation omitted). Information is material if "a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005). "[T]o be actionable under the securities laws, an omission must be misleading . . . it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) (citation and internal quotation marks omitted). "Disclosure [of omitted information] is required . . . only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives*, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b–5(b)).

### a.   Abandoned Claims Based on Certain Challenged Statements

In their reply, Defendants argue that, because Plaintiff has failed to respond to their arguments that the SAC lacks allegations that raise the inference that certain challenged statements were false or misleading when made, Plaintiff has abandoned its claims against the Individual Defendants to the extent that they are premised on those statements. *See* ECF No. 92 at 7, 9. The

United States District Court
Northern District of California

statements in question are: Statement 1[1] (SAC ¶ 231); Statement 8 (*id.* ¶ 279); Statement 9 (*id.* ¶ 280); Statement 10 (*id.* ¶ 280); Statement 16 (*id.* ¶ 312); Statement 17 (*id.* ¶ 313); Statement 23 (*id.* ¶ 330); and Statement 24 (*id.* ¶ 331).

The Court agrees with Defendants. Plaintiff has failed to respond to Defendants' arguments with respect to the statements listed above. *See generally* ECF No. 91 at 17–25. Accordingly, Plaintiff has abandoned its claims to the extent that they are premised on those statements. *See Carvalho*, 629 F.3d at 888; *see also Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*, No. 15-CV-02938-HSG, 2018 WL 3126393, at *10 (N.D. Cal. June 26, 2018) (granting motion to dismiss securities fraud claims without leave to amend on the ground that the plaintiffs "abandoned" those claims by failing to respond to the arguments made in the defendants' motion to dismiss with respect to certain challenged statements) (citation omitted).

The Court, therefore, grants Defendants' motion to dismiss Plaintiff's claim under Section 10(b) and Rule 10b-5(b) to the extent that it is premised on Statements 1, 8, 9, 10, 16, 17, 23, and 24 without leave to amend.

### b. Statements Containing Financial Results That Were Later Restated

Defendants concede that certain statements containing financial results for Q1 2023 and Q2 2023 that Cutera later restated in March 2024 were false when made. *See* ECF No. 90 at 13. Those statements are: Statement 11 (SAC ¶ 310); Statement 12 (*id.* ¶ 311); Statement 13 (*id.* ¶ 311); Statement 14 (*id.* ¶ 310); Statement 18 (*id.* ¶ 328); Statement 19 (*id.* ¶ 329); Statement 20 (*id.* ¶ 329); and Statement 21 (*id.* ¶ 328). Based on Defendants' concession, the Court finds that Plaintiff has adequately alleged falsity with respect to the statements in question.

### c. Statements Regarding AviClear and Core Capital

#### i. Statements Regarding the Launch of AviClear of August 4, 2022

On August 4, 2022, Defendant Mowry stated as follows in a press release announcing the

---

[1] For ease of reference, the Court adopts the statement numbers used in the chart attached to Defendants' motion to dismiss as Appendix 1. *See* ECF No. 90 at 34-37.

results of Q2 2022:

> *During the quarter, our team achieved the successful launch of AviClear*, our first-mover product for the treatment of acne.  In the first three months of our limited commercial release of AviClear, we were able to validate successful clinical outcomes in the hands of our customers, verify patient satisfaction with AviClear post-treatment patient survey data and onboard dozens of practices in the use of the AviClear Laser as they look to provide their patients with a drug-free solution for acne while enhancing the profitability of their practices.

*See* ECF No. 90–3 at 2 (emphasis added); *see also* SAC ¶ 247.  The statement italicized above (Statement 2) was repeated verbatim in a Form 8–K for Q2 2022 that was signed by Defendant Seth and was filed on August 4, 2022 (Statement 3).  *See* ECF No. 90–5 at 7; SAC. ¶ 256.  Plaintiff alleges that the phrase "[d]uring the quarter, our team achieved the successful launch of AviClear" was false or misleading because Defendants Mowry and Seth failed to mention that AviClear's performance was "extremely poor" in the second quarter of 2022 through the end of 2022, as AviClear's revenue underperformed internal projections during that period.  *See* SAC ¶¶ 248–55.

Defendants argue that the omission of AviClear's allegedly poor revenue results from Statements 2 and 3 does not render those statements false or misleading because those statements did not characterize the "successful launch of AviClear" in terms of revenue results.  *See* ECF No. 90 at 16.

Plaintiff does not meaningfully respond to this argument in its opposition.  *See* ECF No. 91 at 22–23.

The Court agrees with Defendants.  The "successful launch of AviClear" in Statements 2 and 3 was described in terms of "validat[ing] successful clinical outcomes," "verify[ing] patient satisfaction with AviClear post-treatment patient survey data," and the "onboard[ing] of dozens of practices in the use of the AviClear Laser[.]"  *See* ECF No. 90–3 at 2; ECF No. 90–5 at 7.  Plaintiff has not pointed to allegations indicating that, at the time Statements 2 and 3 were made, Defendant Mowry was aware that Cutera had not, in fact, validated successful clinical outcomes, verified patient satisfaction based on post-treatment patient survey data, or onboarded dozens of

10

United States District Court
Northern District of California

practices.  Thus, the Court cannot infer that Statements 2 and 3 were false when made.  *See Khoja*, 899 F.3d at 1008 ("Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time.").  The Court also cannot infer that the omission of AviClear's allegedly poor revenue results from Statements 2 and 3 rendered those statements misleading because the "successful launch of AviClear" discussed in those statements was not connected to financial performance.[2]  *See Matrixx Initiatives*, 563 U.S. at 44 ("Disclosure [of omitted information] is required . . . only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'") (citation omitted).

In its opposition, Plaintiff points to allegations that some confidential witnesses reported that an unspecified number of customers and patients who used AviClear were dissatisfied with the product on unspecified dates.  *See* SAC ¶¶ 125–27, 133, 240–45.  However, those allegations lack the particularity required under Rule 9(b) and thus are insufficient to raise the inference that, at the time Statements 2 and 3 were made, there was a material amount of customer and patient dissatisfaction with AviClear that needed to be disclosed to investors in order to make Statements 2 and 3 not misleading.  Plaintiff also points to a press release that was issued about eight months after Statements 2 and 3 were made (in April 2023), stating that Defendant Mowry had been terminated in part because he had not "effectively executed the limited commercial rollout of our AviClear solution *in the Fall of 2022*."  *See* SAC ¶ 168 (emphasis added).  Because the press release states that the failure to effectively execute the AviClear rollout took place in the fall of 2022, which was several months *after* Statements 2 and 3 were made in early August 2022, the Court cannot reasonably infer based on the press release that there were problems with AviClear's rollout at the time that Statements 2 and 3 were made that should have been disclosed to investors

---

[2] Even if AviClear's revenue performance had been relevant to the "successful launch of AviClear" discussed in Statements 2 and 3, Plaintiff's allegations still would not raise the inference that Defendant Mowry was required to disclose that AviClear's revenues were falling short of projections in order to make those statements not misleading.  That is because Plaintiff's allegations lack particularity and thus do not indicate that Defendant Mowry was aware of those revenue results at the time he made Statements 2 and 3.  *See* SAC ¶¶ 249–54 (alleging that people other than Mowry attended meetings at unspecified times during which AviClear's poor performance was discussed, and that people other than Mowry were told at unspecified times about concerns regarding revenue projections for AviClear).

United States District Court
Northern District of California

in order to make those statements not misleading.

Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's claim under Section 10(b) and Rule 10b-5(b) to the extent that it is premised on Statements 2 and 3. The dismissal is WITHOUT LEAVE TO AMEND because the Court previously granted Plaintiff the opportunity to amend the complaint to cure the pleading deficiencies with respect to those statements, and the Court finds that granting further leave to amend would be futile.

### ii. Statement Regarding Physician Feedback of November 3, 2022

On November 3, 2022, Defendant Mowry was asked during the earnings call for Q3 2022 about the feedback from physicians that the company had received to date, and Mowry responded:

> I will tell you that *physicians' feedback has been phenomenal.* I think there's a number of folks that have interviewed physician users. I think the commentary continues to be exceptionally strong. We were just at the Fall Clinical meeting where we reduced -- released our 12-month follow-up, which was outstanding and continues to show improvement over the six-month data. So we are exceptionally proud of the clinical outcomes and I think the physicians are coming on board more and more to understand that this needs to be part of their practice as they evolve, so we're pleased with that.

*See* ECF No. 90–7 at 11 (emphasis added); *see also* SAC ¶ 258. Plaintiff alleges that the statement "physicians' feedback has been phenomenal" (Statement 4) was false or misleading when made because it did not mention that AviClear's revenue performance in 2022 was "extremely poor" given that revenues were falling short of projections. *See* SAC ¶¶ 259–66.

Defendants argue that the omission of AviClear's allegedly poor revenue results from Statement 4 did not render it misleading because revenue results have nothing to do with the subject of the statement, which is physician feedback based on "clinical outcomes." *See* ECF No. 90 at 17–18.

The Court finds that Plaintiff has not plausibly alleged that Statement 4 was false or misleading when made. The subject of the statement is physician feedback based on physician interviews and physicians' responses to AviClear's clinical outcomes. Plaintiff has not pointed to any allegations indicating that Defendant Mowry was aware, at the time he made Statement 4 on

November 3, 2022, that physicians' feedback based on their interviews and their responses to AviClear's clinical outcomes were not, in fact, positive. Thus, the Court cannot infer that Statement 4 was false when made. *See Khoja*, 899 F.3d at 1008 ("Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time."). The Court also cannot infer that Statement 4 was misleading on the basis that it omitted AviClear's allegedly poor revenue results because the subject of Statement 4 was physicians' feedback and not AviClear's financial performance. In other words, because the topic of Statement 4 was not AviClear's financial performance, Defendant Mowry was not required to discuss matters relating to AviClear's revenue results to make Statement 4 not misleading.[3] *See Matrixx Initiatives*, 563 U.S. at 44.

In its opposition, Plaintiff points to allegations that, on unspecified dates, AviClear had poor utilization rates and performance, and that there was "pushback" from an unspecified number of customers regarding AviClear. *See, e.g.*, SAC ¶¶ 125–26, 133, 240–45. The Court cannot reasonably infer that Defendant Mowry needed to disclose those matters to make Statement 4 not misleading because the allegations to which Plaintiff points lack the particularity required under Rule 9(b) and thus do not raise the inference that there was a material amount of dissatisfaction and pushback from physicians with respect to AviClear at the time that Statement 4 was made.

Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's claim under Section 10(b) and Rule 10b-5(b) to the extent that it is premised on Statement 4. The dismissal is without leave to amend because the Court previously granted Plaintiff the opportunity to amend the complaint to cure the pleading deficiencies with respect to that statement, and the Court finds that granting further leave to amend would be futile.

---

[3] Even if AviClear's revenue results had been relevant to the "physicians' feedback" discussed in Statement 4, Plaintiff's allegations still would not raise the inference that Defendant Mowry was required to disclose that AviClear's revenues were falling short of projections in order to make Statement 4 not misleading. That is because Plaintiff's allegations lack particularity and thus do not indicate that Defendant Mowry was aware of those revenue results at the time he made Statement 4. *See* SAC ¶¶ 249–54 (alleging that people other than Mowry attended meetings at unspecified times during which AviClear's poor performance was discussed, and that people other than Mowry were told at unspecified times about concerns regarding revenue projections for AviClear).

United States District Court
Northern District of California

### iii.     Statement Regarding Performance of Core Capital of November 3, 2022

On November 3, 2022, Defendant Mowry stated during the earnings call for Q3 2022:

> In early August, during our second quarter earnings call, we indicated that we believed that the underlying treatment and procedure volumes were steady and that the customer demand for capital remains strong even in light of typical third quarter seasonality.  Indeed these trends continued through August and September, enabling a strong core business performance for Cutera with noteworthy year-over-year growth rates in both our capital equipment sales as well as our consumable product sales.
>
> Looking at the same metrics as we move deeper into the fourth quarter of 2022, our current view is that the treatment volumes remain intact and mostly unchanged from the rates we saw in the third quarter of 2022.  *Practice performance indicators such as patient queues, appointment cancellation rates, also continue to track with prior quarter rates instilling confidence in the core capital equipment and consumable run rates as we bring in the full-year results*.

*See* ECF No. 90–7 at 3 (emphasis added); *see also* SAC ¶ 258.  Plaintiff alleges the statement shown in italics above (Statement 5) was false or misleading when made because it omitted that Cutera's sales personnel were being siphoned from the company's Core Capital segment to the AviClear segment, which ultimately harmed the Core Capital segment.  *See id.* ¶ 259.

Defendants argue that Statement 5 was not false or misleading when made because its subject was Core Capital's performance during Q4 2022 as compared to prior quarters, and Plaintiff has not pointed to any allegations showing that Defendant Mowry's representations on that subject were inaccurate.  *See* ECF No. 90 at 18.

The Court agrees with Defendants.  The subject of Statement 5 is that the practice performance indicators for Core Capital as of the date the statement was made in Q4 2022 "continue[d] to track with prior quarter rates" for the same indicators and that this "instill[ed] confidence" in the company's Core Capital segment as Q4 2022 progressed.  Plaintiff has not pointed to any allegations showing that, at the time Defendant Mowry made Statement 5, Core Capital's practice performance indicators were not, in fact, tracking with "prior quarter rates" for those same indicators.  Thus, the Court cannot infer that Statement 5 was false when made.  The Court also cannot infer that Statement 5 was misleading on the basis that Defendant Mowry did

14

not mention that sales personnel were being diverted from Core Capital to AviClear when he made that statement. That is because Plaintiff has not pointed to any allegations showing that the allocation of sales personnel to AviClear and away from Core Capital was relevant to the comparison of the practice performance indicator rates discussed in Statement 5. *See Matrixx Initiatives*, 563 U.S. at 44 ("Disclosure [of omitted information] is required . . . only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'") (citation omitted).

In its opposition, Plaintiff argues that Statement 5 was "proven false" by what it claims was an "admi[ssion]" by Defendants on January 9, 2023, that Cutera "took its eye off the ball on the core business as it was pushing," AviClear in Q4 2022. *See* ECF No. 91 at 23 (citing SAC ¶¶ 146–47). This argument fails for two reasons. First, the statement that Cutera "took its eye off the ball" was not an admission by Defendants but a statement made by a third-party analyst. *See* SAC ¶ 147. Second, Plaintiff has not pointed to any allegations indicating that the third-party analyst's statement had any connection to the practice performance indicator rates that Defendant Mowry discussed in Statement 5. In the absence of factual allegations suggesting that the third-party analyst's statement indicated that Core Capital's practice performance indicator rates were not, in fact, tracking with "prior quarter rates" as of the date Statement 5 was made, the Court cannot reasonably infer, based on that third-party analyst's statement, that Statement 5 was false when made.

Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's claim under Section 10(b) and Rule 10b-5(b) to the extent that it is premised on Statement 5. The dismissal is without leave to amend because the Court previously granted Plaintiff the opportunity to amend the complaint to cure the pleading deficiencies with respect that statement, and the Court finds that granting further leave to amend would be futile.

### iv.   Statements Regarding the Allocation of Sales Personnel of February 28, 2023

On February 28, 2023, Defendant Mowry stated during the earnings call for Q4 2022

In fourth quarter 2022, the North American capital team focused

15

its efforts on driving AviClear bookings and perhaps over-index some of their efforts. Following the full North American AviClear launch, *strong underlying interest in AviClear quickly converted into customer demand that occupied our sales team throughout November and most of December*. The higher-than-anticipated volume of deals diverted much attention away for routine processing of core capital deals and left a significantly shortened time frame to close deals when *sales reps finally pivoted back to their core capital pipeline*.

*See* ECF No. 90–8 at 4 (emphasis added); *see also* SAC ¶ 268. Plaintiff alleges that the first statement italicized above ("strong underlying interest in AviClear quickly converted into customer demand that occupied our sales team throughout November and most of December") (Statement 6) and the second statement italicized above ("sales reps finally pivoted back to their core capital pipeline") (Statement 7) were false or misleading when made because they created the impression that the company had "reallocated its salespeople back to their core capital pipeline, which was not true" given that Cutera disclosed during the earnings call for the following quarter (Q1 2023) that insufficient sales personnel continued to be allocated to Core Capital during that quarter. *See* SAC ¶¶ 269–70.

Defendants argue that Plaintiff's theory of falsity is premised on an inaccurate interpretation of Statements 6 and 7. Defendants contend that the statements did not convey that Cutera had reallocated sales personnel to Core Capital on a permanent basis at the end of Q4 2022, as Plaintiff alleges, but instead conveyed that sales personnel had pivoted back to the processing of Core Capital deals at the end of Q4 2022 after having been occupied earlier in the quarter with a high volume of AviClear deals. *See* ECF No. 90 at 18–19.

The Court agrees with Defendants. Statements 6 and 7 provide that, in Q4 2022, sales personnel focused on AviClear deals instead of the "routine processing of core capital deals," which left them little time to close Core Capital deals when they "finally pivoted back" to Core Capital deals at the end of the quarter. The representations in Statements 6 and 7 are limited to events that took place in Q4 2022. Because Statements 6 and 7 do not contain any representations about what sales personnel would do in the future, they did not create the impression that sales personnel would focus on Core Capital the following quarter. Thus, Statements 6 and 7 are not false or misleading on the basis that insufficient sales personnel were allocated to Core Capital the

16

next quarter (Q1 2023).

In its opposition, Plaintiff argues that Statements 6 and 7 were false or misleading for the additional reason that they led investors to believe that sales personnel had been diverted from Core Capital to AviClear in Q4 2022 because of strong demand for AviClear when, in reality, sales personnel were diverted to AviClear because of an undisclosed fraudulent scheme by Defendants Mowry, Plants, and Seth. That scheme involved directing sales personnel to focus on placing AviClear devices as fast as possible so that Defendants Mowry, Plants, and Seth could receive higher stock-based compensation. *See* ECF No. 91 at 24 (citing SAC ¶ 265). The Court is not persuaded. The Court cannot reasonably infer that the reason that Defendant Mowry gave for why sales personnel focused on AviClear in Q4 2022, which was a higher-than-anticipated volume of AviClear deals, was false. That is because Plaintiff has not pointed to any allegations indicating that Cutera did not, in fact, experience strong demand for AviClear in Q4 2022 in the form of a higher-than-anticipated volume of deals, as Defendant Mowry represented in the statements in question. The Court also cannot reasonably infer that Statements 6 and 7 were misleading because they omitted that the allocation of sales personnel to AviClear was due to the purported undisclosed scheme involving Defendants Mowry, Plants, and Seth. The only allegation to which Plaintiff points to support its scheme argument is that, on an unspecified date, "Defendants intentionally undercut Cutera's AviClear-exclusive salesforce and diverted resources away from the capital equipment reps haphazardly to get all hands on deck selling AviClear, despite the fact that this strategy hurt the selling prospects for both Core Capital and AviClear-exclusive reps alike." *See* SAC ¶ 265. That allegation lacks particularity and does not raise the inference that the purported "strategy" it describes had been implemented by Defendants Mowry, Plants, and Seth as of the date when Statements 6 and 7 were made. Accordingly, Statements 6 and 7 were not misleading because they failed to disclose that the allocation of sales personnel to AviClear was due to that "strategy."

Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's claim under Section 10(b) and Rule 10b-5(b) to the extent that it is premised on Statements 6 and 7. The dismissal is without leave to amend because the Court previously granted Plaintiff the opportunity

17

to amend the complaint to cure the pleading deficiencies with respect to those statements, and the Court finds that granting further leave to amend would be futile.

### d.    Sarbanes-Oxley ("SOX") Certifications of May 10, 2023, and August 9, 2023

Plaintiff alleges that two SOX certifications executed during the Class Period were false when made (Statements 15 and 22).  The first certification accompanied Cutera's quarterly report for Q1 2023 of May 10, 2023, and it was signed by Defendants Hopkins[4] and Drummond.[5]  *See* SAC ¶ 312 (Statement 15).  The second certification accompanied Cutera's quarterly report for Q2 2023 of August 9, 2023, and it was signed by Defendants Harris[6] and Drummond.  *See* SAC ¶ 330 (Statement 22).  The certifications in question state that, based on the knowledge of the Defendants who signed the certifications, the quarterly reports for Q1 2023 and Q2 2023, and the financial information included in those reports, "*fairly present in all material respects the financial condition, results of operations and cash flows*" of the company for the periods covered by the reports.  *See* SAC ¶¶ 312, 330 (emphasis in the original); *see also* ECF No. 90–13 at 2–3 (certifications for Q1 2023); ECF No. 90–17 at 2–3 (certifications for Q2 2023).  Plaintiff alleges that the certifications were false because the company later restated the financial results for Q1 2023 and Q2 2023 in March 2024.  *See* SAC ¶¶ 314, 332.

Defendants argue that Plaintiff has not plausibly alleged that Statements 15 and 22 were false when made because it alleges no facts showing that the Defendants who signed the certifications knew about the inaccuracy or unreliability of the financial results for Q1 2023 and Q2 2023 at the time they executed the certifications.  *See* ECF No. 90 at 20–21.

The Court agrees with Defendants.  The Defendants who executed the certifications at issue certified the financial information contained in the Q1 2023 and Q2 2023 reports only to the

---

[4] Defendant Hopkins was the company's Interim CEO from April 12, 2023, to August 7, 2023. SAC ¶ 49.

[5] Defendant Drummond was the company's Interim CFO from May 5, 2023, through the rest of the Class Period.  *Id.* ¶ 50.

[6] Defendant Harris was the company's CEO from August 7, 2023, through the rest of the Class Period.  *Id.* ¶ 51.

extent of their knowledge as of the date of the certifications. *See* ECF No. 90–13 at 2–3 (certifications for Q1 2023); ECF No. 90–17 at 2–3 (certifications for Q2 2023). Thus, to plausibly allege that the certifications at issue were false when made, Plaintiff must allege facts showing that the defendants who signed them knew that the financial reporting was inaccurate at the time they executed the certifications. *See Wanca v. Super Micro Computer, Inc.*, No. 5:15-CV-04049-EJD, 2018 WL 3145649, at *6 (N.D. Cal. June 27, 2018) (holding that, to "successfully plead falsity [with respect to an SOX certification regarding the accuracy of financial reporting], Plaintiff must also allege facts explaining why the declarants knew the financial reporting was false at the time it was made" because the defendants "only certified the financial reporting to the extent of his or her knowledge on the date of execution"); *see also Khoja*, 899 F.3d at 1008 ("Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time.").

Here, the allegations to which Plaintiff points in its opposition do not raise the inference that the Defendants who executed the certifications knew at the time they executed them that the financial reporting was inaccurate. Plaintiff points to allegations (1) that the company experienced inventory-related problems in 2022 and early 2023, which led to a one-month plant shutdown in January 2023 that impacted the company's ability to build inventory and ship product for a period of time; (2) that Cutera delayed filing its annual report for 2022 until April 7, 2023, at which point it disclosed in the late annual report that the company had material weaknesses related to inventory controls and that it was in the process of implementing improvements to remediate them; and (3) that the company disclosed on April 12, 2023, that Defendants Mowry and Plants had been terminated for cause. *See* ECF No. 91 at 19–21 (citing SAC ¶¶ 150–51, 158, 161, 163–64, 168, 175–77, 199, 282, 284, 288, 290–95, 297–98, 300–05). However, those allegations do not raise the inference that the inventory problems the company experienced in 2022 and 2023 and the material weaknesses that the company disclosed relating to inventory controls materially impacted the accuracy of the company's financial reporting for Q1 2023 and Q2 2023, and that this was known to the Defendants who executed the certifications at the time they executed them. Thus, the Court cannot reasonably infer that Statements 15 and 22 were false when made. *See*

United States District Court
Northern District of California

*Wanca*, 2018 WL 3145649, at *6 (holding that SOX certifications regarding accuracy of financial reporting were not false when made because the complaint lacked allegations showing that "the declarants knew the financial reporting was false at the time it was made"); *cf. In re Seagate Tech. Holdings PLC Sec. Litig.*, No. 23-CV-03431-RFL, 2025 WL 1744505, at *8 (N.D. Cal. May 12, 2025) (holding that SOX certifications that attested to the absence of known material omissions from risk factors disclosed in SEC filings relating to legal compliance were false when made because the defendants were aware of an undisclosed risk that some of the company's sales were illegal at the time they executed the certifications).

Notably, other allegations in the SAC raise the inference that the inaccuracy or unreliability of the financial reporting for Q1 2023 and Q2 2023 was not discovered until *months after* the certifications at issue were executed in May 2023 and August 2023. *See* SAC ¶¶ 409–17. Specifically, Plaintiff alleges that Cutera disclosed in November 2023 that a physical inventory count performed at the end of Q3 2023 (i.e., in late September 2023) showed an inventory shortfall that may have affected the accuracy of financial results reported in earlier quarters. *See Id.* Then, in December 2023, Cutera announced that its financial statements for Q1 2023 and Q2 2023 were unreliable because of material errors in the company's accounting for physical inventory that were uncovered during the physical inventory count performed at the end of Q3 2023, and it further announced that the financial results for those quarters would be restated. *See* SAC ¶ 208. In March 2024, Cutera restated the financial results for Q1 2023 and Q2 2023, explaining that the inaccurate financial figures for those quarters had been caused by an "accounting error identified by the physical inventory count" conducted at the end of Q3 2023. *See id.* ¶ 430. Because these allegations suggest that the accounting errors that caused the restatement of the Q1 2023 and Q2 2023 financial results were not discovered until the physical inventory count was conducted at the end of Q3 2023 (i.e., late September 2023), the Court cannot reasonably infer that the Defendants who executed the certifications at issue could have been aware of those accounting errors and of their impact on the accuracy of the financial reporting for Q1 2023 and Q2 2023 at the time they executed the certifications in May 2023 and August 2023.

Plaintiff cites *Glazer Cap. Mgmt., L.P. v. Magistri*, 549 F.3d 736, 747 (9th Cir. 2008)

("*Magistri*") for the proposition that, "to successfully plead *falsity* of SOX certifications, like those here, a plaintiff must allege the person signing the certification was [at minimum] severely reckless in certifying the accuracy of the financial statements." ECF No. 91 at 18 (internal quotation marks omitted, emphasis added). However, *Magistri* does not address the requirements for pleading falsity of SOX certifications, as Plaintiff contends. The statements that were allegedly false in *Magistri* were not SOX certifications, as is the case here, but statements that were included in a merger agreement that was attached to a Form 10-K. *See id.* at 743. To the extent that the Ninth Circuit addressed SOX certifications in *Magistri*, it was only for the purpose of determining whether such certifications were probative of *scienter* with respect to the allegedly false statements in the merger agreement. *See id.* at 747–48. *Magistri* is, therefore, inapposite.[7]

Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's claim under Section 10(b) and Rule 10b-5(b) to the extent that it is premised on Statements 15 and 22. The dismissal is without leave to amend because the Court previously granted Plaintiff the opportunity to amend the complaint to cure the pleading deficiencies with respect to these statements, and the Court finds that granting further leave to amend would be futile.

### 2.    Scienter

"To establish liability under § 10(b) and Rule 10b–5, a private plaintiff must prove that the defendant acted with scienter[.]" *Matrixx Initiatives*, 563 U.S. at 48 (citation and internal quotation marks omitted). Scienter is "a mental state that not only covers 'intent to deceive, manipulate, or defraud,' but also 'deliberate recklessness[.]'" *Schueneman v. Arena Pharmaceuticals, Inc.*, 840 F.3d 698, 705 (9th Cir. 2016) (internal citations omitted). "[D]eliberate recklessness is an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* (citation and internal quotation marks omitted). In evaluating scienter, courts must "consider plausible, nonculpable explanations for the

---

[7] *Mulderrig v. Amyris, Inc.*, which Plaintiff also cites in its opposition, is not binding and is inapposite for similar reasons. *See* 492 F. Supp. 3d 999, 1027–28 (N.D. Cal. 2020) (holding that SOX certifications supported an inference of scienter with respect to other allegedly false statements).

defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 323–24.  In performing this inquiry, courts should determine whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.*  "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

The Court considers below whether Plaintiff has alleged facts that raise a strong inference of scienter with respect to the challenged statements that the Court has found were false when made based on Defendants' concession.  Those statements reported financial results for Q1 2023 and Q2 2023 that were later restated in March 2024.  The statements were made by Defendant Drummond, who served as the company's Interim CFO from May 5, 2023, to the end of the Class Period, on (1) May 9, 2023 (Statement 11, SAC ¶ 310; Statement 12, SAC ¶ 311; Statement 13, SAC ¶ 311); (2) May 10, 2023 (Statement 14, SAC ¶ 310); (3) August 8, 2023 (Statement 18, SAC ¶ 328; Statement 19, SAC ¶ 329; Statement 20, SAC ¶ 329); and (4) August 9, 2023 (Statement 21, SAC ¶ 328).

Defendants argue that Plaintiff has not alleged facts that raise the strong inference that Defendant Drummond acted with scienter in connection with any of the statements just described.  *See* ECF No. 90 at 22–31.

Plaintiff responds that Defendant Drummond was at least deliberately reckless when he reported and certified the financial results for Q1 2023 and Q2 2023, because he did so despite various publicly disclosed "red flags" related to the company's inventory controls that pre-dated his appointment as Interim CFO on May 5, 2023.  *See* ECF No. 91 at 29–30.  Plaintiff points to allegations that (1) Cutera experienced a prolonged plant shut down in January 2023 that was caused by inventory problems, SAC ¶ 175; (2) Cutera failed to file its annual report for 2022 on time and, when it finally filed it in April 2023, the company disclosed material weaknesses related to inventory controls and noted that it was in the process of implementing improvements to remediate them, *id.* ¶¶ 151, 158, 161, 199; (3) Cutera disclosed on April 12, 2023, that Defendants Mowry and Plants had been terminated for cause; (4) the company disclosed in early May 2023

22

that Defendant Seth (the company's former CFO) had stepped down, *id.* ¶ 172; and (5) the company disclosed on May 9, 2023, that the company's poor financial results in Q1 2023 were the result of "self-inflicted" "execution issues," *id.* ¶ 173.

The Court finds that, whether considered individually or holistically, Plaintiff's allegations do not support a strong inference that Defendant Drummond acted with scienter when he made the statements at issue.[8]  The fact that the financial results that Defendant Drummond reported and certified for Q1 2023 and Q2 2023 had to be restated in 2024 is insufficient, without more, to raise a strong inference of scienter.  *See DSAM Glob. Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002) (holding that "the mere publication of inaccurate accounting figures . . . without more, does not establish scienter") (citation and internal quotation marks omitted).  Further, other facts in the SAC support an inference of non-culpable conduct rather than a strong inference that Defendant Drummond acted with an intent to deceive, manipulate, or defraud.  The allegations in the SAC do not indicate that, at the time Drummond reported and certified the financial results for Q1 2023 and Q2 2023, he was aware that those financial results were inaccurate.  They also do not suggest that Drummond knew that the financial results' accuracy was impacted by the inventory-related weaknesses and problems that pre-dated his appointment as Interim CFO.  Instead, the allegations in the SAC suggest that the inaccuracy or unreliability of the financial results for Q1 2023 and Q2 2023 was not discovered until months *after* Defendant Drummond reported and certified them, namely when accounting errors were found after a physical inventory count was conducted at the end of Q3 2023.  *See, e.g.*, SAC ¶¶ 208, 430.

Plaintiff contends that Defendant Drummond was deliberately reckless when he reported and certified the financial results for Q1 2023 and Q2 2023.  But "[r]ecklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious

---

[8] For the purpose of determining whether Plaintiff has adequately alleged scienter with respect to Defendant Drummond, the Court does not consider allegations that refer to the knowledge or mental state of "Individual Defendants" or "Defendants."  *See, e.g.*, SAC ¶¶ 515, 519-20.  As the Court noted in its order of September 30, 2025, Plaintiff cannot rely on group pleading to allege scienter with respect to Defendant Drummond.  *See* ECF No. 86 at 18 (citing *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014)).

23

United States District Court
Northern District of California

misconduct." *Glazer*, 63 F.4th at 765 (citation and internal quotation marks omitted); *Constr. Laborers Pension Tr. of Greater St. Louis v. Funko Inc*, 166 F.4th 805, 830 (9th Cir. 2026) (same). To satisfy that standard, the complaint must contain "specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *See S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008) (citation and internal quotation marks omitted). Here, the SAC does not contain any facts that shed light on Defendant Drummond's mental state in connection with the financial results he reported and certified for Q1 2023 and Q2 2023. Further, Plaintiff does not allege any facts suggesting that Defendant Drummond had a motive for reporting and certifying inaccurate financial figures for Q1 2023 and Q2 2023.[9] Thus, the SAC lacks facts that raise the inference that Defendant Drummond reported and certified financial results for Q1 2023 and Q2 2023 with a degree of recklessness that strongly suggests actual intent to mislead investors.

Plaintiff also argues that the SOX certifications where Defendant Drummond certified the financial results for Q1 2023 and Q2 2023 are probative of scienter because he executed them despite the presence of the "red flags" described above, including the inventory-related material weaknesses and problems that pre-dated his appointment as Interim CFO. Plaintiff contends that, because of those "red flags," Drummond should have known or suspected that the financial results for Q1 2023 and Q2 2023 were not accurate at the time he certified them. *See* ECF No. 91 at 28–29. This argument also fails. A "Sarbanes–Oxley certification is only probative of scienter if the person signing the certification was *severely* reckless in certifying the accuracy of the financial statements." *See Magistri*, 549 F.3d at 747 (citation and internal quotation marks omitted, emphasis added). Here, the Court cannot reasonably infer that Defendant Drummond acted with the requisite degree of recklessness when he executed the SOX certifications at issue because the facts in the SAC do not suggest that he was reckless to a degree that strongly suggests actual intent to mislead investors, as discussed above. An inference that Drummond "should have known"

---

[9] Plaintiff does allege that other Defendants had a motive to defraud investors. For example, it alleges that Defendants Mowry and Plants engaged in a scheme to mislead investors because doing so put them in a better position to achieve higher stock-based compensation. *See* SAC ¶¶ 521-24. Plaintiff does not allege similar facts with respect to Defendant Drummond.

about the inaccuracy or unreliability of the financial results for Q1 2023 and Q2 2023 at the time he executed the certifications is "not enough to meet the stringent scienter pleading requirements of the PSLRA," which require allegations suggesting "some degree of intentional or conscious misconduct." *See id.* at 748 (holding that allegations that create the inference that the defendant "should have known" about certain facts are "not sufficient to meet the stringent scienter pleading requirements of the PLSRA") (citation and internal quotation marks omitted).  Thus, the SOX certifications at issue are not probative of scienter.[10]  But even if the certifications were probative, they would not be sufficient to raise a strong inference of scienter with respect to Drummond.  *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1004 (9th Cir. 2009), *as amended* (Feb. 10, 2009) (holding that "Sarbanes–Oxley certifications" do not make "otherwise insufficient allegations more compelling by their presence in the same complaint"); *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1160 (C.D. Cal. 2007) ("Without allegations that each of the Individual Defendants that signed various Hansen public filings knew those public filings contained misstatements, the Individual Defendants' signatures on those public filings alone does not give rise to a strong inference of scienter.").

Plaintiff also argues that the Court should infer that Drummond must have known that the financial results he reported and certified for Q1 2023 and Q2 2023 were inaccurate because he

---

[10] The authorities that Plaintiff cites for the proposition that the SOX certifications that Defendant Drummond executed for Q1 2023 and Q2 2023 are probative of scienter are not binding and are distinguishable.

In *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 247–48 (S.D.N.Y. 2012), SOX certifications about internal controls were probative of scienter because internal control deficiencies were "expressly raised" to the defendant who executed the certifications before he executed them.  Here, by contrast, there are no allegations that actual or potential inaccuracies in the financial results for Q1 2023 and Q2 2023 were expressly raised to Defendant Drummond before he reported and certified those results.

In *In re: Ebix, Inc. Sec. Litig.*, 898 F. Supp. 2d 1325, 1345 (N.D. Ga. 2012) and *Stocke v. Shuffle Master, Inc*., 615 F. Supp. 2d 1180, 1190 (D. Nev. 2009), the SOX certifications were probative of scienter because the defendants who executed them represented to investors that internal controls were effective or had been remediated even though they were aware of facts that directly contradicted those representations at the time they executed the certifications.  Here, Plaintiff's allegations do not raise the inference that Defendant Drummond was aware of facts that directly contradicted his certifications regarding the accuracy of the Q1 2023 and Q2 2023 financial results at the time he executed the certifications.

25

had access to Cutera's financial data by virtue of his role as Interim CFO and his execution of SOX certifications for those financial results. *See* ECF No. 91 at 31. This argument appears to be a reference to the core operations doctrine. "The core operations theory of scienter relies on the principle that corporate officers have knowledge of the critical core operation of their companies." *Police Ret. Sys.*, 759 F.3d at 1062 (citation and internal quotation marks omitted). Where, as here, the statements at issue were false because they contained financial figures that were later restated, a court may infer scienter based on the core operations doctrine where the falsity of the financial figures "is combined with allegations regarding a management's role in the company that are particular and suggest that the defendant had actual access to the disputed information, and where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *See Zucco*, 552 F.3d at 1000 (citation and internal quotation marks omitted). Here, Plaintiff has not alleged any facts that are "particular" and that suggest that Defendant Drummond had access to information based on his role as Interim CFO indicating that the financial figures for Q1 2023 and Q2 2023 were inaccurate at the time he reported and certified them. Plaintiff also has not alleged any facts that raise the inference that the inaccuracy of those financial figures was of such prominence that it would be absurd to suggest that Defendant Drummond was without knowledge of it at the time he reported those figures. Accordingly, Plaintiff's attempt to rely on the core operations doctrine to establish scienter fails.[11]

In sum, the inference of nonfraudulent intent that can be drawn from the allegations in the SAC with respect to Defendant Drummond is far more compelling than the inference that he acted with at least deliberate recklessness when he reported and certified the financial results for Q1 2023 and Q2 2023.

---

[11] The only authority that Plaintiff cites for the proposition that the Court can infer that Defendant Drummond must have known about the inaccuracy of the financial results he reported is inapposite. That case addresses the question of whether the signatory of an SEC filing can be held liable for securities fraud under Section 10(b) as the "maker" of an alleged misstatement in that filing, which is not at issue here. *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 (9th Cir. 2000) ("Although not totally clear on the issue, the district court appeared to hold that because Hui did not participate in the drafting of the allegedly false financial statements, he did not make a statement within the meaning of § 10(b). We conclude that the district court erred in making this determination.").

United States District Court
Northern District of California

Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's claim under Section 10(b) and Rule 10b-5(b) to the extent that it is premised on Statements 11, 12, 13, 14, 18, 19, 20, and 21. The dismissal is without leave to amend because the Court previously granted Plaintiff the opportunity to amend the complaint to cure the pleading deficiencies with respect to those statements, and the Court finds that granting further leave to amend would be futile.

### C.    Scheme-Liability Claim Under Rules 10b–5(a) and 10b–5(c)

Rule 10b–5(a) and Rule 10b–5(c) make it unlawful for any person to "employ any device, scheme, or artifice to defraud" or to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" in connection with the purchase or sale of any security. *See Stoneridge Inv. Partners, LLC v. Sci. Atlanta*, 552 U.S. 148, 156 (2008) (quoting 17 CFR § 240.10b–5(a) & (c)). "To state a claim for scheme liability, a plaintiff must allege each defendant committed a manipulative or deceptive act in furtherance of the scheme." *In re Stem, Inc. Sec. Litig.*, No. 23-CV-02329-MMC, 2025 WL 3675114, at *11 (N.D. Cal. Dec. 17, 2025) (citation and internal quotation marks omitted).

In its opposition, Plaintiff argues that the "SAC adds a scheme liability claim under Rule 10b–5(a) and (c)" that is predicated on allegations that Defendants Mowry, Seth, and Plants engaged in deceptive and manipulative conduct by making false and misleading statements to investors. *See* ECF No. 91 at 14–17. As part of this alleged scheme, Defendants Mowry, Seth, and Plants directed Cutera sales personnel to prioritize the placement of AviClear devices so that they could obtain higher stock-based compensation via the Acne Equity Grant, which tied Cutera executives' stock-based compensation to whether a predetermined number of AviClear devices were placed in physicians' offices by a particular date. *See id.* Plaintiff argues that the Defendants in question made false and misleading statements to make investors believe, incorrectly, that sales personnel had been directed to focus on AviClear placements because of strong demand for AviClear even though the real reason was that those Defendants desired to obtain higher stock-based compensation for meeting AviClear placement targets. *See id.* These allegedly false and misleading statements are the same ones that give rise to Plaintiff's claim under Section 10(b) and Rule 10b–5(b).

27

Defendants respond that Plaintiff did not properly assert a scheme liability claim under Rules 10b–5(a) and (c) in the SAC and that, even if Plaintiff were permitted to assert such a claim, the claim would fail because it is premised on the same allegedly false or misleading statements that Plaintiff challenges under Section 10(b) and Rule 10b–5(b) and that were either abandoned by Plaintiff or that fail to state a claim for securities fraud. *See* ECF No. 92 at 20.

The Court agrees with Defendants. Plaintiff's argument that the "SAC *adds* a scheme liability claim under Rule 10b–5(a) and (c)," *see* ECF No. 91 at 14–15 (emphasis added), fails for two reasons. First, in its order of September 30, 2025, which resolved Defendants' motion to dismiss the prior iteration of the complaint, the Court granted Plaintiff leave to amend the complaint only for the purpose of curing the deficiencies identified in that order with respect to its claims under Section 10(b), Rule 10b–5(b), and Section 20(a).[12] *See* ECF No. 86 at 22. The Court did not grant Plaintiff leave to assert new claims. Thus, to the extent that the SAC "adds" a new claim for violations of Rule 10b–5(a) and Rule 10b–5(c), that claim is subject to dismissal because it exceeds the scope of the amendments permitted under the Court's order of September 30, 2025. *See DeLeon v. Wells Fargo Bank*, N.A., No. 10-CV-01390-LHK, 2010 WL 4285006, at *3 (N.D. Cal. Oct. 22, 2010) ("[W]here leave to amend is given to cure deficiencies in certain specified claims, courts have agreed that new claims alleged for the first time in the amended pleading should be dismissed or stricken.") (collecting cases). Second, the SAC does not actually assert a claim for violations of Rule 10b–5(a) or Rule 10b–5(c). Neither of the two claims asserted in the SAC arises out of violations of Rule 10b–5(a) or Rule 10b–5(c). *See* SAC at 148 (providing that the "FIRST CLAIM FOR RELIEF" arises out of a "Violation of Section 10(b) of the Exchange Act and Rule *10b–5(b)*") (emphasis added); *id.* at 150 (providing that the "SECOND CLAIM FOR RELIEF" arises out of a "Violation of Section 20(a) of the Exchange Act").

Plaintiff has not requested leave to amend the SAC to add a new claim for violations of

---

[12] In its opposition to Defendants' motion to dismiss the prior iteration of the complaint, Plaintiff neither argued that that version of the complaint asserted a claim for violations of Rule 10b–5(a) and Rule 10b–5(c), nor requested leave to amend the complaint to add such a claim. *See* ECF No. 76.

United States District Court
Northern District of California

Rule 10b–5(a) and Rule 10b–5(c), but even if had, the Court would deny the request on the ground that the amendment would be futile. As noted, that new claim would be based on allegations that Defendants Mowry, Seth, and Plants engaged in deceptive and manipulative conduct by making the same allegedly false and misleading statements that Plaintiff challenges under Section 10(b) and Rule 10b–5(b) in the SAC. *See* ECF No. 91 at 14–17. As discussed above, however, none of the allegedly false or misleading statements made by Defendants Mowry, Plants, and Seth are actionable. Plaintiff has abandoned Statements 1, 8, 9, 10, 16, 17, 23, and 24. With respect to the remaining challenged statements made by Defendants Mowry, Plants, and Seth, Plaintiff's allegations continue to be insufficient to raise the inference that such statements were false or misleading when made even though the Court previously granted Plaintiff leave to amend the complaint to allege new facts to establish the falsity of those statements. Accordingly, because none of the allegedly false or misleading statements that are the basis of the proposed scheme-liability claim are actionable, the claim would fail for the same reasons that Plaintiff's claim under Section 10(b) and Rule 10b–5(b) has failed. *See In re Stem*, 2025 WL 3675114, at *11 ("A scheme liability claim can be based on false or misleading statements that also violate section 10(b), but where the alleged scheme consists entirely of failed section 10(b) statements, a plaintiff likewise fails to adequately plead a scheme") (internal citations and quotation marks omitted); c*f. In re Seagate*, 2025 WL 1744505, at *10 (holding that the plaintiffs adequately alleged a scheme-liability claim because the claim was based on false or misleading statements that were also actionable under Section 10(b) and Rule 10b–5(b)); *SEC v. Richman*, No. 21-CV-01911-CRB, 2021 WL 5113168, at *8 (N.D. Cal. Nov. 3, 2021) (same).

### D.    Claim Under Section 20(a) Against the Individual Defendants

"Section 20(a) of the Securities Exchange Act of 1934 provides for liability of a 'controlling person.'" *In re NVIDIA*, 768 F.3d at 1052 (quoting 15 U.S.C. § 78t(a)). "To establish a cause of action under this provision, a plaintiff must first prove a primary violation of underlying federal securities laws, such as Section 10(b) or Rule 10b–5, and then show that the defendant exercised actual power over the primary violator." *Id.* (citation omitted). A claim under Section 20(a) can survive only if the underlying predicate Exchange Act violation also survives. *See City*

*of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 623 (9th Cir. 2017).

Plaintiff asserts a claim under Section 20(a) against the Individual Defendants based on allegations that they had positions of control and authority over Cutera's operations and management and caused the dissemination of the statements challenged in the SAC, which artificially inflated the price of Cutera stock. *See* SAC ¶¶ 525–28.

Defendants move to dismiss this claim, arguing that because Plaintiff has not adequately alleged a claim under Section 10(b) and Rule 10b–5(b), its Section 20(a) claim fails as a matter of law. *See* ECF No. 72 at 32.

The Court agrees with Defendants. Because no primary violation of the securities laws has survived Defendants' motion to dismiss, Plaintiff's claim under Section 20(a) fails. Accordingly, the Court grants Defendants' motion to dismiss the Section 20(a) claim without leave to amend.

**CONCLUSION**

For the foregoing reasons, the Court grants Defendants' motion to dismiss all claims asserted in the SAC without leave to amend.

The Clerk shall enter judgment and terminate the action.

**IT IS SO ORDERED.**

Dated: May 11, 2026

_____
JON S. TIGAR
United States District Judge

United States District Court
Northern District of California

30